

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 13, 2009

BY FACSIMILE

Honorable Lawrence M. McKenna
U.S. District Judge
Southern District of New York
500 Pearl Street
Room 1640
New York, New York 10007

      Re:    United States v. Bernard L. Madoff,
             08 Mag. 2735

Dear Judge McKenna:

      The Government respectfully submits this letter brief to the Court, sitting in its Part I capacity, in support of its appeal of the Opinion and Order entered by United States Magistrate Judge Ronald L. Ellis on January 12, 2009 (the "Order"), which denied the Government's motion pursuant to Title 18, United States Code, Section 3142(f)(2), to detain the defendant pending trial.

      The Government is seeking detention because the defendant, while under perhaps the most stringent conditions of release short of detention, violated a Court order and attempted to transfer $1 million of assets to family and friends. The defendant should not be trusted with a second chance to dissipate assets. His continued release represents a danger to the community of further obstruction of justice and economic harm, and, given: (1) his demonstrated willingness to disobey a Court order designed to protect his victims; and (2) the fact that he has little to lose given the lengthy term of incarceration that he likely faces, there are no conditions short of detention that will adequately assure the safety of the community.

      Today, the defendant stands in a far different position than he did at the times of the prior bail determinations in this case. By way of background, the Government at the outset was faced with a defendant who had confessed, who had indicated through counsel a willingness to assist the Government in doing whatever possible to make victims whole, and who appeared to have strong ties to the community, and the Government agreed to the initial terms of bail approved by the Court. Within a matter of days, the Government twice returned to Court to seek more stringent conditions to protect against the twin risks of flight and harm. Ultimately, the Court

Honorable Lawrence L. McKenna
January 13, 2009
Page 2

below imposed a set of conditions which, in conjunction with the asset freeze order of Judge Stanton, appeared to be sufficient to protect the community in accordance with the Bail Reform Act. But, the defendant, as detailed below, proceeded to violate the asset freeze order in late December 2008, by attempting to deliver to family and friends assets with a value of approximately $1 million. When the various bail terms were proposed and ordered, the Government did not expect that the defendant, with the eyes of prosecutors, regulators and world upon him, would have the audacity blatantly to violate Judge Stanton's order. By doing so, the defendant showed that he would not be deterred in his efforts to pick the winners and losers of his fraudulent scheme. And, by his act, the defendant showed that he could not be trusted to obey the Court's orders, and that no set of conditions could constrain his ability to harm the community. Accordingly, the Government promptly sought detention, and now seeks detention here.

## Background

On December 11, 2008, the defendant was arrested and charged in a criminal complaint, and was presented before U.S. Magistrate Judge Douglas F. Eaton. The complaint alleged one count of securities fraud in violation of Title 15, United States Code, Sections 78j(b), 78ff, and 17 C.F.R. § 240.10b-5. Specifically, the complaint alleged that the defendant had admitted to two senior employees of Bernard L. Madoff Investment Securities LLC – the broker-dealer that defendant owned and operated – that the investment advisory business that he ran was, "basically, a giant Ponzi scheme," and that he estimated the losses from his fraud to be approximately $50 billion. The complaint further alleged that the defendant made similar admissions to FBI agents who spoke to him on the morning of December 11. Specifically, he told the agents that "there is no innocent explanation," and that he expected to go to jail.[1] The breadth and depth of those facts alone distinguish this case from nearly all other white collar crimes.

At presentment, the Government sought, with the consent of defendant: (1) a $10 million personal recognizance bond to be secured by the defendant's Manhattan apartment (valued at approximately $7 million), and to be co-signed by four financially responsible persons including the defendant's wife; (2) surrender of the defendant's passport; (3) travel restricted to the Southern and Eastern Districts of New York and the District of Connecticut; and (4) release upon the signature of the defendant and his wife, with the remaining conditions to be fulfilled by December 16 at 2:00 p.m. The Court rejected the Government's additional requests that the defendant be required to report to Pretrial daily by telephone and once per week in person. On December 16, Magistrate Judge Gabriel W. Gorenstein extended from December 16, 2008, to December 17, 2008, at 2:00 p.m., the time within which the defendant would be permitted to

---

[1]    For the Court's convenience, a copy of the Complaint is attached hereto as Exhibit A.

Honorable Lawrence L. McKenna
January 13, 2009
Page 3

meet all conditions of his bail.

On December 17, when the defendant failed to obtain two of the required four cosigners on his bond, the Government, with the consent of the defendant, requested that the defendant's bail conditions be modified to include:  (a) home detention at the defendant's Manhattan apartment, with electronic monitoring; (b) the entry of confessions of judgment with respect to the defendant's wife's properties in Montauk, New York, and Palm Beach, Florida by December 22; (c) surrender of the defendant's wife's passport by noon on December 18; (d) imposition on defendant of a curfew of 7 p.m. through 9 a.m.; and (e) reduction of the number of required cosigners on the bond from four to two.  Judge Gorenstein approved the requested modifications.

On December 19, the Government, with the consent of the defendant, requested that the defendant's bail conditions again be stiffened, pursuant to Title 18, United States Code, Section 3142, to further ameliorate the risks of harm or flight.  Magistrate Judge Theodore H. Katz approved the proposed changes to defendant's bail conditions, which: (i) required the defendant to be subject to home detention at his Manhattan apartment, 24 hours per day, with electronic monitoring, other than for scheduled court appearances; (ii) required the defendant to employ by December 20, 2008, at his wife's expense, a security firm acceptable to the Government, to provide the following services to prevent harm or flight: (a) round-the-clock monitoring at the defendant's building, 24 hours per day, including video monitoring of the defendant's apartment door(s), and communications devices and services permitting it to send a direct signal from an observation post to the Federal Bureau of Investigation in the event of the appearance of harm or flight; and (b) additional guards on request if necessary to prevent harm or flight.

### The Defendant's Attempted Dissipation Of Assets In Violation Of Court Order

On December 18, 2008, United States District Judge Louis L. Stanton issued an order in a parallel civil proceeding, *SEC* v. *Bernard L. Madoff, et. al.*, 08 Civ. 10791 (LLS), barring the defendant from, among other things, dissipating, concealing, or disposing of any money, real or personal property in the defendant's direct or indirect control, the defendant and his wife sent multiple packages containing valuables to relatives and others.  The defendant consented to the entry of that order.  On December 24, 2008, the defendant and his wife mailed several packages to family and to friends.  (Order at 4.)  Specifically, the defendant sent a package containing a total of approximately 13 watches, one diamond necklace, an emerald ring, and two sets of cufflinks.  The Government has been informed that the value of those items could exceed $1 million, and as noted by the Court below, defendant does not take issue with that valuation.  (*See* Order at 4.)  Two other packages -- containing a diamond bracelet, a gold watch, a diamond Cartier watch, a diamond Tiffany watch, four diamond brooches, a jade necklace, and other assorted jewelry -- also were sent to relatives.  The contents of those packages have been recovered by the Government.  In addition, the defendant and/or his wife sent at least two additional packages to the defendant's brother and to an unidentified couple in Florida.

Honorable Lawrence L. McKenna
January 13, 2009
Page 4

## Procedural History

On January 5, 2009, after learning of the defendant's violation of Judge Stanton's order, the Government moved for detention pursuant 18 U.S.C. § 3142(f)(2).  Following a hearing on the Government's application, the Court below requested additional briefing on the issues raised.[2]  The Government submitted a brief on January 6.  Defense counsel filed opposition papers on January 7, and the Government filed its reply on January 8.  On January 12, Judge Ellis issued the Order denying the Government's motion.

## Applicable Law

**A.     Standard Of Review**

"A district court undertakes a *de novo* review of a magistrate judge's decision to release or detain a defendant."  *United* States v. *Jones*, 566 F. Supp. 2d 288, 289 (S.D.N.Y. 2008) (citing *United States* v. *Leon*, 766 F.2d 77, 80 (2d Cir.1985)); *United States* v. *Gotti*, 358 F. Supp. 2d 280, 282 (S.D.N.Y. 2005); *United States* v. *Smith*, No. 02 Cr. 1399 (LAK), 2002 WL 31521159, at *1 (S.D.N.Y. Nov.13, 2002).

**B.     The Bail Statute**

The Government may move for detention in a case that involves either "(A) a serious risk that the defendant will flee; or (B) a serious risk that [the defendant] will obstruct or attempt to obstruct justice . . . ."  18 U.S.C. § 3142(f)(2).  The relevant statute requires that, should the Court conduct a detention hearing, it must consider all available pertinent information.  Specifically, Title18, United States Code, Section 3142(g) states:

> The judicial officer shall . . . take into account the available information concerning --
>
>> (1) the nature and circumstances of the offense charged . . .
>> (2) the weight of the evidence against the person;
>> (3) the history and characteristics of the person, including --
>>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, . . .
>> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

---

[2]     A copy of the hearing transcript is attached hereto as Exhibit B.

Honorable Lawrence L. McKenna
January 13, 2009
Page 5

18 U.S.C. § 3142(g).

Under 18 U.S.C. § 3142(b),

> The judicial officer shall order the pretrial release of the person
> [charged with an offense] on personal recognizance, or upon the
> execution of an unsecured appearance bond in an amount specified
> by the court . . . unless the judicial officer determines that such
> release will not reasonably assure the appearance of the person as
> required or will endanger the safety of any other person or the
> community.

*Id.*

The legislative history of the Bail Reform Act of 1984 makes clear that Congress
intended that the "safety of any other person or the community" language in Section 3142 was
expected to be given a broad construction. *See* S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983),
*reprinted in* 1984 U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person is
intended to cover the situation in which the safety of a particular identifiable individual, perhaps
a victim or witness, is of concern, while the language referring to the safety of the community
refers to the danger that the defendant might engage in criminal activity to the detriment of the
community. *The Committee intends that the concern about safety be given a broader
construction than merely danger of harm involving physical violence.*") (emphasis added).
Courts have appropriately construed the statute to find that protection of the community from
economic harm is a valid objective of bail conditions. *See United States* v. *Schenberger*, 498 F.
Supp. 2d 738, 742 (D.N.J. 2007) (holding that "[a] danger to the community does not only
include physical harm or violent behavior" and citing the Senate Committee Report language
reproduced above); *United States* v. *Persaud*, No. 05 Cr. 368, 2007 WL 1074906, at *1
(N.D.N.Y. Apr. 5, 2007) (concurring with the Magistrate Judge that "economic harm qualifies as
a danger within the contemplation of the Bail Reform Act"); *United States* v. *LeClercq*, No. 07-
80050-cr, 2007 WL 4365601, at *4 (S.D. Fla. Dec. 13, 2007) (finding that a large bond was
necessary to, among other things, "protect the community from additional economic harm");
*United States* v. *Gentry*, 455 F. Supp. 2d 1018, 1032 (D. Ariz. 2006) (in a fraud and money
laundering case, in determining whether pretrial detention was appropriate, the court held that
danger to the community under Section 3142(g) "may be assessed in terms other than the use of
force or violence . . . [including] economic danger to the community"); *see also United States* v.
*Reynolds*, 956 F.2d 192, 193 (9th Cir. 1992) (post-conviction for mail fraud and witness
tampering, the Court held that "danger may, at least in some cases, encompass pecuniary or
economic harm."); *United States* v. *Provenzano*, 605 F.2d 85, 95 (3rd Cir. 1979) (in a pre-1984
Bail Reform Act case, post-conviction, the Court rejected an application for bail finding that

Honorable Lawrence L. McKenna
January 13, 2009
Page 6

"danger to the community" is not limited to harms involving violence).[3]  Judge Ellis agreed,
concluding that, "there is jurisprudence to support the consideration of economic harm in the
context of detention to protect the safety of the community."  Order at 19.

## **Argument**

In engaging in the *de novo* review required under the law, this Court should consider the
totality of the information now available to the Court to make an appropriate determination
concerning bail.

This is a case that involves both a serious risk of obstruction or attempted obstruction of
justice, and a serious risk of flight.  *See* 18 U.S.C. § 3142(f)(2).  The risk of obstruction is real,
not hypothetical, and is demonstrated by three salient facts:  (1) immediately prior to his arrest,
and after acknowledging to employees that he had committed crimes against his investors, the
defendant announced his intent to distribute the remaining investor assets (about $200-300
million) to certain selected employees, family, and friends (*see* Complaint ¶ 4(e)); (2)
following the defendant's arrest, the Government found in the defendant's office desk
approximately 100 signed checks totaling more than approximately $173 million, ready to be
sent out; and (3) the defendant attempted to redistribute his wealth, in violation of Judge
Stanton's order, when he sent packages of valuable items to family and friends.  Restitution and
forfeiture, are an important part of justice and will, in the event of a conviction, be part of any
sentence in this case.  *See* 18 U.S.C. § 3663A (mandatory restitution provisions apply to cases in
which an identifiable victim or victims has suffered a pecuniary loss).  Dissipation of the
defendant's assets through transfers to third parties obstructs justice within the meaning of the
bail statute, *see* 18 U.S.C. § 3142(f)(2)(B), because such transfers make it more difficult, if not
impossible, to recover all available forfeitable assets to recompense victims.[4]

---

[3]      Pretrial detention cases in which bail is determined pursuant to Section 3142
routinely cite the principle set forth in post-conviction cases, in which bail is determined
pursuant to 18 U.S.C. § 3143, that economic harm may be considered a danger to the community.
*See, e.g., United States* v. *Zaragoza,* No. Cr-08-0083 (PJH), 2008 WL 686825, at * 3 (N.D.Cal.
Mar. 11, 2008) (citing the principle regarding "pecuniary or economic harm" from *Reynolds* in
the context of a pretrial detention analysis); *Gentry,* 455 F. Supp. 2d at 1032 (same).

[4]      The risk of flight stems principally from three facts:  (1) the strength of the case
against the defendant including his admission of guilt; (2) the defendant's demonstrated
willingness to disregard Court orders with which he apparently does not agree; and (3)  the scope
of the defendant's admitted conduct (years of lying to investors to whom the defendant owed a
fiduciary duty and billions of dollars of losses) that likely will result in a lengthy prison sentence.
Given defendant's age, and his ruptured relationships with family, friends, and the community,
the defendant has substantial reason to flee.

Honorable Lawrence L. McKenna
January 13, 2009
Page 7

The harm to the community by the risk that defendant will further attempt to dissipate assets is obvious. The risk of economic harm to the community is a valid concern under the Bail Reform Act. It is a logical extension of that principle that protection of assets from being liquidated or secreted so that they are available to be forfeited as proceeds of fraud or as substitute assets, and used in an effort to make victims whole, is a valid factor for the Court to consider in determining bail. This risk is especially pertinent in the circumstances presented here. No matter the loss amount determined by the sentencing court, it appears that defendant will not be able to come remotely close to having the resources necessary to make his victims whole. Accordingly, every possible penny of the defendant's assets must be protected from dissipation.

In light of all the circumstances, there are simply no set of conditions, including those adopted by the Court below, that can reasonably assure the safety of the community.

At the time the defendant violated Judge Stanton's order, the defendant was under house arrest supervised by a private security firm. To address the Government's legitimate concerns about further economic harm to the community, the Court below added three additional conditions to the defendant's conditions of release:

> (1) The restrictions set forth in the preliminary injunction entered on December 18, 2008, in the civil case brought by the SEC before District Judge Louis L. Stanton, including restrictions on transfer of all property whatsoever, wherever located, in the possession or under the control of Madoff, **SHALL** be incorporated into the current bail conditions;

> (2) The restrictions set forth in the voluntary restraint agreement signed by Mrs. Madoff on December 26, 2008, **SHALL** be incorporated into the current bail conditions; and

> (3) Madoff **SHALL** compile an inventory of all valuable portable items in his Manhattan home. In addition to providing this inventory to the Government, Casale Associates, or another security company approved by the Government, **SHALL** check the inventory once every two weeks. Casale Associates, or another security company approved by the Government, **SHALL** search all outgoing physical mail to ensure that no property has been transferred. The Government and Madoff shall agree on a threshold value for inventory items within one week of this Order.

Order at 22.

First, there is no reason to think that the defendant will be any more likely to abide by

Honorable Lawrence L. McKenna
January 13, 2009
Page 8

Judge Stanton's order if it is made part of the bail conditions than he was when it was an order of a U.S. District Judge in a civil case to which the defendant is a party. Moreover, the defendant, based on his prior actions, should not be given yet another chance to harm the victims in this case.

Second, Mrs. Madoff is not a party in this criminal proceeding, and it is not clear that defendant could be held to account for his spouse's unilateral conduct in dissipating assets. Accordingly, it is doubtful that this second additional condition would have a practical or deterrent effect on the defendant.

Third, permitting the defendant -- whose actions show that he cannot be trusted to abide by Court orders -- to compile an inventory of the valuables in his Manhattan home does little to protect against the harm identified. This condition covers only one of his several real properties. Moreover, checking the contents of his apartment against that inventory every two weeks would only mean that the Government would learn after the fact that assets had been dissipated. The best way to prevent the defendant from transferring valuable assets to third parties and to severely impede his ability to do so with respect to his other properties is to detain him.

*     *     *

This defendant has abused the trust and discretion of the Magistrate Judge who approved his release on bail. In light of all the facts and circumstances now available to the Court, it is clear that there is no combination of conditions that reasonably will assure the presence of the defendant and the safety of the community. Accordingly, the defendant should be detained.

Respectfully submitted,

LEV L. DASSIN
Acting United States Attorney

By:  _____

Marc Litt
Lisa A. Baroni
Assistant United States Attorneys
(212) 637-2295 /-2405

cc:    Ira L. Sorkin, Esq.

# EXHIBIT A

COPY

08 MAG 2735

Approved: _____
MARC LITT
Assistant United States Attorney

Before:   HONORABLE DOUGLAS F. EATON
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :      **COMPLAINT**

          - v. -                  :      Violation of
                                         15 U.S.C. §§ 78j(b),
BERNARD L. MADOFF,                :      78ff; 17 C.F.R. §
                                         240.10b-5
                Defendant.        :

                                  :      COUNTY OF OFFENSE:
                                         NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          THEODORE CACIOPPI, being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation, and charges as follows:

## COUNT ONE
(Securities Fraud)

          1.  From at least in or about December 2008 through the
present, in the Southern District of New York and elsewhere,
BERNARD L. MADOFF, the defendant, unlawfully, wilfully and
knowingly, by the use of the means and instrumentalities of
interstate commerce and of the mails, directly and indirectly, in
connection with the purchase and sale of securities, would and
did use and employ manipulative and deceptive devices and
contrivances in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by (a) employing devices,
schemes, and artifices to defraud; (b) making untrue statements
of material facts and omitting to state material facts necessary
in order to make the statements made, in the light of the
circumstances under which they were made, not misleading, and (c)
engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons, to
wit, MADOFF deceived investors by operating a securities business
in which he traded and lost investor money, and then paid certain

investors purported returns on investment with the principal
received from other, different investors, which resulted in
losses of approximately billions of dollars.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

The bases for my knowledge and the foregoing charges
are, in part, as follows:

2.    I have been a Special Agent with the Federal
Bureau of Investigation ("FBI") for approximately six and one-
half years, and I have been personally involved in the
investigation of this matter.  The information contained in this
Complaint is based upon my personal knowledge, as well as
information obtained from other sources, including: a) statements
made or reported by various witnesses with knowledge of relevant
facts; and b) my review of publicly available information
relating to BERNARD L. MADOFF, the defendant.  Because this
Complaint is being submitted for the limited purpose of
establishing probable cause, it does not include every fact that
I have learned during the course of the investigation.  Where the
contents of documents and the actions, statements and
conversations of others are reported herein, they are reported in
substance and in part, except where otherwise indicated.

3.    I have reviewed the publicly available web site of
a securities broker dealer named Bernard L. Madoff Investment
Securities LLC, from which I have learned the following: (a)
BERNARD L. MADOFF, the defendant, is the founder of Bernard L.
Madoff Investment Securities LLC; (b) Bernard L. Madoff
Investment Securities LLC is a securities broker dealer with its
principal office in New York, New York; (c) Bernard L. Madoff
Investment Securities LLC "is a leading international market
maker.  The firm has been providing quality executions for
broker-dealers, banks and financial institutions since its
inception in 1960;" (d) "[w]ith more than $700 million in firm
capital, Madoff currently ranks among the top 1% of US Securities
firms; (e) BERNARD L. MADOFF, the defendant, is a former Chairman
of the board of directors of the NASDAQ stock market; and (f)
"Clients know that Bernard Madoff has a personal interest in
maintaining an unblemished record of value, fair-dealing, and
high ethical standards that has always been the firm's hallmark."

4.    I have interviewed two senior employees of Bernard
L. Madoff Investment Securities LLC ("Senior Employee No. 1", and
"Senior Employee No. 2", collectively the "Senior Employees").

2

The Senior Employees informed me, in substance, of the following:

a.    The Senior Employees are employed by Bernard L. Madoff Investment Securities LLC, in a proprietary trading, and market making capacity.  According to the Senior Employees, BERNARD L. MADOFF, the defendant, conducts certain investment advisory business for clients that is separate from the firm's proprietary trading and market making activities.  According to the Senior Employees, MADOFF ran his investment adviser business from a separate floor in the New York offices of Bernard L. Madoff Investment Securities LLC.  According to Senior Employee No. 1, MADOFF kept the financial statements for the firm under lock and key, and stated that MADOFF was "cryptic" about the firm's investment advisory business.

b.    In or about the first week of December, BERNARD L. MADOFF, the defendant, told Senior Employee No. 2 that there had been requests from clients for approximately $7 billion in redemptions, that he was struggling to obtain the liquidity necessary to meet those obligations, but that he thought that he would be able to do so.  According to the Senior Employees, they had previously understood that the investment advisory business had assets under management on the order of between approximately $8-15 billion.  According to a Form ADV filed by MADOFF on behalf of Bernard L. Madoff Investment Securities LLC with the SEC on or about January 7, 2008, MADOFF's investment advisory business served between 11 and 25 clients and had a total of approximately $17.1 billion in assets under management.

c.    On or about December 9, 2008, MADOFF informed Senior Employee No. 1 that he wanted to pay bonuses to employees of the firm in December, which was earlier than employee bonuses are usually paid.  Accordingly to the Senior Employees, bonuses traditionally have been paid in February of each year.  On or about December 10, 2008, the Senior Employees visited MADOFF at the offices of Bernard L. Madoff Investment Securities LLC to discuss the situation further, particularly because it MADOFF had appeared to the Senior Employees to have been under great stress in the prior weeks.  At that time, MADOFF informed the Senior Employees that he had recently made profits through business operations, and that now was a good time to distribute it.  When the Senior Employees challenged his explanation, MADOFF said that he did not want to talk to them at the office, and arranged a meeting at MADOFF's apartment in Manhattan.  According to Senior Employee No. 2, MADOFF stated, in substance, that he "wasn't sure he would be able to hold it together" if they continued to discuss the issue at the office.

3

d.  At MADOFF's Manhattan apartment, MADOFF informed the Senior Employees, in substance, that his investment advisory business was a fraud.  MADOFF stated that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that it was "basically, a giant Ponzi scheme." The Senior Employees understood MADOFF to be saying, in substance, that he had for years been paying returns to certain investors out of the principal received from other, different, investors.  MADOFF stated that the business was insolvent, and that it had been for years.  MADOFF also stated that he estimated the losses from this fraud to be at least approximately $50 billion.  One of the Senior Employees has a personal account at Bernard L. Madoff Investment Securities LLC in which several million had been invested under the management of MADOFF.

e.  At MADOFF's Manhattan apartment, MADOFF further informed the Senior Employees that, in approximately one week, he planned to surrender to authorities, but before he did that, he had approximately $200-300 million left, and he planned to use that money to make payments to certain selected employees, family, and friends.

f.  At MADOFF's Manhattan apartment, MADOFF further informed the Senior Employees that he had also recently informed a third senior employee ("Senior Employee No. 3"), of the facts that MADOFF had just told the Senior Employees.

5.  On December 11, 2008, I spoke to BERNARD L. MADOFF, the defendant.  After identifying myself, MADOFF invited me, and the FBI agent who accompanied me, into his apartment.  He acknowledged knowing why we were there.  After I stated, "we're here to find out if there's an innocent explanation."  MADOFF stated, "There is no innocent explanation."  MADOFF stated, in substance, that he had personally traded and lost money for institutional clients, and that it was all his fault.  MADOFF further stated, in substance, that he "paid investors with money that wasn't there."  MADOFF also said that he was "broke" and "insolvent" and that he had decided that "it could not go on," and that he expected to go to jail.  MADOFF also stated that he had recently admitted what he had done to Senior Employee Nos. 1, 2, and 3.

WHEREFORE, deponent prays that BERNARD L. MADOFF, the defendant, be imprisoned, or bailed, as the case may be.

DEC 1 1 2008

THEODORE CACIOPPI
Special Agent
Federal Bureau of Investigation

Sworn to before me this
_____ day of December, 2008

HONORABLE DOUGLAS F. EATON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

5

EXHIBIT B

1

915AAMADH                    Hearing
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                              08 M 2735 (RLE)

BERNARD L. MADOFF,

                    Defendant.

------------------------------x

                                          New York, N.Y.
                                          January 5, 2009
                                          2:30 p.m.


Before:

                    HON. RONALD L. ELLIS,

                                          Magistrate Judge


                    APPEARANCES

LEV L. DASSIN
     Acting United States Attorney for the
     Southern District of New York
MARC O. LITT
     Assistant United States Attorney

DICKSTEIN SHAPIRO LLP
     Attorneys for Defendant Madoff
IRA LEE SORKIN
DANIEL JAMES HORWITZ
NICOLE PAPPAS DE BELLO

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

2

915AAMADH                    Hearing

1          (Case called)
2          MR. LITT:  Mark Litt, for the United States.  With me
3    at counsel table is FBI Special Agent Theodore Cacioppi.
4          Good afternoon, your Honor.
5          THE COURT:  Good afternoon.
6          MR. SORKIN:  For the defendant, Bernard L. Madoff,
7    your Honor, the law firm of Dickstein Shapiro LLP, by Ira Lee
8    Sorkin, Daniel Horwitz and Nicole De Bello and Mr. Madoff is in
9    court today.
10         Good afternoon, your Honor.
11         THE COURT:  Good afternoon.
12         Mr. Litt, why don't you tell me exactly what we're
13   here for.
14         MR. LITT:  Yes, your Honor.
15         Your Honor, the government sought this hearing to
16   request a modification of the defendant's current bail
17   conditions.  Specifically, the government is now seeking
18   detention in this case based on circumstances which are changed
19   since bail conditions were last set.  And just to review
20   briefly the background of this case, the defendant is charged
21   with committing securities fraud, and by his own admission to
22   several witnesses including FBI agents, the defendant has
23   admitted to operating a giant Ponzi scheme with losses in the
24   billions and billions of dollars.  The case against the
25   defendant is strong and it continues to grow stronger as the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

3

915AAMADH                    Hearing

1    government's investigation continues.
2              It appears quite likely that the loss amount will be
3    above the highest level in the guidelines and that the advisory
4    sentence calculated under the guidelines when that is
5    calculated will be very, very lengthy indeed.  Given the
6    defendant's age, the length of the likely sentence, the
7    strength of the proof against the defendant including his
8    confessions, these facts present a clear risk of flight.
9              Now, in prior bail proceedings and the prior
10   conditions imposed by Magistrate Judges Gorenstein and Katz the
11   court attempted to minimize that risk by, among other things,
12   imposing home detention, electronic monitoring and a 24 hour
13   guard to be paid for by the defendant's wife.
14             THE COURT:  It is my understanding that in those prior
15   proceedings the government had accede to the conditions and a
16   package was presented to the magistrate judge is that correct?
17             MR. LITT:  That is correct.  And what I am getting to
18   is why the conditions have changed and why we're before your
19   Honor today.
20             There's another objective of the Bail Act that is
21   insuring the safety of the community and that includes victims
22   of the defendant's criminal acts.  And the defendant's recent
23   actions have shown that the current conditions are not
24   sufficient to protect the community.
25             Let me talk for a minute about because it's pertinent

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

915AAMADH                    Hearing

1    the parallel civil proceeding brought by the Securities and
2    Exchange Commission in this case.  On December 18 Judge Stanton
3    entered a preliminary injunction with the express consent of
4    the defendant and among other things that injunction basically
5    forbid the defendant from transferring any assets either of his
6    company or of his personal asset and set that forth in explicit
7    detail.  It required the defendant to prevent any withdrawal
8    transfer, pledge, encumbrance, assignment, dissipation,
9    concealment or other disposal of any assets funds or other
10   property including money, real or personal property, or other
11   property of any kind, whatsoever, that was under his direct or
12   indirect control.  That was entered on December 18 of last year
13   and the current bail conditions in this case were set on
14   December 19.
15             Now, the government learned on December 29 and
16   December 31 after Judge Stanton's order was entered and after
17   the current bail conditions were in place that jewelry and
18   other valuables belonging to the defendant were transferred by
19   the defendant and his wife to third parties.  One transfer
20   involved property that the government has been told may value
21   in excess of $1 million.  Now, the government has not had an
22   opportunity to determine the exact value of those assets.  And
23   I should note that the government does have all of those assets
24   under its custody at the moment.
25             Now, one of those transfers the one I was just
                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

5

915AAMADH                        Hearing

1    describing that including those valuables was accompanied by a
2    handwritten note from the defendant.  In the government's view
3    that was a clear violation of Judge Stanton's order.  It was an
4    order that the defendant was clearly aware of because he
5    consented to its entry by signing a document and that is the
6    new circumstance that brings the government here today.
7           Under the bail statute a defendant may be detained of
8    his release on conditions pose a risk of flight or would
9    endanger the safety of any other person in the community and
10   safety is not limited to physical safety.
11          Now, any sentence in this case by statute will include
12   restitution and it's the government's intent to not only seek
13   restitution but forfeiture and I think the defendant is well
14   aware that restitution and forfeiture are going to be aspects
15   of any sentence in this case.
16          It's also apparent that the assets of the defendant's
17   company and his personal assets are not going to cover the
18   claims of many victims and therefore it's especially important
19   that all of the defendant's assets be preserved and that they
20   not be transferred or dissipated.
21          The defendant's actions which were taken as I noted
22   after the current bail conditions were imposed and after his
23   consent to Judge Stanton's order show that he is not able to
24   respect the limits imposed by the court.  And the current bail
25   conditions will not protect against any additional efforts to

                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

6

915AAMADH                    Hearing
1    dissipate assets thereby decreasing the recovery of victims.
2    And again because restitution to the victims is not only
3    required by law and it will inevitably be a part of the
4    sentence in this case, but restitution is one of the clear aims
5    of this prosecution and investigation and the defendant's
6    recent actions amount to obstruction of justice under the bail
7    statute and that's one of the things that the bail statute
8    explicitly mentions.
9          And also Mr. Madoff's recent actions have to be viewed
10   in light of the totality of the circumstances in this case
11   including his past actions which he has admitted to in and in
12   which are set forth in the complaint.  The fact that he
13   conducted an enormous Ponzi scheme over many years that
14   resulted in billions of dollars of loss to victims.  And by
15   necessity in order to effect that scheme Mr. Madoff has lied to
16   numerous people over the years, that the defendant would
17   transfer personal assets under these circumstances having been
18   arrested, being subject to bail conditions, being subject to
19   Judge Stanton's order of which he was aware and that he
20   consented to show that the current conditions of the release
21   are not sufficient to mitigate against the risk of flight and
22   danger to the community, and therefore in light of all of these
23   circumstances the government seeks detention.
24         THE COURT:  Before you sit down, I'm not quite clear
25   as to exactly what the transfer was.  These are items that are
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

915AAMADH                    Hearing
1  in the government's possession?
2              MR. LITT:  They're now in the government's possession
3  because they have been, they were collected by the government
4  after their transfer.
5              THE COURT:  Okay.
6              MR. LITT:  These were items that were at least four,
7  and I think today we learned of a fifth transfer of property
8  conducted by the defendant and his wife.  Some of those
9  apparently were done by the defendant's wife but we believe
10 they were done from the defendant's apartment where he has been
11 since his arrest and they certainly constitute assets under his
12 custody and control.
13             One of the transfers which I described in a little
14 more detail was what appears to be very valuable jewelry and
15 other possessions of the defendant and that transfer was
16 explicitly made by the defendant because it was accompanied by
17 a note, a handwritten note from the defendant.
18             But I should say the government does not have all of
19 the items back but I think at least three of the transfers
20 including those transfers of what appear to be the most
21 valuable property, the government currently has in its
22 possession and the others we expect to have shortly.
23             THE COURT:  How were these transfers attempted?  Was
24 there a contract?
25             MR. LITT:  No.  They were -- I don't know the manner
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

8

915AAMADH                    Hearing
1   in which all of them were transferred.  I know, I believe that
2   some of them were mailed.
3            THE COURT:  You mean from the residence?
4            MR. LITT:  Correct.
5            THE COURT:  And just so that I'll be up to speed,
6   exactly what are the conditions that are presently in place?
7            MR. LITT:  Under the current bail conditions there is
8   a $10 million personal recognizance bond which is secured by
9   three properties.  One of the Manhattan apartments where the
10  defendant resides which I understand is in his name, two
11  properties, one in on Long Island, one in Florida that are in
12  his wife's name.  His passport has been surrendered.  His
13  wife's passport has been surrendered.  The bond was cosigned by
14  two people, his wife and his brother.
15           He is on home confinement with electronic monitoring
16  and his wife is paying for the services of 24 hour guard
17  stationed outside the apartment to insure against any risk of
18  flight or harm.
19           THE COURT:  Okay.  Thank you.
20           And Mr. Horwitz?
21           MR. SORKIN:  Sorkin, your Honor.
22           May I be heard, your Honor?
23           THE COURT:  Yes.
24           MR. SORKIN:  Good afternoon, your Honor.
25           THE COURT:  Good afternoon.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

9

915AAMADH                         Hearing

1          MR. SORKIN:  Your Honor, let me put this in context.
2     I am going to give you a, to get you even more up to speed a
3     timeline and more specifics.  Under the Bail Reform Act it goes
4     without saying there is no, and I did hear the government talk
5     about any risk of flight here indeed the original Pretrial
6     Services recommended a personal recognizance bond.
7          The property that is the subject or what Mr. Litt was
8     talking about, the bail property, there was no attempt to take
9     that, sell that, disencumber that or remove that.  The bail
10    property is still in effect and it's real property that there
11    is no claim that he sought to do anything with respect to that
12    property.
13         The government has to show, your Honor, by clear and
14    convincing evidence that he is a danger to the community and
15    there is real risk of flight.  He hasn't been charged with an
16    act of violence.  He hasn't been charged with possession of a
17    firearm, possessing a firearm.  He hasn't been charged with a
18    narcotics offense.  He has been charged in a complaint, dare I
19    say, the presumption the innocence still stays with him with
20    one count of securities fraud.
21         With respect to the authorities, and I am going to
22    refer respectfully to some authorities in a moment, but before
23    I do let me give your Honor something of a timeline here and
24    more specifics which we think will assist the Court in making
25    its decision.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

10

915AAMADH                    Hearing

1      Mr. Madoff was arrested on December 11 in a one count
2  complaint charging him with, as I say, with securities fraud.
3  Bail was set and there was no issue with respect to the bail we
4  consented to.  It hasn't been touched.  No violation of a bail
5  obligations.
6      On December 12, your Honor, before Judge Stanton of
7  this court we consented to a temporary retraining order and I
8  think that's important because if I heard Mr. Litt correctly,
9  the only alleged violative act here alleged is with respect to
10  Judge Stanton's order in which we consented to a preliminary
11  injunction and that was brought by the SEC which is not a party
12  in this action and indeed the U.S. Attorney is not a party to
13  the action before Judge Stanton.
14      Now, the SEC has not stepped forward, your Honor, with
15  respect to alleged violations of Judge Stanton's order but
16  we'll save that for another day.
17      On December 18, your Honor, we consented to the
18  preliminary injunction.  And the preliminary injunction, and
19  Mr. Litt is correct, specifically, prohibited the dissipation
20  of assets including jewelry.  Now, Mr. Madoff to be sure signed
21  that consent, counsel signed the consent on his behalf.
22      On December 24, your Honor, Mr. Madoff and his wife
23  sent out some jewelry by mail to the post office and I think
24  jewelry that Mr. Litt is talking about to his brother Peter
25  Madoff to his son and daughter-in-law, to his other son and to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

915AAMADH                    Hearing

1   a couple who resides in New York who at the time was
2   vacationing in Florida and the jewelry which Mr. Litt has
3   referred to included what can best be described as some
4   heirlooms, some pens, a pair of cuff links which had been given
5   to Mr. Madoff by his granddaughter and possibly on Saturday
6   night the 27th a pair of mittens which Mrs.~Madoff bought for
7   her daughter-in-law.  That's the property.
8           So, to be sure these items were sent out on the 24th
9   most of it included some watches that Mr. Madoff had.  They
10  were apparently antique watches.  They're heirlooms.  He has
11  had them in his possession and he sent them to his family
12  members.  The cuff links I've already referred to and the
13  jewelry came from Mrs.~Madoff.
14          On December 26th the government and Mrs.~Madoff, not
15  Bernard Madoff, Mrs.~ Madoff agreed to a voluntary freeze on
16  her assets among other things, but I think for purposes of
17  relevance here today agreed to a voluntary freeze which
18  included jewelry, her jewelry.  She consented to it.  She
19  signed it and it's a matter of record at the U.S. Attorney's
20  office.
21          On December 30, your Honor, and I want to add and
22  underline, very important, the first time we learned that the
23  government was going to move to change the bail here was this
24  morning.  Mr. Madoff's counsel were unaware of the government's
25  position, so we were not aware of this on December 30 when

915AAMADH                    Hearing

1   Mrs.~Madoff met with one of my partners to go over the
2   statement of financial condition which was timely filed with
3   the SEC, a copy sent to the U.S. Attorney's office on December
4   31, e-mailed to the SEC on the evening of December 31, the hard
5   copy to the U.S. Attorney on the 31 and the hard copy to the
6   SEC, I believe, on January 1 or 2.  I am not sure of the
7   precise date.  It couldn't be delivered to the SEC on the 31st
8   which was Judge Stanton's order because, unfortunately, the SEC
9   had closed its doors on the 31st before we were able to but it
10  was filed timely.
11         On the 30th, your Honor, in preparing a statement of
12  net worth my partner Joel Wolf and Mrs.~Madoff met and at that
13  meeting when they were discussing financial net worth we
14  learned for the first time that this jewelry, these watches,
15  this jewelry had been sent out to family members and to this
16  one couple in Florida.  At that point in time Mrs.~Madoff and
17  Mr. Madoff were told -- and I say this your Honor without
18  waiving the privilege, but specifically -- with respect to
19  these items, you can't do that you have to get it back.
20         At that point in time Mrs.~Madoff e-mailed one of her
21  sons and asked for what she had sent to him to send it back.
22  Also, on December 30th, Mr. Madoff contacted his brother and
23  through conversations with counsel, Mr. Madoff, Peter Madoff's
24  counsel, myself and Mr. Madoff agreeing, obviously, pushing the
25  point what was said to Peter Madoff the brother should be

13

915AAMADH                    Hearing

1  returned.  That was on the 30th.  I believe the items that the
2  government is talking about are items that may have been sent
3  to Mr. Madoff and Mr. Madoff's children which turned them over
4  to the government.
5           On December 30th as well, your Honor, Mrs.~Madoff
6  attempted to contact this couple who was vacationing in Florida
7  to get from them the items that had been sent to them to return
8  them.  My understanding is those people couldn't be reached.
9  We're still attempting to contact them to get those items back.
10          While I cannot comment about the value that the
11 government places on these items.  I can tell you, and I don't
12 mean to be cavalier about this, your Honor, I don't mean to
13 minimize the government's claims, the cuff links were $25.  The
14 mittens were a Hanukkah gift valued at two hundred.  The
15 watches are far more expensive, but, certainly, we've made
16 every effort to get that back and quite frankly we understand
17 the government now has it.  That's good.  And we were
18 attempting to get it and we did the rest of it, your Honor,
19 before we ever learned the government had this concern.
20          It is clear, your Honor, that there was no attempt by
21 Mr. Madoff or Mrs.~Madoff to violate the terms of bail.  There
22 is no claim that they ever sought to flee.  There is no claim
23 that they ever sought to dissipate assets.  The assets that
24 they possess, your Honor, which are set forth in the filings
25 with the SEC and the U.S. Attorney far ex the value of what I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

915AAMADH                    Hearing

1    call heirlooms sent only to their close family and this one
2    couple in Florida which we're trying to get that back.
3             At present, your Honor, they're under 24/7 security
4    paid for, as Mr. Litt correctly says, by Mrs.~Madoff.  There is
5    no evidence anywhere that they did anything to seek or
6    dissipate other assets and I respectfully submit, your Honor,
7    and I disagree respectfully with Mr. Litt, there is nothing
8    that we have found in the Bail Reform Act or in the cases and I
9    can cite you a series of cases that even suggest that there is
10   an obstruction of justice with respect to dissipating some
11   assets so that potential victims assuming Mr. Madoff has been
12   found to have been guilty of the crimes charged constitute an
13   obstruction of justice.
14            There was no attempt, your Honor, to violate Judge
15   Stanton's order and the SEC hasn't contacted us with respect to
16   that.  I can say --
17            THE COURT:  Is there any evidence the SEC knows about
18   this?
19            MR. SORKIN:  Your Honor, I would venture a guess, your
20   Honor, that the SEC certainly does know about the rest of it
21   because the SEC and the U.S. Attorney's Office have been
22   working together on this matter and certainly if the SEC does
23   know about the rest of it or doesn't know about the rest of it
24   we expect to hear from the SEC and we'll take those issues up
25   before Judge Stanton, but nothing has changed, your Honor,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

915AAMADH                       Hearing

1    before this court with respect to the bail conditions.
2              In fact your Honor, we put in after the bail
3    conditions were set the 24/7 security watch.  There are
4    security people around Mr. and Mrs.~Madoff as I said 24/7 and
5    that was put in after the bail conditions were set and he was
6    then confined to his apartment after that and he hasn't left
7    his apartment.  He hasn't violated those bail conditions.
8              I would close, your Honor, by saying that in the cases
9    that we have found in this circuit everything from Judge
10   Gleason's treatise on criminal practice where he discusses the
11   issue of danger to the community there is no mention of
12   pecuniary harm to victims.  Decision by Judge Keenan and a
13   number of Second Circuit cases, and in the Keenan case, your
14   Honor, in the citation to that is United States versus Cashagey
15   at 717 F.Supp 1048 that was a money laundering case where there
16   was a real threat at the time that money would be dissipated,
17   concealed, hidden assets.  And in that decision by Judge
18   Keenan, a 1989 case, Judge Keenan found that the Court should
19   "also bear in mind that it is only a limited group of offenders
20   who should be denied bail pending trial" citing the
21   Congressional records and I believe a Second Circuit case
22   Shakur 817 F.Supp 2d at 195.
23             In the interest of full disclosure there are a couple
24   of cases that peripherally mention assets.  One is a district
25   court case in Pennsylvania.  I believe the other is a district

915AAMADH                         Hearing

```
 1   court case in Florida but that is as far as we can find with
 2   respect to the government's position that this is somehow a
 3   danger to the community.
 4          We've offered the government, your Honor, the
 5   opportunity to take whatever jewelry or watches or cuff links
 6   or mittens that still exist, gather them up, put them in a
 7   vault where the government can hold the key and that solves the
 8   problem.  The government's response has been, well, we can't
 9   monitor the situation.
10          What they can monitor is, one, he is not leaving.  The
11   flight is not an issue.  And two, the bail conditions that were
12   originally set by this Court have not been violated one iota.
13          Thank you, your Honor.  If you have any questions.
14          THE COURT:  Two questions.  One, is the rest of it
15   your position that the items would not have been subject to
16   forfeiture?
17          MR. SORKIN:  Well, the difficulty with that, your
18   Honor, is that the jewelry, and we haven't parsed this out, I
19   emphasize Ruth Madoff, Mrs.~Madoff is not a party either to the
20   SEC action or to the action brought in Southern District New
21   York by the U.S. Attorney.  She hasn't been charged or
22   arrested, and a number of the items were hers.  Indeed, she has
23   agreed with respect to the voluntary freeze order or I won't
24   say order voluntary freeze entered into between the government
25   Mrs.~Madoff and counsel that she would not -- and that was
```

17

915AAMADH                          Hearing

1    December 26 the first time she signed the rest of it on
2    December 26 -- that she would not dissipate assets.  It's not
3    so ordered.  I don't think it was filed, but even if it was,
4    your Honor, Ruth Madoff is not a party to this action and
5    whatever funds are being used to fund his defense, to provide
6    the security are coming out of her assets.  So I don't believe
7    that the jewelry that is attributable to Mrs.~Madoff would be
8    subject to any kind of order at this point other than the
9    voluntary freeze that she entered into.  And with respect to
10   that, your Honor, she agrees that when she realized on the 26th
11   that the rest of it covered the rest of it she notified counsel
12   and made every effort to get the rest of it back.  So I hope
13   that answers the first question.
14             THE COURT:  Okay.  And the second question is as I
15   understand the prior decisions on bail have been the result of
16   an agreement between the government and defendant, Normally if
17   I have a situation where a judge has made a de novo decision
18   about bail I wanted to see if there were any change in
19   circumstances given the fact that the bail in this instance has
20   been a result of agreement, and I'll also ask Mr. Litt this, is
21   the rest of it your position that we should use the same
22   standard, that is look for some changed circumstance before I
23   impose a different bail situation or once the agreement by the
24   parties no longer exists should I undertake to make a de novo
25   determination as to whether or not I should impose any

18

915AAMADH                          Hearing

1    particular bail conditions or impose an order of detention.
2                 MR. SORKIN:  Well, obviously, your Honor, if bail
3    conditions have changed, if the defendant is found in the
4    middle of the night getting on a plane to flee the country
5    which is the most extreme example that I can come up, then,
6    obviously, I expect the government to come forward and seek
7    detention.  If there was any evidence that the defendant was a
8    threat to someone to do them physical violence then I would
9    expect the government to come forward.  And it is not uncommon
10   to seek a change of the bail conditions but I would
11   respectfully submit to your Honor that based on the
12   government's position today that the conditions of bail which
13   require Mr. Madoff to wear a bracelet, to be in his apartment
14   24 hours a day, seven days a week under security, private
15   security that is not a change of circumstances.
16                 Indeed, your Honor, he is under a greater restraint
17   now then when he first agreed to the bail conditions set on the
18   date of December 11.
19                 THE COURT:  My question is this, if I know that a
20   judge has made an independent determination I am not going to
21   overturn that specifically unless you can show me that they are
22   conditions that were not presented to the Court.  On the other
23   hand, if the parties present an agreed package should I treat
24   that with lesser deference in terms of how I approach the
25   question of bail?

915AAMADH                    Hearing

1       MR. SORKIN:  Well, I think, your Honor, if I
2   understand your Honor, if the parties agree then I don't think
3   your Honor unless there is an extraordinary circumstance would
4   set aside an agreement between the government and the
5   defendant.
6       THE COURT:  I think that's correct.
7       MR. SORKIN:  Okay.  The government obviously thinks
8   circumstances have changed here and they're asking I believe
9   for a de novo review and I believe a change in the bail
10  conditions based upon this jewelry issue.  And on that basis I
11  think your Honor can make a decision or should make a decision
12  based upon which we disagreed with, obviously, that conditions
13  have so changed so substantially and changed that a clear and
14  convincing evidence has been shown to this Court that he is
15  either a risk I think of flight or a danger to the community
16  because of substantial changed conditions.
17      If he was found to be selling narcotics, if it's found
18  that he threatened somebody, if it's found that he was fleeing
19  the community then I think your Honor should consider new bail
20  conditions.  But that's not the case here and I think that
21  respectfully answers your Honor's question.
22      One last thing, your Honor, I want to emphasize again
23  and if he forgive me for being redundant.  We learned of this
24  morning.  This effort was made to get those items sent back.
25  The only reason the government has those items that apparently
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

915AAMADH                        Hearing

1   were sent I believe to Mr. Madoff's and Mrs.~Madoff's children
2   because they turned that over to the government, but we made an
3   effort, your Honor.  Could we have done more?  I suppose we
4   could have done more within the confines of being restrained to
5   the apartment and doing what we could.  But we did what we
6   could at the time and we have requested that the government
7   consider another means to provide security to the government
8   with respect to these items.  Clearly, he cannot sell the
9   property.  He cannot sell real property or large physical
10  property.  The only other issue is this jewelry, your Honor,
11  and we've asked the government to consider that.  And even if
12  the government doesn't consider we don't think it's changed in
13  circumstances, your Honor.
14          THE COURT:  Mr. Litt.
15          MR. SORKIN:  Thank you, your Honor.
16          MR. LITT:  Let me just start by saying that you know
17  Mr. Sorkin emphasized mittens and cuff links and the government
18  is not here because of mittens and cuff links.  We're here
19  because of hundreds of thousands of dollars and perhaps
20  millions of dollars worth of very expensive watches and other
21  jewelry.  And the transfer of those assets both to relatives
22  and apparently third parties represents a dissipation of assets
23  under the defendant's control, some of which were his.  And it
24  is, frankly, irrelevant whether the SEC has done anything yet
25  with respect to Judge Stanton's order.  What's important is
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

915AAMADH                    Hearing

1   that the defendant violated that order and that is a change of
2   circumstances.  That's what brings us here.
3           Now, it's the government's view that the Court always
4   has an independent obligation to assess bail conditions and
5   factors in determining what bail is whether the parties reach
6   agreement or not.  And in my experience the Court
7   notwithstanding an agreement by the party may look at bail
8   conditions and decide that they're not adequate or they're too
9   stringent or whatever.
10          The government wouldn't be here if it didn't think
11  that there was a changed bail condition or a changed
12  circumstance to consider and I think so that's why we're here.
13  I think the Court is free to evaluate in determining what the
14  appropriate bail conditions are at this time it's appropriate
15  for the Court to consider all the circumstances because it's
16  the totality of the circumstances that are always considered
17  when determining bail.
18          Let me also say that the actions, I have no doubt that
19  defense counsel took the actions that the rest of it thought
20  were appropriate when they learned of these transfers.  But the
21  issue is not the judgment or the action of defense counsel.
22  The issue here is the defendant, and, again, we believe there
23  is a changed circumstance here.
24          And let me say that you know flight risk, Mr. Sorkin
25  also emphasized flight risk in saying that there was none.

915AAMADH                    Hearing

1  There is always flight risk unless the defendant is
2  incarcerated.  And as I made clear at the outset the prior bail
3  orders substantially diminished that risk by home detention,
4  electronic monitoring and then subsequently by order of the
5  Court the imposition of a 24 hour guard.  But that doesn't make
6  the flight risk zero.  There is still some flight risk in this
7  case given the factors that I've described previously.
8         And Mr. Sorkin talked about the assets of the
9  defendant and his wife which were cataloged and presented to
10 the government and to the SEC as a result of an order in the
11 parallel proceeding.  The defendant has assets in this country,
12 New York, Long Island, Florida, as I understand the rest of it
13 also in France.  And it's simply impractical for the government
14 to go around and collect up anything that might be of value
15 whether it's art work, paintings, sculptures.  It's true the
16 defendant probably would have a very hard time transferring a
17 piece of real estate or something of that nature, but things
18 like art work and jewelry and things that are small but yet
19 have extraordinary value which are scattered around the United
20 States and indeed the world it's simply not practical for the
21 government to collect them all and maintain them.  The most
22 significant thing is in the face of a direct and clear order by
23 a court of which the defendant was aware he violated that order
24 and that is the principle concern that leads us here today.
25         THE COURT:  The bottom line though, Mr. Litt, is that
                 SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

23

915AAMADH                     Hearing

1   the determination that we have to make here today is on what
2   basis you are recommending that he be detained.  Is it either
3   risk of flight or danger to the community and you whether or
4   not you could set conditions which could address the specific
5   arm that you are concerned about in that regard.  The specific
6   concern that you are expressing here is the dissipation of
7   assets?
8           MR. LITT:  It is, your Honor.  The government, as I
9   said, there does remain a risk of flight.  We, obviously, think
10  that that has been substantially reduced by the conditions of
11  confinement and electronic monitoring and surveillance and 24
12  hour security protection but it is not zero risk.  But we're
13  here because of risk to the community presented by dissipation
14  of assets.
15          THE COURT:  And that's specifically as to whether or
16  not Mr. Madoff could transfer assets?
17          MR. LITT:  Correct.
18          THE COURT:  And with regard to what his legal status
19  and his ability to transfer assets now he is unencumbered.
20          MR. LITT:  I'm not sure that I understand your Honor's
21  question.
22          THE COURT:  Is the rest of it possible that
23  Mr. Madoff's ability to transfer assets can be hindered by
24  appropriate restrictions on his ability?  For example,
25  Mr. Madoff, he can only legally transfer things if he has the
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

24

915AAMADH                    Hearing

1    legal ability to transfer the rest of it.  Is the rest of it
2    possible that we can take away that right from him and
3    therefore address the question that you are raising about the
4    dissipation of assets?
5            MR. LITT:  I don't believe so, your Honor, because I
6    believe that's what Judge Stanton's order sought to do.
7            THE COURT:  That sought to enjoin him from doing the
8    rest of it.  I don't think that took away his legal right to do
9    the rest of it.  And again, I am not an expert on these kinds
10   of matters, but I certainly know that there are times when an
11   individual is stripped of his ability either by placing his
12   ability and receivership or transferring his ability to
13   temporarily to some other individual to prevent that individual
14   from having the ability to transfer assets.  Is the rest of it
15   your position that that's not possible in this case?
16           MR. LITT:  Could I have one moment, your Honor?
17           THE COURT:  Yes.
18           (Pause)
19           MR. SORKIN:  Your Honor, if Mr. Litt will allow me I
20   can answer that question.
21           THE COURT:  Without giving up your, you concede the
22   floor to Mr. Sorkin for now?
23           MR. SORKIN:  Your Honor, his bank accounts are frozen.
24   The joint bank accounts are frozen.  Indeed, even the account
25   that Mrs.~Madoff has assets in where she is the sole

915AAMADH                     Hearing

1   beneficiary, that bank, US attorney and us defense counsel and
2   Mrs.~Madoff have agreed to certain restrictions on that account
3   even though we maintained that that is Mrs.~Madoff's assets and
4   there's been no evidence to suggest otherwise.  We have
5   encumbered his real estate through a confession of judgment and
6   while I wanted to make one other point I think that might
7   answer the question.  The government knows every account is
8   frozen.
9           To be sure, your Honor, as Mr. Litt says, we can't
10  stop him from walking out of the apartment but there is a 24
11  hour security there led by a former New York City detective and
12  there is surveillance.  There is always a risk of flight.  Risk
13  of flight didn't exist we wouldn't be here.
14          THE COURT:  Well, you're both agree on something.
15          MR. SORKIN:  I say this respectfully to both the Court
16  and Mr. Litt, if you buy into Mr. Litt's argument about a risk
17  of flight that risk of flight is always -- you might as well as
18  well toss out the Bail Reform Act.
19          THE COURT:  I want to get to the specifics problems
20  that we are concerned about.  The specific thing that I am
21  asking about now, for example, is while we understand that if
22  somebody is incompetent we can take away their ability to
23  really transfer items.  Given the circumstances that's been
24  presented that we at least the bank accounts that have been
25  identified have been frozen that still leaves the possibility

915AAMADH                     Hearing

1    that Mr. Madoff still has the legal ability to transfer items.
2    And even though the government seems to have gotten back some
3    of these items, if Mr. Madoff had transferred them they would
4    have been transferred.  My question specifically is, is
5    there -- and as I said I am not an expert -- is it possible for
6    someone to voluntarily give up, put themselves in as a ward of
7    some other individual?  And I ask that only because the
8    specific harm that you've alleged in terms of danger to the
9    community is the dissipation of assets and if he can't
10   dissipate assets then I don't know that you cannot address that
11   harm.  I am not sure of that.  I am not asking the rest of it
12   of the parties.
13          MR. LITT:  Not, I am not aware of another way beyond
14   the injunction to do that.  I mean, I guess under some
15   circumstance a personal receiver could be appointed who would
16   then, I assume the only way to prevent dissipation of assets
17   would be to go around the world and collect all the assets.
18          THE COURT:  I think it's impractical for you to get
19   the assets or to know them, but I think if you are going to
20   address the issue you have to address the heart of it and that
21   is assuming that there is no possibility or eliminate the
22   flight risk.  If Mr. Madoff were to get to some other place and
23   he has the ability to pick us his assets -- I am specifically
24   asking again whether or not, let us say that Mr. Madoff he now
25   has as an adult has the ability to sell his property.  And if

27

915AAMADH                     Hearing

1    you had not found out about these other items then they could
2    have been sold.  Then of course, you probably could go through
3    the process of trying to get them back but can we again get at
4    the heart of it and stop him from having the ability to
5    transfer?
6              MR. SORKIN:  The government does have -- I think this
7    may respond to your Honor's question -- does have the best of
8    their ability at this time without having any access to report
9    a financial net worth statement which lists the properties both
10   real and personal.  The government can get liens.  They can
11   seek forfeiture.  Again, your Honor, I am not sure the
12   government can get a lien on a watch or a necklace.
13             THE COURT:  Right.  I don't think real property
14   presents as much an issue as personal property or property that
15   is more mobile.  Again, I just ask the questions.  I haven't
16   made any determinations.
17             MR. SORKIN:  We could get an inventory of what exists.
18   The government can get a lien on that.
19             THE COURT:  Let Mr. Litt finish.
20             MR. LITT:  Even being given an inventory doesn't
21   prevent its dissipation unless it's under one's control.  You
22   can look at, you can get inventory and then look a few months
23   the later and say this is missing or that is missing.  First of
24   all, you don't know that it's accurate.  Also, you going to go
25   to the various locations and check every item on the list.

915AAMADH                    Hearing

1   Seems to the government there is no practical way with the
2   amount of relatively small valuable property in the defendant's
3   possession and control, given his failure to adhere to a
4   court's prior order to prevent the very thing that happened in
5   this case that there is no other practical way to prevent the
6   defendant from doing that again.
7              MR. SORKIN:  May I be heard, your Honor, very shortly?
8              THE COURT:  Very briefly.
9              MR. SORKIN:  Your Honor, I say this respectfully to
10  Mr. Litt.  If you buy into this argument then everyone, every
11  defendant brought before this Court should be incarcerated
12  because the Bail Reform Act doesn't talk about how are you
13  going to deal with dissipation, as Mr. Litt said, of these
14  smaller items?  That's not what the Bail Reform Act is all
15  about.
16             Further, your Honor, we did make reference to the fact
17  that a third party did receive something, this couple
18  vacationing in Florida.  Before this morning, your Honor, I
19  don't believe the government knew that.  We voluntarily
20  disclosed that to the government this morning when we spoke to
21  them and advised them of the sequence of events.  So we
22  voluntarily told the government what you have in your pictures.
23  But also this third party -- and we're seeking to get that
24  back -- again, your Honor, I don't mean to say bogged down in
25  these assets but we're talking about the Bail Reform Act and I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

29

915AAMADH                    Hearing

1    have not heard anything that Mr. Litt has said that suggests
2    even innocently which we maintain it happened innocently, we're
3    seeking to get it back and the government has most of it back
4    that this requires him to be incarcerated.  He is not a threat
5    to the community and there is no danger that I've heard that he
6    is going to flee.
7              Thank you, your Honor.
8              THE COURT:  Just one piece here I want you to address
9    Mr. Litt.  Mr. Sorkin raises the issue of whether or not the
10   kind of harm that you are alleging that the Court needs to
11   address that is the possibility of dissipating the assets is
12   something which it's appropriate to use detention as to remedy
13   for.  And he says if we do that here that may be the first time
14   that it's been done.  I take it your position is that when the
15   Bail Reform Act says danger to the community, it including --
16   well, what is, does -- is there any limitation on the kind of
17   danger that we're talking about?
18             MR. LITT:  Well, I am sure there is a limitation.  I
19   am looking at United States versus Shinberger which is 498
20   F.Supp 2d 738 at 762, citing some of the legislative history of
21   the Bail Reform Act quoting saying the judiciary committee
22   contends that the concern about safety be given a broader
23   structure involving physical violence.
24             There is an opinion by Judge Kaplan here in the
25   Southern District.  This is in the Stein case, not reported.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

915AAMADH                    Hearing

1   It's 2005 Westlaw 3071272 and I'll note that the Court in that
2   case at the end of the day did not find that the conditions in
3   that case warranted detention but the Court did agree in
4   principle that nonviolent witness tampering and obstruction
5   poses a danger to the community and that the risk in such an
6   inappropriate case would support pretrial detention.
7            Here the obstruction that we see is the inability to
8   get restitution and forfeiture proceedings to victims in a case
9   so everything has to be looked at afresh by the Court.  This is
10  an unusual case in many respects.  It involves apparently a
11  longstanding very large scheme that involved a greet deal of
12  description and a great deal of losses to victims.
13           Again, what we have here is a defendant who not as of
14  December 11 and not as of December 17 I think when the bail
15  conditions were changed the first time and not as of the 19th
16  when they were changed again had not violated an explicit court
17  order that he was aware of and done so within a week of that
18  order being issued.  That's a significant factor that the court
19  should consider in light of all of the other factors in this
20  case.  This included the length of the case, the less amount,
21  the likely sentence, the defendant's age all of the other
22  things in this 24 case as well as the need to protect the
23  community.
24           THE COURT:  So the bottom line is what you are
25  presenting to the court is whether or not the information which
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

915AAMADH                     Hearing

1   has come to the government's attention and again to the Court
2   at this point since the time of the last bail remand is such
3   that there are no conditions that can be set to address the
4   potential harm.
5           MR. LITT:  I think the Court again has to consider
6   everything, both the potential risk to the community and the
7   risk of flight.  It's, all of it must be considered in
8   determining bail.
9           THE COURT:  Okay.  All right.  I understand that the
10  parties have presented a fair amount of information to me, some
11  of which while I can take down citations, I find that much of
12  what you've done I would like to take a closer look at and what
13  you said.  I am going to give you the opportunity to brief the
14  matter of whether or not first of all the appropriateness of
15  the actions of the defendant here in terms of warranting a
16  change in circumstances.
17          Are you prepared to brief that in short order,
18  gentlemen?
19          MR. LITT:  Yes, your Honor.
20          MR. SORKIN:  Yes, your Honor.
21          THE COURT:  How short?
22          MR. SORKIN:  It's the government's application, your
23  Honor.  They go first.
24          MR. LITT:  Well, I think we should have something to
25  the Court tomorrow.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

32

915AAMADH                    Hearing
 1              THE COURT:  Tomorrow a.m. or p.m.?
 2              MR. LITT:  By noon.
 3              THE COURT:  Okay.
 4              MR. SORKIN:  Cuts it in half.
 5              THE COURT:  And you'll take it commiserate amount of
 6      time to respond.
 7              MR. SORKIN:  I think we can probably get something to
 8      your Honor by tomorrow afternoon on close of business
 9      Wednesday.
10              THE COURT:  Okay.  I can live with that schedule.  Do
11      you think you'll need to have a reply, Mr. Litt, or do you
12      think you'll put it all in the first brief?
13              MR. LITT:  We may need a reply but if we got the
14      defense's submission by noon on Wednesday we could get the
15      Court a reply by close of business Wednesday.
16              THE COURT:  Okay.  I will tell you that on Thursday I
17      will be in grand jury selection.  I will confess that I
18      probably won't look at the -- well, if I get it by noon --
19              MR. SORKIN:  Close of business Wednesday.  I don't
20      have an objection if Mr. Litt takes Thursday to do a reply and
21      then we'll file the paper before your Honor on Friday.
22              THE COURT:  Let's recap.
23              Mr. Litt, you are, did you say noon tomorrow?
24              MR. LITT:  I had anticipated a much more compressed
25      schedule.  If things are going to stretch out that far I would
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

915AAMADH                    Hearing

1   ask till the end of the day tomorrow if Mr. Sorkin is going to
2   take till the end of the day Wednesday.
3           MR. SORKIN:  No objection, your Honor.
4           THE COURT:  Okay.  And then actually, Mr. Litt, if you
5   could get me something by noon on Thursday I'll come out of
6   grand jury proceeding and I will have something to keep me busy
7   in the afternoon.
8           MR. LITT:  All right, your Honor.
9           THE COURT:  I hope too some of my questions have given
10  you some indication of the things I'm concerned about, but just
11  to recap:
12          I am concerned about the use of the economic harm and
13  the question of danger to the community.  You should address
14  your example, in the intervening years there have been a number
15  of situations in which Congress has acted and given certain
16  presumptions in terms of danger to the community.  I think in
17  that regard that might play a role into my determination of
18  what's on their mind about what danger to the community is.
19          However, I understand that when considering these
20  issues just as Judge Kaplan did you don't want to be too
21  restrictive in how he defined what the danger to the community
22  is.  In terms of economic danger may be more severe than
23  potential physical danger, but I want to know was contemplated
24  and if there is some recent law let's put it all out there for
25  me to review.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

34

915AAMADH                    Hearing

1         MR. SORKIN:  That's well, your Honor.  Thank you.
2         THE COURT:  Anything else?
3         MR. LITT:  Not from the government, no.
4         THE COURT:  All right.  Thank you.  We are adjourned
5    for now.
6                         o O o
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25