UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

UNITED STATES OF AMERICA,          :

    - v. -                      :      09 Cr. 213 (DC)

BERNARD L. MADOFF,            :

             Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York

MARC LITT
LISA A. BARONI
Assistant United States Attorneys

    - Of Counsel -

## TABLE OF CONTENTS

Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   A. Application Of The Section 3553 Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     1.  The Nature and Circumstances of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     2.  History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     3.  The Need To Afford Adequate Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     4.  The Need To Avoid Unwarranted Sentence Disparities . . . . . . . . . . . . . . . . . . . 12

     5.  The Need To Provide Restitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     6.  The Contentions of the Defense Lack Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   B.  Application of Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     1.  Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     2.  More Than 250 Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     3.  Substantial Part Of The Fraudulent Scheme
       Committed From Outside The United States . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     4.  Endangering Solvency And Financial Security . . . . . . . . . . . . . . . . . . . . . . . . . 20

     5.  Registered Broker-Dealer/Investment Adviser . . . . . . . . . . . . . . . . . . . . . . . . . 20

     6.  Leadership Role . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :

UNITED STATES OF AMERICA,        :

    - v. -                 :      09 Cr. 213 (DC)

BERNARD L. MADOFF,          :

           Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the sentencing of defendant Bernard L. Madoff, scheduled for June 29, 2009, at 10:00 a.m.

Defendant Madoff's crimes were of extraordinary dimensions. For example, the fraud loss known to date, which is greater than $13 billion, is more than thirty-two times the baseline level of loss that would carry a sentence of life under the U.S. Sentencing Guidelines ("U.S.S.G."). He engaged in wholesale fraud for more than a generation; his so-called "investment advisory" business was a fraud; his frauds affected thousands of investors in the United States and worldwide; and he repeatedly lied under oath and filed false documents to conceal his fraud. The scope, duration and nature of Madoff's crimes render him exceptionally deserving of the maximum punishment allowed by law, and the Guidelines advise a sentence of 150 years (consisting of consecutive terms of the maximum term of imprisonment for each count of conviction, as discussed below). Further, comparisons of this case with the many large and egregious fraud cases in this District, only underscore the enormity of Madoff's offenses. Accordingly, we respectfully submit that a reasonable sentence in this case would be the Guidelines sentence of 150 years or, alternatively, a term of years that both would assure that

Madoff will remain in prison for life, and forcefully would promote general deterrence.

## RELEVANT FACTS

Defendant conceived and orchestrated a multi-billion dollar Ponzi scheme by which he defrauded thousands of investors, including individuals, non-profit organizations and for-profit institutions, who placed money directly or indirectly with his registered broker-dealer and, later, registered investment advisory firm, Bernard L. Madoff Investment Securities ("BLMIS"). For more than two decades, Madoff solicited billions of dollars from investors under false pretenses, failed to invest such funds as promised, and misappropriated and converted investors' funds for his own benefit and the benefit of others. These criminal acts caused billions of dollars of losses to investors, drove many individuals and charitable organizations to economic collapse or near collapse, and visited especially significant non-economic, emotional damage on many of Madoff's victims.

Madoff's scheme spanned from at least as early as the 1980s through on or about December 11, 2008, the day he was arrested. (*See* June 22, 2009 Presentence Investigation Report ("PSR") ¶¶ 44, 70). He solicited, and caused others to solicit, prospective clients to open trading accounts with BLMIS based upon a series of false promises. (*See* PSR ¶¶ 45, 47, 48). For example, he promised to use investor funds to purchase shares of common stock, options and other securities of large, well-known corporations, and he promised to achieve high rates of return for clients, with limited risk. (*See* PSR ¶ 45). Madoff never honored those promises to BLMIS clients. (*See* PSR ¶¶ 45, 62). Instead, and notwithstanding his representations on literally millions of pages of account statements and other documents sent to BLMIS clients throughout the life of this scheme, Madoff operated a Ponzi scheme in which he misappropriated

2

client funds for his benefit and, in his discretion, the benefit of others. (*See* PSR ¶¶ 62, 69). Madoff used investors' funds to meet periodic redemption requests of other investors (*see* PSR ¶ 62), took some of these funds as "commissions," which he used to support the market-making and proprietary trading businesses of BLMIS, and took vast sums for himself and family members and friends. (*See* PSR ¶¶ 72, 82-85).

Madoff created a broad infrastructure at BLMIS to generate the impression that BLMIS was operating a legitimate investment advisory business in which client funds were actively traded as he had promised, and to conceal the fact that no such business was actually being conducted. (*See* PSR ¶ 67).   Further to conceal his scheme, Madoff repeatedly lied to the United States Securities and Exchange Commission ("SEC") in written submissions and in sworn testimony and withheld information from regulators. (*See* PSR ¶¶ 35, 74). Madoff also caused to be created fraudulent certified financial statements for BLMIS, including balance sheets, statements of income, statements of cash flows, and reports on internal control (*see* PSR ¶ 73), and caused those false statements to be sent to the SEC and certain clients. (*Id.*).

As of on or about November 30, 2008, BLMIS had approximately 4,900 client accounts. (*See* PSR ¶ 35).   On or about December 1, 2008, BLMIS issued account statements for the calendar month of November 2008 reporting that those client accounts held a total balance of approximately $64.8 billion. (*Id.*).   In fact, BLMIS held only a small fraction of that balance on behalf of its clients. (*See* PSR ¶ 86).

On March 12, 2009, Madoff pleaded guilty before this Court to an eleven-count Criminal Information charging him with securities fraud, investment adviser fraud, mail fraud, wire fraud, three counts of money laundering, false statements, perjury, false filings with the SEC, and theft

from an employee benefit plan.  (*See* PSR ¶¶ 1-5).

## DISCUSSION

I.   **APPLICABLE LAW**

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the

Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed

similar crimes in similar ways." *United States* v. *Booker*, 125 S. Ct. 738, 760 (2005).   Thus, the

Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of

a sentencing judge." *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005*)*.   The applicable

Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when

considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d

Cir. 2005).

In furtherance of that goal, a sentencing court is required to "consider the Guidelines

'sentencing range established for . . . the applicable category of offense committed by the

applicable category of defendant,' the pertinent Sentencing Commission policy statements, the

need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims"

*United States* v. *Booker*, 125 S. Ct. at 764 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be

considered.  Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater

than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets

forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

4

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See United States* v. *Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id.* Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* at 113. In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

5

## II.   ANALYSIS

As discussed below, the Government respectfully submits that application of the sentencing factors to Madoff's conduct calls for a Guidelines sentence of 150 years or, alternatively, a term of years that both would assure that Madoff will remain in prison for life, and forcefully would promote general deterrence.[1]

### A.   The Section 3553 Factors

#### 1.   The Nature and Circumstances of the Offense

Madoff's crimes were serious and long-running, complex and highly orchestrated and devastating to generations of investors around the country and abroad.  His crimes also harmed not-for-profit organizations and undermined investor confidence generally.  Through years of deceit and deception, Madoff abused his position of trust (as the owner-operator of a broker dealer, and as the former Chairman of NASDAQ), and misled individuals and institutions. (*See* PSR ¶¶ 29, 32, 46, 69, 91).  His crimes included repeated lies to the SEC about the number of his advisory clients, the nature of his investment "strategy," and the liabilities of BLMIS. (*See* PSR ¶¶ 9-11).

The sheer scale of the Madoff fraud calls for severe punishment.  As a result of his lies about how investor funds would be and were invested and how successful such "investments" supposedly were – lies documented by Madoff and others in millions of pages of false account documents created over a period of decades –  approximately $170 billion of funds flowed into the principal account used by Madoff to perpetrate the Ponzi scheme. (*See* PSR ¶ 16(o)).  As of

---

[1]      The defense does not dispute the applicable Guidelines or Guidelines sentencing range; accordingly, the Government first addresses the Section 3553 sentencing factors, and, for completeness, includes a discussion of the applicable Guidelines in Part B of this Memorandum.

the November 30, 2008 account statements provided to account holders, Madoff had represented to his account holders that they had assets with BLMIS worth approximately $65 billion when, in fact, Madoff had not purchased any securities on their behalf. (*See* PSR ¶¶ 35, 62). According to an analysis prepared for the court-appointed trustee for BLMIS (the "SIPA Trustee"), based just on accounts into which investments were first made between December 1995 and December 2008, approximately 1,341 accounts suffered net losses totaling approximately $13.2 billion.[2] (*See* PSR ¶¶ 90, 116).   The defense does not contest this loss amount.

 Further, reference to these enormous losses captures only in part the harm to victims caused by the Madoff schemes.   As illustrated by the following selected passages from the victim impact statements filed with the Court (in each case filed with the submitter's consent to make such statement a part of the public record), defendant is responsible not only for wiping away the financial resources of many generations within families  – the effects of which will be felt for years to come – but also for causing profound levels of stress and emotional injury:

- He has stolen more than money. . . .  When you determine [his] sentence, I hope you will keep in mind that he has taken not only my 25 years of savings, but also the lifetime of savings of my 80 year-old parents.  Keep in mind how he bathed himself and his family in luxury with our money.  He ruined lives.  He deserves no mercy.  (Jesse L. Cohen, Marcia Cohen, Larry Cohen)

- I invested and trusted over my entire life's savings of $250k.  The effects of this robbery on my family has hit us like a tidal wave.  I have spent many years caring for my husband who has advanced liver disease.  Then in March 09 I was diagnosed with Breast Cancer.  I am now undergoing Chemotherapy, bald, feel unwell.  The devastation that Bernard Madoff has brought into my life has erased

---

[2]    That analysis summed up the losses of investor accounts into which more money was deposited than withdrawn during the period. The Government expects that, as records going back to the 1970s are digitized and analyzed, the estimated losses from defendant's fraud will increase.

all thoughts of man being inherently good.  Mr. Madoff has stolen my health, peace of mind along with my money.  (Rosalind Sabella Clark)

- Many members of my family suffered catastrophic losses including those of my 94 year-old mother who has been rendered penniless and my legally blind sister most of whose life savings have been wiped out. (Donald Schupak)

- Personally, my wife and I invested with Madoff many years ago in planning for our retirement and our five grandchildren's college education.  That now is all lost.  We need to find jobs in order to pay our bills, which we are finding extremely difficult in the current climate.  There is no work available for retired persons and the bills just keep rolling in.  Our grandchildren may not be able to go to college as they were relying on funds from us.  Where does it all end?  Not only has Madoff's fraud caused us great financial hardship, the emotional toll is extreme.  My wife is now taking anti-depressant medication and sleep medication.  We just do not know where to turn.  (Robert and Jacqueline Avergon)

- I have lost the ability to help future generations of my family get an education.  I have lost the ability to help them with housing. . . .  It pains me so much to remember my husband, a fine physician, getting up in the middle of the night and going into the hospital, in snow and ice and rain, to save someone's life so that Bernie Madoff could buy his wife a Cartier watch.  (Maureen Ebel)

- [H]e has caused me untold worry about my family's collective future.  He has caused sleepless nights for us as we try to figure out how to make ends meet. . . .  [H]e has taken away our ability to contribute yearly to the few causes that were close to our hearts.  In other words, he has stolen more than our money.  He has stolen our feeling of security.  (Loretta Weinberg)

- The agony and stress of the last 5 ½ months has been unbelievable.  (Stephanie Halio)

- We now have nothing.  Only living off social security.  I told my father (89) he could not die because I didn't have enough money to bury him.  (Kathleen Bignell)

- At the age of 69, I had to go back to work. I now work 10-12 hours daily trying to make a sufficient amount of money to cover our basic needs.  (Eileen Stone)

- I am 86 years old, I have a broken knee, I have lung cancer and thanks to Madoff, I am now bankrupt.  (Morton J. Chalek)

- My husband is 92 and I am 87 years of age and the distress and misery and anguish his vile acts have caused deserves a severe sentence.  If I could I would charge him with heart break, sadness and tears.  (Shirley Stone)

The defendant's crimes also damaged institutions.  As noted in the PSR, "[t]he extensive list of victims reflects losses incurred by financial institutions, . . . trust funds, . . . pension funds, . . . and charitable organizations, including The Elie Wiesel Foundation ($10,680,922)."  (PSR ¶ 91).  As David Levin noted in his victim impact statement, "[t]he main tragedy for our family and for our community is the loss of our Family Foundation.  With over five million dollars invested with Madoff, the entire Principal of the Foundation, we are no longer able to support the various organizations which depended on us.  These include Food Banks, Homeless Shelters, Homes for the aged, Various Jewish Organizations and a wonderful program for teaching outdoor winter sports to the disabled including all disabilities and more recently for disabled veterans."  In sentencing the defendant, the Court should consider the lost jobs, lost careers, lost retirement funds, lost opportunities for good works, and other lost services that the fraud caused.

Moreover, Madoff's crimes were personal to the account holders (both small and large) to whom he owed a fiduciary duty, and with many of whom he and his firm had a personal relationship over the course of years.  His wholesale breach of duty further warrants the stiffest of punishments.

## 2.    History and Characteristics of the Defendant

Madoff blatantly and repeatedly lied to and violated the trust placed in him by individuals and institutions that invested with BLMIS.  Madoff also committed perjury in testimony before the SEC, caused false financial statements to be filed with the SEC, and made false statements to the SEC in connection with the registration of BLMIS as an investment adviser.  (*See* PSR ¶¶ 35,

9

73, 74).  In so doing, Madoff demonstrated his lack of respect for the law, basic ethical norms and the property of others.  Nor did Madoff hatch his scheme in the face of economic privation – he was fully capable of making a living lawfully.

With respect to his patent disrespect for law and basic ethical conduct, the duration of Madoff's criminal conduct speaks for itself.  His crimes were not a one-time event arising, for example, from a split-second decision made under financial duress.  Rather, Madoff's crimes were the product of a series of decisions made over the course of years, and it was within his power to stop his crimes at any point in time.  Madoff first generated and then sent investors millions of pages of false documents "confirming" securities transactions that had not taken place and "confirming" account balances that amounted to IOUs not worth the paper on which they were printed.  Madoff apparently disregarded – or did not care – that BLMIS account holders made significant life decisions based on those false documents, including estate planning and retirement decisions, decisions about how to care for elderly relatives, decisions about how to fund the education expenses of children and grandchildren, health care decisions, and decisions about charitable contributions, among others.

Although Madoff could have ended his scheme at any time, he chose not to do so.  Instead, Madoff waited until late 2008, but only after he ran out of ways to keep the fraud alive.  By then, when he revealed to his sons his purported plans to turn himself in, his scheme was on the verge of collapsing under its own weight.  (*See* PSR ¶¶ 37-39).  Within days, investors would have been unable to redeem billions of dollars and inevitably would have complained to the authorities.

Importantly, in the days immediately prior to his arrest on December 11, Madoff made

10

other decisions that revealed his character.  Specifically, Madoff made plans to distribute to employees, family, and close associates the remaining cash that BLMIS had on hand; in fact, $173 million in signed checks were found in his office's desk drawer.  (*See* PSR ¶¶ 39, 43). Madoff's willingness to disregard his fiduciary duty right up until the very end, and to favor family and employees over others to whom he owed that duty, further demonstrates his lack of character.  And, whatever intentions he may have voiced, he did not admit his conduct to the Government until he was confronted by Special Agents of the Federal Bureau of Investigation ("FBI") on the morning of December 11, 2008.  (*See* PSR ¶ 42).

Furthermore, Madoff did not initiate his criminal scheme in response to economic hardship.  (*See* PSR ¶¶ 141, 176-78).  He had every opportunity to succeed in life through legitimate work, given his college education and supportive family.  Madoff chose instead to abandon honest work to pursue riches and influence through crime, and he used the proceeds of those crimes to enjoy a lavish lifestyle that included well-appointed homes in Montauk, New York, Palm Beach, Florida, Cap d'Antibes, France, and on Park Avenue in Manhattan. (PSR ¶¶ 144-148).  He also used investor funds to benefit himself and his family through millions of dollars in below market interest rate loans to his brother and his sons, purchased yachts, shares in private jets, country club memberships, and paid the salaries of personal employees (including his boat captain, housekeepers in New York and Florida, and a house-sitter in Florida) and his sister-in-law (who did no work for BLMIS).  (PSR ¶¶ 82-85).

Next, Madoff demonstrated his willingness to deceive not only through his execution and management of the fraud, but also through his deceit in the face of investigation.  Whenever an investigation threatened to uncover his fraud, Madoff resorted to obstruction and lies.  For

11

example, Madoff repeatedly lied under oath at a deposition in an SEC proceeding, caused false

financial statements to be filed with the SEC that did not, among other things, accurately reflect

BLMIS's liabilities, and filed false descriptions of his investment advisory business.

### 3.    The Need To Afford Adequate Deterrence

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to

criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered.  Here, the Government

respectfully submits that a life sentence is necessary to serve this purpose.

The enormity and audacity of Madoff's crimes has understandably captured the attention

of both the public, generally, and members of the financial services industry specifically.  Thus,

the deterrent message and effect of the sentence imposed by the Court in this case will resonate

significantly with any individual or institution tempted to engage in conduct similar to Madoff's.

This need for deterrence is especially important at smaller institutions like BLMIS – a private

company – where individuals may operate under the mis-impression that they are "under the

radar screen," and can avoid scrutiny or significant jail terms.  The Government further

respectfully submits that the Court should consider that Madoff's conduct occurred before and

continued for years *after* the well-publicized stiff sentences were meted out in *WorldCom*,

*Adelphia*, *Refco*, and other recent fraud cases involving breaches of duty by financial and

corporate professionals and substantial economic harm.  The term of imprisonment imposed here

should reinforce the deterrent message conveyed by those prior sentences.

### 4.    The Need To Avoid Unwarranted Sentence Disparities

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted

sentencing disparities."  But, here, because Madoff is not similarly situated to any other

defendant, the sentence requested by the Government could not generate a cognizable disparity.

Any comparison of Madoff's case to recent, long-lasting and substantial fraud cases prosecuted in this District – for example, Bernard Ebbers (WorldCom; 25 years), John and Timothy Rigas (Adelphia; 12 and 17 years, respectively, on re-sentencing), Phillip Bennett (Refco; 16 years), and Samuel Israel (Bayou; 20 years) – simply underscores the enormity of the harm caused by defendant's conduct, the scope and complexity his schemes, and the duration of his fraud.  While the above-cited defendants engaged in egregious conduct meriting severe punishment, Madoff's conduct is unique in its scope and duration.  His fraud was perpetrated month-by-month and year-by-year, at his own choosing and under his direction, for decades, and involved billions and billions of dollars in investor losses.

### 5.      The Need To Provide Restitution

Section 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims of the offense" in fashioning a sentence.  Following a Government motion, on June 24, 2009, the Court found that "the number of victims, the difficulties posed by the lack of proper record-keeping, and the scope, complexity, and duration of the fraud make it impossible, at this stage, to determine whether restitution is practicable" and, accordingly, pursuant to 18 U.S.C. § 3664(d)(5), extended the time for determining whether restitution is practicable for 90 days to permit the Government to continue to analyze records to identify victims and their losses.  As the Government reiterated in its motion papers on June 19, the Government is committed to the distribution of forfeited assets to victims as soon as practicable, and is continuing, along with the SIPA Trustee, to marshal and forfeit assets for that purpose.  The extension will neither hinder nor delay the Government's efforts to maximize the recovery of victims.

### 6.   The Contentions of the Defense Lack Merit

In its sentencing submission, the defense seeks to obtain credit for Madoff for (a) effectively turning himself in prior to the fraud's detection, (b) not fleeing the country, (c) willingly submitting to FBI custody on December 11, 2009, (d) cooperating fully with bail conditions, (e) pleading guilty, (f) accepting responsibility for his actions, (g) taking steps to assist the Government in preserving, transferring and liquidating assets for the benefit of victims, and (h) meeting with the Inspector General of the SEC and cooperating with the SIPA Trustee. (*See* June 22, 2009 Sentencing Letter of Ira Lee Sorkin, Esq. referred to herein as "Def.'s Ltr.," at 2-3). The defense suggests that a term of incarceration of twelve years is appropriate, given his life expectancy, so that he does not receive what would otherwise effectively be a life sentence. (Def.'s Ltr. at 3). Alternatively, the defense suggests that a term of fifteen to twenty years' incarceration would be appropriate to prevent disparities in treatment among "similarly situated non-violent offenders." (*Id.*).

Madoff's claim that he deserves credit for "turning himself in" misses the mark. In fact, Madoff waited to tell his family of his purported plans to turn himself in only when it became clear, and inevitable, that his scheme would collapse, he was almost out of money, and he faced redemption requests that he knew he could not meet. (*See* PSR ¶¶ 36-40). Even then, he took steps that were inconsistent with any real acceptance of responsibility for his acts. For example, he directed the preparation of approximately 100 checks totaling $173 million made out to preferred customers, employees, friends and family, thereby attempting to dissipate investors' remaining assets. (*See* PSR ¶ 43). Had the FBI not arrested him the next day, he might well have succeeded.

Nothing that Madoff has done since his arrest should receive more than minimal weight in the sentencing calculus. The Guidelines adequately take account of the defendant's entry of a guilty plea and acceptance of personal responsibility. (*See* U.S.S.G. §§ 3E1.1(a) and (b)). Moreover, although Madoff did not contest the transfer and liquidation of his assets after his arrest, he plainly could not have prevailed had he done anything differently. Fleeing was not a realistic option, in light of his apparent interest in attempting to shield all others from culpability, and resisting arrest by the FBI would have been futile once agents were at his doorstep. The defense's assertion that Madoff followed all bail conditions ignores the fact that he and his wife mailed approximately $1 million of watches and jewelry in violation of the Honorable Louis B. Stanton's order in the parallel SEC civil case and, in any event, adds little to counterbalance the character of the defendant so amply demonstrated by his decades of crimes. (*See* PSR ¶ 26). Furthermore, according to counsel to the SIPA Trustee, "Mr. Madoff has not provided meaningful cooperation or assistance to the Trustee since his arrest." (June 25, 2009 Ltr. from David Sheehan, Esq. to the Court). And, the defense's speculation about the results of his recent meeting with the SEC Inspector General should be given little credence. Indeed, the Inspector General has informed the Government that Madoff's information will <u>not</u> "shape and fortify the future of Wall Street regulation and oversight." (*See* Def.'s Ltr. at 3).

Moreover, the defense request for a 12-year sentence should also be rejected because such a sentence would not distinguish this case from the mine run of securities fraud cases that in this District regularly result in sentences of 10 to 15 years. Indeed, the Guidelines call for a sentence

of 11 to 14 years in a typical securities fraud case involving losses less than $20 million.[3]  Such

crimes are serious, and are deserving of commensurate punishment; however, in this case,

sentencing the defendant to a term of imprisonment comparable to that regularly imposed on

much smaller-dollar fraud cases would not adequately account for the magnitude of defendant's

crimes and would result in the very sentencing disparity that Section 3553(a)(6) and the

Guidelines seek to prevent.

**B.    Application of Sentencing Guidelines**

Under the applicable Sentencing Guidelines, Madoff is in Criminal History Category I,

and has an adjusted offense level of 52.   The Guidelines therefore call for a sentence of life

imprisonment. *See* U.S.S.G. § Ch. 5, Pt. A.  Because Madoff is not charged with any offense that

carries a maximum term of life imprisonment, the Sentencing Guidelines require that the Court

add the applicable statutory maximums on all counts of conviction, which results in a Guidelines

sentence of 150 years' imprisonment.[4]  *See* U.S.S.G. § 5G1.2(d).

Although no longer binding upon the Court, the Guidelines represent the considered

judgment of the U.S. Sentencing Commission, a body of experts, drawn from all areas of the

_____

[3]        This is based on a base offense level of 7 (Section 2B1.1(a)(1)), 20 levels for a
loss greater than $7 million (Section 2B1.1(b)(1)(K)), 2 levels for ten or more victims (Section
2B1.1(b)(2)(A)), and 4 levels for committing securities fraud while associated with a broker-
dealer or investment adviser (Section 2B1.1(b)(16)(A)).   An offense level of 33 in Criminal
History Category I yields a Guidelines range of 135-168 months.

[4]        The Guidelines sentence is calculated as follows: 20 years on each of Counts One
(Securities Fraud), Three (Mail Fraud), Four (Wire Fraud), Five and Six (International Money
Laundering), and Ten (False Filing With The SEC); 10 years on Count Seven (Money
Laundering); and 5 years on each of Counts Two (Investment Adviser Fraud), Eight (False
Statements), Nine (Perjury) and Eleven (Theft From An Employee Benefit Plan).

legal profession, specifically created to determine the appropriate sentence in particular types of cases.   As the Honorable Gerard E. Lynch has recognized, it is important for "rational judges [to] seek guidance . . . in the collective judgment of their peers and of institutions that have sought to develop a logical structure for guiding their discretion, such as the Sentencing Commission." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 426 (S.D.N.Y. 2004). Judge Lynch further noted the significance of the Guidelines "as an advisory system of principles that both (1) sets a general level of severity of sentences deemed appropriate by a judicious body of politically-responsible experts, and (2) creates a methodology and enumerates factors to be applied to assess the seriousness of criminal conduct and the severity of an offender's criminal record." *Emmenegger*, 329 F. Supp. 2d at 426.   And both the *Booker* and *Crosby* courts stressed the continuing significance of the Guidelines under the new sentencing framework.

The Guideline Sentence in this case reflects the seriousness of the offenses of conviction and the particular aggravating factors relating to Madoff's conduct.   Because each of the offenses of conviction is fraud-related and grouped, Section 2B1.1 determines the applicable offense level.   Under Section 2B1.1, and including applicable Chapter Three adjustments, the defendant's offense level is 52, calculated as follows: base offense level of 7 (2B1.1(a)(1)), 30 levels for a loss of more than $400 million (2B1.1(b)(1)(P)), 6 levels for more than 250 victims (2B1.1(b)(2)(C)), 2 levels for a substantial part of the scheme being committed outside the United States (2B1.1(b)(9)), 2 levels for endangering the financial security of 100 or more individuals (2B1.1(b)(14)(B)),[5] 4 levels for committing the crimes through a registered

---

[5]      Although this enhancement normally calls for a four-level increase, only two levels are added pursuant to a reduction for overlapping enhancements pursuant to U.S.S.G. § 2B1.1(b)(14)(C).

investment adviser or broker-dealer (2B1.1(b)(16)(A)), 4 levels for his role as an organizer or

leader (3B1.1(a)), and a reduction of 3 levels for acceptance of responsibility for his role in the

offense (3E1.1). (PSR ¶¶ 114-128).

Madoff does not contest any of the Guideline calculations set forth above; nevertheless,

for the sake of completeness, the Government briefly reviews below the bases for these

calculations.

### 1.    Loss

In determining the amount of loss resulting from a fraud offense, the sentencing court is

not required to compute the loss "'with precision.'" *United States* v. *Jacobs*, 117 F.3d 82, 95 (2d

Cir. 1997) (quoting U.S.S.G. § 2F1.1, comment. (n.9) (1987)). Instead, the applicable Guidelines

provide that:

> The court need only make a reasonable estimate of the loss. The
> sentencing judge is in a unique position to assess the evidence and
> estimate the loss based upon that evidence. For this reason, the
> court's loss determination is entitled to appropriate deference.

U.S.S.G. § 2B1.1, comment. (n.3(C)); *see also United States* v. *Bennett*, 252 F.3d 559, 565 (2d

Cir. 2001) (court need only make reasonable estimate of loss). As the Sentencing Commission

explained, following the passage of the Sarbanes-Oxley Act of 2002, Pub. Law 107-204, the loss

table was increased, as well as other enhancements added, to "punish adequately offenses that

cause catastrophic losses of magnitudes previously unforseen" and "address congressional

concern regarding particularly extensive and serious [corporate] fraud offenses." U.S.S.G. App.

C, amend. 647.

In view of these standards, Madoff is responsible, under the Sentencing Guidelines, for a

loss of no less than $13 billion – far in excess of the maximum loss threshold of $400 million in

the Section 2B1.1(b).  (*See* PSR ¶ 116).  A conservative valuation of the losses that resulted from

Madoff's crimes – more than $13 billion – is more than thirty-two times the maximum loss

threshold established by the Guidelines.  Moreover, although the loss amount is responsible for

37 of the 52 offense levels attributable to defendant's conduct, the applicable Guidelines range

reflects numerous other enhancements, discussed below, that apply given Madoff's offense

conduct and role.  Given those enhancements, any finding of loss greater than $7 million

(assuming all the other enhancements would still apply) would yield an identical result.

### 2. More than 250 Victims

Pursuant to Section 2B1.1(b)(2)(C), the defendant's offense level should be enhanced six

levels because the offense involved more than 250 victims.  Here, Madoff's offenses involved

thousands of account holders, with an unknown number of thousands of victims who had

interests in those accounts who were proximately harmed by Madoff's crimes.  (*See* PSR ¶ 87).

### 3. Substantial Part Of The Fraudulent Scheme Committed From Outside The United States

Section 2B1.1(b)(9)(B) provides for a two-level sentencing enhancement if "a substantial

part of a fraudulent scheme was committed from outside the United States."  U.S.S.G. §

2B1.1(b)(9)(B).  A substantial part of Madoff's fraudulent conduct clearly was conducted from

outside the United States.  Among other things, Madoff wired hundreds of millions of dollars of

investor funds to Madoff Securities Investments Ltd. accounts in the United Kingdom in part to

fraudulently create the appearance that he was engaged in trading on behalf of clients in Europe

when, in fact, he was not.  (*See* PSR ¶¶ 68, 71).

19

### 4.      Endangering Solvency and Financial Security

Section 2B1.1(b)(14)(B)(iii) provides for a four-level increase if an offense "substantially endangered the solvency or financial security of 100 or more individuals."[6] This enhancement reflected the Commission's conclusion "that the specificity of Section 805(a)(4) [of Sarbanes-Oxley] required an enhancement focused specifically on conduct that endangers the financial security of individual victims.  Thus, use of this prong of the enhancement will be appropriate in cases in which there is sufficient evidence for the court to determine that the amount of loss suffered by individual victims of the offense substantially endangered the solvency or financial security of those victims."  U.S.S.G., App. C, amend. 647.  The Commission also concluded that this enhancement should be applied cumulatively with that for the number of victims "to reflect the particularly acute harm suffered by victims of offenses for which the new prongs of subsection (b)([14](b) apply."

As noted in the PSR, based on the SIPA Trustee's analysis of accounts that first invested during or after December 1995, and which suffered a loss as described at p. 7, n. 2, *infra*, there were approximately 864 accounts that suffered losses of more than $1 million.  (*See* PSR ¶ 119). As noted previously, it is quite likely that there are numerous victims with an economic interest in any given account.  Accordingly, it is likely that the number of victims who suffered losses of more than $1 million is significantly understated.  Thus, this enhancement plainly applies.

### 5.      Registered Broker-Dealer/Investment Adviser

Sections 2B1.1(b)(16)(A)(ii) and (iii) provides that if an offense involved a violation of

---

[6]       The Guidelines state, however, that in cases such as this, where the 6-level adjustment for more than 250 victims applies, only two levels are added pursuant to U.S.S.G. § 2B1.1(b)(14)(C).

the securities laws and the defendant was, at the time of the offense, a registered broker or dealer, or a person associated with a broker or dealer, or was an investment adviser or a person associated with an investment adviser, the offense level should be enhanced four levels.

This enhancement applies in light of Madoff's ownership and control over BLMIS, which was a registered broker-dealer at all times pertinent to the offenses, and was during the final years of the scheme registered as an investment adviser. (*See* PSR ¶¶ 29, 30, 35). The enhancement, of course, makes sense given the "heightened fiduciary duties imposed by securities law upon such individuals." U.S.S.G. App. C, amend. 647.

### 6.    Leadership Role

Section 3B1.1 provides for a sentencing enhancement where the defendant is the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Madoff organized and led this fraud. Numerous clerical employees and others assisted Madoff in the operation of his business, and it would not have been possible to execute his scheme without their assistance. Although the Government's investigation is continuing, and will not end with the sentencing of the defendant, this enhancement properly applies, even before any additional charges are brought. It is sufficient that the scheme was "otherwise extensive," as Madoff's scheme undeniably was. (*See* PSR ¶ 122). A four-level enhancement under Section 3B1.1(a) is therefore warranted.

## **CONCLUSION**

As set forth above, the Government respectfully submits that a reasonable sentence in this case would be a the Guidelines sentence of 150 years or, alternatively, a term of years that both would assure that Madoff will remain in prison for life, and forcefully would promote general deterrence.

Dated:   New York, New York
         June 26, 2009

Respectfully submitted,

LEV L. DASSIN
Acting United States Attorney
Southern District of New York

By:  /s/ _____

MARC LITT
LISA A. BARONI
Assistant United States Attorneys
(212) 637-2295 / 2405