UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------
UNITED STATES OF AMERICA                          09-CR-213 (DC)

v.

BERNARD L. MADOFF,

      Defendant.


-----------------------------------------------------


# MEMORANDUM OF LAW IN SUPPORT OF VICTIMS' MOTION FOR RECONSIDERATION



PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
Attorneys for Diane and Roger Peskin and
Maureen Ebel


Of counsel

Helen Davis Chaitman, Esq.

1092276.1

# TABLE OF CONTENTS

**Page**

Table of Authorities .................................................................................................... i

Preliminary Statement.................................................................................................. 1

STATEMENT OF FACTS ........................................................................................... 3

ARGUMENT................................................................................................................. 4

   SIPA REQUIRES SIPC TO PAY BASED UPON THE CUSTOMER'S
   LAST STATEMENT.................................................................................................. 4

   AT THE URGING OF SIPC AND THE SEC, THE SECOND
   CIRCUIT HAS RECOGNIZED THE CORRECT DEFINITION OF
   "NET EQUITY" ........................................................................................................ 5

   SIPC IS DESTROYING INVESTOR CONFIDENCE IN DIRECT
   VIOLATION OF CONGRESSIONAL INTENT.......................................................... 9

   CONGRESS INTENDED TO PROTECT VICTIMS OF A PONZI
   SCHEME .................................................................................................................. 11

   THE SEC AND SIPC REPRESENTED TO THE SECOND CIRCUIT,
   IN *NEW TIMES,* THAT IT WAS APPROPRIATE TO RECOGNIZE
   THE APPRECIATION IN ACCOUNTS OF CUSTOMERS WHO
   HAD A LEGITIMATE EXPECTATION THAT THE STATEMENTS
   WERE ACCURATE.................................................................................................. 11

CONCLUSION............................................................................................................. 18

# TABLE OF AUTHORITIES

## CASES

In re Adler Coleman Clearing Corp., 247 B.R. 51 (B. S.D.N.Y. 1999) ..........................................6

Appleton v. First National Bank of Ohio, 62 F.3d 791 (6th Cir. 1995).........................................10

In re First Street Sec. Corp., 34 B.R. 492 (B. S.D. Fla. 1983).........................................................9

In re New Times Sec. Services, Inc., 463 F.3d 125 (2d Cir. 2006) .....................................7, 8, 13,
15, 16, 17,
18, 19

In re New Times Securities Services, Inc., 371 F.3d 68 (2d Cir. 2004) ..............................6, 7, 10,
13, 14, 15

In re Oberweis Sec., Inc., 135 B.R. 842 (B. N.D. Ill. 1991).........................................................14

Rich v. NYSE, 522 F.2d 153 (2d Cir. 1975)....................................................................................9

SEC v. Goren, F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-CV-970) .............................................17

Securities Investor Protection Corp. v. BDO Seidman, LLP, 49 F. Supp. 2d 644
(S.D.N.Y. 1999) ............................................................................................................................6

## STATUTES

§ 8(d), Pub. L. No. 95-283, 92 Stat. 249, 263 (1978) ...................................................................11

17 C.F.R. §§ 300.500-300.503.......................................................................................................14

Pub. L. No. 91-598, 84 Stat. 1636, 1648-50 (1970) .....................................................................10

15 U.S.C. § 78ccc(b)(4) ...................................................................................................................5

15 U.S.C. § 78fff(a)(1)......................................................................................................................5

15 U.S.C. § 78fff-2(d)......................................................................................................................11

15 U.S.C. § 78fff-3(a) .......................................................................................................................9

15 U.S.C. §78lll(11)...........................................................................................................................5

18 U.S.C. Section 3663A(c)(3).........................................................................................................2

## Preliminary Statement

Diane and Roger Peskin, Maureen Ebel and a large group of victims (the "Victims") of the fraud of Bernard L. Madoff who invested their life savings in Bernard L. Madoff Investment Securities, LLC ("Madoff") submit this memorandum of law with respect to the Government's motion for remission pursuant to 18 U.S.C. Section 3663A(c)(3).

The Victims agree with the Government that restitution to persons "directly and proximately harmed" by the Madoff fraud is mandatory and that the Government has an obligation under the Crime Victims' Rights Act to ensure that crime victims receive "full and timely restitution as provided in law." 18 U.S.C. Sections 3663A(a)(1) and 3771(c)(1).

However, the Victims strongly object to the Government's stated intention to seek the assistance in the remission process of Irving H. Picard, the Trustee appointed at the behest of the Securities Investor Protection Corporation ("SIPC") in the liquidation of Madoff pursuant to the Securities Investor Protection Act ("SIPA"). SIPC was formed to assess its members, the SEC-regulated broker/dealers, so as to establish a fund to provide insurance against the fraud or dishonesty of a broker or dealer.

Unfortunately, the 38-year history of SIPC proves that it has functioned like a commercial insurance company, seeking to enrich itself at the expense of the insureds, innocent investors who lost money because of the fraud or dishonesty of a broker or dealer. Picard is the last person in the world who should be involved in the remission process because he has proven, in the ten months of his appointment, that his loyalty is solely to SIPC and he has violated the clear provisions of SIPA, its legislative history,

and controlling Second Circuit authority in order to enrich SIPC at the expense of the victims.

The Government mistakenly relies, for example, upon Picard's analysis of the customer claims. According to Picard, of the 15,870 claims that have been filed, only 2,336 are valid because only 2,336 customers had a net loss. Thus, Picard has reduced the victims entitled to SIPC insurance from 15,870 to 2,336 and reduced SIPC's liabilities from more than $7 billion to approximately $1.2 billion.

However, the term "net loss" does not appear anywhere in SIPA. On the contrary, as set forth in greater detail herein, SIPC is obligated under SIPA to "promptly" replace securities held by each Madoff customer up to a value of $500,000 as reflected on the November 30, 2008 statements received by each customer from Madoff. Picard, acting as SIPC's puppet, has devised a scheme to reduce SIPC's exposure by inventing a new statutory provision of SIPA pursuant to which victims are only entitled to SIPC insurance if they have a net loss, over the life of their investment. There is no support for this formulation under SIPA, its legislative history, its regulations, or the controlling Second Circuit authority to which both SIPC and the Securities and Exchange Commission ("SEC") consented.

In fact, there is a very simple procedure for establishing the loss of the vast majority of customers: one can simply look at their tax returns which reflect the payment of tens of billions of dollars of taxes on purported income in the victims' Madoff accounts since the 1970's. The only victims for whom this would not be a measure of loss are IRA and other deferred benefit investors. But, as to these investors, the last

2

account statements they received from their IRA custodians would accurately reflect their losses.

The reason Picard has not abided by the clear provisions of SIPA is that SIPC does not want to assess its members, the SEC-regulated broker/dealers, as it has been required to do under SIPA.  Congress repeatedly warned SIPC that it was under-funded. Yet, SIPC chose to charge its members a mere $150 per year for the privilege of printing on hundreds of billions of dollars of trade confirmations that the customers' accounts were insured up to $500,000 by SIPC.  (Yes, Goldman Sachs paid a mere $150 per year for SIPC insurance for all of its customers' accounts.)  Having provided essentially free insurance to the financial services industry, which was vastly enriched by the public's reliance upon SIPC insurance, SIPC has now violated the public trust, through Picard, in depriving the victims of the prompt replacement of up to $500,000 of securities listed on their November 30, 2008 statements.  Aside from the devastation Picard has caused to thousands of customers, he has created a serious threat to the national economy because he is single-handedly destroying investor confidence in the capital markets.

Thus, giving Picard a role in the remission process is like putting the fox in charge of the hen house.

## STATEMENT OF FACTS

The Court is respectfully referred to the accompanying declaration of Helen Davis Chaitman dated September 29, 2009.

3

## ARGUMENT

### SIPA REQUIRES SIPC TO PAY BASED UPON THE CUSTOMER'S LAST STATEMENT

Pursuant to SIPA, Picard is obligated to "satisfy net equity claims of customers."

15 U.S.C. § 78fff(a)(1)(A)-(B).  SIPA defines "net equity" as the value of the securities

positions in the customer's account as of the SIPA filing date, less any amount the

customer owes the debtor.  This is the Statutory Balance of each customer's account.

> The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by –
>
> (A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus
>
> (B) any indebtedness of such customer to the debtor on the filing date. . .

15 U.S.C. §78lll(11).

Congress specifically prohibited SIPC from changing any definitions contained in

§ 78lll, which section includes the definition of "net equity."  As stated in SIPA:

> SIPC shall have the power. . . to adopt, amend and repeal, by its Board of Directors, such rules as may be necessary or appropriate to carry out the purposes of this chapter, including rules relating to . . .the definition of terms in this chapter, **other than those terms for which a definition is provided in section 78lll of this title. .**

15 U.S.C. § 78ccc(b)(4)(A) (emphasis added).  Because SIPC has no power to change the

statutory definition of "net equity," SIPC has no power to employ a "cash in minus cash

out" definition of net equity in the Madoff case.

In a May 2001 Report, the United States General Accounting Office, wrote:

> **SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash and/or securities held at a failed firm.  SIPC fulfills its mission by**

4

> initiating liquidation proceedings where appropriate and transferring customer accounts to another securities firm or returning the cash or securities to the customer **by restoring to the customer accounts the customer's "net equity." SIPA defines net equity as the value of cash or securities in a customer's account as of the filing date, less any money owed to the firm by the customer, plus any indebtedness the customer has paid back** with the trustee's approval within 60 days after notice of the liquidation proceeding was published.

See Exh. A: GAO Report to the Ranking Minority Member, Energy and Commerce

Committee, House of Representatives entitled "Securities Investor Protection:  Steps

Needed to Better Disclose SIPC Policies to Investors," (the "GAO Report") at 15;

emphasis added).

## AT THE URGING OF SIPC AND THE SEC, THE SECOND CIRCUIT HAS RECOGNIZED THE CORRECT DEFINITION OF "NET EQUITY"

The Second Circuit has recognized the statutory definition of net equity:

> Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" corrected for "any indebtedness of such customer to the debtor on the filing date."

*In re New Times Securities Services, Inc.*, 371 F.3d 68, 72 (2d Cir. 2004); *see also*

*Securities Investor Protection Corp. v. BDO Seidman, LLP,* 49 F. Supp. 2d 644, 649

(S.D.N.Y. 1999) ("As defined by SIPA, 'net equity' is the amount that the broker would

have owed a customer had it liquidated all the customer's holdings on the date SIPC filed

for a protective decree, less any outstanding debt the customer owed to the broker."); *In*

*re Adler Coleman Clearing Corp.*, 247 B.R. 51, 61 n. 2 (B. S.D.N.Y. 1999) ("'Net

equity' is calculated as the difference between what the debtor owes the customer and

what the customer owes the debtor on the date the SIPA proceeding is filed.").

5

In the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a lengthy period and had never purchased the securities reflected on the customers' monthly statements.  In fact, SIPC's President, Stephen Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 **including the appreciation** in their accounts.  As Mr. Harbeck explained, if customers are led to believe that "real, existing" securities had been purchased for their accounts, then those customers are entitled to get the full value of their securities positions as of the filing date even if the securities had never been purchased:

> MR. HARBECK:  **Even if they're not there.**
>
> THE COURT:  Even if they're not there.
>
> MR. HARBECK:  Correct.
>
> THE COURT:  In other words, **if the money was diverted, converted –**
>
> MR. HARBECK:  And the **securities were never purchased**.
>
> THE COURT:  Okay.
>
> MR. HARBECK:  **And, if those positions triple, we will gladly give the people their securities positions**.

Hearing Transcript at 37-38, *In re New Times Sec. Servs. Inc.*, 371 F.3d 68 (B. E.D.N.Y. 2000) (emphasis added), annexed as Exh. B.

In a brief SIPC submitted to the Second Circuit in 2005, **SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities**.  SIPC wrote:

> [R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality.  Thus, for

example, **where a claimant orders a securities purchase and receives a
written confirmation statement reflecting that purchase, the claimant
generally has a reasonable expectation that he or she holds the
securities identified in the confirmation and therefore generally is
entitled to recover those securities (within the limits imposed by
SIPA), even where the purchase never actually occurred and the
debtor instead converted the cash deposited by the claimant to fund
that purchase** . . . [T]his emphasis on reasonable and legitimate claimant
expectations frequently yields much greater 'customer' protection than
would be the case if transactional reality, not claimant expectations, were
controlling, as this Court's earlier opinion in this liquidation well
illustrates.

See Exh. C: Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27,

2005) at 23-24 (citing *New Times*)(emphasis added).

SIPC's position in the Madoff case is directly contradicted, not only by SIPC's

prior treatment of customers in *New Times*, but also by a statement that SIPC's general

counsel, Josephine Wang, gave to the press on December 16, 2008 wherein Ms. Wang

acknowledged that a Madoff customer is entitled to the securities in his account:

Based on a conversation with the SIPC general counsel, Josephine Wang,
if clients were presented statements and had reason to believe that the
securities were in fact owned, the SIPC will be required to buy these
securities in the open market to make the customer whole up to $500K
each.  So if Madoff client number 1234 was given a statement showing
they owned 1000 GOOG shares, even if a transaction never took place, the
SIPC has to buy and replace the 1000 GOOG shares.

See Exh. D: December 16, 2008 Insiders' Blog,

http://www.streetinsider.com/Insiders+Blog/SIPCs+Role+In+Madoff-Of-All-

Scams+Could+Save+The+Stock+Market/4243249.html

SIPC's position conflicts with other federal statutes including the Internal

Revenue Code and ERISA.  For example,

(a)     IRS Form 4506 requires the IRS to destroy returns after seven
years.  Yet, the Trustee is refusing to pay SIPC insurance to Customers who cannot
produce records of deposits dating back 15 – 20 years.

7

(b)     Rev. Proc. 2009-20, issued by Commissioner Shulman on March 17, 2009, expressly recognizes the income earned by Customers, on which they paid taxes annually. Yet, the Trustee has taken the position that the income earned by Customers is not their money.

(c)     Rev. Proc. 2009-20 provides for a five-year carryback of the theft loss. Yet, the Trustee has indicated he intends to "claw back" income withdrawn by Customers over the last six years.

(d)     Customers were required by law to take mandatory withdrawals from their IRA accounts. Yet, the Trustee is deducting from SIPC insurance the mandatory withdrawals that Customers took and paid taxes on.

Because of his refusal to comply with SIPA's mandate that he "promptly" satisfy customer claims based on the Statutory Balances, 15 U.S.C. § 78fff-3(a) and 4(c), Picard has decided that he needs a vast team of forensic accountants to pore through decades of records to determine each Customer's net investment before SIPC pays any amount to a Customer. Clearly, this is inconsistent with the statutory scheme and the legislative intent.

Customers' "securities positions" are readily ascertainable from their November 30, 2008 statements. Moreover, the Customers did not have any "indebtedness" to Madoff. They did not owe Madoff any cash or securities since they did not borrow from Madoff on margin. *See* H.R. Rep. No. 95-746, at 4754 (1977) (describing customers owing cash or securities to the stockbroker as "margin customers"), *Rich v. NYSE*, 522 F.2d 153, 156 (2d Cir. 1975) (under the 1970 statutory regime, when there were shortages of securities to satisfy "net equity" claims, customers received cash for their securities "less, in the case of holders of margin accounts, amounts owed" to the broker); *In re First Street Sec. Corp.*, 34 B.R. 492, 497 (B. S.D. Fla. 1983) (offsetting indebtedness of customer to broker from claim amount where unauthorized stock purchase was partially

8

funded by borrowing on margin). Because the Customers have no indebtedness to

Madoff, there is no need to perform any calculations whatsoever to determine the amount

of Customers' net equity. Their net equity is simply the "securities positions" set forth on

their last statements.

## SIPC IS DESTROYING INVESTOR CONFIDENCE IN DIRECT VIOLATION OF CONGRESSIONAL INTENT

The purpose of SIPA, as evidenced by its title, was to "protect" investors who

allowed the Financial Services Industry to hold their life savings in street name securities.

*See, e.g.,* H.R. Rep. No. 91-1613, at 3-4 (1970)("[SIPA] will reinforce the confidence that

investors have in the U.S. securities markets."). *See also In re New Times*, 371 F.3d at 87

("[T]he [SIPA] drafters' emphasis was on promoting investor confidence in the securities

markets and protecting broker-dealer customers."); *Appleton v. First Nat'l Bank of Ohio*,

62 F.3d 791, 794 (6th Cir. 1995) ("'Congress enacted [SIPA] to . . . restore investor

confidence in the capital markets[ ] and upgrade the financial responsibility requirements

for registered brokers and dealers.")(citations omitted). SIPA attempted to do this

initially by satisfying customers' "net equity" claims for securities with actual securities

only if the debtor held securities of the appropriate class and kind to satisfy customers'

claims, while otherwise customers would receive the cash equivalent of the value of their

securities on the filing date. SIPA § 6(c)(2)(B)-(D), Pub. L. No. 91-598, 84 Stat. 1636,

1648-50 (1970); H.R. Rep. No. 95-746 (39-41)(statement of SIPC Chairman Hugh F.

Owens).

When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest

shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978

amendments], *[i.e.],* . . . **the failure to meet legitimate customer expectations of**

9

**receiving what was in their account at the time of their broker's insolvency.**" D 922

Cong. Rec. H. 36326 (daily ed. Nov. 1, 1977)(statement of Rep. Robert C.

Eckhardt)(emphasis added).  See also Hearing on H.R. 8064 Before the Subcomm. on

Consumer Protection and Finance of the H. Comm. On Interstate and Foreign Commerce,

94th Cong. 63 (1975)("The basic framework of the 1970 Act in regard to satisfaction of

customers' claims should be modified to better meet the legitimate expectations of

customers.") (report to the SIPC Board of Directors by the Special Task Force to consider

possible amendments to SIPA); Hearing on H.R. 8331 before the Subcomm. on

Consumer Protection and Finance of the H. Comm. on Interstate and Foreign Commerce,

95th Cong. 81 (1977) ("The proposed [1978] amendments carry out the Task Force

recommendations and are designed to make the Act more responsive to the reasonable

expectations of investors.") (statement of SIPC Chairman Hugh F. Owens); Hearing on

H.R. 8064 Before the Subcomm. on Consumer Protection and Finance of the H. Comm.

on Interstate and Foreign Commerce, 94th Cong. 161-162 ("[T]he principal purpose of

these amendments is to meet more nearly the reasonable expectations of brokerage firm

customers.")(statement of SEC Commissioner Philip A. Loomis, Jr.).

　　　A customer's reasonable expectations were that their actual securities, as shown

on their statements, would be returned to them "in the form they existed on the filing

date." H.R. Rep. No. 95-746, at 21.  Thus, SIPA was amended to state that "[t]he trustee

shall, to the extent that securities can be purchased in a fair and orderly market, purchase

securities as necessary for the delivery of securities to customers in satisfaction of their

claims for net equities. . ." 15 U.S.C. § 78fff-2(d); SIPA § 8(d), Pub. L. No. 95-283, 92

Stat. 249, 263 (1978).

Here, the legitimate expectations of the Customers were contained in the account statements and trade confirmations they received. They expected that their accounts held the securities reflected therein. Thus, recognizing Customer claims in the amount of their Statutory Balances will further the goals of SIPA, as memorialized in the legislative history.

**CONGRESS INTENDED TO PROTECT VICTIMS OF A PONZI SCHEME**

Congress **specifically contemplated** that "securities positions" reflected in a customer's statements could include securities that were never actually purchased, as was the case here. The Senate and House Reports on the 1978 amendments to SIPA show that SIPA was intended to cover securities that the broker-dealer did not actually purchase:

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, **never purchased** or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. . . By seeking to make customer accounts whole and returning them to customers in the form they existed on the filing date, the amendments. . . would satisfy the customers' legitimate expectations. . . .

S. Rep. No. 95-763, at 2 (1978) (emphasis added).

> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, **never purchased**, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. No. 95-746 at 21 (emphasis added).

**THE SEC AND SIPC REPRESENTED TO THE SECOND CIRCUIT, IN *NEW TIMES*, THAT IT WAS APPROPRIATE TO RECOGNIZE THE APPRECIATION IN ACCOUNTS OF CUSTOMERS WHO HAD A LEGITIMATE EXPECTATION THAT THE STATEMENTS WERE ACCURATE**

In *New Times*, SIPC and the SEC took the position that the claims of customers who received trade confirmations and account statements reflecting the purchase of real securities should be allowed in the amount of their last statements. The Madoff customers are in the exact same position as the *New Times* customers whose claims were satisfied – they all received statements showing securities positions in actual, existing securities.

*New Times'* principal, William Goren, engaged in a "classic Ponzi scheme" where new investors' money was used to pay earlier investors. *In re New Times Sec. Servs. Inc.* ("*New Times I*"), 371 F.3d 68, 72 n.2 (2d Cir. 2004). However, while Madoff presented Customers with trade confirmations and statements showing securities positions in real securities, only some *New Times* customers were presented with statements showing investments in mutual funds that actually existed (the "Existent Securities"); the remaining *New Times* customers received statements showing that they were invested in money market funds that were totally fictitious (the "Non-Existent Securities"). 371 F.3d at 71-72.

SIPC treated the two categories of customers differently. SIPC applied the statutory net equity definition to the Existent Securities customers' claims by paying the claims according to the full value of those securities positions as of the date of the liquidation filing, and the Second Circuit endorsed that treatment. However, with respect to customers whose statements showed Non-Existent Securities, SIPC used the net investment methodology that the Trustee is using in this case. The customers with Non-Existent Securities appealed SIPC's treatment. The Second Circuit took particular note of SIPC's position:

investors who were misled by Goren to believe that they were investing in
mutual funds that in reality existed were treated much more favorably.
Although they were not actually invested in those real funds – because
Goren never executed the transactions, the information that these
claimants received on their account statements "mirrored what would have
happened had the given transaction been executed." [Br. for New Times
Trustee and SIPC] at 7 n.6. As a result, the Trustee deemed those
customers' claims to be "securities claims" eligible to receive up to
$500,000 in SIPC advances. *Id.* The Trustee indicates that this disparate
treatment was justified because he could purchase real, existing securities
to satisfy such securities claims. *Id.* Furthermore, the Trustee notes that,
if they were checking on their mutual funds, the "securities claimants," in
contrast to the "cash claimants" bringing this appeal, could have
confirmed the existence of those funds and tracked the funds' performance
against Goren's account statements. *Id.*

*New Times I,* 371 F.3d at 74.

The Second Circuit found that the customer's legitimate expectations based on

written confirmations and account statements control how a "net equity" claim is

determined, citing SIPC's Series 500 Rules, 17 C.F.R. §§ 300.500-300.503, which

confirm the importance of written confirmations. The Court explained that "the premise

underlying the Series 500 Rules [is] that a customer's 'legitimate expectations' based on

written confirmations of transactions, ought to be protected." 371 F.3d at 87. It noted

that "Under the Series 500 Rules, whether a claim is treated as one for securities or cash

depends not on what is *actually* in the customer's account, but on what the customer has

been told by the debtor in written confirmations." *Id* at 86 (emphasis in original). *See*

*also In re Oberweis Sec., Inc.*, 135 B.R. 842, 847 n. 1 (B. N.D. Ill. 1991) ("The court

agrees with the trustee's argument that Congress did not intend to treat customers without

confirmations the same as those with confirmations; that customers with confirmations

have a legitimate expectation of receiving securities, but customers without confirmations

do not have the same expectation.").

In contrast to those *New Times* customers whose statements showed Existent Securities, the Second Circuit held that the net equity of *New Times* customers whose statements showed Non-Existent Securities should be determined as the amount of money invested minus any withdrawals. *New Times I*, 371 F.3d at 88. The court held that customer recoveries based on "fictitious amounts in the firm's books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality." *Id.* Obviously, customers whose confirmations indicated the purchase of Non-Existent Securities could not have had a legitimate expectation that they owned those securities. Thus, only when securities positions "necessarily have no relation to reality," *i.e.*, are based on securities that *do not exist*, should a "cash in minus cash out" methodology be employed.

Each Madoff customer received trade confirmations and account statements showing investments in real securities. Thus, each Customer had a legitimate expectation that he owned the assets shown on his last statement and is entitled to a claim in the amount of the balance on his November 30, 2008 statement.

In *New Times II*, a different Second Circuit panel considered related issues and found, once again, "[i]t is a customer's legitimate expectations on the filing date . . . that determines the availability, nature and extent of customer relief under SIPA." *In re New Times Sec. Servs., Inc.* 463 F.3d 125, 128 (2d Cir. 2006) (*New Times II*). The Second Circuit in *New Times II* added that, in the case of customers who believed they held fictitious securities:

> Because there were no such securities, and it was therefore impossible to reimburse customers with the actual securities or their market value on the filing date (the usual remedies when customers hold specific securities), the [*New Times I* Court] determined that the securities should be valued

14

according to the amount of the initial investment. The court declined to base the recovery on the rosy account statements telling customers how well the imaginary securities were doing, because treating the fictitious paper profits as within the ambit of the customers' "legitimate expectations" would lead to the absurdity of "duped" investors reaping windfalls as a result of fraudulent promises made on fake securities . . . The court looked to the initial investment as the measure for reimbursement because the initial investment amount was the best proxy for the customers' legitimate expectations.

*New Times II*, 463 F.3d at 129-30 (citations omitted).

SIPC and the *New Times* Trustee valued Existent Securities customers' claims in accordance with the statutory definition of net equity even when those claims included mutual fund shares that were purchased through "dividend reinvestments," despite the fact that since the initial securities had never been purchased, the customers **had received no dividends to reinvest**. Specifically:

[I]nvestors who believed that their accounts held shares of mutual funds that actually existed (but were never purchased for their accounts) are having their claims (both as to shares of mutual funds never purchased by Goren and shares shown in customer statements as purchased through dividend reinvestment) satisfied by the Trustee up to the statutory maximum of $500,000.

See Exh. E:  Claimants' Joint Mem. of Law in Opposition to Joint Motion of Trustee and SIPC for Order Upholding Determinations at 3, SEC v. Goren 206 F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-CV-970).

[W]hereas the Trustee has disallowed that portion of the claim of [the Non-existent Securities] investors representing shares of [the Non-existent Securities] purchased through dividend reinvestment, the Trustee has allowed that portion of the mutual fund investors' claims [i.e., "Existent Securities" investors' claims] as represents shares of such mutual funds purchased by them through dividend reinvestment.

See Exh. F: Limited Objection to Trustee's Determination of Claim at 6 n.4, SEC v. Goren, 206 F. Supp.2d 344 (E.D.N.Y. 2002) (No. 00-CV-970).

SIPC and the Trustee described their method in the *New Times* liquidation:

15

> In every case [of an 'Existent Security' customer], the Trustee has been able to identify the actual mutual fund in question by cross-checking the information supplied by Goren on the customer statements, including share price information, with publicly available information and then been able to purchase that security.

See Exh. G:  Joint Mem. of Law in Support of Trustee's Motion for an Order Upholding the Trustee's Determinations with Respect to Claims Filed for Investments in Non-Existent Money Market Funds and Expunging Objections to Those Determinations, *SEC v. Goren*, F. Supp. 2d 344 (E.D.N.Y. 2002) (No. 00-CV-970).  They further stated that where customers' statements reflected securities positions in closed mutual funds, "the Trustee properly gave the customers cash equal to the filing date values of the closed mutual funds."  Reply Mem. in Further Support of Trustee's Motion for Order Upholding Determinations at 20, *S.E.C. v. Goren*.

Even when challenged regarding their position by customers of the "Non-existent Securities," SIPC (and the SEC) stood by their approach with respect to the Existent Securities customers.  In an *amicus curiae* brief, the SEC stated "[o]ur view [is] that when possible, SIPA should be interpreted consistently with a customer's legitimate expectations based on confirmations and account statements."  See Exh. H:  Br. of the SEC, Amicus Curiae, In Partial Support of the Position of Appellants and In Partial Support of the Position of Appellees ("SEC Amicus Curiae Brief") at 13, New Times I (No. 02-6166).

> The briefs filed by SIPC and the *New Times'* Trustee likewise stated that:

> In those cases [concerning the payment of interest and dividends on bona fide mutual funds] the claimants had an objectively legitimate expectation of receiving interest/dividends because the security in question had actually earned them.  Here, the bogus mutual fund [the Fictitious New

16

Age Fund] was never organized as a mutual fund and had no assets or investments.

See Exh. I:  Br. for Appellants James W. Giddens as Trustee for the Liquidation of the

Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc.

and Securities Investor Protection Corporation, at 38, *New Times I* (No. 02-6166).

SIPC stated in its brief in *New Times II* that:

[R]easonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality. Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

See Exh. C: Br. of Appellant SIPC, available at 2005 WL 5338148 (Dec. 27, 2005) at 23-

24 (citing *New Times*)(emphasis added).  Thus, SIPC recognized that it is "claimant

expectation," rather than "transactional reality" that controls.

There were no "imaginary securities" listed on the Madoff account statements.

Thus, *New Times II* does not apply. Yet, in direct contravention of SIPC's position in

*New Times*, in which SIPC "gladly" paid customers whose statement showed Existent

Securities that were never purchased their full claims, even if the actual securities' value

had "triple[d]," here, Picard has refused to recognize the Customers' Statutory Balances.

Madoff customers had the legitimate expectation that they owned real securities.

Indeed, they could have had no other expectation, based upon the trade confirmations and

17

account statements they received.  Thus, SIPC must employ the same method used in *New Times* and honor customer claims in the amount of their Statutory Balances.

## CONCLUSION

Given Picard's violation of the public trust and violation of the explicit provisions of SIPA, the Victims respectfully request that the Court condition the grant of the Government's remission motion on its recognition of the Madoff customers' claims as the amount reflected on their November 30, 2008 statements.

September 29, 2009

PHILLIPS NIZER LLP


By s/s Helen Davis Chaitman

666 Fifth Avenue
New York, NY 10103-0084
 (212) 841-1320
hchaitman@phillipsnizer.com

Attorneys for Diane and Roger Peskin and
Maureen Ebel

1092276.1