# EXHIBIT A

United States General Accounting Office

# GAO

Report to the Ranking Minority
Member, Energy and Commerce
Committee, House of Representatives

May 2001

# SECURITIES INVESTOR PROTECTION

## Steps Needed to Better Disclose SIPC Policies to Investors





GAO-01-653

# Contents

| | | |
|---|---|---|
| **Letter** | | 1 |
| **Executive Summary** | | 3 |
| **Chapter 1** | **Introduction** | 14 |
| | SIPC's Mission, Organization, Funding, and Oversight | 15 |
| | SIPC Protection Versus Federal Deposit Insurance | 17 |
| | How SIPC Liquidates a Member Firm and Protects Its Customers | 18 |
| | SIPC Liquidation Proceedings Are Relatively Infrequent | 21 |
| | Objectives, Scope, and Methodology | 22 |
| **Chapter 2** | **Opportunities Exist to Improve the Disclosure of SIPC's Policies in Liquidations Involving Unauthorized Trading** | 25 |
| | Unauthorized Trading Liquidations Accounted for Nearly Two-Thirds of Liquidations Initiated From 1996 Through 2000 | 25 |
| | The Establishment of an Evidentiary Standard Is Authorized Under SIPA | 28 |
| | Bankruptcy Court Rejected the Stratton Oakmont Trustee's Procedure for Satisfying Certain Approved Unauthorized Trading Claims | 31 |
| | SIPC and SEC Have Missed Opportunities to Disclose Information About the Evidentiary Standard to Investors | 32 |
| | Conclusions | 38 |
| | Recommendations | 39 |
| | Agency Comments and Our Evaluation | 40 |
| **Chapter 3** | **Disclosure of SIPC Policies in Liquidations Involving Nonmember Affiliates Could Be Improved** | 43 |
| | SIPC and Trustees Denied Nonmember Affiliates Claims on Several Grounds | 43 |
| | The Trustee and SIPC Concluded in the Most Recent Liquidation That Customers of the Nonmember Affiliate Were Customers of the SIPC Member | 48 |
| | Information Available to Investors About Avoiding Risks That Can Be Associated With Nonmember Affiliates Is Limited | 49 |
| | Conclusions | 50 |

|  |  |  |
|---|---|---|
| | Recommendations | 52 |
| | Agency Comments and Our Evaluation | 52 |

| **Chapter 4** | **Despite Positive Initiatives, SEC's SIPC Oversight Program Faces Some Challenges** | 53 |
|---|---|---|
| | SEC's SIPC Oversight Examination Program Has Some Limitations | 53 |
| | SEC Has Not Implemented SEC IG Recommendation on Sharing Information About SIPC Issues | 57 |
| | SEC OGC Has Established a Pilot Program to Monitor Ongoing SIPC Liquidations | 58 |
| | Conclusions | 58 |
| | Recommendations | 59 |
| | Agency Comments and Our Evaluation | 59 |

| **Chapter 5** | **Investors May Confuse SIPC With Other Financial Guarantee Programs as U.S. Financial Industries Restructure** | 60 |
|---|---|---|
| | Some Investors May Confuse SIPC and State Insurance Guarantee Associations With FDIC | 60 |
| | Investor Confusion May Increase as Financial Services Industy Consolidate | 67 |
| | Conclusions | 69 |
| | Recommendation | 69 |
| | Agency Comments and Our Evaluation | 69 |

| **Appendix I** | **Comments From the Securities Investor Protection Corporation** | 72 |
|---|---|---|

| **Appendix II** | **Comments From the Securities and Exchange Commission** | 83 |
|---|---|---|

| **Appendix III** | **GAO Contacts and Acknowledgments** | 89 |
|---|---|---|

## Tables

Table 1: Selected SIPC Liquidations Involving Nonmember
Affiliates.                                                      45
Table 2: Protections and Disclosure Rules of SIPC, FDIC, and State
Life/Health Insurance Guarantee Associations                    62

## Figures

Figure 1: Sample Back Page of Confirmation Statement             37
Figure 2: Official Symbols of SIPC and FDIC                      65

### Abbreviations

| | |
|---|---|
| FDIC | Federal Deposit Insurance Corporation |
| GLBA | Gramm-Leach-Bliley Act of 1999 |
| IG | Inspector General |
| NERO | Northeast Regional Office |
| NYSE | New York Stock Exchange |
| OCIE | Office of Compliance Inspections and Examinations |
| OGC | Office of General Counsel |
| SEC | Securities and Exchange Commission |
| SIPA | Securities Investor Protection Act of 1970 |
| SIPC | Securities Investor Protection Corporation |
| SRO | Self-Regulatory Organization |



**G A O**
Accountability * Integrity * Reliability

**United States General Accounting Office**
**Washington, DC 20548**

May 25, 2001

The Honorable John D. Dingell
Ranking Minority Member
Committee on Energy and Commerce
House of Representatives

Dear Mr. Dingell:

This report responds to your November 16, 1999, and April 13, 2000, requests that we assess the operations of the Securities Investor Protection Corporation (SIPC), which was established by the Securities Investor Protection Act of 1970. As you requested, this report discusses (1) the basis for SIPC policies involving unauthorized trading and the extent that these policies are disclosed to investors; (2) the basis for SIPC policies involving the affiliates of SIPC member firms and the extent that these policies are disclosed to investors; (3) the Securities and Exchange Commission's (SEC) oversight of SIPC; and (4) the disclosure rules for SIPC, the Federal Deposit Insurance Corporation, and state insurance guarantee associations, as well as the related implications for consumers as the financial services industry consolidates. This report includes recommendations to the Chairman, SIPC, and the Chairman, SEC, regarding disclosure of SIPC policies and SEC's SIPC oversight.

As we agreed with your office, we plan no further distribution of this report until 30 days from its issuance date unless you publicly release its contents sooner. We will then send copies of this report to Senator Phil Gramm, Chairman, Senate Committee on Banking, Housing and Urban Affairs; Senator Paul Sarbanes, Ranking Member, Senate Committee on Banking, Housing and Urban Affairs; Representative W.J. "Billy" Tauzin, Chairman, House Committee on Energy and Commerce; Representative Michael G. Oxley, Chairman, House Committee on Financial Services; Representative John J. LaFalce, Ranking Minority Member, House Committee on Financial Services; Debbie Dudley Branson, Acting Chairman, SIPC; Michael Don, President, SIPC; the Honorable Laura Unger, Acting Chairman, SEC; Mr. Robert R. Glauber, President and CEO, National Association of Securities Dealers; Richard Grasso, Chairman and CEO, New York Stock Exchange; and other interested committees and organizations. Copies will be made available to others upon request.

Major contributors to this report are acknowledged in appendix III. If you or your staff have any questions, please call me or Orice M. Williams at (202) 512-8678.

Sincerely yours,

Richard J. Hillman
Director, Financial Markets
 and Community Investment

# Executive Summary

The Securities Investor Protection Act of 1970 (SIPA) created the Securities Investor Protection Corporation (SIPC) to provide certain protections against losses to customers from the failure of a securities firm. However, the large number of claims denied in several recent SIPC liquidation proceedings, has raised concerns that certain SIPC policies and practices may unduly limit the actual protection afforded customers. Critics assert that SIPC and court-appointed trustees, who carry out the liquidation proceedings, interpret SIPA so rigidly that they act inconsistently with, if not contrary to, the customer-protection purpose of the act. SIPC's handling of two types of claims has been most heavily criticized. The first type involves claims of unauthorized trading, which is the buying or selling of securities in an investor's account without the investor's prior approval. The second type involves claims from investors who were doing business with a nonmember affiliate but believed that they were dealing with a SIPC-member firm and, therefore, covered by SIPC.[1] These two types of claims were filed in 75 percent, or 28, of the 37 liquidation proceedings initiated by SIPC between 1996 and 2000.

The enactment of the Gramm-Leach-Bliley Act of 1999 (GLBA) eliminated many legal barriers to affiliation among banks, securities firms, and insurance companies, and other financial service providers. As the financial services industry consolidates to provide one-stop shopping mainly through affiliates, concerns have been raised about whether consumers are adequately informed about the respective coverage provided by SIPC, the Federal Deposit Insurance Corporation (FDIC), and state insurance guarantee funds for various financial products. In light of the concerns raised about SIPC's implementation of SIPA and the potential for increased investor confusion surrounding coverage, the specific objectives of this report are to

- review the basis for SIPC's policies and practices for validating and satisfying claims involving unauthorized trading and the extent that these policies were disclosed to investors;
- review the basis for SIPC's policies and practices for determining claims in liquidations of SIPC-member firms and their nonmember affiliates and the extent that these policies were disclosed to investors;
- evaluate the Securities and Exchange Commission's (SEC) oversight of SIPC's operations and compliance with SIPA; and

---

[1]Most registered securities firms automatically become members of SIPC. However, affiliates of securities firms are not required to become members of SIPC.

- compare the coverage provided by and disclosure rules for SIPC, FDIC, and state insurance guarantee associations and the implications for consumers as some banks, securities firms, and insurance companies consolidate their operations.

GAO reviewed SIPA and its legislative history; reviewed legal briefs and court decisions; and interviewed SIPC and SEC officials, SIPA trustees and their attorneys, and claimants' attorneys. GAO focused its review on liquidations initiated between 1996 and 2000 involving introducing firms[2] engaged in unauthorized trading and SIPC members with affiliates. GAO also reviewed information relating to SEC's oversight of SIPC and the differences between SIPC and FDIC coverage and a summary of disclosure policies typical of state insurance guarantee programs. A complete discussion of GAO's scope and methodology can be found in chapter 1.

## Results in Brief

SIPC's policies and practices in liquidation proceedings involving certain unauthorized trading claims have generated controversy because many claims were denied or claimants received worthless securities instead of cash.[3] Two practices are central to the controversy. The first practice requires that claimants provide some form of objective evidence that they complained about an unauthorized trade within a reasonable time after the disputed trade. SIPC's practice of requiring objective evidence, usually a letter to the broker, is based on the authority that SIPA provides SIPC and the trustees to establish standards to determine the validity of customer claims. Although challenged by some claimants and critics as unreasonable, courts have upheld this policy. The second practice involves how SIPC and a trustee satisfied certain unauthorized trading claims. Approved claims for substantial amounts of cash were satisfied with worthless securities. Claimants have successfully challenged this practice in a bankruptcy court, but the appeals process is ongoing.

SIPC and SEC, which plays an important role in investor education, have not adequately disclosed to investors information about the policy on

---

[2]An introducing firm does not clear securities transactions or hold customer cash or securities.

[3]See "Many Holes Weaken Safety Net for Victims of Failed Brokerages," *The New York Times*, Sept. 25, 2000; "Group Assails Insurer of Investors," *The Washington Post*, July 21, 1999; and "Many Unhappy Returns: Ex-Stratton customers still fighting to recoup $130m," *Newsday*, Dec. 20, 1998.

providing objective evidence to prove unauthorized trading claims. For example, SIPC's informational brochure does not disclose information on this policy to investors. For the claims we reviewed, investors seemed unaware of the importance of documenting their complaints and were more than twice as likely to telephone their broker to complain about an unauthorized trade as to write a letter. GAO recommends that SIPC and SEC take actions to better inform investors about this policy and the steps investors can take to protect their interests.

SIPC's position in liquidation proceedings involving SIPC members with affiliates has also generated controversy because many claimants were determined not to be customers of the failed member firm. SIPA authorizes SIPC to liquidate only SIPC members. Therefore, only customers of the member in liquidation are entitled to protection under SIPA. In general, for a claim of a customer of the nonmember to be approved, SIPC requires that the cash or securities involved has been entrusted to the SIPC member firm.[4] Several claimants, whose claims were denied because SIPC and the trustee determined that they did not entrust funds with the SIPC member firm, appealed the determination in Federal Court. In 2000, a Federal Court of Appeals agreed, ruling that under the circumstances of that case, a claimant's reasonable belief that he or she was dealing with the member can serve as the basis for a claim. However, in other cases, courts have upheld SIPC's position that a claimant's belief does not constitute evidence that funds in fact were entrusted to the member. Although SIPC has been involved in several liquidation proceedings involving nonmember affiliates since 1996, there is limited information available to help investors avoid the potential risks associated with the nonmember affiliates. GAO recommends that SIPC and SEC take actions to increase the availability of this information.

SEC, which is responsible for oversight of SIPC, faces important challenges in its oversight of SIPC. Since 1971, SEC has initiated only three examinations. The first two examinations focused on the adequacy of the SIPC fund and administrative issues. The scope of the most recent examination initiated in May 2000 was expanded to include many of the more controversial issues raised in this report. To date, SEC examiners have focused on a limited number of liquidations involving unauthorized trading and none of the liquidation proceedings involving the affiliate

---

[4]Claimants must also meet other requirements such as the products purchased must be securities as defined by SIPA.

issue. SEC officials agreed and said that they would expand the number of liquidations reviewed. In addition, in March 2000, SEC's Inspector General (IG) issued a report[5] suggesting that SEC establish a formal mechanism to share information about SIPC proceedings, but SEC has not implemented the recommendation to date. A formal mechanism to share information could enhance SEC's ability to discuss staffs' varying opinions on issues relevant to SIPC and ensure a comprehensive oversight program. GAO recommends that SEC expand its oversight of SIPC operations to include a larger sample of proceedings involving unauthorized trading and nonmember affiliates and establish a formal coordination mechanism to share information about SIPC liquidation proceedings within SEC.

Consolidation in the financial services industry has raised concerns about whether consumers are adequately informed about the respective differences in coverage provided by SIPC; FDIC; and, to a lesser degree, state insurance guarantee funds as more companies offer banking, securities, and insurance products from a single location or through an affiliated entity. Differences in the coverage largely stem from the differences in the products offered and the nature of the relationship between the financial institution (bank, securities firm, or insurance company) and its customers. Many regulatory and securities industry officials that GAO contacted said that consumers already confuse SIPC with FDIC because of similarities in the amount of cash coverage and misunderstandings about what that coverage entails. Without improved investor education—especially that SIPC does not cover losses due to changes in market prices—investor confusion is likely to increase as the U.S. financial industry continues to consolidate and offer similar financial products under a single corporate umbrella. GAO recommends that SIPC improve the standard disclosure language it uses to describe its coverage.

## Background

By law, securities firms are to keep customer accounts separate from the firms' funds. For the firms that fail to do this and that are liquidated by SIPC, SIPC's statutory mission is to promptly replace missing cash and securities in an investor's account up to the statutory limits. Securities firms registered with SEC automatically become members of SIPC and must pay an annual assessment to the SIPC fund. The SIPC fund, valued at $1.2 billion as of February 9, 2001, is used to replace the missing securities

---

[5] *Oversight of Securities Investor Protection Corporation.* Securities and Exchange Commission Office of Inspector General. Audit Report No. 301. Mar. 31, 2000.

and cash and to pay administrative costs of the liquidation proceeding. However, SIPC does not protect against losses from declines in the market value of securities.

In typical proceedings under SIPA, SEC or the Self-Regulatory Organizations—such as the NASDR[6] and the New York Stock Exchange—notify SIPC when a SIPC member firm is in financial trouble. Upon receiving such information, SIPC may file a petition in a federal district court to liquidate the firm.[7] The district court appoints a trustee at SIPC's recommendation. SIPC serves as the trustee in some cases. The liquidation proceeding is then removed to a U.S. bankruptcy court. The trustee notifies the firm's customers of the liquidation proceeding. Typically, the trustee tries to sell or otherwise transfer customer accounts to another SIPC member. Customers must file claims to recover missing funds or securities from the member in liquidation. The trustee and SIPC staffs review submitted claims and related information and notify individuals whether their claims are approved or denied. To the extent that the SIPC member firm's assets are insufficient, SIPC advances funds for the payment of customer claims up to the statutory limits. Claimants may seek review of the trustee's decision on their claims by the bankruptcy court. If the trustee's fees and administrative expenses cannot be recovered from the members' assets, SIPC advances funds to cover them.

# Principal Findings

## SIPC's Policies and Practices Involving Unauthorized Trading Need Additional Disclosure

Pursuant to the authority provided under SIPA, SIPC and trustees generally require claimants to provide objective evidence that they complained within a reasonable time after the allegedly unauthorized trade or their claims will be denied. However, SIPC and the trustees may consider other forms of objective evidence, such as complaints to regulators. SIPC and the trustees assert that objective evidence, such as reliable and timely documentation showing a trade was unauthorized, is necessary to ensure claim accuracy and to protect against fraudulent claims. Although courts have upheld this policy, critics argue that the standard is unreasonable and places an undue burden on claimants. For

[6]NASDR, Inc., is the regulatory arm the National Association of Securities Dealers.

[7]In certain situations, SIPC may elect to use a direct payment procedure in lieu of instituting a liquidation proceeding to pay customer claims.

example, critics of the policy believe that it is unrealistic to expect unsophisticated investors to complain about unauthorized trades in writing within a specified period of time because securities orders and related transactions routinely are conducted by telephone. Available evidence lends support to the contention that investors are unaware of SIPC's practice. For example, GAO reviewed a random and representative sample of 152 unauthorized trading claims from 2 of the larger liquidation proceedings and found that about 87 percent of the claimants indicated that they telephoned to complain about unauthorized trades compared with 38 percent of the claimants who provided letters.

The second controversial practice in SIPC liquidations involving unauthorized trading occurred in a case in which the trustee satisfied certain claims for cash by unwinding all trades determined to be unauthorized, including those not specified in the claims. As a consequence of this process, the trustee treated the claims as claims for securities. This practice resulted in some claimants receiving worthless securities, rather than substantial amounts of cash for which they had filed claims. In this case, claimants filed claims for cash that had been used to make unauthorized purchases of securities. However, the trustee determined that the securities had been purchased with proceeds from prior unauthorized sales of securities. Therefore, SIPC and the trustee determined that the claimants were entitled to the securities that were in the account before the unauthorized sales, rather than the cash that was received from the sales and placed in the account before the unauthorized purchase. Claimants challenged the trustee's practice, and a federal bankruptcy court rejected the practice as not authorized by SIPA or any other law. SIPC and the trustee maintained that SIPA requires the trustee's approach. The court determined that the claims for cash should be paid because the statute does not authorize the trustee to consider trades not disputed in a claim form and, therefore, treat a claim as if it were a claim for securities. According to SIPC officials, SIPC and the trustee have filed notices of appeal.

SIPC and SEC, which has an important role in investor education, have not adequately disclosed information about the importance of documenting unauthorized trading complaints. Although SIPC and SEC—through an informational brochure and Web sites—provide much useful information, they do not fully and consistently explain the need to complain in writing about unauthorized trades within a reasonable time period of the unauthorized trade. SEC's Web site, for example, provided inconsistent advice about when to telephone complaints and when to follow up in writing. Limited disclosure may, in part, explain why many investors with

Executive Summary

unauthorized trading complaints appear to have been unaware of the importance of documenting their complaints about trades that were not authorized in a timely manner.

## Information Shared With Investors About SIPC's Policies Involving Nonmember Affiliates Is Not Adequate

Under SIPA, only customers of a SIPC member firm qualify for SIPA protection and only securities defined in the act and determined to be in the member's custody are covered. In three SIPC liquidations involving nonmember affiliates that GAO reviewed, trustees or SIPC denied claims they determined were not covered by SIPA because one or more of these requirements were not satisfied, as well as for other reasons. SIPC and the trustees denied certain claims in these proceedings, for example, on the grounds that persons who dealt with the affiliates were not customers of the SIPC member firms. They said that certain evidence, including checks made out to the affiliates or fund transfers to accounts with the affiliates, demonstrated that the claimants were not the customers of the SIPC members. In addition, SIPC and the trustees determined that the investments purchased were not securities as defined in the act.

In 2000, claimants in one liquidation involving a nonmember affiliate successfully challenged the trustee's and SIPC's denials of their claims. The claimants believed that they qualified as customers of the SIPC member because the SIPC member and its affiliates were presented to them and operated as a single enterprise and that the investments at issue were securities. Moreover, the common owner used the member and nonmember in a scheme to defraud customers. In August 2000, the Federal Court of Appeals for the Eleventh Circuit found that the claimants reasonably believed that they were dealing with the SIPC member and that the owner of both entities used funds raised through the nonmember affiliate as if they were the funds of the SIPC member. The court also found that the claimants deposited cash to purchase securities covered under the act. However, other courts have supported SIPC's and the trustee's position in similar cases.

Although disclosure alone would not resolve all of the issues surrounding these types of liquidations, greater disclosure could help investors better understand SIPC liquidation proceedings and what steps they could take to protect their interests. SIPC's informational brochure provides useful information that tells investors that they should avoid writing checks to anyone other than the firm, including affiliates. However, SEC does not require SIPC member firms to routinely distribute the SIPC brochure to investors. In addition, SEC's Web site provides some information on dealings with affiliates, but the information is generally limited.

**SEC's SIPC Oversight Has Improved but Faces Ongoing Challenges**

SEC has taken steps to improve its oversight of SIPC. However, the oversight program faces ongoing challenges. SEC's Division of Market Regulation (Market Regulation) has primary responsibility for ensuring SIPC's compliance with SIPA. Market Regulation has engaged in several important oversight activities, such as monitoring the size of the SIPC customer-protection fund and maintaining regular communication with SIPC. However, Market Regulation initiated only two SIPC examinations between 1971 and 1999.

In 2000, SEC started a joint examination led by Market Regulation and the Office of Compliance Inspections and Examinations (OCIE). Consistent with observations made by SEC's IG, the scope of this examination was expanded. The examination guidelines include some of the issues raised by the more recent controversial liquidations discussed in this report. As of March 2001, the sample of liquidations reviewed by SEC included 4 of the 28 liquidations involving the controversial policies and practices and none of nonmember affiliate proceedings. In response to this observation, SEC staff stated that they plan to review additional liquidations involving unauthorized trading and the nonmember affiliate issue.

In September 2000, SEC also established a pilot program to monitor SIPC liquidation proceedings. Although this program is a positive development, it is too soon to determine its efficacy. The pilot program also highlights the need for more formal information sharing among SEC units. The IG report on SEC's SIPC oversight found that communication among SEC units could be improved and recommended that SEC units establish a formal method for sharing information. GAO's review found that SEC had not yet implemented the IG recommendation. Given that different offices and divisions receive different information about SIPC liquidations, more formal communication among the groups that are involved in reviewing these liquidations—such as Market Regulation, OCIE, and the Division of Enforcement (Enforcement)—is important. Without a formal means to share information across organizational lines, SEC's ability to establish a comprehensive SIPC oversight strategy could be hampered. SEC officials said that they plan to begin holding quarterly meetings to share information about SIPC.

**Potential Exists for Increased Investor Confusion**

The type of financial protection that SIPC provides is similar to that provided by FDIC and, to some extent, state life and health insurance guarantee associations, but important differences exist. Consumers may confuse the coverage offered by these programs. When a member firm fails, if customer accounts are not transferred to another institution, both SIPC and FDIC return up to $100,000 of missing customer or depositor

cash; however, SIPC also replaces missing securities. The total amount of coverage under SIPA is up to $500,000, of which no more than $100,000 can be a claim for cash. Customer securities held by a securities firm are not assets of the firm, but are held in custody by the firm for its customers. SIPA protects the firm's obligation to return these assets. Because securities, unlike cash, are subject to price fluctuations, the securities returned to a customer can be worth less than their purchase price. In contrast, FDIC protects deposits, which are obligations of the accepting firm, which includes banks and thrifts. FDIC protects depositors against the risk that the institution that accepted the deposit will fail and not have assets sufficient to return a customer's deposit. Unlike securities accounts, cash deposits do not fluctuate in value. Therefore, in order to fulfill failed member depository obligations, FDIC returns the amount in the account up to the statutory limit. The state life/health insurance guarantee associations also serve to preserve an insurance company's obligation to those insured. The state insurance associations guarantee that owners of covered products will not lose their insurance coverage up to certain limits and step in to fulfill the obligations of the policy when an insured institution fails.

According to many regulatory and securities industry officials, some consumers likely confuse SIPC with FDIC, given the similarities in coverage amounts, misunderstandings between the nature of securities investing versus making deposits, and the similarity in the SIPC and FDIC logos. Yet, neither SIPC or SEC requires firms who are SIPC members to disclose in advertising to the investing public a key fact that might help consumers distinguish SIPC from FDIC: that SIPC does not protect against losses due to declines in their securities' market value.

GLBA allows banks, securities firms, and insurance companies, primarily through affiliates, to underwrite and sell each other's traditional financial products to a degree not previously allowed. To the extent that financial companies consolidate and begin to offer a full range of banking, securities, and insurance products to the public, individuals will be more likely to purchase financial products from the same corporate family that are covered by different guarantee organizations. Any public confusion that already exists between SIPC and FDIC or the state insurance guarantee associations may increase. Given the limitations of SIPC's disclosure requirements, unsophisticated investors who do not fully understand the difference between investing in securities and depositing funds in a bank may not realize that SIPC will not protect their securities investments from certain losses, such as declines in market value.

## Recommendations

To improve investor awareness of SIPC's policies, practices, and coverage, GAO recommends that the Chairman, SIPC,

- as part of SIPC's ongoing effort to revise the informational brochure and Web site, include a full explanation of the steps necessary to document an unauthorized trading claim and
- amend SIPC advertising bylaws to require that the official explanatory statement about a firm's membership in SIPC include a statement that SIPC coverage does not protect investors against losses caused by changes in the market value of their securities.

In addition, SEC can take steps to improve the information it provides to investors and that investors receive about SIPC and about how to protect investor interests. GAO recommends that the Chairman, SEC

- require SIPC member firms to provide the SIPC brochure to their customers when they open an account and encourage firms to distribute the brochure to its existing customers more widely and
- review the sections of SEC's Web site and, where appropriate, advise customers to complain promptly in writing when they believe trades in their account were not authorized and update the SEC Web site to include a full explanation of SIPC's policies and practices in liquidations involving nonmember affiliates.

In chapter 2 of this report, GAO makes additional recommendations to the SEC Chairman to improve disclosure.

Finally, to improve oversight of SIPC operations, GAO recommends that the Chairman, SEC

- ensure that OCIE and Market Regulation include in their ongoing SIPC examination a larger sample of liquidations involving unauthorized trading and nonmember affiliates claims and
- require Market Regulation, OCIE, General Counsel, and Enforcement to establish a formal procedure to share information about SIPC issues.

## Agency Comments and Our Evaluation

GAO received written comments on a draft of this report from SIPC and SEC. These comments are discussed in greater detail at the end of chapters 2 through 5. In addition, SIPC's and SEC's comments are printed in appendixes I and II, respectively. SIPC and SEC also provided technical comments, which have been incorporated into the report where appropriate. Officials from SIPC and SEC agreed with most of the

conclusions and recommendations in the draft report and both have begun to take steps to implement several of GAO's recommendations.

For example, SIPC officials said that they have begun to implement GAO's recommendation concerning improving disclosure of SIPC's unauthorized trading policies and practices. Specifically, SIPC officials said that changes they are making to the informational brochure would urge investors to complain about unauthorized trading in writing. In addition, SEC officials said that they would consider the appropriateness of requiring firms to distribute the SIPC brochure to new customers and existing customers more widely. In addition, SEC officials said that they had already reviewed SEC's Web site and made changes in response to GAO's recommendations where appropriate. SEC officials also agreed with GAO's recommendations concerning its oversight effort. Specifically, SEC officials agreed to review additional liquidation proceedings during its ongoing examination, and SEC officials stated that they would hold quarterly meetings to discuss various issues related to SIPC.

SIPC disagreed with GAO's recommendation that it amend its bylaws to require that any statement about a firm's membership include a statement that SIPC coverage does not protect investors against losses caused by changes in the market value of their securities. First, SIPC officials believe SIPC lacks the authority to implement such a change in SIPC's bylaws. Second, they believe such a statement would be misleading. GAO has revised the recommendation to make clear that it applies to only SIPC's "official explanatory statement." On the basis of GAO's conversation with SEC officials concerning SIPC's authority to amend its bylaws and GAO's review of the statute and legislative histories, GAO continues to believe that SIPC has authority, with SEC approval, to determine what should be disclosed in its official explanatory statement. GAO also does not share SIPC's concern that simply stating that SIPC does not protect against losses caused by changes in the market value of securities would be misleading. Such disclosure would be similar to information disclosed in SIPC's informational brochure, as well as information contained on the Web sites of SEC and NASDR describing SIPC coverage.

# Chapter 1: Introduction

The Securities Investor Protection Act of 1970 (SIPA) established the Securities Investor Protection Corporation (SIPC) to provide certain financial protections to the customers of insolvent securities firms. As required by SIPA, SIPC either liquidates a failed firm itself (in cases where the liabilities are limited and there are less than 500 customers) or a trustee selected by SIPC and appointed by the court liquidates the firm.[1] In either situation, SIPC is authorized to make advances from its customer protection fund to promptly satisfy customer claims for missing cash and securities up to amounts specified in SIPA. Between 1971 and 2000, SIPC initiated a total of 287 liquidation proceedings and paid about $234 million to satisfy such customer claims.

In the past 5 years, some SIPC liquidation proceedings have involved controversial policies and practices because trustees denied large numbers of investor claims.[2] One controversial practice involved the trustees' denials of many claims because claimants did not satisfy the trustee's requirement that the claimants reliably demonstrate that trading in their accounts was unauthorized (i.e., the firm had bought or sold securities for a customer's account without approval). Another controversial practice involved denials of claims of individuals who said they believed that they were customers of a firm covered under SIPA but actually had been dealing with an affiliated entity not covered by SIPA. In these liquidations, critics argue that SIPC's main goal has been to protect its industry-supplied fund rather than to protect customers as contemplated by SIPA. SIPC maintains that its policies are consistent with SIPA. An additional issue related to SIPC coverage has emerged from another source: consolidation in the financial services industry. As securities firms, banks, and insurance companies begin to merge and sell each others' traditional products through affiliates, it raises important implications about the extent of disclosure that SIPC should require its member firms to make concerning the program's coverage. In response to a request from the Ranking Member of the House Energy and Commerce Committee, we reviewed SIPC's policies and practices in liquidations involving unauthorized trading and affiliate issues, Securities and

---

[1] SIPA authorizes an alternative to liquidation under certain circumstances when all customer claims aggregate to less than $250,000.

[2] See "Many Holes Weaken Safety Net for Victims of Failed Brokerages," *The New York Times*, Sept. 25, 2000; "Group Assails Insurer of Investors," *The Washington Post*, July 21, 1999; and "Many Unhappy Returns: Ex-Stratton customers still fighting to recoup $130m," *Newsday*, Dec. 20, 1998.

Exchange Commission (SEC) oversight of SIPC, and the potential for greater investor confusion as banks, securities firms, and insurance companies offer financial products from the same corporate family that are covered by different guarantee organizations.

## SIPC's Mission, Organization, Funding, and Oversight

SIPC was established in response to a specific problem facing the securities industry in the late 1960s: how to ensure that customers recover their cash and securities from securities firms that fail or cease operations and cannot meet their custodial obligations to customers. The problem peaked in the late 1960s, when outdated methods of processing securities trades, coupled with the lack of a centralized clearing system able to handle a large surge in trading volume, led to widespread accounting and reporting mistakes and abuses at securities firms. Before many firms could modernize their trade processing operations, stock prices declined sharply, which resulted in hundreds of securities firms merging, failing, or going out of business. During that period, some firms used customer property for proprietary activities, and procedures broke down for proper customer account management, making it difficult to locate and deliver securities belonging to customers. The breakdown resulted in customer losses exceeding $100 million because failed firms did not have their customers' property on hand. Congress became concerned that a repetition of these events could undermine public confidence in the securities markets.

SIPC's statutory mission is to promote confidence in securities markets by allowing for the prompt return of missing customer cash and/or securities held at a failed firm. SIPC fulfills its mission by initiating liquidation proceedings where appropriate and transferring customer accounts to another securities firm or returning the cash or securities to the customer by restoring to customer accounts the customer's "net equity." SIPA defines net equity as the value of cash or securities in a customer's account as of the filing date, less any money owed to the firm by the customer, plus any indebtedness the customer has paid back with the trustee's approval within 60 days after notice of the liquidation proceeding was published. The filing date typically is the date that SIPC applies to a federal district court for an order initiating proceedings.[3] SIPC sets

---

[3]Under SIPA, the filing date is the date on which SIPC files an application for a protective decree with a federal district court, except that the filing date can be an earlier date under certain circumstances, such as the date on which a Title 11 bankruptcy petition was filed.

coverage at a maximum of $500,000 per customer, of which no more than $100,000 may be a claim for cash. SIPC is not intended to keep firms from failing or to shield investors from losses caused by changes in the market value of securities.

SIPC is a nonprofit corporation governed by a seven-member Board of Directors that includes two U.S. government, three industry, and two public representatives. SIPC has 29 staff located in a Washington, D.C., office. Most securities firms that are registered as broker-dealers under Section 15(b) of the Securities Exchange Act of 1934 automatically become SIPC members regardless of whether they hold customer property. As of December 31, 2000, SIPC had 7,033 members. SIPA excludes from membership securities firms whose principal business, as determined by SIPC subject to SEC review, is conducted outside of the United States, its territories, and possessions. Also, a securities firm is not required to be a SIPC member if its business consists solely of (1) distributing shares of mutual funds or unit investment trusts,[4] (2) selling variable annuities,[5] (3) providing insurance, or (4) rendering investment advisory services to one or more registered investment companies or insurance company separate accounts. SIPA, as recently amended, also exempts a certain class of firms that are registered with SEC solely because they may affect transactions in single stock futures.

SIPA covers most types of securities such as notes, stocks, bonds, and certificates of deposit.[6] However, some investments are not covered. SIPA does not cover any interest in gold, silver, or other commodity; commodity contract; or commodity option. Also, SIPA does not cover investment contracts that are not registered as securities with SEC under the Securities Act of 1933. Shares of mutual funds are protected securities, but securities firms that deal only in mutual funds are not SIPC members and thus their customers are not protected by SIPC. In addition, SIPA does not

---

[4]A unit investment trust is an SEC-registered investment company, which purchases a fixed, unmanaged portfolio of income-producing securities and then sells shares in the trust to investors.

[5]An annuity is a contract that offers tax-deferred accumulation of earnings and various distribution options. A variable annuity has a variety of investment options available to the owner of the annuity, and the rate of return the annuity earns depends on the performance of the investments chosen.

[6]Typically, bank certificates of deposit are not securities under the Securities Exchange Act of 1934, however, they are defined as securities in SIPA.

cover situations where an individual has a debtor-creditor relationship—
such as a lending arrangement—with a SIPC member firm.

SIPC has a fund valued at $1.2 billion as of February 9, 2001, that it uses to
make advances to trustees for customer claims and to cover the
administrative expenses of a liquidation proceeding.[7] Administrative
expenses in a SIPC liquidation include the expenses incurred by a trustee
and the trustee's staff, legal counsel, and other advisors. The SIPC fund is
financed by annual assessments on all member firms—periodically set by
SIPC—and interest generated from its investments in U.S. Treasury notes.[8]
If the SIPC fund becomes or appears to be insufficient to carry out the
purposes of SIPA, SIPC may borrow up to $1 billion from the U.S.
Treasury through SEC (i.e., SEC would borrow the funds from the U.S.
Treasury and then re-lend them to SIPC). In addition, SIPC has a $1 billion
line of credit with a consortium of banks.

SIPA gives SEC oversight responsibility over SIPC. SEC may sue SIPC to
compel it to act to protect investors. SIPC must submit all proposed
changes to rules or bylaws to SEC for approval, and may require SIPC to
adopt, amend, or repeal any bylaw or rule.[9] In addition, SIPA authorizes
SEC to conduct inspections and examinations of SIPC and requires SIPC
to furnish SEC with reports and records that it believes are necessary or
appropriate in the public interest or to fulfill the purposes of SIPA.

## SIPC Protection Versus Federal Deposit Insurance

SIPC and the Federal Deposit Insurance Corporation (FDIC) transfer or
return customer property in the event that a member fails; however, there
are important differences in the protection provided to investors. First,
while both protect cash left with the banks or securities firms, only SIPC
protects securities. Second, securities firms act as custodians for
customers' securities; this property does not become an asset of the firm.
SEC rules prohibit securities firms from using customer securities or cash

---

[7]The SIPC board decided the fund balance should be raised to $1 billion to meet the long-term financial demands of a very large liquidation. The SIPC balance reached $1 billion in 1996.

[8]As of February 2001, the annual assessment for SIPC members was $150.

[9]A proposed rule change becomes effective 30 days after it is filed with SEC, unless the period is extended by SIPC or SEC takes certain actions. A proposed rule change may take effect immediately if it is of a type that SEC determines by rule does not require SEC approval.

to finance their own operations, and require firms to maintain minimum levels of liquid assets to meet obligations to customers and other market participants. However, if a firm fails and is unable to return all customer securities or cash, SIPA provides limited protection, namely, the return of the securities or cash in a given customer's account up to the statutory limits. SIPC generally returns the securities or cash that should have been in the investor's account on the liquidation filing date. Therefore, if the price of the securities declines, SIPC does not protect investors from that loss. However, investors benefit from continuing to hold the securities if the price increases. Deposits held by a bank or thrift are different from investments held by securities firms. Unlike securities, cash deposits do not fluctuate in value. In addition, deposits are obligations of the institution that accepts them. Banks are free to use these customer deposits to finance their own operations (e.g., make loans or other investments). If a bank makes bad investment decisions and fails with insufficient assets to meet its liabilities to depositors, FDIC will provide coverage up to the $100,000 limit.

## How SIPC Liquidates a Member Firm and Protects Its Customers

When SEC or a self regulatory organization (SRO), such as NASDR, Inc.,[10] informs SIPC that one of its member firms is in or is approaching financial difficulty, SEC, the SROs, and SIPC take steps to determine whether the firm might fail and whether and to what extent customers, as that term is defined in SIPA, may be exposed. SIPC initiates liquidation proceedings if it determines that the member firm has failed or is in danger of failing to meet its obligations to customers, among other factor(s).[11] SIPC initiates liquidation proceedings by applying for a protective order in a federal district court or initiating a direct payment procedure.[12] The firm has an opportunity to challenge the ruling. If the court issues the order, the court appoints a disinterested trustee selected by SIPC, or, in certain cases, SIPC

---

[10]NASDR, Inc., is the regulatory arm of the National Association of Securities Dealers, which was granted self-regulatory authority under the Securities Exchange Act of 1933.

[11]For SIPC to initiate a proceeding, at least one of the following other factors must exist (1) the firm must be insolvent under the Bankruptcy Code or unable to meet its obligations as they become due; (2) the firm is subject to a court or agency proceeding in which a receiver, liquidator, or trustee has been appointed for the member; (3) the firm is not compliant with applicable financial responsibility rules of the Commission or SROs; or (4) the firm is unable to show compliance with such rules.

[12]In the smallest proceedings (in which, among other factors, the claims of all customers are less than $250,000), SIPC directly pays customer claims without filing an application for a protective order with a court and without the appointment of a trustee.

itself, to liquidate the firm.[13] The district court orders removal of the entire liquidation proceeding to the federal bankruptcy court for that district. To the extent that it is consistent with SIPA, the proceeding is conducted pursuant to pertinent provisions of the Bankruptcy Code. SIPA requires that the trustee investigate facts and circumstances relating to the liquidation; report to the court facts indicating fraud, misconduct, mismanagement, or irregularities; and submit a final report to SIPC and others designated by the court. Also, the trustee is to periodically report to the court and SIPC on its progress in distributing cash and securities to customers.

Promptly after being appointed, the trustee is to publish a notice of the proceeding in one or more major newspapers, in a form and manner determined by the court. The trustee also is to mail a copy of the notice to existing and recent customers listed on the firm's books and records, and is to provide notice to creditors in the manner prescribed by the Bankruptcy Code. Customers must file written statements of claims. The notice typically informs customers how to file claims and explains the deadlines for filing claims. Two deadlines apply. One is set by the bankruptcy court supervising the proceeding and the other is set by SIPA. The deadline set by the bankruptcy court for filing customer claims applies to customer claims for net equity. Under SIPA, the deadline may not exceed 60 days after the date that notice of the proceeding is published. Failure to satisfy the deadline can affect what the customer may be able to recover. The second deadline occurs 6 months after the publication date. SIPA mandates that no customer or general creditor claim received after the 6-month deadline can be allowed by the trustee, except for claims filed by the United States, any state, infant, or certain incompetent persons.

The trustee and SIPC staffs review each claim that the trustee receives. In some cases, the trustee's staff, SIPC staff, or both may write a brief analysis of the claim, which recommends whether the claim should be allowed or denied. If the trustee and SIPC staff initially disagree over whether the claim is valid, they hold a discussion. Typically, if the claim lacks sufficient supporting evidence, the trustee will write to the claimant requesting additional information. Once a final decision is made, the

---

[13]SIPC may decide to serve as a trustee in any case where it determines that the firm's liabilities to unsecured general creditors and subordinated lenders appear to aggregate to less than $750,000 and it appears that there are less than 500 customers.

GAO-01-653  Securities Investor Protection

trustee sends a determination letter to each claimant that informs him or her of the decision and its basis. The letter also informs a claimant of his or her right to object to the determination and how to do so. The bankruptcy court judge overseeing the liquidation rules on customers' objections after holding a hearing on the matter. Decisions of the bankruptcy court may be appealed to the appropriate federal district court, and then upward through the federal appellate process.

Under the typical SIPA property distribution process, SIPC customers are to receive any securities that the firm holds that are registered in their name or that are in the process of being registered in their name, subject to the payment of any debt to the firm. Any other customer property in an account is part of a customer's net equity as calculated by the trustee. Net equity claims are satisfied first by allowing customers to share on a pro rata basis in the firm's remaining customer property. The trustee may use up to $500,000 advanced from the SIPC fund to satisfy a customer's claim remaining after the distribution; however, only $100,000 may be advanced to satisfy a claim for cash.[14] SIPA specifies that a customer claim for securities must be satisfied with securities whenever feasible. That is, if the firm being liquidated does not possess the securities, then the trustee must purchase them in the open market and return them to the customer if a fair and orderly market for the securities exists.

Investors who attain SIPC customer status are a preferred class of creditors compared with other individuals or companies that have claims against the failed firm and are much more likely to get a part or all of their claims satisfied. This is because SIPC customers share in any customer property that the bankrupt firm possesses before any other creditors may do so. Moreover, the trustee may use advances from the SIPC fund up to the $500,000/$100,000 limits to satisfy claims that cannot be fully satisfied by the estate of customer property. In fact, since many bankrupt securities firms have no assets left at all, SIPC customers may be the only parties with claims against the firm to have any of their claims satisfied.

SIPC liquidates clearing and introducing firms, which are distinct entities. Introducing firms do not clear securities transactions or hold customer cash or securities. Instead, introducing firms contract with clearing firms to clear their customers' transactions and hold their customers' cash and

---

[14]SIPC may advance funds to the trustee to satisfy claims prior to the distribution of customer property.

securities. Introducing firms introduce their customers to a clearing firm on a fully disclosed basis. This means that each introducing firm customer has a securities account at the clearing firm in the customer's name and in which the customer's securities transactions are cleared and securities and cash are held. Under this scenario, the customers know their accounts are at the clearing firm, and the clearing firm treats them as customers for purposes of securities regulations governing custody of customer assets and the financial responsibility of broker-dealers. In general, the clearing firm, not the introducing firm, prepares and mails trade confirmations and periodic account statements.[15] Some SIPC liquidations have involved introducing firms that stole or misplaced customer property intended to go to a clearing firm.

## SIPC Liquidation Proceedings Are Relatively Infrequent

SIPC has initiated a fairly small number of liquidations each year compared with the number of securities firms that go out of business annually. Between its inception in 1971 and the end of 2000, SIPC commenced 287 liquidations of member securities firms. From 1996 through 2000, SIPC initiated a total of 37 liquidations of member firms or about 7 per year. By contrast, SIPC data indicate that hundreds of SIPC member firms go out of business each year without ever becoming SIPC liquidations.[16] For example, our 1992 report found that between 1971 and 1991, 20,344 SIPC members went out of business, but only 228 (about 1 percent) became SIPC liquidations. Similarly, in 1999, a total of 865 SIPC members went out of business but SIPC initiated liquidation proceedings against a total of 9 firms.

Many of the thousands of SIPC members that have gone out of business without SIPC involvement were firms that traded solely for their own accounts, did not hold customer property, and did not introduce customer accounts to a clearing firm. Accordingly, there were no customers in need of SIPC protection. In addition, because introducing firms are not permitted to hold customer cash or securities, most go out of business without any customer securities or cash to return to customers. (These assets are at the clearing firm.) However, if an introducing firm improperly holds, loses, or embezzles customer securities or cash, there may be a need for a SIPA liquidation. Furthermore, SEC's financial responsibility

---

[15]According to SEC, in some cases, the introducing firm sends the confirmation or account statement rather than the clearing firm.

[16]Although some firms fail financially, others go out of business for nonfinancial reasons, such as mergers.

and customer protection rules establish controls that securities firms must follow, which promote firm solvency and the safekeeping of customer assets. Regulators monitor compliance with these rules and intervene when problems arise prior to a firm's failure. SEC and SROs—such as NASDR and the New York Stock Exchange (NYSE)—have primary responsibility for overseeing and regulating SIPC member firms. SIPC does not have any authority under SIPA to regulate or examine its membership. In some cases, securities regulators may oversee the transfer of customer accounts from a troubled firm to a healthy firm without the need for SIPC involvement.

## Objectives, Scope, and Methodology

Our objectives were to (1) review the basis for SIPC's policies and practices for validating and satisfying claims involving unauthorized trading and the extent that these policies were disclosed to investors; (2) review the basis for SIPC's policies and practices for determining claims in liquidations involving SIPC-member firms and their nonmember affiliates, and the extent that these policies were disclosed to investors; (3) evaluate SEC's oversight of SIPC's operations and compliance with SIPA; and (4) compare the coverage provided by and disclosure rules for SIPC, FDIC, and state insurance guarantee associations; and identify the implications for greater confusion among consumers as some banks, securities firms, and insurance companies consolidate their operations.

To meet the first two objectives, we reviewed SIPA and its legislative history, court decisions, legal briefs, and other documents that were relevant to understanding SIPC's or its critics' views concerning the legal aspects of SIPC positions. Consistent with our general policy, we have not taken a position on issues involving ongoing litigation. To review the implementation of SIPC's policies and to assess investor awareness of these policies, we also reviewed a total of 152 customer claim files from 2 recent liquidations in which many claimants alleged unauthorized trading. For each of the two liquidations, we randomly selected a sample of claim files and reviewed documents from the files. These documents included affidavits and other supporting evidence provided by the claimants, if any were supplied, and the determination letter sent by the trustee to the claimant that explained the reason for allowing or denying the claim. We interviewed officials from SIPC and SEC, individuals who are or who have served as SIPC trustees and their attorneys, and attorneys who have represented claimants who have disputed trustee claim decisions concerning both the unauthorized trading and affiliate issues. In addition, we reviewed SIPC and SEC informational sources—such as brochures and Web sites—to determine what SIPC disclosed to investors regarding its policies and practices.

To fulfill our third objective, to evaluate SEC oversight of SIPC, we reviewed past SEC inspections of SIPC, the work plan and other documents relating to SEC's ongoing inspection of SIPC, a recent report by the SEC's Office of the Inspector General that reviewed SEC's oversight of SIPC,[17] our 1992 report on SIPC,[18] and other SIPC and SEC documents. We also interviewed officials in different organizational units of SEC, including the divisions of Market Regulation (Market Regulation) and Enforcement (Enforcement); the Office of General Counsel (OGC); the Office of Compliance, Inspections, and Examinations (OCIE); and the Northeast Regional Office (NERO) located in New York City.

To accomplish our fourth objective, to identify differences between SIPC and other financial guarantee programs and the potential for increased investor confusion as the financial services industry, we first compared general characteristics of the coverage provided by SIPC, FDIC, and state insurance guarantee associations. Then, we reviewed disclosure requirements regarding firms' participation in these organizations' coverage. To compare SIPC to FDIC, we reviewed pertinent statutes, regulations, and bylaws; and we interviewed officials from both organizations. With respect to state insurance guarantee associations, we focused on the 52 state life/health guarantee associations because the policies they sell, such as annuities, more closely resemble investments than do many of the types of insurance covered by property/casualty insurance guarantee associations. For information on the life/health state associations, we relied solely on information provided by the National Organization of Life and Health Guarantee Associations, a group to which all of the state associations belong. We did not verify the information this organization gave us with individual state insurance laws.

---

[17] *Oversight of Securities Investor Protection Corporation.* Securities and Exchange Commission Office of Inspector General. Audit Report No. 301. Mar. 31, 2000.

[18] *Securities Investor Protection: The Regulatory Framework Has Minimized SIPC's Losses* (GAO/GGD-92-109, Sept. 22, 1992).

**Chapter 1: Introduction**

We obtained written comments on a draft of our report from SIPC and SEC, which are provided in full in appendixes I and II. We did our work in Jacksonville and Tampa, Florida; New York, New York; and Washington, D.C., between March 2000 and April 2001 in accordance with generally accepted government auditing standards.