# EXHIBIT C

Original Image of this Document with Appendix (PDF)

2005 WL 5338148 (2nd Cir.)
For opinion see 463 F.3d 125

**Briefs and Other Related Documents**

United States Court of Appeals,
Second Circuit.
In Re: NEW TIMES SECURITIES SERVICES, INC., and New Age Financial Services,
Inc., Debtors,
Mary Ann STAFFORD, Rheba Weine, Joel Weine, Plaintiffs-Appellees,
v.
James GIDDENS, as Trustee for the Liquidation of the Substantively Consolidated
Estates of New Times Securities Services, Inc., and New Age Financial Services,
Inc., Securities Investor Protection Corporation, Defendants-Appellants.
No. 05-5527-bk.
December 27, 2005.
On Appeal from Order of the United States District Court for the Eastern District of New York

Brief of Appellant Securities Investor Protection Corporation

Of Counsel:, Christopher H. Larosa, Assistant General Counsel.
Josephine Wang, General Counsel, Securities Investor, Protection Corporation, 805 Fifteenth Street,
N.W., Suite 800, Washington, D.C. 20005, Telephone: (202) 371-8300.

TABLE OF CONTENTS

Table of Authorities ... iii

PRELIMINARY AND JURISDICTIONAL STATEMENT ... 1

STATEMENT OF THE ISSUES ... 2

STATEMENT OF THE CASE ... 3

STATEMENT OF THE FACTS ... 10

SUMMARY OF THE ARGUMENT ... 13

ARGUMENT ... 16

I. CLAIMANTS BORE THE BURDEN TO PROVE THAT THEY WERE "CUSTOMERS" WITH "NET EQUITY"
CLAIMS FOR CASH OR SECURITIES ON THE FILING DATE ... 17

1. The Customer's Burden of Proof ... 17

2. "Customer" Status and the Limits of Protection ... 19

3. The Customer's Legitimate Expectations ... 22

II. CLAIMANTS WERE LENDERS, NOT "CUSTOMERS," ON THE FILING DATE ... 26

III. ON THE FILING DATE, CLAIMANTS ALREADY HELD THE PROMISSORY NOTES THAT THEY SOUGHT
TO RECOVER AND THEREFORE HAD NO CLAIMS FOR "NET EQUITY" ... 28

CONCLUSION ... 33

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ... 34

TABLE OF AUTHORITIES

CASES:

*In re Adler Coleman Clearing Corp.,* 195 B.R. 266 (Bankr. S.D.N.Y. 1996) ... 22- 24, 30

*In re Adler Coleman Clearing Corp.,* 198 B.R. 70 (Bankr. S.D.N.Y. 1996) ... 21, 32

*In re Adler Coleman Clearing Corp.,* 204 B.R. Ill (Bankr. S.D.N.Y. 1997) ... 18, 20, 21

*In re A.R. Baron & Co.,* 226 B.R. 790 (Bankr. S.D.N.Y. 1998) ... 18

*Aurecchione v. Schoolman Transp. Sys., Inc.,* 462 F.3d 635 (2d Cir. 2005) ... 16

*In re Bell & Beckwith,* 124 B.R. 35 (Bankr. N.D. Ohio 1990) ... 21

*In re Brentwood Securities, Inc.,* 925 F.2d 325 (9th Cir. 1991) ... 19

*In re Brittenum & Assoc., Inc.,* 82 B.R. 64 (Bankr. E.D. Ark. 1987) ... 26

*In re Carolina First Sec. Group. Inc.,* 173 B.R. 884 (Bankr. M.D.N.C. 1994) ... 26

*In re Chitwood,* 3 B.C.D. 1033 (Bankr. S.D. Ala. 1977) ... 19

*In re C.J. Wright & Co.,* 162 B.R. 597 (Bankr. M.D. Fla. 1993) ... 18

*In re First Interregional Equity Corp.,* 290 B.R. 265 (Bankr. D.N.J. 2003) ... 26

*In re Government Securities Corp.,* 90 B.R. 539 (Bankr. S.D. Fla. 1988) ... 21

*In re Hanover Square Sec.,* 55 B.R. 235 (Bankr. S.D.N.Y. 1985) ... 26-28

*In re June S. Jones Co.,* 52 B.R. 810 (Bankr. D. Or. 1985) ... 22

*In re Klein, Maus & Shire, Inc.,* 301 B.R. 408 (Bankr. S.D.N.Y. 2003) ... 19

*Muller v. Committee on Special Educ. of East Islip Sch. Dist.,* 145 F.3d 95 (2d Cir. 1998) ... 16

*In re MV Securities, Inc.,* 48 B.R. 156 (Bankr. S.D.N.Y. 1985) ... 21, 32

*In re New Times Securities, Inc.,* 371 F.3d 68 (2d Cir. 2004) ... 24, 30

*In re O.P.M. Leasing Securities. Inc.,* 60 B.R. 679 (Bankr. S.D.N.Y. 1986) ... 19

*Pereira v. Farace,* 413 F.3d 330 (2d Cir. 2005) ... 16

*Prima U.S. Inc. v. Panalpina, Inc.,* 223 F.3d 126 (2d Cir. 2000) ... 16

*SEC v. F.O. Baroff,* 497 F.2d 280 (2d Cir. 1974) ... 20, 21, 26

*SEC v. JNT Investors. Inc.,* [1979 Transfer Binder] CCH, Fed. Sec. L. Rep. ¶96, 729 (Bankr. S.D.N.Y. February 8, 1978) ... 22

*SEC v. Packer, Wilbur & Co.,* 498 F.2d 978 (2d Cir. 1974) ... 17

*SEC v. S.J. Salmon & Co.,* 375 F.Supp. 867 (S.D.N.Y. 1974) ... 21-23, 32

*SIPC v. Associated Underwriters, Inc.,* 423 F.Supp. 168 (D. Utah 1975) ... 23, 25

*SIPC v. Exec. Sees. Corp.,* 556 F.2d 98 (2d Cir. 1977) ... 19-20, 26

*SIPC v. I.E.S. Mgmt Group, Inc.,* 612 F.Supp. 1172 (D.N.J. 1985), *aff'd without opinion,* 791 F.2d 921 (3d Cir. 1986) ... 18

*SIPC v. Morgan. Kennedy & Co.,* 533 F.2d 1314 (2d Cir. 1976), *cert den.,* 426 U.S. 936 (1976) ... 19, 20, 26

*SIPC v. Stratton Oakmont,* 229 B.R.273 (Bankr. S.D.N.Y. 1999), *aff'd sub nom., Arford v. Miller,* 210 F.3d 420 (2d Cir. 2000) ... 18, 20, 21, 24

*In re Stalvey & Associates, Inc.,* 750 F.2d 464 (5th Cir. 1985) ... 19, 21

*In re Stratton Oakmont, Inc.,* 2003 WL 22698876 (S.D.N.Y. 2003) ... 22, 25, 30

*In re Stratton Oakmont. Inc.,* 239 B.R. 698 (S.D.N.Y.1999), aff'd, 210 F.3d 420 (2d Cir. 2000) ... 21, 32

STATUTES AND RULES:

Securities Investor Protection Act, as amended, 15 U.S.C. §

78ddd ... 17, 18

78ddd(f) ... 18

78ddd(g) ... 18

78ddd(h) ... 18

78eee(b)(2)(A) ... 1

78eee(b)(4) ... 4

78eee(d) ... 1

78fff(c)(2)(B) ... 23

78fff-2(a)(3) ... 5

78fff-2(b) ... 5, 17, 18, 22, 24, 25

78fff-2(c)(1) ... 17

78fff-2(c)(2)(B) ... 23

78fff-2(d) ... 24

78fff-3(a) ... 18

78111(2) ... 20

Securities Investor Protection Act, as amended,15 U.S.C. §

78 *111*(2)(B) ... 27

78111(4) ... 17

78111(7) ... 22

78111(7)(B) ... 4

78111(11) ... 22, 25

28 U.S.C. §

158(a) ... 1

1291 ... 1

Rules of the Securities Investor Protection Corporation, 17 C.F.R. § 300.

502(a) ... 24, 30

LEGISLATIVE MATERIALS:

S. Rep. No. 763, 95th Cong. 2d Sess.(1978), *reprinted at* 1978 U.S.C.C.A.N. 764 ... 22, 23

H.R. Rep. No. 746, 95th Cong., 1st Sess. (1977) ... 24

Hearings on H.R. 8331 before the Subcommittee on Consumer Protection and Finance of the House Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. (1977) ... 23

## PRELIMINARY AND JURISDICTIONAL STATEMENT

Appellant the Securities Investor Protection Corporation ("SIPC") submits this brief in support of its appeal from the Judgment entered by the United States District Court for the Eastern District of New York (Hon. Joanna Seybert) ("District Court") on August 17, 2005 reversing a memorandum decision and order of the United States Bankruptcy Court for the Eastern District of New York (Hon. Melanie L. Cyganowski) ("Bankruptcy Court"). The District Court had jurisdiction over this contested matter pursuant to Section 78eee(b)(2)(A) of the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), and 28 U.S.C. § 158(a). [FN1]

> FN1. Under SIPA section 78eee(d), SIPC is a party in interest as to all matters arising in a SIPA liquidation proceeding, "with the right to be heard on all such matters." For the reference of the Court, an overview of SIPA and liquidation proceedings thereunder is attached hereto.

SIPC and James W. Giddens ("Trustee"), as Trustee for the liquidation of New Times Securities Services, Inc. ("New Times") and New Age Financial Services, Inc. ("New Age") (collectively "Debtor"), timely filed a joint notice of appeal from the District Court's Judgment on September 13, 2005. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

Through the Judgment, the District Court reversed a Bankruptcy Court order upholding the determination of the Trustee denying the claims of Rheba and Joel Weine (together "Weines") and Maryann Stafford ("Stafford") (collectively "Claimants") to recover as "customers" of the Debtor certain promissory notes reflecting loans made by Claimants to the Debtor outside of the securities markets. The Bankruptcy Court's order was correct. Under SIPA, a putative "customer" must demonstrate that, on the "filing date" (as defined by SIPA), he or she is owed cash or securities in connection with a transaction in the securities markets. This Circuit has specifically excluded lenders from "customer" status. Although Claimants were lenders on the filing date and already held the promissory notes they claim, the District Court reversed the Bankruptcy Court's order.

## STATEMENT OF THE ISSUES

To be eligible for preferred status under SIPA, a claimant must qualify as a "customer" of the debtor with a claim for "net equity" on the "filing date." As of that date, the would-be "customer" must be owed cash or securities by the debtor in connection with a transaction in the securities markets. This Court has specifically excluded lenders from "customer" status. This appeal presents the following issues:

1. Whether, on the filing date, Claimants seeking to recover certain promissory notes were lenders to the Debtor, not "customers," where:

a. The notes reflect loans made by Claimants to the Debtor and/or its principal outside of the securities markets, as indicated, *inter alia,* by the fact that both the Debtor and its principal were co-obligors on the notes, agreeing to repay Claimants the amounts loaned, with 18% interest;

b. Claimants: (i) authorized the underlying loans; (ii) received confirmation and account statements indicating that they had made the loans; (iii) failed to object to the loans after receiving those statements; and (iv) accepted interest payments made to them in connection with the loans; and

c. The District Court itself concluded that "at the time of the filing date, they [Claimants] believed they were creditors, not customers."

2. Whether, on the filing date, Claimants seeking to recover promissory notes had no claims for "net equity" because they already held the notes they sought.

## STATEMENT OF THE CASE

This appeal arises from the Trustee's denial of the "customer" claims filed by Claimants with the Trustee in the consolidated liquidation under SIPA of New Times and New Age, and constitutes part of a contested matter within that liquidation. On February 17,2000, prior to the commencement of the liquidation, the Securities and Exchange Commission ("SEC") filed in the District Court a complaint against New Times, New Age, and their principal, William Goren ("Goren"), along with an application for an order freezing the assets of New Times and New Age and appointing a temporary receiver for them. (Joint Appendix ("JA") 68-86.) The District Court granted the SEC's application and appointed a temporary receiver for New Times and New Age in an order entered the next day. (JA 87-101.) Although the liquidation of New Times and New Age under SIPA had not commenced as of February 17, 2000, that date is deemed to be the "filing date" for purposes of the liquidation. *See* SIPA § 78lll (7)(B).

On May 18, 2000, SIPC filed a motion for entry of a protective decree placing New Times in liquidation under SIPA. (*See* JA 102-19.) The District Court granted SIPC's application on the same day, entering an Order finding that the customers of New Times, a securities broker-dealer, were in need of the protections afforded by SIPA. (JA 120-23.) Through the same order, the District Court placed New Times in liquidation under SIPA, appointed James W. Giddens as Trustee for the liquidation, appointed Hughes Hubbard & Reed LLP as counsel to the Trustee, and removed the liquidation to the Bankruptcy Court in accordance with Section 78eee(b)(4)of SIPA. *(Id.)* Upon motion by the Trustee, the estates of New Times and New Age were substantively consolidated through a Bankruptcy Court order entered on November 27, 2000. (*See* JA 163-72, 200-04.)

On May 30, 2000, the Bankruptcy Court entered an Administrative Order specifying procedures governing the filing of claims by customers, and the review and determination of those claims by the Trustee. (JA 157-62.) Through the Administrative Order, the Bankruptcy Court required the Trustee to publish notice of the commencement of the liquidation proceeding and to mail court-approved notices and claims materials to all persons who appeared from New Times's books and records to have been customers of New Times during the year prior to publication and mailing. (JA 158.) Pursuant to Section 78fff-2(a)(3) of SIPA, all claims were to be filed with the Trustee no later than six months from the date of publication.

In the Administrative Order, the Bankruptcy Court also directed the Trustee to satisfy, within the limits imposed by SIPA, the "net equity" claims of "customers" to the extent that the claims agreed with the Debtor's books and records or were otherwise established to the satisfaction of the Trustee pursuant to Section 78fff-2(b) of SIPA. (JA 160-62.) The Bankruptcy Court further mandated that any claimant who wished to oppose the Trustee's determination of his or her "customer" claim file with the Bankruptcy Court and with the Trustee, within thirty days from the date the Trustee mailed its determination to the claimant, a written statement setting forth the basis of the claimant's opposition to the Trustee's determination. (JA 161-62.)

Following publication and mailing, the Trustee received eight-hundred ninety-eight (898) claims from claimants asserting "customer" status under SIPA, of which two-hundred eighty-two (282) involved promissory notes upon which Goren and/or New Age were obligors. (*See* JA 400.) The Trustee denied all claims premised upon such notes on the ground that the claimants could not qualify as

"customers" within the meaning of SIPA. (Id.) Only twenty-three (23) of these claimants filed written statements of opposition, while two-hundred fifty-nine (259), the overwhelming majority, did not contest the Trustee's determinations. (Id.) In accordance with the Administrative Order, these determinations became final after the expiration of the thirty-day period following the dates on which the Trustee mailed them. (See id.)

The Trustee and SIPC jointly moved to expunge the objections of eleven (11) of the claimants who had given money to Goren or New Age to make certain investments and had received promissory notes in return. (See JA 400.) On June 24, 2002, the Honorable Thomas C. Platt of the District Court entered a Memorandum and Order overruling the objections of these claimants, and sustaining the Trustee's determinations as to their claims. (See JA 273- 81,400.) The Court reasoned that the claimants had failed to demonstrate that they gave Goren and/or New Age money to invest in the capital markets and that "[p]ersons who lend funds to broker-dealers for a purpose other than direct investment in capital markets through those broker-dealers are not customers for SIPA's purposes." (JA 278-79.)

The claims at issue here were based upon transactions similar to those considered by Judge Platt, and were resolved in the same manner by both the Trustee and the Bankruptcy Court. The Weines filed a "customer" claim with the Trustee on July 20, 2000. (JA 212-15.) They left blank the portion of the claim form entitled "claim for money balances as of February 17, 2000" and instead completed only the portion entitled "claim for securities as of February 17, 2000." (JA 212-13.) In the latter section, the Weines listed "promissory notes" among the securities they sought to recover, including one dated March 1, 1999. (JA 213.) According to the Weines' claim and supporting documents, in May 1998, they deposited $35,000.00 with New Age for the purchase of 35,000 shares of New Age Securities Money Market Fund ("New Age Fund"). On March 8, 1999, they authorized the exchange of $20,000.00 worth of those shares for a $20,000 "private note" reflecting a loan to Goren and/or New Age. (See JA 212-15, 282- 84.) On their claim form, the Weines sought recovery of the note and of their remaining shares of the New Age Fund. (JA 213.)

In determinations issued on March 30, 2001 and May 18, 2001, the Trustee denied the Weines' claim in part, and allowed it in part. (JA 216-18, 401-02.) Consistent with the other determinations described above, the Trustee denied the Weines' customer claim to the extent of $20,000.00, the amount of the loan/note transaction. (JA 216-18,402.) The Trustee allowed the Weines' claim as a customer claim for cash in the amount of $13,000.00, representing the remaining $15,000.00 in cash originally deposited by the Weines, less a $2,000.00 withdrawal made by the Weines from their account prior to the commencement of the liquidation. (JA 21618, 402.)

Stafford filed a similar claim with the Trustee, and the Trustee determined it in like manner. In an amended claim form, Stafford sought recovery of two promissory notes on which Goren and New Age appeared as obligors. [FN2] (See JA 28891.) According to Stafford's claim form and supporting documents, in August 1998, she deposited $75,000.00 with the Debtor for the purpose of purchasing securities, and subsequently instructed the Debtor to transfer her investment into loans reflected in the two promissory notes she sought to recover, dated August 15, 1999 (in the amount of $20,000.00) and November 15, 1999 (in the amount of $49,000.00), respectively. [FN3] (See JA 347, 349, 402-03.) Again, consistent with his other determinations regarding claims based upon similar notes, the Trustee denied Stafford's "customer" claim in a determination issued on May 18, 2001. (See JA 233-35.)

FN2. As discussed below, Stafford also appended a hand-written statement to her claim in which she essentially asked the Trustee to ignore the promissory note transactions and to provide her with the New Age fund shares that she believed had been sold to fund the loans reflected in the promissory notes. (See JA 347, 349.)

FN3. Although Stafford deposited $75,000.00 with the Debtor, her claim is for $69,000.00 due to the interim receipt by her of payments totaling $6,000.00. (JA 252 n. 4.)

In July 2001, both Stafford and the Weines objected to the Trustee's determinations denying their customer claims. (*See* JA 207-37.) On or about May 23, 2003, SIPC and the Trustee jointly moved the Bankruptcy Court for entry of an order upholding the Trustee's determinations and expunging Claimants' objections from the record. (*See* JA 238-94.) Following the completion of briefing, the Bankruptcy Court held a hearing concerning the joint motion on September 11, 2003 and, on November 18, 2004, entered a Memorandum and Order granting that motion. (JA 374-397, 398-410.) The Bankruptcy Court explained that "when the Claimants authorized Goren to transfer assets in their securities accounts for the purpose of entering into promissory notes,...the Claimants no longer had money on deposit with the Debtor for the purpose of purchasing securities." (*See* JA 409.) On this basis, the Bankruptcy Court concluded that, on the SIPA filing date - the controlling date for purposes of determining customer status - Claimants were not "customers" within the meaning of SIPA. (*See* JA 409-10.)

On November 23, 2005, Claimants filed in the Bankruptcy Court a notice of appeal to the District Court. (JA 411-13.) Following the completion of briefing, but without a hearing, the District Court issued an Order and Judgment dated August 16, 2005 and entered on the docket on August 17,2005. (*See* Special Appendix ("SPA") 18-25.) Without even acknowledging the decisions of this Court specifically excluding lenders from "customer" status, and ignoring the fact that Claimants already held the notes they sought, the District Court reversed the Bankruptcy Court's decision upholding the denial of Claimants' customer claims. (SPA 18-24.) This appeal followed. (JA 500-02.)

## STATEMENT OF THE FACTS

The claims in issue relate to misconduct by the Debtor's principal, William Goren, who used several methods to solicit monies from investors and creditors. (JA 398-99.) One of those methods was to solicit loans from individuals for use in various purported commercial ventures. (*Id.*) In connection with these loans, Goren issued and personally executed in favor of the lenders promissory notes on which both he and New Age were identified as obligors, and promised lenders above-market interest rates, ranging from 18% to 30%. (*See* JA 248-49.) [FN4] Goren typically delivered these notes to the lenders, who retained possession thereafter. (JA 248.)

> FN4. The facts below were undisputed, as Claimants repeatedly acknowledged. (*See* JA 300, 419 ("The Bankruptcy Court's conclusion was not based upon any finding of disputed fact").)

The lenders funded these "loans" either by making deposits with the Debtor or by authorizing the transfer of funds held in their brokerage accounts at New Age. (*See* JA 249.) Where the lenders followed the latter procedure, the Debtor made entries on their New Age account statements reflecting the transfer of funds from their "customer" accounts and into "Private Notes" with the Debtor. (*Id.*) With the exception of these statements, there were no "customer accounts" or monthly account statements associated with the loans or the notes reflecting them. (JA 248.) Thus, when interest was due to a lender under the notes, it was not credited to the lender's "customer" account, and instead was either paid directly to the lender with a New Age check or was placed in a "renewal note." (JA 249.)

The facts underlying the customer claims filed by the Weines and Stafford conform closely to these general patterns. The Weines deposited $35,000.00 with the Debtor in May 1998 to purchase shares of New Age Fund. (JA 401.) In March 1999, they authorized the sale of 20,000 of the New Age Fund shares that they believed they held, and further authorized the use of the proceeds from this purported sale to fund a loan reflected in a promissory note dated March 1, 1999. (JA 401-02.) The note was signed by Goren and identified both Goren and New Age as obligors. (*See* JA251.)

The Weines were notified of the transaction in several ways, but never disputed or objected to it in any way. They received two New Age statements reflecting the transaction: a confirmation statement dated March 1, 1999 and an account statement for their New Age account for March 1999. (*See* JA 249-50, 282-84.) Both statements show a sale of 20,000 shares of New Age Fund for $20,000.00 and indicate that these sales proceeds were "[t]ransferred to: Private Note with New Age Financial Services." (*Id.*) The Weines also received the promissory note itself and held it on the filing date. (*See* JA 250-51.)

The note, and the Weines' conduct following receipt of the note, provide unequivocal evidence of an

unsecured loan transaction, not a transaction in the securities markets. In this regard, the note identifies the: 1) principal amount loaned ($20,000.00; 2) loan term (one-year with a renewal option); 3) lender (Rheba Weine); and 4) obligors (Goren and New Age). (See JA 250-51.) The note also provides for an above-market interest rate - 18% per annum - consistent with unsecured debt. (Id.) The Weines held the note for more than a year prior to the filing date, and received interest payments on it. (JA 250, 364-66.)

Stafford's customer claim is premised on similar transactions, and suffers from the same defects. Stafford deposited $75,000.00 with the Debtor in August 1998 to purchase shares of the New Age Fund, but subsequently authorized the sale of the shares that she believed she held. (See JA 252-54.) She further authorized the use of the sales proceeds to fund loans in the amounts of $20,000.00 and $49,000.00 that were reflected in promissory notes dated August 15, 1999 and November 15, 1999, respectively. [FN5] (JA 252-54,346-49,402-03.) Characteristically, the notes were signed by Goren and identified Goren and New Age as the obligors. (See JA 253-54.) Like the Weines, Stafford received the notes and held them on the filing date, and also received account statements reflecting the loan transactions, all without protest. (JA 252-55, 292-93, 346- 49, 402-05.)

> FN5. Again, these loans were made net of $6,000.00 in payments previously received by Claimants. (JA 252 n. 4.)

Again, like the Weines, Stafford's conduct, and the notes that she received, unequivocally reflect unsecured loan transactions, not transactions in the securities markets. The notes are nearly identical in form to the note received by the Weines, and identify the principal amounts loaned, the loan terms, the lender, and the obligors. (See JA 251, 253-54.) They provide for the same above-market interest rate (18%) reflected in the Weines' note. (Id.) Like the Weines, Stafford received monthly interest payments on the notes ($1,050 per month on the August 15, 1999 note; an initial payment of $ 1,000 and monthly payments of $375 on the November 15, 1999 note). (JA 252, 402.) Stafford also sought to recover the notes through the "customer" claim that she filed with the Trustee, although she already had those notes in her possession when she filed the claim. (JA 346-49, 403.)

## SUMMARY OF THE ARGUMENT

"Customer" status under SIPA confers priority over other creditors and entitles "customers" to limited advances from SIPC where the fund of "customer property" administered by the SIPA trustee is insufficient to satisfy their allowed "customer" claims. To qualify for this preferred status, a claimant must demonstrate both that he or she was a "customer" on the "filing date" and that, as of that date, he or she had a cognizable "net equity" claim for cash or securities. A customer's "net equity" is the net amount owed to him by the debtor broker-dealer on the filing date. "Net equity" is generally calculated by subtracting from the amount owed by the broker to the customer the amount of any indebtedness of the customer to the broker on the filing date.

Both "customer" status and the nature and extent of a claimant's "net equity" turn on the claimant's reasonable and legitimate expectations on the filing date; expectations which must be supported by the debtor's books and records or otherwise established to the satisfaction of the trustee. Lenders to the debtor do not qualify as "customers" as a matter of law, nor do persons asserting claims based upon fraud or rescission. Likewise, claimants who, on the filing date, already hold the property they believe they are owed have no "net equity" and are ineligible for preferred relief under SIPA.

On the filing date here, Claimants were lenders, not "customers," as to the loan transactions in issue. The Debtor's books and records accurately confirm that Claimants made these loans. As the undisputed record confirms, Claimants understood themselves to be lenders, not brokerage customers, on the filing date. For example, without any objection or protest, Claimants received promissory notes and account and confirmation statements evidencing their loans to the Debtor and/or Goren - the only brokerage account statements associated with the notes or underlying loans - and accepted multiple payments of loan interest. The account and confirmation statements that Claimants received reference "private notes," not market-traded securities. These "private notes" provide for above-market interest rates (18% per annum) characteristic of unsecured debt. In short, on the filing date, Claimants had every reason to believe that they were lenders to, and creditors of, the Debtor and/or its principal, and actually viewed themselves as such, as the District Court itself recognized. As lenders, Claimants were not "customers" as a matter of law.

Moreover, Claimants had no claims for "net equity" on the filing date arising from the transactions is issue. They received the promissory notes they sought, held those promissory notes through the filing date, and actually attached copies of the notes to their "customer" claims. Claimants thus already held on the filing date the only property they claimed, and were owed no other property by the Debtor on that date.

In an effort to shift the focus away from the Debtor's books and records and from their filing date expectations, Claimants attempted to change the character of their claims during the course of the court proceedings below. Ignoring the content of the claim forms they filed with the Trustee - in which they left blank the portions of the forms pertaining to cash claims - they asserted for the first time before the Bankruptcy Court that their claims were for the cash they originally deposited with the Debtor, and that all subsequent transactions in their accounts, including their loans to the Debtor, were "fictitious" and therefore irrelevant. Although Claimants succeeded in misleading the District Court in this way, they were unable to fool the Bankruptcy Court. The Bankruptcy Court correctly determined, as this Court should, that Claimants' legitimate *expectations* on the filing date determined their statuses under SIPA and that, consistent with the Debtor's books and records, Claimants believed that they were lenders on that date and therefore were not "customers."

At bottom, Claimants' complaint is that they were defrauded by Goren and/or the Debtor. Now that the Debtor and Goren can no longer honor their obligations under the loans, Claimants seek to rescind the loans. As alleged fraud victims seeking rescission, Claimants are not SIPA "customers" as a matter of law.

## ARGUMENT

This Court reviews *de novo* the District Court's conclusions of law and its application of the law to the undisputed facts. *See, e.g, Aurecchione v. Schoolman Transp. Sys., Inc.,* 462 F.3d 635, 638 (2d Cir. 2005); *Pereira v. Farace,* 413 F.3d 330, 341 (2d Cir. 2005); *Prima U.S. Inc. v. Panalpina, Inc.,* 223 F.3d 126, 129 (2d Cir. 2000); *Muller v. Committee on Special Educ. of East Islip Sch. Dist.,* 145 F.3d 95, 102 (2d Cir. 1998).

### I. CLAIMANTS BORE THE BURDEN TO PROVE THAT THEY WERE "CUSTOMER" WITH "NET EQUITY" CLAIMS FOR CASH OR SECURITIES ON THE FILING DATE

**1. The Customer's Burden of Proof**

In a SIPA proceeding, claimants who qualify as "customers" of the debtor receive preferred treatment in several ways. They have priority in the distribution of "customer property," a fund of assets generally consisting of the cash and securities "received, acquired or held" by the debtor for its "customers" in the ordinary course of its business, along with the proceeds of any such property transferred by the debtor. *See* SIPA §§ 78fff-2(b) and (c)(1), 78lll(4). "Customers" generally share ratably in this fund to the extent of their "net equity" and do so on a priority basis, to the exclusion of general creditors. *See* SIPA § 78fff-2(b) and (c)(1).

Moreover, to the extent that the fund of "customer property" is insufficient to satisfy the "net equity" claims of "customers" in full, SIPA mandates that SIPC provide additional relief by making limited advances to the SIPA trustee for this purpose from the SIPC fund - a "quasi-public" fund established by SIPC via assessments upon its members. SIPA § 78ddd. *See also, SEC v. Packer, Wilbur & Co.,* 498 F.2d 978, 983, 985 (2d Cir. 1974). In this regard, SIPC may advance to the SIPA trustee not more than $500,000 per customer, of which no more than $100,000 may be used to satisfy that portion of a claim which is for cash rather than for securities. [FN6] *See* SIPA § 78fff-3(a). Thus, each "customer" with a valid claim is assured of satisfaction within the limits indicated, relief not available to general creditors. *Id.; In re A.R. Baron & Co.,* 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998) ("Customer status in a SIPA proceeding is a preferred status which gives the customers priority over other creditors in the distribution of certain assets marshaled by the trustee as well as entitlement to advances from the SIPC fund").

> FN6. If SIPC's funds should become inadequate, SIPA authorizes SIPC to borrow up to one billion dollars from the United States Treasury to make up the shortfall. *See* SIPA §§ 78ddd(f), (g), and (h).

Because "customers" receive preferred status under SIPA - and because the "quasi-public" SIPC fund

from which "customer" claims may be satisfied is limited - the obligations of the debtor broker-dealer to the customer must be ascertainable from the debtor's books and records or must be established by the claimant "to the satisfaction of the trustee." *See* SIPA § 78fff-2(b); *In re Brentwood Securities, Inc.,* 925 F.2d 325, 328 (9th Cir. 1991); *SIPC v. I.E.S. Mgmt Group, Inc.,* 612 F. Supp. 1172, 1177 (D.N.J. 1985), *aff'd without opinion,* 791 F.2d 921 (3d Cir. 1986); *SIPC v. Stratton Oakmont,* 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999), *aff'd sub nom., Arford v. Miller,* 210 F.3d 420 (2d Cir. 2000); *In re Adler Coleman Clearing Corp.,* 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997); *In re C.J. Wright & Co.,* 162 B.R. 597, 604 (Bankr. M.D. Fla. 1993). The claimant's burden to establish "customer" status to the trustee's satisfaction is a heavy one that is difficult to meet, and this Court and others have repeatedly emphasized the term "customer" must be construed narrowly. [FN7] *See Brentwood Securities,* 925 F.2d at 327 (SIPA was "carefully crafted, precisely delineating the categories of investors it protects"); *In re Stalvey & Associates, Inc.,* 750 F.2d 464, 472 (5th Cir. 1985) ("Judicial interpretations of "customer" status support a narrow interpretation of the SIPA's provisions"); *SIPC v. Morgan, Kennedy & Co.,* 533 F.2d 1314, 1317 (2d Cir. 1976), cert. den., 426 U.S. 936 (1976); *In re Klein, Maus & Shire, Inc.,* 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003) ( "The courts have consistently taken a restrictive view of the definition of 'customer' under SIPA and, accordingly, the burden is not easily met").

> FN7. Assignment of this burden to claimants is consistent with general bankruptcy law requiring claimants to establish their entitlement to priority treatment. *See, e.g., In re O.P.M. Leasing Securities. Inc.,* 60 B.R. 679, 680 (Bankr. S.D.N.Y. 1986); *In re Chitwood,* 3 B.C.D. 1033, 1034 (Bankr S.D. Ala. 1977).

## 2. "Customer" Status and the Limits of Protection

In affording preferred status to "customers," Congress intended to protect securities investors against losses stemming from the failure of an insolvent or otherwise failed securities brokerage to properly perform its custodial function. To do so, Congress sought to restore the brokerage accounts of such investors to the statuses legitimately expected by them at the time of brokerage failure, within the limits imposed by SIPA. *See SIPC v. Exec. Secs. Corp.,* 556 F.2d 98, 99 (2d Cir. 1977); *Morgan Kennedy,* 533 F.2d at 1317; *SEC v. F.O. Baroff Co.,* 497 F.2d 280, 282-83 (2d Cir. 1974). Accordingly, "customer" status under SIPA is not a shorthand designation for anyone who deals with a broker-dealer, but rather is limited to those who entrust cash or property to a broker-dealer for the purpose of engaging in securities investing and trading. *See, e.g., Morgan Kennedy,* 533 F.2d at 1316. A claimant asserting "customer" status therefore has the burden to prove that: 1) in the ordinary course of the debtor's business as a broker or dealer, and for specified purposes, the debtor "received, acquired or held" securities from or for the account of the claimant; 2) the claimant deposited cash with the debtor for the purpose of purchasing securities; or 3) the debtor unlawfully converted or otherwise improperly transferred property in either of the first two categories. [FN8] *See* SIPA §§ 78lll(2) and (7); *Baroff,* 497 F.2d at 282 n. 2; *Stratton Oakmont,* 229 B.R. at 277; *Adler, Coleman,* 204 B.R. at 115. Moreover, the would-be "customer" must make this showing separately with respect to every cash balance, security, and/or transaction as to which the claimant asserts "customer" status. *Baroff,* 497 F.2d at 282 n. 2 (SIPA "contemplates that a person may be a "customer" with respect to some of his claims for cash or shares, but not with respect to others"); *Stratton Oakmont,* 229 B.R. at 277 ("[M]oreover, an investor can be a customer vis-a-vis certain transactions but not others"); *Adler, Coleman,* 204 B.R. at 115 ("By design, SIPA focuses on the specific securities or transactions that are the subject of a claim"); *Stalvey,* 750 F.2d at 471 ("Customer status 'in the air' is insufficient to confer the SIPA's protection on a given transaction.").

> FN8. Under SIPA, in pertinent part, a "customer" is defined as:
>
> [A]ny person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant

to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has deposited cash with the debtor for the purpose of purchasing securities...

SIPA § 78lll(2).

Consistent with these limitations, "customer" relief is not available to claimants asserting claims based upon fraud, fraudulent inducement, misrepresentation, nondisclosure, or other similar acts or omissions by the debtor or its principals. *See In re Stratton Oakmont. Inc.,* 239 B.R. 698, 701 (S.D.N.Y. 1999) ("SIPA does not protect against all cases of alleged dishonesty or fraud"), aff'd, 210 F.3d 420 (2d Cir. 2000); *SEC v. S.J. Salmon & Co.,* 375 F. Supp. 867, 870-71 (S.D.N.Y. 1974); *In re Adler Coleman Clearing Corp.,* 198 B.R. 70, 75 (Bankr. S.D.N.Y. 1996); *In re Bell & Beckwith,* 124 B.R. 35 (Bankr. ND. Ohio 1990); *In re Government Securities Corp.,* 90 B.R. 539, 540 (Bankr. S.D. Fla. 1988); *In re MV Securities, Inc.,* 48 B.R. 156, 160 (Bankr. S.D.N.Y. 1985). For this reason, the courts have consistently rejected putative "customer" claims seeking rescission of securities transactions. *See, e.g., S.J. Salmon,* 375 F. Supp. at 870-71 (even though securities purchase was fraudulently induced, claimant's rescission claim was not "customer" claim under SIPA); *In re June S. Jones Co.,* 52 B.R. 810, 816 (Bankr. D. Or. 1985) ("Claimants may well have a right of rescission under [state] law. This right, however, is not the equivalent of a net equity claim under SIPA"); *SEC v. JNT Investors, Inc.,* [1979 Transfer Binder] CCH, Fed. Sec. L. Rep. ¶96,729 (Bankr. S.D.N.Y. February 8, 1978) (claimant seeking to rescind securities transactions based upon alleged violations of Florida's Blue Sky laws was not SIPA "customer").

**3. The Customer's Legitimate Expectations**

Most importantly for purposes of this appeal, the availability, nature, and extent of "customer" relief under SIPA are measured by claimant expectations as of the "filing date" - a proxy for the date of brokerage failure, generally fixed as the date on which SIPC filed its application to have the debtor placed in liquidation; except, as here, where a receiver was appointed for the debtor prior to the date of that filing. *See* SIPA §§ 78fff-2(b), 78lll(7) and (11). *See also, In re Stratton Oakmont, Inc.,* 2003 WL 22698876 at *7 (S.D.N.Y. 2003); *In re Adler Coleman Clearing Corp.,* 195 B.R. 266,274 (Bankr. S.D.N.Y. 1996). *See also,* S. Rep. No. 763, 95th Cong. 2d Sess. 2 (1978), *reprinted at* 1978 U.S.C.C.A.N. 764, 765 ("Senate Report") ("By seeking to make customer accounts whole and returning them to the form they existed on the filing date, the amendments ... would satisfy the customer's legitimate expectations..."); *Hearings on H.R. 8331 Before the Subcommittee of Consumer Protection and Finance of the House Committee on Interstate and Foreign Commerce,* 95th Cong, 1st Sess., 112, 115 (1977) ("Task Force Recommendation") ("Customers whose claims fall within the limits of protection provided by the Act should receive their account as they stood on the filing date"). Claimant expectations lie at the heart of SIPA due to Congress's desire to treat brokerage customers as investors and, where appropriate, to return their securities to them, not merely the cash equivalent thereof. *See, e.g., SIPC v. Associated Underwriters, Inc.,* 423 F. Supp. 168, 173 (D. Utah 1975) ("Section 78fff(c)(2)(B) of SIPA provides that to the greatest practicable extent, customers' net equities should be paid in the form of securities held in their accounts on the filing date"); *S.J. Salmon & Co.,* 371 F. Supp. 867, 871 (S.D.N.Y. 1974) (SIPA's "statutory scheme was designed to facilitate the return of property of customers of insolvent brokerages ..."); *Adler Coleman,* 195 B.R. at 274 ("[t]he assumption underlying the statute is that the customer is an investor and desires to retain the securities").

Of vital importance here, reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transactional reality. Thus, for example, where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund the purchase. *See, e.g.,* 17 C.F.R. § 300.502(a) (customer has claim for securities "if the Debtor has sent written confirmation that the securities in question have been purchased for ... the customer's account"). [FN9] Given the discrepancy in the limits on

SIPC protection available to "customer" claims for cash ($100,000) versus those for securities ($500,000), this emphasis on reasonable and legitimate claimant expectations frequently yields much greater "customer" protection than would be the case if transactional reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates. [FN10] See In re New Times Securities, Inc., 371 F.3d 68, 87 (2d Cir. 2004) (investors who received trade confirmations showing the purchase for their accounts of certain bogus securities reasonably believed that they held these "securities" and therefore had claims for securities, not cash, even though the "securities" in question were entirely fictional).

> FN9. As a rule adopted by SIPC and approved by the SEC, Rule 502(a) has the force and effect of law. See Stratton Oakmont, 229 B.R. at 279; Adler Coleman, 195 B.R. at 275; H.R. Rep. No. 746, 95th Cong., 1st Sess. 25 (1977).

> FN10. Where a customer is owed a security that is not in the possession or under the control of the debtor, the trustee purchases the security for delivery to the customer. SIPA §78fff-2(d). If the security cannot be purchased in a fair and orderly market, the trustee pays the customer the filing-date market value of the security. SIPA § 78fff-2(b).

The centrality of claimant filing-date expectations is evident throughout SIPA. For example, the extent of a claimant's eligibility for "customer" relief is determined, as of the filing date, by the customer's "net equity" - generally the difference between the filing date value of the cash and securities owed by the debtor to the customer and the filing date value of any indebtedness of the customer to the debtor. See SIPA § 78lll(11). The first component in the net equity calculus - the cash or securities owed by the debtor to the customer - turns entirely on the claimant's legitimate, filing date expectations regarding his or her account. See, e.g., Stratton Oakmont, 2003 WL 22698876 at *7 ("whether customers have claims for securities or for cash hinges on what they expected to have in their accounts on the filing date"); Adler Coleman, 195 B.R. at 274. Thus, within the limitations imposed by SIPA, where a claimant legitimately expected to have securities in his or her account on the filing date, he or she will receive those securities, valued as of the close of business on the filing date, in satisfaction of his or her claim. See, e.g., Associated Underwriters, 423 F. Supp. at 173; S.J. Salmon, 375 F. Supp. at 871; Adler Coleman, 195 B.R. at 274. See also, SIPA § 78fff-2(b) ("For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date"). Where the claimant legitimately expected to have cash on that date, he or she will receive cash. Where the claimant had no legitimate expectation of a brokerage relationship with the debtor on the filing date, or already held any cash or securities with respect to which he or she had such an expectation, the claimant has no "net equity" and no claim for "customer" relief under SIPA. See Exec. Secs. Corp., 556 F.2d at 99; Morgan Kennedy, 533 F.2d at 1317; Baroff, 497 F.2d at 282-83.

## II. CLAIMANTS WERE LENDERS, NOT "CUSTOMERS," ON THE FILING DATE

As noted, this Court and others have consistently held that those who invest in or lend money to the debtor do not qualify as "customers." See Exec. Secs., 556 F.2d at 99 (denying customer status to claimants whose loan agreements do not bear indicia of fiduciary relationship between broker and public customer, but rather indicia of ordinary debtor-creditor relationship); Baroff, 497 F.2d at 282-84 (claimant who lends shares to the debtor in order to help it out of cash bind is not a "customer"); In re Hanover Square Sec., 55 B.R. 235, 238 (Bankr. S.D.N.Y. 1985) ("Lenders are simply not a class to be specially protected under SIPA..."). See also, In re First Interregional Equity Corp., 290 B.R. 265, 277 (Bankr. D.N.J. 2003) (denying customer status to claimant who delivers bonds to the debtor in connection with a loan to the debtor, not for the purpose of investing, trading, or otherwise participating in the securities markets); In re Brittenum & Assoc., Inc., 82 B.R. 64, 68 (Bankr. E.D. Ark. 1987); In re Carolina First Sec. Group. Inc., 173 B.R. 884, 887 (Bankr. M.D.N.C. 1994). Congress codified the decisions of this Court in Section 78lll(2)(B) of SIPA, which expressly excludes from "customer" status "any person to the extent that such person has a claim for cash or securities which...is part of the capital of the debtor ..." See SIPA § 78lll(2)(B); Hanover Square, 55

B.R. at 239. On the basis of that section and this Court's decisions, Judge Platt of the District Court held earlier in this liquidation that the holders of promissory notes identical in all material respects to those held by Claimants - on which Goren and New Age appeared as obligors and pursuant to which monthly interest payments were made to the noteholders - were unsecured lenders to the Debtor, not SIPA "customers." (*See* JA 27880.)

The same result is required here. The record establishes beyond dispute that Claimants understood that they were loaning money to the Debtor and/or Goren when they obtained the subject promissory notes. (*See* JA 409-10, SA 20.) Claimants first authorized the loans underlying the notes, and then, without any protest, received confirmation and account statements indicating that they had made the loans. (JA 213, 250-55, 282-84, 292-93, 347, 349.) They accepted interest payments made to them in connection with the notes, which bear all of the indicia of unsecured, private debt, and none of the indicia of instruments traded in the securities markets. (JA 25255, 364-66.) The notes specify an interest rate (18% per annum) well above the rates prevalent in the securities markets, for example, a rate characteristic of unsecured, extra-market debt. (*See* JA 251,253-54.) The account and confirmation statements that Claimants received identify the instruments as "private notes," not marketable securities. (*See* JA 282-84,292-93.) In accepting the notes, Claimants assumed no risk of market loss, and instead received instruments entitling them to a return of principal at a fixed time and interest at a fixed rate.

This evidence overwhelmingly points to a private loan transaction with the Debtor and/or its principal outside the securities markets. It was sufficient to convince even the District Court, which concluded that "at the time of the filing date, they [Claimants] believed they were creditors, not customers." (SPA 20.) In fact, Claimants had no reasonable or legitimate basis for any other belief. Rather, "[f]rom whatever door claimants attempt to enter, they reach the room reserved for lenders." *Hanover Square,* 55 B.R. at 242. As lenders to, and creditors of, the Debtor and/or its principal, Claimants were not "customers" on the filing date.

## III. ON THE FILING DATE, CLAIMANTS ALREADY HELD THE PROMISSORY NOTES THAT THEY

## SOUGHT TO RECOVER, AND THEREFORE HAD NO CLAIMS FOR "NET EQUITY"

Claimants also had no "net equity" on the filing date. The reason is simple: on the filing date, Claimants already held the promissory notes they claimed and thus were owed no cash or securities by the Debtor. Claimants made crystal clear on the claim forms they filed with the Trustee that they sought to recover the promissory notes themselves, not the cash value of those notes, the cash they believed had been used to purchase those notes, or the cash that they initially deposited with the Debtor for the purchase of shares of the New Age Fund. (*See* JA 212-15, 346-49.) In fact, for all their claims, Claimants left blank the portions of the claim forms marked "claim for money balances as of February 17, 2000," and instead completed only those portions of the forms marked "claim for securities as of February 17, 2000." (JA 212-13, 346,347.) In the securities claim portions of the forms, Claimants listed the subject promissory notes themselves - not even the value thereof-as the property they sought to recover. (JA 213, 347.)

In their claims, Claimants did not contend they had not learned of the note transactions prior to the filing date or that they had not received the notes. (JA 21215, 346-49.) On the contrary, Claimants attached account and confirmation statements to their claims reflecting the transfer of funds purportedly held in their New Age brokerage accounts into "private notes" with the Debtor. (*See id.,* JA 28284,292-93.) Claimants also attached copies of the notes themselves, confirming that they received those notes and held them to, and past, the filing date. (JA 251, 25354.) Claimants' claims were thus self-defeating, establishing conclusively that Claimants held on the filing date, and continued to hold when their claims were filed, the only property that they sought to recover.

Belatedly recognizing these defects, with a dawning awareness of the controlling importance of their filing date expectations, Claimants backpedaled furiously in the court proceedings below. Ignoring the content of their claims, Claimants asserted in the Bankruptcy Court for the first time that they became "customers" of the Debtor when they made their initial cash deposits for the purpose of purchasing shares in the New Age Fund, that the cash so deposited was converted by Goren and/or the Debtor, and that the courts could not give effect to any of the transactions that occurred thereafter, including the promissory note transactions, because those "fictitious" transactions were based upon the use of "phantom" cash. (See JA 301-02,308-09,311,404-05.) Claimants now insisted that they were owed their initial cash deposits, effectively inviting the courts to ignore the content of their claim forms. (See JA 299, 405.)

Although the District Court was misled by Claimants' change of approach, this Court should not be. As

noted, Claimants' reasonable and legitimate filing date expectations - whether based upon real or imagined transactions - control their eligibility for "customer" relief. *See, e.g., Stratton Oakmont,* 2003 WL 22698876 at *7; *Adler Coleman,* 195 B.R. at 274; 17 C.F.R. § 300.502(a); Senate Report at 2; Task Force Recommendation at 115. *Cf., New Times,* 371 F.3d at 87- 88. The record is devoid of evidence showing that Claimants believed that the Debtor held cash for them on the filing date, or that their loans to the Debtor and/or Goren were not voluntarily and knowingly made. In fact, Claimants' claim forms accurately reflect what they understood themselves to be on the filing date, lenders to the Debtor holding promissory notes, not cash claimants. As noted, the record evidence confirming that this was Claimants' understanding is abundant, and demonstrates that Claimants actually received the promissory notes and held them to the filing date, that they received account and confirmation statements confirming the funding of the loans underlying the notes, and that they received multiple interest payments on the notes, all without protest. (JA212-15,250-55,282-84,292-93,346-49,364-66,401-03, 409-10.) The District Court itself found that Claimants believed themselves to be creditors of the Debtor, not customers, on the filing date. (SPA 20 ("The issue presented is whether Plaintiffs should be protected by SIPA when at the time of the filing date, they believed they were creditors, not customers").) That finding, coupled with the fact that on the filing date, Claimants already held the notes they claimed, compels the conclusion that Claimants had no cognizable claim for cash or securities held for them by the Debtor.

In fact, Claimants' claims are for rescission of their loan transactions and for damages stemming from fraud or similar misconduct committed by Goren and/or the Debtor. Stafford was nearly explicit on this point. In the body of the amended claim form that she submitted, she identified the promissory notes that she received as the property she sought to recover via her "customer" claim. (JA 347.) She then added a handwritten-note extending over two pages of the form, however, in which she asked the Trustee to ignore the underlying note/loan transactions and instead to treat her claim as one for the New Age Fund shares that she believed had been sold to fund the loans. (See JA 347, 349.) She cited "coercion," by which she seems to have meant fraud, as the basis for this request, stating that:
In (August) 1988 Goren convinced me to put all of my $75,000 into a New Age Securities Money Market Fund ... In 1999, Goren coerced me into turning the money market fund into promissory notes *stating that my return on this investment would be higher.* I am asking SIPC and its representatives to review my claim as a money market claim so I can recoup my investment and because it was Goren himself who moved my money to a note, to serve his own purposes.
(JA 347, 349 (emphasis added).) As noted, such claims are not compensable as "customer" claims for "net equity" under SIPA. *See Stratton Oakmont,* 239 B.R. at 701; *S.J. Salmon,* 375 F. Supp. at 870-71; *Adler Coleman,* 198 B.R. at 75; MV *Securities,* 48 B.R. at 156.

## CONCLUSION

For the reasons stated above, this Court should reverse the District Court's Judgment and should direct the District Court to enter a new judgment upholding the Trustee's determinations denying Claimants' "customer" claims.

Appendix not available.

In Re: NEW TIMES SECURITIES SERVICES, INC., and New Age Financial Services, Inc., Debtors, Mary Ann STAFFORD, Rheba Weine, Joel Weine, Plaintiffs- Appellees, v. James GIDDENS, as Trustee for the Liquidation of the Substantively Consolidated Estates of New Times Securities Services, Inc., and New Age Financial Services, Inc., Securities Investor Protection Corporation, Defendants-Appellants.

## Briefs and Other Related Documents (Back to top)

• 2006 WL 4452911 (Appellate Brief) Reply Brief of Appellant Securities Investor Protection Corporation (Feb. 16, 2006)
• 2006 WL 4452912 (Appellate Brief) Reply Brief for Appellant James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc. (Feb. 15, 2006)
• 2006 WL 4452910 (Appellate Brief) Brief for Plaintiffs-Appellees (Jan. 30, 2006)
• 2005 WL 5338147 (Appellate Brief) Brief for Appellant James W. Giddens as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc. (Dec. 20, 2005)
• 05-5527 (Docket) (Oct. 18, 2005)
END OF DOCUMENT

Adobe Reader is required to view PDF images.



(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.