# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - X

In re:                                          :

                                                :

NEW TIMES SECURITIES SERVICES, INC.             :     Case No. 800-8178 (SB) SIPA
and NEW AGE FINANCIAL SERVICES, INC.,           :     (Substantively Consolidated)

                                                :

                                  Debtors.:           Hearing Date:  July 1, 2001
                                                :     Time:  2:00 p.m.

- - - - - - - - - - - - - - - - - - - - - - - - X

**ORIGINAL**

## JOINT MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER UPHOLDING THE TRUSTEE'S DETERMINATIONS WITH RESPECT TO CLAIMS FILED FOR INVESTMENTS IN NON-EXISTENT MONEY MARKET FUNDS AND EXPUNGING OBJECTIONS TO THOSE DETERMINATIONS

James B. Kobak, Jr. (JK-1218)
One Battery Park Plaza
New York, New York 10004
Tel: (212) 837-6000

Attorneys for James W. Giddens as
Trustee for the liquidation of the
businesses of New Times Securities
Services, Inc., and New Age
Financial Services

Stephen P. Harbeck (SH-7734)
General Counsel

Securities Investor Protection
      Corporation
805 Fifteenth Street, N.W., Suite 800
Washington, D.C. 20005-2207
Tel: (202) 371-8300

Of Counsel:

Karen A. Caplan
Assistant General Counsel

74
m

A.    Stockbroker Liquidations Before 1938 ...................................................................5

B.    Section 60e of the Bankruptcy Act ......................................................................6

C.    SIPA As Enacted in 1970 ...................................................................................7

D.    SIPA As Amended .............................................................................................8

E.    SIPC and Its Funds............................................................................................10

F.    Use of SIPC Funds to Satisfy Customer Claims.................................................10

G.    Nature of a SIPA Proceeding ............................................................................11

H.    The Burden Of Proof ........................................................................................12

ARGUMENT ...............................................................................................................13

I.     CLAIMS BASED ON CASH INTENDED BY THE CUSTOMER
       TO BE USED TO PURCHASE A NON-EXISTENT MONEY
       MARKET FUND MAY ONLY BE TREATED AS NET EQUITY
       CLAIMS FOR CASH UNDER THE STATUTE AND CASE
       LAW. ...................................................................................................................13

       A.    CASE LAW, THE STATUTE, AND ITS LEGISLATIVE
             HISTORY ALL CONFIRM THE TRUSTEE'S
             POSITION. ...................................................................................................13

       B.    SIPC'S SERIES 500 RULES DO NOT APPLY TO THE
             NON-EXISTENT NEW AGE MONEY MARKET FUND....................................22

       C.    THE TRUSTEE HAS UPHELD THE LAW AND ACTED
             LOGICALLY AND CONSISTENTLY; HE HAS NOT
             ABUSED HIS DISCRETION OR TREATED
             CLAIMANTS INEQUITABLY. ........................................................................25

II.    CLAIMANTS' CLAIMS FOR DIVIDENDS OR INTEREST
       EARNED ON PURCHASES OF NEW AGE MONEY MARKET
       FUND ARE NOT ALLOWABLE CUSTOMER CLAIMS.............................................28

CONCLUSION..............................................................................................................29

# TABLE OF AUTHORITIES

## CASES

In re A.R. Baron & Co., 226 B.R. 790 (Bankr. S.D.N.Y. 1998) ..........................................11, 20, 21

In re Adler Coleman Clearing Corp., 195 B.R. 266 (Bankr. S.D.N.Y. 1996) ...............................16

In re Adler Coleman Clearing Corp., 198 B.R. 70 (Bankr. S.D.N.Y. 1996) .....................12, 20, 21

In re Adler Coleman Clearing Corp., 204 B.R. 111 (Bankr. S.D.N.Y. 1997) .............,.................13

Appleton v. Hardy (In re First Ohio Secs., Co.), No. 590-0072, Adv. No. 92-5085
    (Bankr. N.D. Ohio 1992) ........................................................................................................15

Barton v. SIPC, 182 B.R. 981 (Bankr. D.N.J. 1995) ........................................................................21

In re Bell & Beckwith, 124 B.R. 35 (Bankr. N.D. Ohio 1990) .........................................................21

Campos Guardado v. INS, 809 F.2d 285 (5th Cir. 1987) .................................................................26

In re Chitwood, 3 B.C.D. 1033 (Bankr. S.D. Ala. 1977).............................................................. ....12

Duel v. Hollins, 241 U.S. 523 (1916) ................................................................................................5

Exchange Nat'l Bank of Chicago v. Wyatt, 517 F.2d 453 (2d Cir. 1975) .......................................11

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989) ..........................................................26

In re First RepublicBank Corp., 95 B.R. 58 (Bankr. N.D. Tex. 1988) ...........................................26

Gans v. Reddington (In re Weis Secs., Inc.), [1974-1975 Transfer Binder], Fed. Sec. L.
    Rep. (CCH) ¶ 94,780 (S.D.N.Y. 1974).................................................................................22

Gold v. Hyman, [1974-75 Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶ 95,043, 72 Civ.
    5431, 1975 U.S. Dist. LEXIS 13060 (S.D.N.Y. 1975).........................................................11

In re Government Secs., Corp., 90 B.R. 539 (Bankr. S.D. Fla. 1988).............................................12

In re Hanover Square Secs., 55 B.R. 235 (Bankr. S.D.N.Y. 1985) .................................................12

In re Investors Sec. Corp., 6 B.R. 415 (Bankr. W.D. Pa. 1980) ................................................16, 23

In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or. 1985) .......................................17, 22, 23, 25

In re Lewellyn, 26 B.R. 246 (Bankr. S.D. Iowa 1982) .....................................................................11

In re Lloyd Secs., Inc., 75 F.3d 853 (3d Cir. 1996) ........................................................................11

In re MV Secs., Inc., 48 B.R. 156 (Bankr. S.D.N.Y. 1985)..........................................................20 21

Murray v. McGraw (In re Bell & Beckwith) , 821 F.2d 333 (6th Cir. 1987)...........................22, 23

In re O.P.M. Leasing Servs., Inc., 60 B.R. 679 (Bankr. S.D.N.Y. 1986) ........................................12

In re Oberweis Secs., Inc., [1992 Decisions], Fed. Sec. L. Rep. (CCH) ¶ 96,890 (Bankr.
    N.D. Ill. 1992)........................................................................................................................13

Plumbers & Steamfitters Local 490 Severance & Retirement Fund v. Appleton (In re
    First Ohio Secs. Co.), No. 93-3313, 1994 U.S. App. LEXIS 31347, 39 F.3d 1181 (6th
    Cir. 1994), cert. denied, 514 U.S. 1918 (1995) ........................................................14, 15, 27

In re Riley, Bankruptcy No. 91-20397-172, 1991 WL 717226 (Bankr. E.D. Mo. 1991).............26

SEC v. Aberdeen Secs., Co., 480 F.2d 1121 (3d Cir.), cert. denied sub nom. Seligsohn v.
    SEC, 414 U.S. 1111 (1973) ..........................................................................................11, 15, 16

SEC v. Albert & Maguire Secs., Co., 378 F. Supp. 906 (E.D. Pa. 1974)........................................11

SEC v. Albert & Maguire Secs. Co., 560 F.2d 569 (3d Cir. 1977) ..................................................11

SEC v. F.O. Baroff Co., 497 F.2d 280 (2d Cir. 1974)................................................................13, 21

SEC v. Howard Lawrence & Co., 74 Civ. 193, 1975 Bankr. LEXIS 15 (Bankr. S.D.N.Y.
    1975) ......................................................................................................................................17, 20

SEC v. Packer, Wilbur & Co., 498 F.2d 978 (2d Cir. 1974) .....................................................10, 27

SEC v. S.J. Salmon & Co., 375 F. Supp. 867 (S.D.N.Y. 1974) ................................................17, 20

### TABLE OF AUTHORITIES
#### (continued)

**Page**

SIPC v. Ambassador Church Fin./Dev. Group, Inc., 788 F.2d 1208 (6th Cir.), cert. denied
    sub nom. Pine Street Baptist Church v. SIPC, 479 U.S. 850 (1986) ........................................11

SIPC v. Associated Underwriters, Inc., 423 F. Supp. 168 (D. Utah 1975).........................11

SIPC v. Barbour, 421 U.S. 412 (1975) ..........................................................................7, 27

SIPC v. C.J. Wright & Co. (In re C.J. Wright & Co.), 162 B.R. 597 (Bankr M.D. Fla.
    1993) ..............................................................................................................28

SIPC v. Christian-Paine & Co., 755 F.2d 359 (3d Cir. 1985) .......................................11

SIPC v. I.E.S. Mgmt., 612 F. Supp. 1172 (D.N.J. 1985), aff'd without opinion, 791 F.2d
    921 (3d Cir. 1986)..........................................................................................12

SIPC v. Morgan, Kennedy & Co., 3 B.C.D. 15 (S.D.N.Y. 1977) .....................................22

SIPC v. Oberweis Secs., Inc., (In re Oberweis Secs.), 135 B.R. 842 (Bankr. N.D. Ill.
    1991) ..............................................................................................................28

SIPC v. Old Naples Secs. Inc., (In re Old Naples Secs., Inc.), 218 B.R. 981 (Bankr. M.D.
    Fl. 1998), aff'd, 223 F.3d 1296 (11th Cir. 2000).................................................16, 28

SIPC v. Pepperdine Univ. (In re Brentwood Secs., Inc.), 925 F.2d 325 (9th Cir. 1991)...12, 13, 16

SIPC v. Stratton Oakmont, Inc., 229 B.R. 273 (Bankr. S.D.N.Y. 1999), aff'd, 210 F.3d
    420 (2d Cir. 2000)...........................................................................................12

SIPC v. Wise (In re Stalvey & Assoc.), 750 F.2d 464 (5th Cir. 1985)................................21

Schultz v. Omni Mutual, Inc., [1993-94 Decisions], Fed. Sec. L. Rep. (CCH) ¶ 98,095.............13

SIPC v. Waddell Jenmar Secs., Inc. (In re Waddell Jenmar Secs., Inc.), 126 B.R. 935
    (Bankr. E.D.N.C. 1991), aff'd, 991 F.2d 792 (4th Cir. 1993) ..................................13

### STATUTES/RULES

11 U.S.C. § 96(e) (repealed 1979) ..............................................................................6

11 U.S.C. § 96e(2) (repealed 1979) ..........................................................................6

17 C.F.R. §§ 300.500 - 300.503 ("Series 500 Rules")........................................... passim

Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et. seq ................... passim

53 Fed. Reg. 10368 (Mar. 31, 1988).................................................................22, 23, 24

### LEGISLATIVE HISTORY

H.R. Rep. No. 91-1613 (1970), reprinted in 1970 U.S.C.C.A.N. 5255 .................................7

H.R. Rep. No. 95-746 (1977)......................................................................................9

Pub. L. No. 94-29, 89 Stat. 163 (1975)........................................................................8

Pub. L. No. 95-283, 92 Stat. 249 (1978).......................................................................8

Pub. L. No. 95-598, 92 Stat. 2674 (1978)......................................................................8

Pub. L. No. 96-433, 94 Stat. 1855 (1980)......................................................................8

Pub. L. No. 97-258, 96 Stat. 1067 (1982)......................................................................8

Pub. L. No. 97-303, 96 Stat. 1410 (1982)......................................................................8

Pub. L. No. 100-181, 101 Stat. 1265 (1987)...................................................................8

Hearings on Securities Investor Prot. Before the Subcomm. on Commerce and Fin. of the

**TABLE OF AUTHORITIES**
(continued)

**Page**

House Comm. on Interstate and Foreign Commerce, 91st Cong. 2d Sess. (1970)...................20

Report of Special Study of Securities Markets of the Securities and Exchange
    Commission, H.R. Doc. No. 95, 88th Cong., 1st Sess., Pt. 1 (1963)......................................6, 7

Rules of the Securities Investor Protection Corp., 53 Fed. Reg. 1793, 1998 WL 236666
    (1988) .........................................................................................................................................22

S. Rep. No. 91-1218 (1970)...........................................................................................................7

S. Rep. No. 95-763 (1978), reprinted in 1978 U.S.C.C.A.N. 764 ......................................... passim

**MISCELLANEOUS**

3 Collier on Bankruptcy, ¶¶ 60.73-60.76 (14th ed. 1978) ...............................................................7

Michael E. Don & Josephine Wang, Stockbroker Liquidations Under the Securities
    Investor Protection Act and Their Impact on Securities Transfers, 12 Cardozo L. Rev.
    509 (1990)................................................................................................................................ passim

James M. Storey & Thomas M. Clyde, Mutual Fund Law Handbook, "The Legal
    Framework", 3-3 ......................................................................................................................19

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - X
In re:                                          :
                                                :
NEW TIMES SECURITIES SERVICES, INC.             :   Case No. 800-8178 (SB) SIPA
and NEW AGE FINANCIAL SERVICES, INC.,           :   (Substantively Consolidated)
                                                :
                                  Debtors.       :
- - - - - - - - - - - - - - - - - - - - - - - - X

### JOINT MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR AN ORDER UPHOLDING THE TRUSTEE'S DETERMINATIONS WITH RESPECT TO CLAIMS FILED FOR INVESTMENTS IN NON-EXISTENT MONEY MARKET FUNDS AND EXPUNGING OBJECTIONS TO THOSE DETERMINATIONS

James W. Giddens, as Trustee (the "Trustee") for the liquidation under the Securities

Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et. seq., of the substantively consolidated

estates of New Times Securities Services, Inc. ("New Times") and New Age Financial Services

("New Age") (collectively, the "Debtor"), and the Securities Investor Protection Corporation

("SIPC") respectfully submit this Joint Memorandum of Law in support of their Motion for an

order upholding the Trustee's determinations that claims based on cash deposited with the

Debtor for investment in a bogus, non-existent New Age Securities Money Market Fund ("New

Age Money Market Fund") are net equity claims for the cash deposited minus any withdrawals

or redemptions and expunging objections with respect to those determinations (the "Motion").

## STATEMENT OF THE CASE

### Procedural Background

On May 18, 2000, the United States District Court for the Eastern District of New York entered an Order pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. § 78aaa et. seq.,[1] finding that the customers of New Times were in need of the protections afforded by SIPA.  Pursuant to SIPA § 78eee(b)(3), James W. Giddens was appointed as Trustee (the "Trustee") for the liquidation of the business of New Times,[2] and Hughes Hubbard & Reed LLP his counsel.  Pursuant to SIPA § 78eee(b)(4), the liquidation proceeding was removed to this Court.

On May 26, 2000, the Trustee applied to this Court ex parte for entry of an Administrative Order.  This Court granted the Trustee's Application on May 30, 2000.  (A true and correct copy of the Administrative Order is attached hereto as Exhibit A.)  Pursuant to this Court's Administrative Order, the Trustee issued determinations to a number of claimants; some of these claimants have objected to a portion of the Trustee's treatment of their claims.

### Statement of Facts

To date, eight hundred ninety-three (893) claims have been filed in this proceeding.  One hundred seventy-four (174) of these claims relate to funds deposited with the Debtor in order to purchase non-existent New Age Money Market Fund shares ("New Age Money Market Fund claims").  The Trustee has determined one hundred forty-eight (148) of the 174 New Age Money

---

1.    For convenience, references hereinafter to provisions of SIPA shall omit "15 U.S.C."

2.    On November 6, 2000, the Trustee sought an order substantively consolidating the estates of New Times and New Age.  This Court granted the Order on November 27, 2000 (the "Substantive Consolidation Order").  Pursuant to the Substantive Consolidation Order the assets and liabilities of New Times and New Age are pooled, all intercompany liabilities and claims are cancelled, and the combined estate is to be administered by the Trustee in accordance with SIPA and the Bankruptcy Code under the jurisdiction of this Court.  Pursuant to the Substantive Consolidation Order, for purposes of determining "customer" claims under SIPA, the Debtor includes New Times and New Age for claims arising after April 19, 1995, the date that New Times became registered with the SEC and a member of SIPC.

Market Fund claims filed. Of the 148 New Age Money Market Fund claims determined, nine (9) claimants (the "Claimants") have objected to the Trustee's determinations by filing timely written objections to be resolved pursuant to the Claims Resolution Procedures set forth in the Administrative Order.[3] (See Claimant Chart attached as Exhibit A to Joint Motion.)

The Trustee notified each Claimant that his or her claim was allowed as a claim for cash in the amount deposited with the Debtor for the purpose of purchasing the bogus New Age Money Market Fund shares, minus any withdrawals or redemptions. The Trustee further notified the Claimants that amounts shown on account statements as dividends or interest earned on the fictitious New Age Money Market Fund were not allowable customer claims. All 9 Claimants are represented by the same attorney, and their objections set forth similar fact patterns and make like, if not identical, arguments. (See Joint Motion, Ex. A.)

Claimants' objections arise from the fact that they were fraudulently induced by William Goren (the principal and founder of the Debtor) or his employees to part with cash or other property that was supposedly to be invested in the New Age Money Market Fund, a non-existent money market fund allegedly held at Fleet Bank. Claimants deposited money with New Age for investment in the bogus New Age Money Market Fund based on Goren's misrepresentations. Allegedly, Goren misrepresented that the New Age Money Market Fund yielded higher interest rates than bank money market funds, that it would maintain a constant share value of $1.00 per share, and that it would provide a return that was better than a bank deposit. Goren also offered investors a tax-free version of the New Age Money Market Fund and another fictitious fund which he called the New Times Prime Money Market Fund. Goren promised the Claimants

---

[3]      These Claimants are: Myrna K. Jacobs, Simon & Helga Noveck, Miriam Seidenberg, Felice Linder, Angelo Scarlata, Rose Marie Ceparano Irrevocable Trust, Allan A. Blynd, Project Earth Environmental Fundraisers, Inc., and New York Optical. In addition to these nine Claimants, the Trustee expects that Stella & Salvatore DiGiorgio will also file a written objection to his determination of their claim. To the extent they do so, the Trustee asks that they be included within this Omnibus Motion.

3

returns 1 to 1 ½ points higher than most bank savings accounts, and the promised returns ranged from 5 ¼ to 6 ½ percent. The New Age Money Market Fund and the other funds never existed; none of these funds was ever organized as a mutual fund registered with the SEC or issued a prospectus for investors. The cash that Goren received for these bogus funds was used to support his lavish lifestyle, to finance the Debtor's operating costs, to fund returns of principal, to make supposed interest payments on promissory notes and to redeem mutual funds[4] allegedly purchased on behalf of customers.

To conceal his misappropriation of funds, Goren created and provided Claimants with fake monthly account statements containing phony customer account information and trade confirms. The New Age statements resembled legitimate brokerage statements in many ways. Goren interchangeably used the names "New Age Securities Corporation" or "New Times Securities Corporation" on the false account statements. Account numbers under either corporation's name started with the "OXY" prefix. Goren was listed as the registered representative on most of these fake account statements and most indicated SIPC coverage — incorrectly — for up to $10,500,000. Claimants received written trade confirms purporting to verify non-existent purchase and sale transactions and the account statements reflected reinvestment of ersatz dividends.

---

4. Goren's mutual fund scheme paralleled in many respects that of the money market scheme except that the mutual funds purportedly sold to investors actually existed. Investors in Goren's mutual fund scheme believed that Goren was purchasing bona fide mutual funds (e.g., Vanguard, Putnam, Kemper) for their accounts. The mutual fund claimants received written confirmations of such purchases and monthly account statements. Although these transactions were never executed, the information provided on the account statements mirrored what would have happened had the given transaction been executed. Goren tracked each mutual fund that he purported to purchase on behalf of a customer in order to generate account statements which accurately reflected the value of the bona fide mutual fund in question. As explained in more detail within, because real securities existed at all times and could be purchased to satisfy these claims to complete the claimants' transactions with the Debtor, the Trustee has treated these claims as securities claims, rather than cash claims.

## ISSUE PRESENTED

The Claimants are, without question, "customers" of the Debtor for purposes of SIPA. Because claims for cash are not eligible for advances from SIPC in excess of $100,000, the issue presented is:

Whether the Trustee correctly determined that cash deposited by a customer for the purpose of purchasing a non-existent money market fund, which fund never existed, is properly satisfied under SIPA as a claim for cash rather than as a claim for securities.

SIPC and the Trustee submit that the Trustee correctly determined that the claims at issue are claims for cash.

## STATUTORY BACKGROUND

### Overview of SIPA

In assessing the correctness of the Trustee's determination, it is useful to consider the determinations in the context of the purposes and provisions of SIPA and the customer protection program created thereunder. Accordingly, the nature of a SIPA proceeding in light of the legislative history, purposes, and provisions of the statute is discussed below.

### A.    Stockbroker Liquidations Before 1938

Prior to 1938, customers of a bankrupt stockbroker were considered as general creditors if they could not reclaim cash or securities which they could trace into the broker's possession. Duel v. Hollins, 241 U.S. 523, 527-29 (1916). Whether a customer could reclaim depended on what state law governed the securities transaction and on whether the securities were still in the custody of the broker-dealer. See generally, Michael E. Don & Josephine Wang, Stockbroker Liquidations Under the Securities Investor Protection Act and Their Impact on Securities Transfers, 12 Cardozo L. Rev. 509, at 520-24 (1990) (noting that reclamation was a complicated matter that resulted in the unequal treatment of customers). Because serious inequities could and

did result from these requirements, Congress enacted section 60e of the Bankruptcy Act in 1938.[5]

### B.    Section 60e of the Bankruptcy Act

Section 60e sought to remedy these defects by dividing customers of a failed broker-dealer into two categories:  (1) cash customers, and (2) single and separate fund creditors.  "Cash customers," as defined in the Act, were permitted to reclaim fully paid securities which were "specifically identifiable" as their property.  11 U.S.C. § 96(e) (repealed 1979).  See Stockbroker Liquidations Under the Securities Investor Protection Act and Their Impact on Securities Transfers, supra, at 526.  Otherwise, customers' cash, securities, or property of a similar character (not "specifically identifiable"), comprised a "single and separate fund."  That fund was used to satisfy claims (other than for "specifically identifiable property") of the "single and separate class of creditors" on a pro rata basis, subject only to prior payment of certain administrative expenses.  11 U.S.C. § 96e(2) (repealed 1979).

The rights established by section 60e were carefully delineated.  In order to reclaim "specifically identifiable" property or share in the "single and separate fund," it was necessary that a claimant be a "customer."[6]  11 U.S.C. § 96e(1) (repealed 1979).  A person who qualified as a customer received a pro rata distribution of the fund according to the "net equity" of his or her account.  As for the unpaid balance of their net equities, customers shared with general

---

5.    Report of Special Study of Securities Markets of the Securities and Exchange Commission, H.R. Doc. No. 95, 88th Cong., 1st Sess., Pt. 1, at 411 (1963).  (Under section 60e, the rights of customers "are not dependent upon the fortuitous circumstances . . . of the extent to which securities can be traced to the stockbroker's pledgee."  Id. at 412).

6.    As defined by the Bankruptcy Act, "customers' of a stockbroker shall include persons who have claims on account of securities received, acquired, or held by the stockbroker from or for the account of such persons (a) for safekeeping, or (b) with a view to sale, or (c) to cover consummated sales, or (d) pursuant to purchases, or (e) as collateral security, or (f) by way of loans of securities by such persons to the stockbroker. . . ."  11 U.S.C. § 96e(1) (repealed 1979).

6

creditors in the general estate. A more detailed discussion of section 60e is contained in 3
Collier on Bankruptcy, ¶¶ 60.73-60.76 (14th ed. 1978).

### C.   SIPA As Enacted in 1970

Because of the usually inadequate single and separate fund, section 60e did not prevent
customer losses. Customer losses mounted when the rate of failures accelerated in 1969 and
1970. Congress responded to the crisis by enacting SIPA. See S. Rep. No. 91-1218, at 4 (1970).
See also H.R. Rep. No. 91-1613, at 1 (1970), reprinted in 1970 U.S.C.C.A.N. 5255; SIPC v.
Barbour, 421 U.S. 412, 415 (1975). SIPA created SIPC and, among other things, established
procedures for liquidating financially troubled broker-dealers that are members of SIPC.

Like section 60e, customers were still entitled to the return of their "specifically
identifiable property." SIPA § 78fff(c)(2)(C) (1970). SIPA also continued the "single and
separate fund" to satisfy customers' net equity claims. The customers in the "single and separate
class of creditors" shared pro rata and to the exclusion of general creditors. To the extent
customers' claims could not be satisfied from the single and separate fund, SIPC's funds were
used, within the limits of protection, to augment the single and separate fund. Customers who
were owed securities that were not "specifically identifiable property" shared on a pro rata basis
in the available securities held by the debtor for the benefit of customers. SIPA § 78fff(c)(2)(B)
(1970). Where the supply of securities fell short of satisfying claims, the balance of the claims
was paid in cash based on the filing date market value of the security owed to the customer.
SIPA §§ 78fff(c)(2)(A)(iv), 78fff(1) (1970). Customers whose net equity claims could not be
satisfied from the combined sources of SIPC advances and the single and separate fund, then
shared pro rata with general creditors in the general estate. Thus, those who fit the definition of
"customer" under section 60e or SIPA were accorded preferential treatment in the form of a
priority over general creditors. See Report of Special Study of Securities Markets of the
Securities and Exchange Commission, H.R. Doc. No. 95, 88th Cong., 1st Sess., Pt. 1, at 411-12
(1963).

7

**D.** **SIPA As Amended**

In 1978, SIPA was amended[7] to provide greater flexibility to SIPC in satisfying customer claims in an expeditious fashion. The essential elements of a SIPA proceeding remained unchanged. The concept of a "single and separate fund" was altered to a fund of "customer property" encompassing a somewhat broader range of assets than the "single and separate fund." SIPA § 78lll(4). Under the 1978 version, only customers to whom a "customer name security" was owed, that is, a security registered in the customer's name or in the process of registration on the date SIPC filed the application to place the firm into liquidation, could receive the security back outright, without regard to the limits of SIPA protection. SIPA § 78lll(3). The method of satisfying claims for securities was changed. These changes reflected one of two aims of the amendments: (1) to treat equally situated customers equally, and (2) to restore customers as quickly as possible to the position in which they would have been had not the broker-dealer financially failed. Stockbroker Liquidations Under the Securities Investor Protection Act and Their Impact on Securities Transfers, supra, at 540-41. See S. Rep. No. 95-763 at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 764 ("a principal underlying purpose of the bill is make customer accounts whole and returning them to customers in the form they existed on the filing date") (emphasis added).

As with "specifically identifiable property" in the past, customer name securities are not viewed as part of the debtor's estate, but as being held by the debtor as bailee. Stockbroker Liquidations Under the Securities Investor Protect Act and Their Impact on Securities Transfers, supra, at 541 (citing SIPA legislative history). All other securities and cash "received, acquired, or held by or for the account of a debtor from or for the securities accounts of customers, and the

---

7.      SIPA has been amended by Pub. L. No. 94-29, 89 Stat. 163 (1975); Pub. L. No. 95-283, 92 Stat. 249 (1978); Pub. L. No. 95-598, 92 Stat. 2674 (1978); Pub. L. No. 96-433, 94 Stat. 1855 (1980); Pub. L. No. 97-258, 96 Stat. 1067 (1982); Pub. L. No. 97-303, 96 Stat. 1410 (1982); and Pub. L. No. 100-181, 101 Stat. 1265 (1987).

8

proceeds of any such property transferred to the debtor, including property unlawfully converted," is customer property.  SIPA § 78lll(4).  See S. Rep. No. 95-763 at 16, reprinted in 1978 U.S.C.C.A.N. 764, 779 (stating that the act provides that all cash and securities, exclusive of SIPC advances and customer name securities, which are available to the trustee for the satisfaction of customer claims are customer property).  Customer property is distributed pro rata among customers to the extent of their net equities.  SIPA § 78fff-2(c)(1).  The customer's "net equity" under the amended SIPA takes into account the customer's repayment of indebtedness.  SIPA § 78lll(11).  In addition, SIPA was amended to authorize the Trustee to purchase securities for the benefit of customers, SIPA § 78fff-2(d),[8] and to deliver securities of the same class and series of an issuer as securities in the net equity claims.[9]  SIPA § 78fff-2(b)(2).  See S. Rep. No. 95-763 (1978), reprinted in 1978 U.S.C.C.A.N. 764 ("One of the central features of the bill is this subsection's grant of authority to the Trustee to purchase securities in the open market or otherwise obtain them for the purpose of restoring customer accounts to their filing date positions.") (Emphasis added).  This additional power was conferred on the Trustee to effectuate more fully a purpose of SIPA, namely, restoring customers to the position they held on the filing date, so that they could receive what they would have expected to receive had the firm voluntarily ceased doing business.  See H.R. Rep. No. 95-746 at 21 (1977).

---

[8]    Section 78fff-2(d) provides:

> The trustee shall, to the extent that securities can be purchased in a fair and orderly market, purchase securities as necessary for the delivery of securities to customers in satisfaction of their claims for net equities based on securities under section 78fff-1(b)(1) of this title. . . , in order to restore the accounts of such customers as of the filing date. . . .

[9]    Under the amended SIPA the Trustee is authorized to deliver securities in satisfaction of net equity claims for securities to the extent the securities are available or can be purchased in the open market.  SIPA §§ 78fff-2(b), (d).  However, if the securities are unavailable, the customer receives their cash value.  In view of the net equity definition of SIPA section 78fff-2(b) which provides that for "purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date," the amount remitted to the customer is the value of the securities as of the close of business on the filing date.

9

### E.    SIPC and Its Funds

SIPC is a non-profit corporation whose members include most interstate broker-dealers. Membership in SIPC is automatic upon registration as a broker or dealer with the SEC under section 15b of the Securities Exchange Act of 1934. SIPA § 78ccc(a)(2)(A).

SIPA requires SIPC to establish a fund via assessments upon its members. SIPA § 78ddd. If SIPC's funds should become inadequate, SIPA authorizes a borrowing against the U.S. Treasury of up to one billion dollars. SIPA §§ 78ddd(f)-(h). These resources are available for the satisfaction of customer claims within certain limits.

### F.    Use of SIPC Funds to Satisfy Customer Claims

The SIPC fund is "a quasi-public fund" which provides "relief to certain classes of customers." SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983, 985 (2d Cir. 1974). Under section 78fff-3(a), SIPC may advance to the trustee, in order to satisfy net-equity claims of customers, up to $500,000 per customer, of which no more than $100,000 may be used to satisfy that portion of a claim which is for cash rather than for securities.[10]  Regardless of the assets of the failed firm, each customer with a valid claim is assured of satisfaction within the limits indicated. However, SIPA does not attempt to make all customers whole and SIPC's role is carefully delineated. SIPA contemplates that customers' claims will be satisfied to the maximum extent possible from the assets of the defunct member firm. Thus, customers share on a pro rata basis in any fund of customer property and any general estate. SIPA § 78fff-2(c)(1). SIPC's funds supplement those assets within the limits and in the manner provided by the statute. The availability of SIPC's funds does not lessen the burden of customer claims on the estate or its general creditors. To the extent of its advances, SIPC is subrogated to the claims of such

---

[10]     The distinction between the $500,000 and $100,000 amounts is important to this case—because all of the Claimants here have claims for cash in excess of $100,000.

customers. SIPA § 78fff-3(a). See SIPC v. Associated Underwriters, Inc., 423 F. Supp. 168, 170-173 (D. Utah 1975).

### G.    Nature of a SIPA Proceeding

Notwithstanding the special protection afforded customers, a SIPA proceeding essentially is a bankruptcy liquidation. SIPA § 78fff(a). See, e.g., In re Lloyd Secs., Inc., 75 F.3d 853, 857 (3d Cir. 1996); SIPC v. Ambassador Church Fin./Dev. Group, Inc., 788 F.2d 1208, 1210 (6th Cir.), cert. denied sub nom. Pine Street Baptist Church v. SIPC, 479 U.S. 850 (1986); SEC v. Albert & Maguire Secs. Co., 560 F.2d 569, 572 (3d Cir. 1977); Exchange Nat'l Bank of Chicago v. Wyatt, 517 F.2d 453, 457-459 (2d Cir. 1975). With its roots in section 60e of the Bankruptcy Act, a SIPA liquidation effectively is an ordinary bankruptcy liquidation remodeled to achieve the special purposes of SIPA. See SEC v. Albert & Maguire Secs., Co., 378 F. Supp. 906, 909, 911 (E.D. Pa. 1974); SEC v. Aberdeen Secs., Co., 480 F.2d 1121, 1123 (3d Cir.), cert. denied sub nom. Seligsohn v. SEC, 414 U.S. 1111 (1973). Under SIPA section 78fff(b), the "liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7" of the Bankruptcy Code, but only to the extent consistent with SIPA.

The SIPA proceeding looks not only to the disposition of claims of customers, but also to the claims of general creditors. In re Lewellyn, 26 B.R. 246, 253 (Bankr. S.D. Iowa 1982); Gold v. Hyman, [1974-75 Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶ 95,043 at 97,657-58, No. 72 Civ. 5431, 1975 U.S. Dist. LEXIS 13060 (S.D.N.Y. 1975). Estate property is distributed in the order provided in section 726 of the Bankruptcy Code. SIPA § 78fff(e). The SIPA trustee has "the same powers and title with respect to the debtor" and its property as a trustee in bankruptcy, as well as powers that enable him to perform the special functions of a SIPA liquidation. SIPA § 78fff-1(a). See SIPC v. Christian-Paine & Co., 755 F.2d 359, 361 (3d Cir. 1985).

A SIPA liquidation has some elements that differ from those of a bankruptcy case, for example, with respect to the selection of trustee and counsel under section 78eee(b)(3); the

mailing of notices to customers and other creditors under section 78fff-2(a)(1); and the time period for filing claims under section 78fff-2(a)(3).

### H.  The Burden Of Proof

"Customer" status in a SIPA proceeding is a preferred status which gives the customers priority over other creditors in the distribution of certain assets marshaled by the trustee. Accordingly, courts take a restrictive view of Congress's intended scope of investor protection under SIPA.  SIPC v. Pepperdine Univ. (In re Brentwood Secs., Inc.), 925 F.2d 325, 327 (9th Cir. 1991) (hereinafter "Brentwood Securities"); SIPC v. I.E.S. Mgmt., 612 F. Supp. 1172, 1177 (D.N.J. 1985), aff'd without opinion, 791 F.2d 921 (3d Cir. 1986) ("customers" under SIPA receive preferential treatment by being satisfied ahead of general creditors); SIPC v. Stratton Oakmont, Inc., 229 B.R. 273, 278 (Bankr. S.D.N.Y. 1999), aff'd., 210 F.3d 420 (2d Cir. 2000); In re A.R. Baron & Co., 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1998); In re Adler Coleman Clearing Corp., 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996); In re Government Secs., Corp., 90 B.R. 539, 540 (Bankr. S.D. Fla. 1988) ("customers" under SIPA have "preferred status"); In re Hanover Square Secs., 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("[a]ffording customer status confers preferential treatment").

In Brentwood Securities, the Ninth Circuit noted the narrow scope of customer protection under SIPA, stating that "SIPA is carefully crafted, precisely delineating the category of investors it protects.  Specifically, only a 'customer' of a registered broker-dealer may recover from the fund. . . ."  925 F.2d at 327.

In ordinary bankruptcy, claimants seeking a preferred status bear the burden of showing that they are within the class of eligible persons and that their transactions are protected under the Act.  As stated in In re Chitwood, 3 B.C.D. 1033, 1034 (Bankr. S.D. Ala. 1977):

> When statutes involving priorities are in issue, a strict construction must be placed thereon; and the burden falls on those asserting a priority to establish that they were within the intended class.

Accord, In re O.P.M. Leasing Servs., Inc., 60 B.R. 679, 680 (Bankr. S.D.N.Y. 1986).  The same

12

rule applies to a SIPA case. Provisions of SIPA make clear a claimant's burden, by requiring that a debtor's obligations to its customers be "ascertainable from the books and records of the debtor" or "otherwise established to the satisfaction of the trustee." SIPA § 78fff-2(b) (emphasis added). See also, In re Brentwood Secs., Inc., 925 F.2d at 327 (court must determine whether claimants have established that they entrusted cash or securities to the debtor); In re Adler Coleman Clearing Corp., 204 B.R. 111, 115 (Bankr. S.D.N.Y. 1997) ("claimants must prove that they are 'customers'"); Schultz v. Omni Mutual, Inc., [1993-94 Decisions], Fed. Sec. L. Rep. (CCH) ¶ 98,095 at 98,763 (Bankr. S.D.N.Y. 1993) (in SIPA proceeding the claimant bears the burden of proof); SIPC v. Waddell Jenmar Secs. Inc., (In re Waddell Jenmar Secs., Inc.), 126 B.R. 935, 942 (Bankr. E.D.N.C. 1991), aff'd, 991 F.2d 792 (4th Cir. 1993) (unpublished opinion); In re Oberweis Secs., Inc., [1992 Decisions], Fed. Sec. L. Rep. (CCH) ¶ 96,890, at 93,650-51 (Bankr. N.D. Ill. 1992).

## ARGUMENT

**I.  CLAIMS BASED ON CASH INTENDED BY THE CUSTOMER TO BE USED TO PURCHASE A NON-EXISTENT MONEY MARKET FUND MAY ONLY BE TREATED AS NET EQUITY CLAIMS FOR CASH UNDER THE STATUTE AND CASE LAW.**

In adjudicating customer claims under SIPA and its predecessors, the Second Circuit and other courts look to the language of SIPA as well as to the legislative history and goals of SIPA and its Bankruptcy Act antecedent. See, e.g., SEC v. F.O. Baroff Co., 497 F.2d 280, 282-87 (2d Cir. 1974). Whether the focus is on statutory language or on legislative history and purposes, it is beyond question that the Claimants herein have "net equity" claims for cash. SIPA § 78lll(11).

**A.  CASE LAW, THE STATUTE, AND ITS LEGISLATIVE HISTORY ALL CONFIRM THE TRUSTEE'S POSITION.**

Customers have claims for "cash" and not "securities" where they deposit money with a broker-dealer for the purchase of non-existent or fictitious securities. Simply put, a fictitious security, such as the New Age Money Market Fund, is not a "security" which the broker-dealer could have purchased. In turn, it cannot be returned to, or purchased for, a customer by a SIPA

trustee. Nor can a SIPA trustee assign a filing date value to a fictitious security without compounding the fiction. The case law makes clear that the only proper way to treat claims for fictitious securities that is consistent with SIPA is for the Trustee to determine as here: that the customer has a net equity claim for cash equal to the amount deposited by the customer with the broker-dealer minus any withdrawals or redemptions. SIPC is limited by statute to advancing up to $100,000 to satisfy a claim for cash. The remainder of the claim is an allowable claim against the fund of customer property. The treatment afforded these Claimants represents the full statutory protection to which they are entitled and is comparable to that available for bank money market funds for which Goren represented his bogus fund was a substitute.

In Plumbers & Steamfitters Local 490 Severance & Retirement Fund v. Appleton (In re First Ohio Secs. Co.), 39 F.3d 1181, No. 93-3313, 1994 U.S. App. LEXIS 31347, at *2 (6th Cir. 1994) (unpublished opinion), cert. denied, 514 U.S. 1918 (1995) (attached hereto as Exhibit B), investors believed that they had purchased, collectively, over $3 million worth of "pooled certificates of deposit" offered by the debtor, First Ohio Securities Company ("First Ohio"). Gilmartin, the founder of First Ohio, sent investors bogus purchase-confirmation notices and fictitious account statements, and used the investors' funds for his own personal use. Id. After SIPC initiated a liquidation proceeding the investors filed claims with the Trustee for approximately $3 million in securities and cash. Id. The First Ohio Trustee determined that the securities in which the investors believed they had invested never existed and therefore treated their claims as claims for cash rather than for securities based on the information in the bogus account statements and confirmations. Id., at 2-3. Both the bankruptcy court and the district court upheld the Trustee's determinations. Id., at *3. On appeal, the Sixth Circuit affirmed, stating:

> [u]nfortunately for the plaintiffs here, the record fully supports the finding by the trustee and by both the bankruptcy and district courts that the "pooled certificates of deposit" which were the subject of the agreement between the plaintiffs and the broker-dealer not only were not purchased by Gilmartin but, indeed, never even existed. Given this fact, the only legal conclusion possible is that the claims against First Ohio were ones "for cash" and not "for securities." As the district

14

judge noted, SIPA is intended to protect investors against a broker-dealer's insolvency; it is not designed to achieve restitution for fraud.

1994 U.S. App. LEXIS 31347 at *3 (emphasis added).

Similarly, in Appleton v. Hardy (In re First Ohio Secs., Co.), No. 590-0072, Adv. No. 92-5085 (Bankr. N.D. Ohio 1992) (unpublished Order) (attached hereto as Exhibit C), the claimants deposited $140,000 with the debtor for the purchase of securities which included certificates of deposit and a mutual fund, the "All American Fund." The First Ohio Trustee determined that the claimants had a net equity claim for securities and paid them $141,203.58 (including interest). The Trustee made this payment based on his belief that the securities in question existed. Subsequently, the Trustee discovered that neither the certificates of deposit nor the All American Fund existed. Because the securities were fictitious the Trustee asserted that the claimants' claim was not for securities but for cash and thus subject to the $100,000 statutory limit on SIPC advances for cash claims. He therefore filed a turnover proceeding to recover the $41,203.58 excess payment. The claimants filed a motion to dismiss the Trustee's action. Claimants argued that the Trustee could not recover the excess payment on two grounds: (1) a SIPA proceeding does not create an "estate" and pursuant to the Bankruptcy Code only "property of the estate" is recoverable by a Trustee, and (2) even if an estate is created, SIPC advances are not property of the estate. After reviewing all the relevant materials and construing the facts in the light most favorable to claimants, the court held that the claimants' arguments were "specious" and therefore denied their motion to dismiss. (Ex. C, at 4.) In doing so, the court implicitly acknowledged that the Trustee had a right to recover the overpayment made to the claimants based on his incorrect classification of their claim as one for securities. Accord In re First Ohio Secs. Co., 1994 U.S. App. LEXIS 31347 at *3 (affirming bankruptcy court's and district court's decision to uphold Trustee's determination that where certificates of deposit did not exist claimants had claims for cash).

In SEC v. Aberdeen Securities, 480 F.2d 1121, 1127 (3d Cir.), cert. denied sub. nom Seligsohn v. SEC, 414 U.S. 1111 (1973), the claimant had purchased shares of a prospective new

15

issue. The shares were paid for, and the trade confirmed to the claimant by its broker, Aberdeen

Securities Co. ("Aberdeen"). Although Aberdeen remitted the funds to the broker-dealer

underwriting the offer, no certificates were received. Instead, before the stock could be issued,

both the issuer and the underwriter went into bankruptcy. A SIPA liquidation proceeding

subsequently was initiated for Aberdeen, and the claimant filed a claim in that proceeding.

Because the security had no value, the Aberdeen Trustee determined that no payment could be

made to the claimant, a conclusion that was affirmed by the lower court. On appeal, the Third

Circuit disagreed, commenting as follows:

> because the facts demonstrate that since this particular stock was not in existence,
> the purchase could never be made. [Claimants], therefore, do not have a claim for
> the stock itself. . . . We have no doubt, however, that the "dollar amount" of a
> customer's account includes his cash which the broker has, or should have, been
> holding. . . . Thus, if under local law, or by virtue of regulations under which it
> operated, the debtor was obligated to refund the $500 to the [claimants] because
> of inability to deliver the Boatland stock, then there would be a claim for cash
> properly included in the term "net equity."

480 F.2d at 1127 (following remand the Trustee returned to claimants the cash they had

deposited for the purchase of the Boatland stock)." Accord, e.g., SIPC v. Old Naples Secs., Inc.,

(In re Old Naples Secs., Inc.), 218 B.R. 981 (Bankr. M.D. Fl. 1998), aff'd, 223 F.3d 1296 (11th

Cir. 2000) (finding that claimants had asserted customer claim for cash in situation where

claimants had received monthly account statements indicating investments in non-specified

bonds but where no such bonds were "in fact" purchased); In re Brentwood Secs., Inc., 925 F.2d

325, 329 (9th Cir. 1991) (debtor broker-dealer did not hold shares of a security for a claimant

where the shares did not come into existence); In re Investors Sec. Corp., 6 Bankr. 415 (Bankr.

W.D. Pa. 1980) (where claimants intended to purchase bona fide certificates of deposit and had

received interest payments on such purchases for seven months, but where no such purchases

---

11.   The fact that Aberdeen arose prior to the adoption of the Series 500 Rules is inconsequential. As discussed
      infra, the Series 500 Rules have no bearing on this case.

16

had in fact been made, and where certificate of deposit would have nonetheless matured into cash prior to the filing date even if it had been purchased, claimants had a claim for cash); In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or. 1985) (distinguishing case from Aberdeen and Investors based on the fact that June S. Jones' claimants placed orders to purchase bona fide securities even though they were not actually purchased, while claimants in Aberdeen and Investors placed orders to purchase non-existent securities (Aberdeen) or securities that would have matured into cash on the filing date (Investors)). The result reached in these cases is the only result that is consistent with SIPA and its legislative history.

SIPA remedies customers' losses by having the Trustee return to them the actual property that the broker should be holding for them in their accounts. See SEC v. Howard Lawrence & Co., 74 Civ. 193, 1975 Bankr. LEXIS 15, at *7 (Bankr. S.D.N.Y. 1975) ("The Act is designed to remedy situations where the loss arises directly from the insolvency of the broker-dealer."); SEC v. S.J. Salmon & Co., 375 F. Supp. 867, 871 (S.D.N.Y. 1974). The goal of a SIPA proceeding is, thus, to return to customers property that they could have claimed from the broker as of the filing date. S. Rep. No. 95-763, reprinted in 1978 U.S.C.C.A.N. 764.

Where a customer's account should contain certain securities, but does not, the Trustee is authorized to use SIPC cash advances to purchase securities of the "same class and series of an issuer" on the open market to the extent practicable. SIPA §§ 78fff-1(b), 78fff-2(d). See In re Adler Coleman Clearing Corp., 195 B.R. 266, 273 (Bankr. S.D.N.Y. 1996) ("The distribution of a security of the same class and series of an issuer as the security credited to the customer's account on the filing date is deemed to satisfy that customer's claim for that security.") (Emphasis added). In short, what a SIPC Trustee is authorized to do is to step into the shoes of the debtor and to fulfill its obligations to customers as of the filing date.[12]

---

12.    In most instances SIPA requires that unavailable securities be replaced in kind to satisfy a customer claim for securities. SIPA allows a Trustee to satisfy a customer claim for securities by paying the customer the filing date value of the securities in question in instances where the purchase of the securities would be

(Footnote continued on next page)

17

The statute's legislative history unambiguously reflects that the goal of a SIPA proceeding is to restore customers as nearly as possible their accounts as they actually existed at the filing date – supplemented with SIPC funds as needed:

> Under present law, because securities belonging to customers may have been lost, improperly hypothecated, misappropriated, never purchased or even stolen, it is not always possible to provide to customers that which they expect to receive, that is, securities which they maintained in their brokerage account. Instead, when the customer claims for a security exceed the supply available to the trustee in the debtor's estate, then customers generally receive pro rata portions of the securities claims, and as to any remainder, they receive cash based on the market value as of the filing date. . . . A principal underlying purpose of the bill is to permit a customer to receive securities to the maximum extent possible instead of cash, in satisfaction of a claim for securities. By seeking to make customer accounts whole and returning them to customers <u>in the form they existed on the filing date</u>, the amendments not only would satisfy the customers' legitimate expectations, but also would <u>restore the customer to his position prior to the broker-dealer's financial difficulties</u>.

S. Rep. No. 95-763 at 2 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 765 (emphasis added).

---

(Footnote continued from previous page)

detrimental to the estate. The 1978 Amendments' legislative history provides:

> Our expectation is that, in almost all cases, a customer's claim for securities would be satisfied by the delivery of securities, and, where necessary, to accomplish this the trustee would go into the open market and purchase securities. We believe, however, that it is advisable to provide that the trustee would not be required to purchase securities where that could not be done in a fair and orderly market. One chief concern is that the trustee not be required to make purchases in a market which is being improperly controlled or manipulated. This may be of particular significance where the member being liquidated was a market maker. <u>Under those circumstances</u>, the trustee would decline to purchase the needed securities and would instead satisfy the claim by <u>paying cash</u> in lieu of the securities based on <u>the market value of the securities on the filing date</u>. (Emphasis added.)

1977 H. Rep. at 41-42. The option to satisfy claims for securities with cash in lieu of securities does not apply where the security in question does not exist. Nor would Claimants wish it to apply since the filing date market value of their nonexistent securities was zero. Thus, not only is the Trustee's determination to treat claims filed for investments in the non-existent money market fund legally correct, its result is the most equitable.

18

Claimants do not contend that the Trustee misidentified the purported investment at issue.[13] Claimants concede that they intended to invest in the New Age Money Market Fund, an entirely fictitious, non-existent security. Although Claimants may have been innocent to the fraud, the fact is that, as they themselves recognize (e.g., Jacobs' Limited Objection at ¶ 13), no such fund was ever organized as a mutual fund, it was never registered with the SEC, and no prospectus was ever issued or sent to customers, as required for a money market fund's shares to be a security protected by SIPA, let alone returned to Claimants.[14] The non-existent New Age Money Market Fund never satisfied any of these requirements of a security,[15] and nothing of the

---

13.    Section 78fff-2(b) of SIPA provides:

> After receipt of a written statement of claim. . . the trustee shall promptly discharge, in accordance with the provisions of this section, all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer. . . insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee.

SIPA § 78fff-2(b) (emphasis added). It is under the authority of this section that the Trustee has determined to satisfy net equity claims of mutual fund claimants as claims for securities. Contrary to the objections, the Trustee has not allowed "as valid customer claims 'for securities' claims of customers who purchased shares of other non-existent mutual funds. . . ." (Jacobs' Limited Objection at 7.) In each instance in which the Trustee has allowed a mutual fund claimant's claim as a valid claim for securities the Trustee established to his satisfaction the bona fide mutual fund the claimant had intended to purchase. No mutual fund claimant has to date objected to the Trustee's identification of the mutual fund at issue, even though it is possible that a claimant might be entitled to a larger SIPC advance if the claim were treated as a cash claim since some mutual funds have declined in value since their purchase. Thus the question of whether the Trustee abused his discretion in identifying securities is not at issue.

14.    "Mutual funds" are "investment companies" that pool unrelated investors' funds and invest them in securities. The term "mutual fund" implies regulation under the Investment Company Act of 1940 (the "1940 Act") and the Securities Act of 1933. Pursuant to these acts mutual funds must be registered with the SEC and must use a prospectus that has gone through the 1933 Act registration procedures administered by the SEC in selling its shares. James M. Storey & Thomas M. Clyde, Mutual Fund Law Handbook, "The Legal Framework", at 3-3.

15     SIPA defines a "security" as:

> any note, stock, treasury stock, bond, debenture, evidence of indebtedness, any collateral trust certificate, preorganization certificate or subscription, transferable share, voting trust certificate, certificate of deposit, certificate of deposit for a security, any investment contract or certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or mineral royalty or

(Footnote continued on next page)

19

"same class and series" can be purchased, returned to Claimants, or even identified by the Trustee. The fact that Claimants intended to buy securities makes them "customers" entitled to SIPA protection; it does not, however, mean that as customers they are owed securities.

As the legislative history makes clear, SIPA was intended to insure against such practices as the broker-dealers' misappropriation of customer property in its possession, and failure to properly segregate securities entrusted to the broker for safekeeping, sale, or as collateral for margin loans. SIPA was not intended to provide protection in addition to that already provided by law for other types of claims against broker-dealers such as fraud and breach of contract. Hearings on Securities Investor Prot. Before the Subcomm. on Commerce and Fin. of the House Comm. on Interstate and Foreign Commerce, 91st Cong. 2d Sess., at 230 (1970). See In re Adler Coleman Clearing Corp., 198 B.R. 70, 75 (Bankr. S.D.N.Y. 1996) ("No SIPA protection for claims based on fraud or breach of contract."); Howard Lawrence Co., 1975 Bankr. LEXIS 15, at *7 ("The SIPA does not protect customer claims based on fraud or breach of contract.").

Thus, SIPA does not protect customers against all losses. It only protects against the particular customer risks associated with a broker-dealer's insolvency by restoring customers to their original position vis a vis the broker. See In re MV Secs., Inc., 48 B.R. 156, 160 (Bankr. S.D.N.Y. 1985) (noting that SIPA does not protect customer claims based on fraud or breach of contract claims); S. J. Salmon, 375 F. Supp. 867 (investor's rescission claim based on fraudulent inducement not a SIPA customer claim). SIPA does not provide general insurance against

---

(Footnote continued from previous page)

lease (if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933), any put, call, straddle, option, or privilege on any security, or group or index of securities (including any interest therein or based on the value thereof), or any put, call straddle, option or privilege entered into on a national securities exchange relating to foreign currency, any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase or sell any of the foregoing, and any other instrument commonly known as a security.

SIPA § 78lll(14) (emphasis added).

investment risk or even investment fraud, and does not provide special protection for general creditors of the broker, however meritorious their claims.  See F.O. Baroff Co., 497 F.2d at 283 (citing assurances in legislative history that SIPA "is not to be a bailout operation; it is to protect the public customers"); SIPC v. Wise (In re Stalvey & Assoc.), 750 F.2d 464, 468 (5th Cir. 1985) (stating that "[t]he statutory scheme envisioned by the drafters of the statute was to protect persons buying and selling securities through a stockbroker" and that "there is evidence in the legislative history that Congress believed that the SIPA was only an 'interim step' that would not provide complete protection for losses occasioned by the failure of broker-dealer firms"). Indeed, the courts have repeatedly imposed a narrow construction of the definition of "customer" status and have thus limited the types of "claims" that are eligible for SIPC funds.  See, e.g., In re Adler Coleman Clearing Corp., 198 B.R. at 75 (claim for damages for fraudulent concealment of trade confirms not a SIPA customer claim); In re A.R. Baron & Co., 226 B.R. at 796 (failure to execute trades are not customer claims protected by SIPA); Barton v. SIPC, 182 B.R. 981, 985 (Bankr. D.N.J. 1995) (breach of contract claims not customer claims entitled to SIPC funds); In re MV Secs., Inc., 48 B.R. at 160 (same).  In re Bell & Beckwith, 124 B.R. 35, 36 (Bankr. N.D. Ohio 1990) (claims predicated on broker's fraudulent conduct not compensable under SIPA).

As discussed earlier, a claim for a security is satisfied either by delivering the security or tendering its filing date market value.  If the Claimants' claims had been for securities, no delivery could have been made by the Trustee because no security existed to deliver or to purchase.  Instead, the Trustee would be forced to treat the securities as "unavailable" and to remit to the Claimants the filing date market value of the New Age Money Market Fund. Because the New Age Money Market Fund did not exist, its filing date value was zero.  Thus, if this Court were to interpret SIPA in the manner in which Claimants propose, Claimants would be entitled to no SIPC advances whatsoever.  Surely this is not the result that Claimants desire.

The proper reading of SIPA leads to the inescapable conclusion that Claimants have claims for the cash that was to be used for the purpose of purchasing non-existent securities. Since the securities they wished to purchase did not exist the only thing the Debtor could have

21

held in their accounts as of the filing date is the cash that was supposed to be used to make those imaginary purchases. The Trustee proposes to restore that cash to them insofar as SIPA permits.

### B.   SIPC'S SERIES 500 RULES DO NOT APPLY TO THE NON-EXISTENT NEW AGE MONEY MARKET FUND.

In their objections, the Claimants ignore the well established body of case law, the wording of SIPA and its relevant legislative history and rely instead on rules proposed by SIPC and adopted by the SEC in March of 1988 for determining whether a customer claim is for cash or for securities. 17 C.F.R. §§ 300.500 – 300.503 ("Series 500 Rules"). Claimants' reliance is misplaced. The Series 500 Rules do not govern the purchase or sale of non-existent securities, and thus do not apply to the fictitious New Age Money Market Fund.

The Series 500 Rules apply where there is a question of whether a particular securities transaction gives rise to a claim for cash or for securities under SIPA. 17 C.F.R. § 300.500 (emphasis added). See In re A.R. Baron & Co., 226 B.R. 790, 796 (Bankr. S.D.N.Y. 1998). Thus, by definition, in order for the Series 500 Rules to apply, a "security" must first exist. The reason the Series 500 Rules were adopted reinforces this basic point.

Prior to the enactment of the Series 500 Rules, SIPC and SIPA trustees frequently litigated whether SIPA customer claims were claims for cash or claims for securities where a security transaction (i.e. purchase or sale of a security) straddled the filing date. 53 Fed. Reg. 10368 (Mar. 31, 1988). See Murray v. McGraw (In re Bell & Beckwith) , 821 F.2d 333 (6th Cir. 1987); Gans v. Reddington (In re Weis Secs., Inc.), CCH Fed. Sec. L. Rep. 94,780, at 96,576 (S.D.N.Y. 1974); SIPC v. Morgan, Kennedy & Co., 3 B.C.D. 15 (S.D.N.Y. 1977); In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or. 1985). The Series 500 Rules were adopted in order to avoid the uncertainty that arose with trades straddling the filing date. See Rules of the Securities Investor Protection Corp., 53 Fed. Reg. 1793, 1998 WL 236666 (1988) (hereinafter "SIPC Proposed Rules") (noting purpose of rules); In re Adler Coleman Clearing Corp., 218 B.R. at 700

(stating that Series 500 Rules were enacted because prior to 1988 "SIPA provided no clear solution for a situation involving customer trades straddling the filing date").[16]

The Series 500 Rules were enacted to make the treatment of customers' claims in this situation consistent and to make the delivery of a confirmation (which completes a contract for statute of fraud purposes) usually controlling. Thus, Claimants are correct that under the Series 500 Rules it is the receipt of a confirmation of the purchase or sale of a security, "rather than the execution of a trade, that determines whether the customer's net equity claim is one for cash or securities." (Jacobs Limited Objection at 8.) In this case, however, Claimants did not receive written confirmation of the purchase or sale of an actual security and thus do not fall under the rubric of the Series 500 Rules.

The Series 500 Rules were not meant to govern the situation where, as here, the debtor sent written confirmation of the purchase of a non-existent security, but rather, only the situation in which the "security in question" actually exists. See 53 Fed. Reg. at 10368 (a review of the cases giving rise to the Series 500 Rules reveals that in no instance was the security in question fictitious). As Rule 500 expressly states: "These rules will be applied in determining whether a securities transaction gives rise to a "claim for cash" or a "claim for securities" on the filing date. . . ." 17 C.F.R. § 300.500 (emphasis added).

---

16.   Prior to the Series 500 Rules, customers sometimes objected to having their claim deemed a claim for cash for a securities purchase ordered but not completed by the filing date when their claim exceeded the maximum amount SIPC could advance to satisfy a cash claim. See, e.g., Murray v. McGraw (In re Bell & Beckwith), 821 F.2d 333, 335 (6th Cir. 1987); In re Investors Sec. Corp., 6 Bankr. 415 (Bankr. W.D. Pa. 1980); SIPC Proposed Rule, 1988 WL 236666 at *1. Conversely, customers would object to having their claims treated as claims for securities when the underlying value of the security in question had declined. See, e.g., In re June S. Jones Co., 52 B.R. at 813 (claimants argued they had claim for cash, not securities, where securities were not purchased by the filing date, and securities had declined in value); SIPC Proposed Rule, 1988 WL 236666 at *2. Customers wishing to disavow securities purchased for their account in order to have a "claim for cash" argued that a purchase of securities did not occur because their broker never *actually* purchased the securities in question. See id. (emphasis added). Similarly, customers wishing to disavow a sale of securities in order to have a "claim for securities" argued that the securities were not *actually* sold by the broker-dealer so that they were still in their account. See id. (emphasis added).

23

In proposing the enactment of the Series 500 Rules, SIPC stated:

> The proposed rules . . . give full effect to the Congressional intent to "satisfy the customers' legitimate expectations" and "restore the customer to his position prior to the broker-dealer's financial difficulties." S. Rep. No. 763, 95[th] Cong., 2d Sess. 2, [reprinted in], 3 U.S. Code Cong. & Admin. News, 95[th] Cong., 2d Sess., at 765 (1987). Indeed, the results reached under the proposed rules will affirmatively effectuate the Commission's previously stated view on this subject. . . . [T]hat "[w]hen a customer sells securities, his claim from that time until settlement and delivery of the funds is a claim for cash."
>
> * * * *
>
> [T]he Proposed Rules . . . will provide both nationwide uniformity and reasonable certainty for customers as to how their claims will be treated in the event of the failure of a SIPC member, and will provide an objective standard for determining each claimant's legitimate expectations. . . .[T]he proposed rules are in complete accord with all final judicial decisions on this subject, including cases decided prior to SIPA's enactment.

SIPC Proposed Rules, 1988 WL 236666, at *2-3. The Commission approved SIPC's Proposed Rules because it believed that the rules would "satisfy customers' legitimate expectations" in the following way:

> [A] customer that orders securities in his account sold and receives written confirmation of that sale anticipates that his market risk has terminated and that he has a claim for cash in the event of a SIPC liquidation. On the other hand, a customer that orders securities purchased with the cash in his account and receives written confirmation of that purchase believes that he has the investment benefits and risks in that security and that he has a claim for securities in the event of a SIPC liquidation. In addition to satisfying customers' legitimate expectations, the Commission believes that the proposed rules will provide nationwide uniformity and will allow each customer generally to know, with certainty, how their claims will be treated in the event of the failure of a SIPC member. The rules provide an objective standard for determining each customer's legitimate expectations. By providing such a standard, the rules alleviate potential uncertainty and improve investor confidence in the securities markets.

53 Fed. Reg. 10368, 10369. Furthermore, as the legislative history makes clear, the Series 500 Rules are "in complete accord with all final judicial decisions on this subject including cases decided prior to SIPA's enactment." SIPC Proposed Rules, 1988 WL 236666, at *3.

24

In In re June S. Jones Co., 52 B.R. 810 (Bankr. D. Or. 1985), a case decided prior to SIPC's adoption of the Series 500 Rules but noted in SIPC's Proposed Rules as being in accord with them, 1998 WL 236666, at *3, the court specifically addressed whether customers were entitled to receive either cash or securities in satisfaction of their SIPA claims. The claimants relied on Aberdeen Securities and Investors Security Corp. to argue that they had net equity claims for cash since the securities could not be purchased by the filing date. The court rejected their argument noting that:

> In Aberdeen Securities and Investors Security, unlike this case, the securities either never could be purchased, or, if purchased, would have matured into cash prior to the filing date.

In re June S. Jones, 52 B.R. at 814. When the securities actually existed, the return of the securities, rather than treating the claims for cash, to the customers furthered the express purpose of SIPA. Id. at 814.

The result reached in June S. Jones and other cases considering this issue is the only result consistent with section 78fff-2(d) of SIPA, mandating that a trustee satisfy a customer's net equity claim for securities by purchasing or delivering securities of the same class and series as in the net equity claim, and with SIPA's stated goals both before and after the enactment of the Series 500 Rules: to return to customers, whenever possible, that which should and could have been in their account on the filing date. In a circumstance where no security ever existed, that can only be cash. Accordingly, the Trustee's determination should be upheld.

### C. THE TRUSTEE HAS UPHELD THE LAW AND ACTED LOGICALLY AND CONSISTENTLY; HE HAS NOT ABUSED HIS DISCRETION OR TREATED CLAIMANTS INEQUITABLY.

Claimants argue in essence that the Trustee has abused his discretion in allegedly treating money market fund claimants less favorably than mutual fund claimants whose claims have been treated as securities claims and who have received actual mutual fund shares subject to higher

SIPA limit on SIPC advances.[17] As stated earlier, however, both money market claimants and the mutual fund claimants have been treated in accord with SIPA and the Series 500 Rules which limit advances for cash claims to $100,000 because federal protection for bank deposits is so limited. As to the mutual fund claimants, their confirms referred to bona fide mutual funds that existed in the real world outside of Goren's imagination. As a result, the Trustee has been able to identify securities of the same class and series of the issuer and has used funds advanced by SIPC to purchase these mutual funds and return them to claimants. The Trustee was required to treat the mutual fund claims as securities claims, because unlike the New Age Money Market Fund, the listed mutual funds are bona fide securities of issuers of the same class and series and thus fall under the express language of the statute and the Series 500 Rules.

Claimants argue that in a few cases there may be a less than perfect or somewhat ambiguous reference to a mutual fund in a statement or confirm ( a very slight difference in name or an inconsistency in Goren's use of names and legends). In every case, however, the Trustee has been able to identify the actual mutual fund in question by cross-checking the information supplied by Goren on the customer statements, including share price information, with publicly available information and then been able to purchase that security. The Trustee has not simply guessed or purchased something that seemed close or generally similar to a name

---

17.   To the extent reviewable at all, a judicial review of the discretionary acts of the Trustee would be governed by an abuse of discretion standard. See In re Riley, Bankruptcy No. 91-20397-172, 1991 WL 717226 , at *2 (Bankr. E.D. Mo. 1991) (appropriate standard of review of U.S. Trustee's discretionary acts is abuse of discretion); In re First RepublicBank Corp., 95 B.R. 58, 60 (Bankr. N.D. Tex. 1988) (same). See also, Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) (where plan (ERISA) gives the Trustee discretion to determine benefit eligibility or to construe plan terms the standard of review is abuse of discretion); Campos Guardado v. INS, 809 F.2d 285, 298 (5th Cir. 1987) (holding that a statute granting the Attorney General discretion is subject to the arbitrary and capricious standard of review by the court). The Trustee has authority under SIPA to determine whether obligations are ascertainable to his satisfaction. His decision to treat claims filed for investments in non-existent money market funds as claims for cash, rather than claims for securities, was eminently logical given the statutory scheme, its legislative history and the case law; certainly the Trustee did not act arbitrarily and capriciously in (a) drawing a distinction between real, registered, identifiable mutual funds which can be purchased and chimerical, unregistered figments, or (b) endeavoring to restore accounts as closely as possible to their actual pre-liquidation status.

listed by Goren. If the Trustee were to encounter a claim for a mutual fund that he could not identify with a high degree of certainty or that he determined was non-existent and unregistered, he would have to treat that claim as one for cash rather than securities, just as he has treated the claims of these objectors.

Claimants seem to suggest, but do not directly ask, that this Court authorize the Trustee to go out in the market and purchase some money market fund and that this would be more consistent with the statute, the Series 500 Rules, and the treatment of those with claims to bona fide mutual funds. (See, e.g., Linder Limited Objection at 6, 10.) But how is the Trustee to determine which of the thousands of money market funds is most like the non-existent fund? The statute directs the Trustee to purchase securities of the same class and series of the issuer to the extent they are available, not to purchase securities that seem to be most similar to securities that are not only unavailable but never existed. SIPA § 78fff-2(b)(2). If Goren had induced customers to part with cash to purchase non-existent shares in imaginary dotcoms, computer companies, and biotech firms, would a Trustee have to investigate and buy shares in other start-ups most like the fictitious ones? Clearly, this hypothetical is not what SIPA or Congress intended.

The Series 500 Rules were not enacted to circumvent SIPA's prohibition against allowance of fraud claims as "customer claims." See SIPC v. Barbour, 421 U.S. 412 (1975) (SIPA was not designed to achieve restitution for fraud); In re First Ohio Secs., Co., 1994 U.S. App. LEXIS 31347, at *4; SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983 (2d Cir. 1974) (discussing limited and definite goal of SIPA). As discussed above, they were enacted to meet customers' "legitimate expectations" in terms of restoring their position vis a vis the debtor with regard to claims treatment where confirmation of a bona fide securities transaction had occurred. There are and never have been securities of any class and series that either the broker or the Trustee could ever have purchased or held for Claimants. Pre-liquidation, claimants never have had or could have had anything but a claim for the return of the cash they deposited with a potential claim for damages for fraud or breach of contract. The claim for cash deposited is a net

equity claim against the fund of customer property for cash subject to the SIPA limit, and the claim for damages is a general creditor claim.

## II.   CLAIMANTS' CLAIMS FOR DIVIDENDS OR INTEREST EARNED ON PURCHASES OF NEW AGE MONEY MARKET FUND ARE NOT ALLOWABLE CUSTOMER CLAIMS.

For the reasons stated above, Claimants are entitled to the return of the cash entrusted to the Debtor but not the final balance shown in their New Age Money Market account, to the extent that the account shows fictitious interest or dividends as having been reinvested in shares. This amount is often about 5 to 10 percent of the total claim. The law is clear that non-existent dividends or interest supposedly "earned" on non-existent shares are not customer claims protected by SIPA, although they may be allowable general creditor claims. See In re Old Naples Securities, Inc., 218 B.R. at 987 ("[t]he Claimants are entitled to no more than a return of principal. Each claim must be reduced by the amount that the claimant received in 'interest' payments."); SIPC v. C.J. Wright & Co. (In re C.J. Wright & Co.), 162 B.R. 597 (Bankr M.D. Fla. 1993) ("Because debtor misappropriated these funds, claimants have a claim for that which they entrusted to debtor as customer property: the principal amount that was to be invested. Debtor did not convert the interest promised because it was never earned. Debtor only misused claimants initial investment. Likewise, net equity as defined in SIPA does not contain any reference to providing interest on claims to customers. Thus the most claimants are entitled to receive is the return of the principal invested."). See also, In re Oberweis Secs., 135 B.R. 842 (Bankr. N.D. Ill. 1991) (rejecting claim for dividends in failure to execute purchase case and stating that claim for dividends is more properly characterized as one for "damages" and is not part of the claimants' net equity but may be recovered from the general estate). Thus, the Trustee properly determined that the portion of Claimants' claims that sought return of fictitious dividends or interest added to the fictitious value of the fictitious New Age Money Market Fund on customer statements are not allowable customer claims.

28

In summary, the Trustee's treatment of the claims at issue here as claims for cash:

- Is the only interpretation of SIPA consistent with SIPA and case law; and

- Is the only interpretation of SIPA which avoids a determination that the Claimants' investments have no current value.

## CONCLUSION

For the foregoing reasons, the Trustee and SIPC respectfully request that this Court uphold the Trustee's determinations treating claims filed for the value of shares in the non-existent New Age Money Market Fund as net equity claims for cash in the amount deposited by the customer and expunge Claimants' objections with respect to those determinations.

Dated: New York, New York
      May 1, 2001

Respectfully submitted,

HUGHES HUBBARD & REED LLP

By: _____
James B. Kobak, Jr. (JK-1218)
One Battery Park Plaza
New York, New York 10004
Tel: (212) 837-6000

Attorneys for James W. Giddens as Trustee
for the liquidation of the businesses of New
Times Securities Services, Inc., and New
Age Financial Services

SECURITIES INVESTOR PROTECTION CORP.

By: _____
Stephen P. Harbeck (SH-7734)
General Counsel
805 Fifteenth Street, N.W., Suite 800
Washington, D.C. 20005-2207
Tel: (202) 371-8300

OF COUNSEL

    Karen A. Caplan
    Assistant General Counsel

29

NY 550132_3