# EXHIBIT H

Original Image of this Document (PDF)

2003 WL 24132250 (C.A.2) (Appellate Brief)
For opinion see 371 F.3d 68

Briefs and Other Related Documents

United States Court of Appeals,
Second Circuit.
In Re: NEW TIMES SECURITIES SERVICES, INC., and New Age Financial Services, Inc., Debtors,
v.
Myrna K. JACOBS, Simon and Helga Noveck., Miriam Seidenberg. Felice Linder, Angelo Scarlata. the
Rose Marie Ceparano Irrevocable Trust, the Estate of Allan A. Blynd, Salvatore and Stella Digiorgio,
Project Earth Environmental Fundraisers, Inc., New York Optical, Inc., the Carl Carter Irrevocable
Trust, Craig Roffman, Ellen Eschen, and Jill Gundry, Claimants-Appellees.
No. 02-6166.
June 20, 2003.

On Appeal from the United States District Court for the Eastern District of New York

Brief of the Securities and Exchange Commission, Amicus Curiae, in Partial Support of the Position of
Appellants and in Partial Support of the Position of Appellees

Giovanni P. Prezioso General Counsel

Jacob H. Stillman Solicitor

Hope Hall Augustini, Senior Litigation Counsel, Securities & Exchange Commission, 450 Fifth Street,
N.W., Washington D.C. 20549-0606, (202) 942-0912 (Augustini)

## *i TABLE OF CONTENTS

TABLE OF AUTHORITIES ... ii

STATEMENT OF THE ISSUES ADDRESSED BY THE SECURITIES AND EXCHANGE COMMISSION ... 1

INTRODUCTION AND SUMMARY ... 2

BACKGROUND ... 5

ARGUMENT ... 8

I. Under Section 9(a), the Customers Have "Claims for Securities" and Are Therefore Entitled to
$500,000 of SIPC Coverage ... 8

II. The Customers' Net Equity Is Limited to the Amounts Paid to Buy the Fictitious Securities ... 15

III. The Series 500 Rules Are Not Applicable ... 18

CONCLUSION ... 19

## *ii TABLE OF AUTHORITIES

## CASES

Plumbers & Steamfitters Local 490 Severance & Ret. Fund, 39 F.3d 1181 (Table), 1994 WL 599433 (6th Cir. 1994) ... 15, 17

*SEC v. Aberdeen Securities Co.*, 480 F.2d 1121 (3d Cir. 1973) ... 16, 17, 18

*SEC v. Goren*, 206 F. Supp. 2d 344 (E.D.N.Y. 2002) ... 5, 7, 16

## STATUTE AND REGULATIONS

*Securities Investor Protection Act of 1970*, 15 U.S.C. 78aaa

Section 8(b), 15 U.S.C. 78fff-2(b) ... 13, 14, 16

Section 9(a)(1), 15 U.S.C. 78fff-3 ... 2, 3, 4, *passim*

Section 16(11), 15 U.S.C. 78lll(11) ... 5, 13, 14, *passim*

*Series 500 Rules, 17 C.F.R. 300.500*

17 C.F.R. 300.502(a)(1) ... 2, 3, 4, *passim*

## LEGISLATIVE MATERIALS

Federal Broker-Dealer Insurance Corporation: Hearings on S. 2348, 3988 and 3989 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency, 91st Cong. (1970) ... 10

Hearings on H.R. 13308, H.R. 17585, H.R. 18081, H.R. 18109, and H.R. 18458 Before the Subcomm. on Commerce and Fin. of the House Comm. and Interstate an Foreign Commerce, 91st Cong., 2d Sess. (1970) ... 10, 11

Sec. 35(m)(11), S. 2348, 91st Cong. 2d Sess. (Sept. 21, 1970) ... 11

Sec. 6(e)(1), H.R. 19333, 91st Cong. 2d Sess. (Oct. 21, 1970) ... 11

H.R. Rep. No. 91-1613, Securities Investor Protection Act of 1970, 91st Cong. 2d Sess. (Oct. 21, 1970) ... 9

Cong. Rec. S19969 (Dec. 10, 1970) ... 11

Securities Investor Protection Act of 1970, Conf. Rep. No. 91-1788 at 26, 91st Cong. 2d Sess., (Dec. 18, 1970) ... 12

H.R. Rep. No. 95-746, Securities Investor Protection Act Amendments of 1977, at 21, 95th Cong. 1st Sess. (Oct. 26, 1977) ... 9

S. Rep. No. 95-763, The Securities Investor Protection Act Amendments of 1978, at 2, 95th Cong. 2d Sess. (April 25, 1978) ... 4, 9

53 F.R. 10368, 1988 WL 263894, Rules of the Securities Investor Protection Corporation (March 31, 1988) ... 6, 7, 9, *passim*

## STATEMENT OF THE ISSUES ADDRESSED BY THE SECURITIES AND EXCHANGE COMMISSION

The Securities and Exchange Commission submits this brief in response to the Court's request that the Commission submit an amicus curiae brief in this appeal in a broker-dealer liquidation proceeding

brought by the Securities Investor Protection Corporation (SIPC). The appeal raises issues involving the reimbursement of customers of a failed broker-dealer firm under the Securities Investor Protection Act (SIPA) when the securities that the firm sold to the *2 customers were fictitious, non-existent, securities. The Commission takes the following position on these issues:

1. A customer's claim for reimbursement is a "claim for securities" within the meaning of Section 9(a) of S1PA, and therefore is entitled to coverage by SIPC up to $500,000, rather than a "claim for cash," as to which coverage is limited to $100,000, when, as reflected in a confirmation or account statement sent to the customer by the broker-dealer firm, the customer has made a securities purchase and holds the securities in his account, regardless of whether the security is fictitious or real. On this issue, we agree with the customer-claimants in this case rather than with SIPC.

2. The customer's claim for reimbursement under SIPA is measured not by the fictitious value of the non-existent security (and of fictitious dividends on the security) set forth by the firm on the customer's account statement but, rather, by the amount of money paid by the customer to the firm to purchase the security. On this issue, we agree with the result urged by SIPC rather than with the customers.

3. The Series 500 Rules, promulgated by SIPC and approved by the Commission, are not applicable to transactions involving fictitious securities because those rules were adopted to deal with transactions involving real, not fictitious, securities. On this issue, which the Court need not reach but on which the Court has requested the Commission's views, we agree with SIPC rather than with the customers.

## INTRODUCTION AND SUMMARY

SIPA provides that SIPC is to advance funds to the trustee (appointed in a SIPA liquidation proceeding) to pay claims up to $500,000 per customer, except that if any portion of *3 the customer's claim "is a claim for cash, as distinct from a claim for securities, the amount advanced to satisfy such claim for cash shall not exceed $100,000." Section 9(a)(1), 15 U.S.C. 78fff-3.

In this case, customers of a broker-dealer firm bought securities in a non-existent money market fund. They received confirmations of their purchases and thereafter received monthly account statements reflecting their ownership of the fictitious securities and the purported reinvestment of fictitious dividends purportedly paid by the non-existent fund. At issue is whether, under Section 9(a) of SIPA, customers have claims for securities subject to $500,000 protection or claims for cash subject to $100,000 protection. Also at issue is whether the claims are measured by the fictitious figures on the account statements or by the amounts paid by the customers to purchase the securities.

SIPC and the trustee argued in the district court that because the securities never existed, the customers had claims for cash, measured by the amounts paid to purchase the securities, and subject to the $100,000 limit, rather than claims for securities. The court disagreed, agreeing instead with the customers' argument that they had legitimate expectations that their accounts contained securities, fictitious or not, and that, consistent with those expectations, they held claims for securities subject to the $500,000 limit. The court relied on the Series 500 rules, promulgated by SIPC and approved by the Commission, that govern securities transactions that have not been completed when the SIPC filing is made. The court valued the customers' claims based on the fictitious figures set forth in the final account statements, which included fictitious dividend reinvestments, rather than by using the amounts paid by the customers to the firm. SIPC and the trustee have appealed.

*4 It is the Commission's view that, because the firm sent confirmations and account statements reflecting the customers' purchases, and the continued holding of the securities in their accounts, their claims for reimbursement are claims for securities and not for cash within the meaning of Section 9(a), and are thus entitled to $500,000 in coverage. Congress provided for the $500,000/ $100,000 distinction in Section 9(a) because it wanted brokerage customers who use their accounts

as depositories for cash to be limited to the same protection for cash that bank depositors receive under FDIC coverage. That statutory purpose is satisfied by interpreting "claims for securities" in Section 9(a), as the district court and the Commission do, to include claims by customers who made payments for the purchase of securities, whether fictitious or not, in transactions that were reflected in confirmations or account statements as securities purchases. Indeed, construing Section 9(a) to cover these claims furthers the legislative intent of SIPA to "satisfy the customers' legitimate expectations." S. Rep. No. 95-763, 95th Cong., 2d Sess. at 2, 3 (1978).

Turning to the issue of how to determine the value of the customers' claims, the Commission believes that the customers' claims should be measured by the amount of money they paid to the firm to purchase the fictitious securities. SIPA does not permit the claims to be valued, as the district court valued them, by the fictitious values assigned to those securities, and to fictitious dividends, in the account statements. The district court's method of valuation entitles customers to a recovery that bears no relation to reality.

Finally, this Court asked the Commission to specifically address the Series 500 Rules. Although the Commission believes that this Court need not reach this question using the foregoing analysis, the Commission believes, contrary to the view of the district court, that these *5 rules were intended to deal with transactions in real securities that are not completed when the SIPC filing is made and thus do not apply to fictitious securities. Nonetheless, these rules and their rationale lend support to our conclusion that, consistent with the customers' reasonable expectations, they have securities claims protected up to $500,000.

## BACKGROUND

On May 18, 2000, the District Court for the Eastern District of New York entered an order pursuant to the Securities Investor Protection Act of 1970, 15 U.S.C. 78eee(b), finding that the customers of New Times Securities Services, Inc. were in need of the protections afforded by SIPA. JA-763. A trustee was appointed to liquidate the business of New Times (JA-762); and, after the trustee discovered extensive intermingling of the business operations of New Times and New Age Financial Services, Inc., the bankruptcy court consolidated the estates of New Times and New Age (collectively the "debtor"). JA-134.

Claimants in this appeal are customers who paid money to the debtor to buy shares of non-existent money market funds. These customers received confirmations of those securities transactions from the debtor, and thereafter received monthly statements indicating the reinvestment of dividends in the fictitious securities. SEC v. Goren, 206 F. Supp. 2d 344, 345-47 (E.D.N.Y. 2002). In fact, the customers' funds were misappropriated.

Under Section 16(11) of SIPA, 15 U.S.C. 78111(11), which defines a customer's "net equity" i.e., the value of a customer's account - the trustee is required to determine the dollar value of the account by adding up the cash that is or should be in the account and the value of securities (as of the date of the filing) that are or should be in the account and subtracting any customer liabilities to the debtor. In this case, the trustee determined that because the debtor *6 could not have bought a fictitious security for its customers, and because the securities did not exist and therefore could not be valued in the way contemplated by the Act - by determining the sum owed by the debtor had it liquidated the securities on the filing date - the net equity of the customers' accounts could only be the cash that was paid to the firm to buy the fictitious securities. Because the net equity was calculated by looking to the amount of that cash, the trustee determined that the customers had "claims for cash" and therefore that SIPC's coverage for their claims was limited to $100,000.[FN1]

> FN1. We note that other customers of the debtor who thought they had purchased securities in real mutual funds, but whose cash was similarly misappropriated and the securities never purchased by the debtor, were treated differently by the trustee. The trustee agreed that because they purported to buy real securities, they had "claims for

securities" and were entitled to $500,000 of SIPC coverage. JA-552-60.

The customers objected to the trustees' characterization of their claims, arguing that because they intended to purchase securities and believed that they had done so. their claims were claims for securities and subject to the higher limit of $500,000 in Section 9(a). The customers based their analysis on SIPC's Series 500 Rules, 17 C.F.R. 300.500 (entitled "Rules Relating to Satisfaction of a 'Claim for Cash' or a 'Claim for Securities'"), arguing that these rules provide for classification of claims in accordance with the legitimate expectations of a customer based on the contents of written transaction confirmations sent by the firm. Responding to the contentions of SIPC and the trustee that these rules were adopted for the limited purpose of addressing what happens when a securities transaction has not been completed as of the filing date and do not apply to fictitious transactions involving nonexistent securities, the customers argued that the rules do not distinguish between real or fictitious securities and *7 were written broadly enough to cover both.

On May 28, 2002 the district court denied the trustee's motion to uphold his determinations and sustained the claimants' objections. Goren, 206 F. Supp. 2d 344. The district court held that the confirmations and monthly account statements established that the claimants' claims were for securities, not cash, because the claimants had legitimate expectations that their accounts held securities. Id. at 351. In so holding, the district court relied on the provision in the Series 500 Rules that a customer has a claim for securities if the brokerage firm "has sent written confirmation to the customer that the securities in question have been purchased for or sold to the customer's account." 17 C.F.R. 300.502(a)(1).

The court held that receipt of "confirmations and monthly statements bred legitimate expectations within the Claimants that they owned shares of an existing security" and was "sufficient to establish that the Claimants hold securities claims." 206 F. Supp.2d at 351. "SIPA's cash/securities distinction does not hinge on the unilateral actions of the fraudfeasor who embezzled his clients' funds, but instead turns on the transaction notice provided to customers and their legitimate expectations." Id.

With respect to the customers' claims that fictitious dividends that were purportedly reinvested in additional shares of the nonexistent money market fund were also within SIPC's coverage, the court held that the "monthly account statements spawned the Claimants' legitimate expectations that dividends realized on their MMF holdings were reinvested back into the MMF to purchase additional shares" and were "sufficient to establish that Claimants hold securities claims for the amount of the dividend reinvestments." 206 F. Supp.2d at 351. The court ordered the trustee to satisfy the customer's claims with cash "based on the number and value of MMF *8 shares * * * based on the Claimants' equity positions as stated in their final account statements and in New Age's and New Time's records." Ibid.

SIPC and the trustee have appealed the district court's decision.

## ARGUMENT

I. UNDER SECTION 9(a), THE CUSTOMERS HAVE "CLAIMS FOR SECURITIES" AND ARE THEREFORE ENTITLED TO $500,000 OF SIPC COVERAGE.

The parties in this case disagree over whether the customers who bought fictitious securities are entitled to $100,000 or $500,000 of SIPC coverage. The relevant provision of Section 9(a), 15 U.S.C. 78fff-3 provides (emphasis added):

(a) Advances for Customers' Claims - In order to provide for prompt payment and satisfaction of net equity claims of customers of the debtor, SIPC shall advance to the trustee such moneys, not to exceed $500,000 for each customer, as may be required to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property, except that -

(1) if all or any portion of the net equity claim of a customer in excess of his ratable share of customer property is a claim for cash. as distinct from a claim for securities, the amount advanced to satisfy such claim for cash shall not exceed $100,000 for each such customer.

Section 9(a) should be interpreted by looking at its language as well as the legislative intent in enacting that section. SIPA does not define a "claim for cash" or a "claim for securities." But the legislative intent in distinguishing between cash and securities claims in Section 9(a), and the overall purpose of SIPA, support the view, consistent with the statutory language, that the customer claims here are "claims for securities" because the confirmations and account statements sent by the broker-dealer to these customers confirmed their purchases and the continued existence of securities in their accounts. This construction of Section 9(a) is consistent with a customer's legitimate expectations.

**\*9** SIPA was enacted to "provide investors protection against losses caused by the insolvency of their broker-dealer," H.R. Rep. No. 91-1613, Securities Investor Protection Act of 1970, at 2, 91st Cong., 2d Sess. (Oct. 21, 1970), after a number of broker-dealer insolvencies threatened investor confidence in the safety of assets entrusted to broker-dealers. Subsequent amendments to SIPA were intended to "make SIPA more responsive to the reasonable expectations of public investors." H.R. Rep. No. 95-746, Securities Investor Protection Act Amendments of 1977, at 21, 95th Cong. 1st Sess. (Oct. 26, 1977). See also 53 F.R. 10368, 1988 WL 263894, Rules of the Securities Investor Protection Corporation (March 31, 1988) (Commission order approving SIPC's Series 500 Rules, agreeing with SIPC that rules will give full effect to the Congressional intent to "satisfy the customers' legitimate expectations.") (quoting S. Rep. No. 95-763 at 2.95th Cong. 2d Sess. (April 25, 1978)).

The legislative history of SIPA shows that bills proposed in both houses originally provided SIPC coverage for all customer claims, without distinguishing claims for securities from claims for cash, up to a limit of $50,000. The later inclusion in SIPA of the distinction between claims for cash and claims for securities was simply to address a matter identified by the Department of the Treasury and the Board of Governors of the Federal Reserve System that under the proposed legislation, brokerage customers would get more protection for cash on deposit with a brokerage firm than they would be entitled to for cash on deposit with banking institutions.

In an April 6, 1970 letter to the Senate Committee on Banking and Currency, the Acting General Counsel of the Department of the Treasury opposed the $50,000 SIPC coverage, stating:

**\*10** The proposed maximum insurance limit of $50,000 per account would be excessive as compared to the maximum coverage provided by FDIC and FSLIC of $20,000 per account, and could be construed as an indication that the Federal Government attaches greater importance to the preservation of public confidence in broker-dealers than to the preservation of confidence in the banking system.

Federal Broker-Dealer Insurance Corporation: Hearings on S. 2348, 3988 and 3989 Before the Subcomm. on Securities of the Senate Comm. on Banking and Currency, 91st Cong. (1970)at 80. On April 16, 1970, the Acting General Counsel sent a letter to the House Committee on Interstate and Foreign Commerce, opposing for the same reason the $50,000 coverage in the House bill. See Hearings on H.R. 13308. H.R. 175 85, H.R. 18081, H.R. 18109, and H.R. 18458 Before the Subcomm. on Commerce and Fin. of the House Comm. and Interstate an Foreign Commerce, 91st Cong., 2d Sess. 146 (1970) ("House Hearings"). The Federal Reserve, although not opposing the legislation, likewise made an observation about the disparity between the proposed $50,000 coverage for customers of broker-dealers and the $20,000 coverage provided by FDIC. In a July 9, 1970 letter to the House Committee on Interstate and Foreign Commerce, the Vice Chairman of the Board of Governors of the Federal Reserve System observed (emphasis added):

The Board recognizes * * * that coverage of customers of broker- dealers cannot be entirely parallel to that afforded depositors in banks, because the broker performs a custodial function - an integral part of customer account services - in holding customers' fully-paid securities in safe-keeping. The accounts of customers of broker-dealers thus reflect partly depository claims (credit balances)

Case 1:09-cr-00213-DC   Document 111-11   Filed 09/30/09   Page 8 of 12

comparable to claims insured by the FDIC and partly custodial claims comparable not to deposits but to bank trust accounts.

*11 House Hearings at 146.

Notwithstanding the disparity in coverage, as the legislation progressed through the House and Senate and was reported out of the respective committees, the provision for coverage continued to state that "[i]n order to provide for prompt payment and satisfaction of the net equities of customers of the debtor," the corporation "shall advance to the trustee such moneys as may be required to pay or otherwise satisfy claims in full of each customer, but not to exceed $50,000" for each customer. See Section 35(m)(1 1), S. 2348, 91st Cong. 2d Sess. (Sept. 21, 1970); Sec. 6(e) (1), H.R. 19333, 91st Cong. 2d Sess. (Oct. 21, 1970).[FN2] The provision in the House bill passed without change, but in the Senate the provision was changed by way of amendment offered on the floor on December 10, 1970, which reduced the amount of coverage from $50,000 to $20,000. Senator McIntyre explained that the amendment was to "bring investor protection in line with the protections which the Congress has already made available to depositors in banks and shareholders in savings and loan associations." Cong. Rec. S19969 (Dec. 10, 1970). In response to the proposed amendment, Senator Bennett inquired whether "it might be more acceptable and more efficient in restoring confidence if the figure in the original bill with respect to securities only were left at $50,000 and the $20,000 applied to the cash." Id. at S19970. After extended debate, the amendment nonetheless passed, with the understanding that this issue would be further examined in conference. See S19970-75.

> FN2. Thereafter, in a December 8, 1970 letter to the Senate Committee, the Acting Secretary of the Treasury, unlike the earlier letter from the Department's Acting General Counsel, expressed support for the legislation. Cong. Rec. S19967 (Dec. 10, 1970).

During conference, the language was again amended and for the first time distinguished *12 between claims for cash and claims for securities, and provided the two-tier type of protection currently found in Section 9(a). The Conference Committee explained that "the Conference substitute continues the $50,000 limitation, but provides further that, insofar as all or any portion of a customer's claim is for cash (as distinct from securities), the amount advanced for such claim to cash shall not exceed $20,000." Securities Investor Protection Act of 1970, Conf. Rep. No. 91-1788 at 26, 91st Cong. 2d Sess., (Dec. 18, 1970).

In light of the legislative history, it is apparent that the dichotomy struck in Section 9(a) between "claim for cash" and "claim for securities" was intended to distinguish the custodial functions of a broker-dealer with respect to securities from the broker-dealer's depository-like functions with respect to cash deposits. The carve-out in Section 9(a) for cash claims was intended to apply to the latter, not the former. It was intended to limit the protection of a brokerage firm customer who uses his account as a depository for cash to the same protection for that cash that bank depositors receive under FDIC coverage.

Based on the foregoing, the relevant question in this case is whether, in light of the statutory purpose to satisfy a customer's legitimate expectations, the customers' claims here with respect to the fictitious securities are more properly characterized as claims involving the debtor's function as a securities custodian or the debtor's function as a cash depository. When a customer has been sent confirmations and account statements reflecting his securities purchases and showing that he holds the securities in his account, his claim, in the Commission's view, involves the debtor's function as securities custodian and is one for securities entitled to SIPC protection up to $500,000. Conversely, if the customer is using his brokerage account as a cash depository, as reflected in his account statements, he has a claim for cash entitled to protection up *13 to $100,000 - no more protection than that provided to bank depositors.

The Commission notes that although the Series 500 Rules are not applicable here (as we explain below in Part 3). they are consistent with our view that when possible, SIPA should be interpreted consistently with a customer's legitimate expectations based on confirmations and account

statements. The goal of the Series 500 Rules was to "provide an objective standard for determining each customer's legitimate expectations" by choosing the transaction confirmation notice sent by a firm to its customer as the relevant event for determining whether a customer had a "claim for cash" or "claim for a security." 53 F.R. at 10369. We see no compelling reason to deviate from that approach in interpreting Section 9(a) in this case.

SIPC argues (Br. 25) that because no securities ever existed here, the claims for purposes of Section 9(a) must be ones for cash, and to construe them as securities claims would be inconsistent with other provisions in the Act. SIPC argues (Br. 25-27) that the Act sets up a dichotomy found in various provisions in the Act - between matters relating to securities and matters relating to cash - and that although the Act does not refer to those matters in an identical fashion in each place, they nonetheless should be interpreted consistently. SIPC points out (Br. 10, Reply Br. 5) that under Section 8(b), 15 U.S.C. 78fff-2(b). the trustee is required to discharge the debtor's obligations with respect to securities by delivery of securities, or by payment of their ascertainable filing date value. Because non-existent securities cannot be delivered and have no value under Section 8(b), SIPC argues (Br. 19-20), the customer's claim cannot be a "claim for securities" within the meaning of Section 9(a). SIPC also argues that if a customer's "net equity," a term used in Section 9(a) in referring to customer claims, is calculated under Section 16(11)(A) by looking to the amount of cash paid to purchase the non-existent security, rather *14 than by determining the filing-date value, the customer can only have a "claim for cash" within the meaning of Section 9(a).

SIPC's desire for cash-versus-securities consistency (Br. 25) among the various provisions is not an unreasonable approach, and indeed, the terms "securities" and "cash" are used in several provisions in the Act. Nonetheless, the provisions on which SIPC relies, Sections 8(b) and 16(11)(A), do not use the Section 9(a) terms "claim for cash" and "claim for securities," and the cash-security dichotomy in Sections 8(b) and 16(11)(A) serves very different purposes than the distinction in Section 9(a). The purpose of the distinction between securities and cash in Section 8(b) relates to the different ways in which a trustee must satisfy the debtor's obligations - the delivery of securities or cash. Furthermore, the term "cash" is not even mentioned in the net equity definition in Section 16(11), which provides a method of calculating in dollar terms the amount of a customer's claim. Neither Section 8(b) nor Section 16(11) compels any conclusion about the status of customer claims under Section 9(a).

More importantly, we believe that SIPC's argument disregards the legislative purpose of Section 9(a) and defeats the reasonable expectations of broker-dealer customers. Categorizing these customers' claims to be claims for cash under Section 9(a) would undermine the fundamental goal of SIPA to reassure investors that they may entrust custody of securities to their broker, and that, should the firm become insolvent, the customer will be protected up to $500,000. The amount of SIPC coverage should not depend on whether the securities the customer expects to be in his account are real or fictitious. Whether the securities are fictitious or actually exist, in both cases, the customer is entitled to rely on the confirmations and account *15 statements sent by the broker-dealer stating that his account contains securities and not cash.[FN3]

> FN3. We recognize that one court of appeals has held that a claim for non-existent securities is a claim for cash under Section 9(a). In Plumbers & Steamfitters Local 490 Severance & Ret. Fund. 39 F.3d 1181 (Table), 1994 WL 599433 (6th Cir. 1994), an unpublished decision, the Sixth Circuit held that customer claims for "pooled certificates of deposit" that were never purchased by the debtor and never in fact existed, were claims for cash and not claims for securities under Section 9(a). The court fails to explain its reasoning other than to state that "SIPA is intended to protect investors against a broker-dealer's insolvency; it is not designed to achieve restitution for fraud." 1994 WL 599433, at *1. A Sixth Circuit decision is not controlling in this Circuit.

II. THE CUSTOMERS' NET EQUITY IS LIMITED TO THE AMOUNTS PAID TO BUY THE FICTITIOUS SECURITIES.

The amount payable by SIPC under Section 9(a) is dependent on a customer's "net equity," a term

defined in Section 16(11). The district court held that the amounts of the customers' net equity claims were the fictitious amounts listed on the customers' final account statements, which included fictitious dividend reinvestments in the non-existent money market fund. SIPC contends (Br. 20) that the customers' net equity is limited to the amount of cash the customers paid to purchase the fictitious securities. We agree with SIPC.

Section 16(11), in pertinent part, defines "net equity" as follows:

The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by -

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer.

Because the securities in this case were fictitious, their value on the filing date cannot be determined by calculating the filing date liquidation price as provided in subsection (A); a fictitious security cannot be "liquidated." The district court erred in attempting to value those fictitious securities, and fictitious dividend reinvestments, by looking at the fictitious amounts *16 and values assigned by the debtor in the claimants' final account statements. The requirement in Section 8(b) that a trustee is to discharge a debtor's obligations "insofar as such obligations are ascertainable from the books and records of the debtor" presupposes, contrary to the position of the district court (see 206 F. Supp. 2d at 352), that the figures in those books and records are accurate. To apply the securities valuation method set forth in Section 16(11)(A) using fictitious amounts in the firm's books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality.

We recognize that in this case, the amount of a customer's cash contribution will likely be similar to the value of the customer's account set forth in the account statement. This is true only in the special circumstances of this case where the broker purports to sell shares in a money market fund, for $1 per share, that provided an investment return that was arguably within the range of the returns being provided by other money market funds at the time. But fictitious securities in future cases could also involve other types of mutual funds or stocks which, unlike money market funds, are subject to valuations not generally understood to be $1 per share. Valuing the customers' claims for fictitious securities by looking at whatever imaginary values the broker assigns leaves the SIPC fund unacceptably exposed.

Nevertheless, the claimants did pay money to the debtor to purchase securities which the debtor was not capable of purchasing; and, on the filing date, that money should have been in the accounts and the debtor was obligated to return those customers' funds. Therefore, the claimants' net equity is the dollar amount owed by the debtor - in this case, the amount paid by the claimants to purchase the securities. As the Third Circuit observed in SEC v. Aberdeen Securities Co. 480 F.2d 1121, 1127 (3d Cir. 1973) (emphasis added):

*17 [Section 16 (11)] does not make it crystal clear that the customer's net equity consists of both his cash balance and the securities account valued as of the filing date. We have no doubt, however, that the "dollar amount" of a customer's account includes his cash which the broker has. or should have been holding.

As we have already explained, however, the fact that the customer's net equity in this case is determined by the amount of cash paid for the securities does not mean that the customer has a "claim for cash" within the meaning of Section 9(a).[FN4] The statutory language does not compel this conclusion, and the abuse identified by SIPC (Br. 29) if these customers' claims were construed to be "claims for securities" was based on its assumption that the customers' claims for securities would be measured by their fictitious value on the filing date. Because those customers will only recover the cash they paid, up to a limit of $500,000, SIPC coverage will not be subject to the whim of the broker-dealer who makes up fictitious values for securities and dividends.[FN5] We believe that limiting the amount of the customers' net equity claims in this fashion, and allowing $500,000

coverage, best serves the Act's goal to satisfy the customers' reasonable expectations that when they paid money to purchase securities, and were sent *18 confirmations and account statements documenting the transactions and the presence of securities in their accounts, they were protected by the coverage afforded to "claims for securities."

> FN4. To the extent that Aberdeen could be read (and we note that the parties dispute the significance of that case) to hold not only that the customer's claim was the amount of money the customer paid to buy the security, but also that his claim was one for cash in Section 9(a), we disagree. Moreover, like Plumbers & Steamfitters, Aberdeen is not controlling in this Circuit.

> FN5. We recognize that the approach suggested here would treat customers who bought fictitious securities more favorably than those who were fraudulently induced to purchase real securities, albeit worthless, and who, under the net equity definition, would have no claim. There are two distinct risks, however, facing broker-dealer customers: the risk that the security purchased will be a bad investment and the risk that the broker-dealer will not execute the order, convert the customer's funds and become insolvent, leaving the customer with no cash or securities. SIPA was intended to protect customers against the latter risk, not the former, which is borne by the investor.

## III. THE SERIES 500 RULES ARE NOT APPLICABLE.

SIPC promulgated, and the Commission approved, the Series 500 Rules to determine "whether a securities transaction gives rise to a 'claim for cash' or a 'claim for securities' on the filing date." Before the Series 500 Rules were adopted, SIPC frequently litigated whether a customer's claim was for cash or securities when a transaction straddled the filing date. Customers seeking to disavow a purchase transaction would argue that the purchase had not occurred until their broker had actually delivered cash to the contra-broker, who had in turn delivered the securities to the customer's broker. Alternatively, customers seeking to disavow a sale transaction would argue that the sale had not occurred until their broker had delivered the securities to the contra-broker, who had in turn delivered the cash to the customer's broker. Under the Series 500 Rules, the sending of a written confirmation for a purchase or sale, rather than the delivery of cash or securities, determines whether a claim is for securities or cash. 53 F.R. 10368, 1988 WL 263894.

Nowhere in the discussion of either the proposed or adopted rules is there any indication that SIPC contemplated using these rules in determining whether a customer's claim based on the sale of a non-existent security was a claim for cash or a claim for a security. Nor is it likely that SIPC intended, without discussion, to overturn its longstanding position (see Aberdeen Securities Co. 480 F.2d at 1127) with respect to the treatment of non-existent securities. Accordingly, we agree with SIPC that the Series 500 Rules are not applicable to this case.

## *19 CONCLUSION

In the Commission's view, when a customer pays money to a broker-dealer to purchase a fictitious security and the broker-dealer confirms the purchase and thereafter sends account statements that reflect the purchase and the existence in the account of the securities, rather than cash on deposit, that customer has a claim for securities within the meaning of Section 9(a). Under the net equity provision in Section 16(11), the amount of the claim will be limited to the amount paid by the customer to purchase the security, but the claim will be covered under Section 9(a) up to $500,000.

In Re: NEW TIMES SECURITIES SERVICES, INC., and New Age Financial Services, Inc., Debtors, v. Myrna K. JACOBS, Simon and Helga Noveck., Miriam Seidenberg. Felice Linder, Angelo Scarlata. the Rose Marie Ceparano Irrevocable Trust, the Estate of Allan A. Blynd, Salvatore and Stella Digiorgio, Project Earth Environmental Fundraisers, Inc., New York Optical, Inc., the Carl Carter Irrevocable Trust, Craig Roffman, Ellen Eschen, and Jill Gundry,

2003 WL 24132250 (C.A.2) (Appellate Brief)


Briefs and Other Related Documents (Back to top)

- 2003 WL 25817232 (Appellate Brief) Brief (Jul. 3, 2003) Original Image of this Document (PDF)
- 2003 WL 25817233 (Appellate Brief) Brief (Jul. 3, 2003) Original Image of this Document (PDF)
- 2003 WL 24132249 (Appellate Brief) Brief for Appellants James W. Giddens as Trustee for the Liquidation of the Businesses of the Substantively Consolidated Estates of New Times Securities Services, Inc. and New Age Financial Services, Inc., and Securities Investor Protection Corporati on (Jun. 30, 2003) Original Image of this Document (PDF)
- 2002 WL 32487939 (Appellate Brief) Brief for Appellants James W. Giddnes as Trustee for the Liquidation of the Businesses of New Times Securities Services, Inc. and New Age Financial Services, Inc., and Securities Investor Protection Corporation (Oct. 17, 2002) Original Image of this Document (PDF)
- 02-6166 (Docket) (Jul. 8, 2002)
END OF DOCUMENT


Adobe Reader is required to view PDF images.



(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.