Brandon Sample
Brandon Sample PLC
P.O. BOX 250
Rutland, VT 05702
Tel: 802-444-4357
E-mail: brandon@brandonsample.com
https://compassionaterelease.com
Vt Bar # 5573

*Attorney for Bernard L. Madoff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :
UNITES STATES OF AMERICA,
                                                                 :
                 Plaintiff,                                               MOTION FOR
                                                                 :        COMPASSIONATE RELEASE

           -   v   -                                             :

                                                                 :

BERNARD L. MADOFF,                                               :        No.: 1:09-cr-00213-DC-1

                 Defendant.                                      :

                                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## I. INTRODUCTION

In 2009, Scotland released the Lockerbie bomber, Abdel Baset Ali al-Megrahi, on compassionate grounds sparking significant controversy over the use of compassionate release. After serving approximately eight years in prison for the bombing of Pan AM flight 103, which killed 270 people, including 189 Americans, the convicted terrorist was released because he met the criteria for compassionate release

based on his terminal diagnosis of prostate cancer. *Lockerbie Convict Returns to Jubilant Welcome*, New York Times (Aug. 21, 2009), https://www.nytimes.com/2009/08/21/world/europe/21lockerbie.html. The cases of al-Megrahi and Bernard Madoff could not be more different—different jurisdictions, different crimes, different victims; however, the release of the Lockerbie bomber raises two fundamental questions at the heart of this case: (1) what are the limits of compassionate release? and (2) when is it appropriate to release a terminally ill prisoner?

A term of imprisonment that constituted just and proportionate punishment at the time of sentencing may become disproportionately severe based on changed circumstances, such as terminal illness. Congress clearly contemplated this scenario when it enacted the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018), in partial response to the Bureau of Prisons' ("BOP") minimal use of the compassionate release program.

When this Court sentenced Bernard Madoff ("Madoff") it was clear that Madoff's 150-year prison sentence was symbolic for three reasons: retribution, deterrence, and for the victims. (Sentencing Transcript, ECF No. 103, at 46:21–49:13.) Over the past ten years circumstances have changed. This Court must now consider whether keeping Madoff incarcerated, in light of his terminal kidney failure and a life expectancy of less than 18 months, is truly in furtherance of statutory sentencing goals and our society's value and understanding of compassion.

Madoff does not dispute the severity of his crimes nor does he seek to minimize the suffering of his victims. Madoff has expressed remorse for his crimes. Now, after over ten years of incarceration and with less than 18 months to live, Madoff humbly asks this Court for a modicum of compassion.

Madoff presents "extraordinary and compelling reasons" for compassionate release and the BOP recognizes that Madoff meets the criteria for a reduction in sentence based on his end-stage renal disease. However, Madoff disagrees with the BOP's denial of his compassionate release request because a reduction in sentence would not minimize the severity of his offense—his circumstances fall within the Sentencing Commission's standards for a sentence reduction, and consideration of the 18 U.S.C. § 3553(a) factors do not outweigh the indisputable fact that Madoff is dying or that he has already been punished significantly for his crimes.

Accordingly, for the reasons argued herein, the Court should grant Madoff compassionate release.

## II. BACKGROUND

On December 21, 2018, the President signed the First Step Act ("FSA") into law, removing a major obstacle from judicial review of sentences to determine whether "extraordinary and compelling reasons" exist to permit a sentence reduction that is "sufficient, but not greater than necessary," under 18 U.S.C. § 3553(a). First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018). Under the FSA, this Court is afforded jurisdiction to make the § 3553(a) determination of

whether Madoff's over ten years in prison is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.

### A.      History of Compassionate Release

Congress enacted the current compassionate release statute, 18 U.S.C. § 3582, as part of the Comprehensive Crime Control Act ("CCCA") of 1984. Section 3582(c) states that a district court can modify a final term of imprisonment after consideration of the § 3553(a) factors if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).  In 1984, Congress conditioned the reduction of sentences on the BOP Director moving for the reduction; absent a BOP motion, sentencing courts had no authority to modify a prisoner's sentence for extraordinary and compelling reasons. *Id.* Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under § 3582(c), but the legislative history indicates that Congress expected courts to grant relief pursuant to the statute in appropriate cases.

One of Congress's initial goals in passing the CCCA was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep. No. 98-225, at 52, 53, n.196 (1983). Yet, recognizing that parole historically played a key role in responding to changed circumstances, the Senate Committee stressed how some individual cases may still warrant a second look at resentencing, including "cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence." *Id.* at 55. Rather than having the parole commission review every federal sentence focused only on an

offender's rehabilitation, Congress decided that § 3582(c) could and would enable courts to decide, in individual cases, if "there is justification for reducing a term of imprisonment." *Id*. at 56.

Congress intended for the situations listed in § 3582(c) to act as "safety valves for modification of sentences" to enable sentence reductions when justified by various factors that previously could have been addressed through the (now abolished) parole system. *Id*. at 121. This safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." *Id*. (alterations added). Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with the U.S. Parole Commission, the statute permitted "later review of sentences in particularly compelling situations." *Id*.

In sum, Congress via § 3582(c)(1)(A) gave federal sentencing courts the equitable power to correct sentences that—while lawful when originally imposed—no longer make sense.

**B.     The U.S. Sentencing Commission Concluded That § 3582(c)(1)(A)'s "Extraordinary and Compelling Reasons" Includes, But Is Not Limited To, Terminally Ill, Elderly, or Family Circumstances.**

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the U.S. Sentencing Commission. *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). Congress provided only one

limitation to that delegation of authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

The Commission initially neglected its duty, leaving the BOP to fill the void and develop its own standards for extraordinary and compelling reasons warranting resentencing under § 3582(c)(1)(A). The Commission finally acted in 2007, promulgating a policy that extraordinary and compelling reasons include (A) medical conditions of the defendant; (B) age of the defendant; (C) family circumstances; and (D) "other reasons." U.S.S.G. § 1B1.13(1); U.S.S.G. § 1B1.13, Application Note 1(A).

After a negative DOJ Inspector General report found that the BOP rarely moved courts for a § 3582(c)(1)(A) modification—even for prisoners who met the objective criteria—the Commission amended its policy statement, admonishing the BOP to file motions for compassionate release whenever a prisoner was found to meet the criteria in U.S.S.G. § 1B1.13. U.S. DOJ Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (Apr. 2013); U.S.S.G. § 1B1.13, App. Note 4; *see United States v. Dimasi*, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines).

## C. Congress Changed the Process for Compassionate Release Through the First Step Act Based on Criticism of the BOP's Inadequate Use of Its Authority, Returning to the Federal Judiciary the Authority to Reduce Sentences For "Extraordinary and Compelling Reasons."

Only the BOP could move for a sentence reduction under § 3582(c)(1)(A) before Congress enacted the FSA. *See* P.L. 98-473 (H.J. Res. 648), P.L. 98-473, 98 Stat. 1837

(Oct. 12, 1984).  Even if a federal prisoner qualified under the Sentencing Commission's definition of extraordinary and compelling reasons, absent a BOP motion, the sentencing court had no authority to reduce the sentence. This led to several problems.

For example, the Department of Justice's Office of the Inspector General (OIG) found that the BOP failed to provide adequate guidance to staff on the criteria for compassionate release, failed to set timelines for reviewing compassionate release requests, failed to create formal procedures for informing prisoners about compassionate release, and failed to generate a system for tracking requests. *See The Federal Bureau of Prisons Compassionate Release* Program, April 2013. OIG # I-2013-006 at i, iv.[1]  The OIG concluded that "FBOP does not properly manage the compassionate release Program, resulting in inmates who may be eligible candidates for release not being considered." *Id*.; *see, generally*, Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies in Overincarceration*, 21 FED. SENT. RPTR. 167 (Feb. 2009).

Congress heard those complaints.  On December 21, 2018, Congress passed the FSA, which transformed the process for compassionate release under § 3582(c)(1)(A). Congress labeled these changes, "*Increasing the Use* and Transparency of Compassionate Release."  164 Cong. Rec. H10346, H10358 (2018) (emphasis added).

---

[1]        The OIG report is accessible at https://oig.justice.gov/reports/2013/e1306.pdf

Pursuant to the FSA, this Court has discretion to reduce the term of imprisonment imposed in this case based on § 3582(c)(1)(A)(i) if it concludes that: (1) Madoff has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of the request by the warden of the defendant's facility, whichever is earlier"; (2) "extraordinary and compelling reasons warrant" a reduction in sentence; (3) consideration of "the factors set forth in section 3553(a)"; and (4) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

The U.S. Sentencing Commission defines "extraordinary and compelling reasons" via Commentary to U.S.S.G. § 1B1.13. For instance, Application Note 1 to § 1B1.13 states:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> > (A) **Medical Condition of the Defendant**.—
> >
> > > (i) *The defendant is suffering from a terminal illness* (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), *end-stage organ disease*, and advanced dementia.
> > >
> > > (ii) The defendant is—
> > >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or

> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> . . .
>
> (D) **Other Reasons**.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13, comment. n.1(A)(i)-(ii) & (D) (emphasis added).

While the Sentencing Commission's Policy Statement on sentence reductions lists categories of "extraordinary and compelling reasons" there is no restrictive list or combination of factors required to warrant release. U.S.S.G. § 1B1.13, comment. n.1(A)–(D). Moreover, the reason for seeking a reduction in sentence "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, Appl. Note 2.

In light of the FSA, Congress intended the judiciary would not only take on the role the BOP once held as the functional adjudicator of compassionate release requests, but also to grant sentence reductions on the full array of grounds reasonably encompassed by the "extraordinary and compelling" standard set forth in the statute.

### III.   PROCEDURAL HISTORY

On March 12, 2009, Madoff pleaded guilty to 11 counts in connection with his fraudulent investment scheme involving billions of dollars. (Plea Allocution, ECF No.

50; Minute Entry for March 12, 2009 proceedings.). On June 29, 2009, this Court sentenced Madoff to the maximum allowable sentence—150 years in prison. (Judgment, ECF No. 100.) Madoff is currently incarcerated at FMC Butner; he is 81 years old.

## IV.    MADOFF HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES

On September 24, 2019, Madoff submitted a Request for Compassionate Release to the Warden of FMC Butner, requesting the BOP move under 18 U.S.C. § 3582(c)(1)(A) for a reduction in sentence.[2] (Letter to Warden, attached as Exhibit A.) Assistant Director/General Counsel of BOP, Ken Hyle, denied Madoff's request on December 5, 2019.   (Hyle Letter, attached as Exhibit B.) In its denial, the BOP expressly acknowledged that Madoff's condition (end-stage renal disease) "is considered terminal with a life expectancy of less than 18 months." (Ex. B.) Moreover, the BOP recognized that Madoff "meets the criteria for [reduction in sentence] under section 3(a)." (Ex. B.) However, the BOP denied Madoff's request because "in light of the nature and circumstances of his offense, his release at this time would minimize the severity of his offense." (Ex. B.)

Madoff has fully exhausted his administrative remedies because the BOP did not respond to his September 24, 2019, request for compassionate release within 30 days. 18 U.S.C. § 3582(c)(1)(A). Pursuant to the authority provided by the FSA, Madoff now brings his request for a sentence reduction directly to this Court.

---

[2]     In June 2019, Madoff requested compassionate release without the assistance of counsel, which was denied in May 2019. The September 2019 submission attached as Exhibit A is Madoff's renewed request.

## V. ARGUMENT

### A.    BOP Concedes Madoff Is Terminally Ill

Madoff has end-stage renal disease and other chronic, serious medical conditions, including hypertension, cardiovascular disease, esophageal reflux, hyperparathyroidism, bladder neck obstruction, and insomnia. (Ex. B; BOP Reduction in Sentence/Compassionate Release Comprehensive Medical Summary attached as Exhibit C.) The BOP concluded that Madoff's "condition is considered terminal with a life expectancy of less than 18 months."[3] (Ex. B, C.) Based upon the BOP's determination and the attached medical support, there can be no dispute that Madoff's medical condition is an "extraordinary and compelling" reason qualifying him for compassionate release. (*See* Ex. B) (setting forth the BOP's recognition of Madoff's terminal condition).

### B.    Madoff Suffers From End-Stage Renal Disease And Has Less Than 18 Months To Live.

Madoff has chronic kidney failure that has progressed to end-stage renal disease.  He now has less than 18 months to live. (BOP Medical Records attached as Exhibit D, at 34; Ex. C.) A diagnosis of kidney disease means that a person's "kidneys are damaged and cannot filter blood the way they should. . . . causing waste to build up in the body." *Kidney Disease Statistics for the United States*, National Institute of Diabetes and Digestive and Kidney Diseases, https://www.niddk.nih.gov/health-information/health-statistics/kidney-disease (last visited Jan. 24, 2020). Kidney

---

[3]    The BOP determined that Madoff has less than 18 months to live in September 2019. (Ex. C). Over four months have passed since that finding, leaving Madoff with only 14 months to live—under a best case scenario.

disease can be fatal, and "[e]ach year, kidney disease kills more people than breast or prostate cancer." *Id*. Sufferers of end-stage renal disease like Madoff require dialysis or a kidney transplant to stay alive; in the alternative, people may forgo dialysis or a transplant and opt for conservative care to manage symptoms until their death. Mayo Clinic, *End-Stage Renal Disease*, https://www.mayoclinic.org/diseases-conditions/end-stage-renal-disease/symptoms-causes/syc-20354532 (last visited Jan. 24, 2020).

Symptoms of end-stage renal disease include: nausea, vomiting, loss of appetite, fatigue and weakness, sleep problems, changes in urination, decreased mental sharpness, muscle twitches and cramps, swelling of feet and ankles, persistent itching, chest pain, shortness of breath, and hypertension. *Id*. As discussed in more detail below, Madoff exhibits most of these symptoms.

Kidney damage has significant potential complications, including stroke, heart attack, pulmonary edema, hyperkalemia, cardiovascular disease, weakened bones, anemia, central nervous system damage, decreased immune response (which can increase potential for infection), and pericarditis. *Id*.

Madoff was admitted to the Comfort Care Unit for palliative care for end-stage renal disease on July 18, 2019. (Ex. C; Ex. D, at 200–204, 206.) The goal of palliative care is to make a patient as comfortable as possible for their remaining life, generally through pain and symptom management. *What Are Palliative Care and Hospice Care?*, National Institute on Aging, https://www.nia.nih.gov/health/what-are-palliative-care-and-hospice-care (last visited Jan. 26, 2020).

The BOP Reduction in Sentence/Compassionate Release Comprehensive Medical Summary describes Mr. Madoff's condition as follows:

> He has chronic kidney failure that has progressed to end stage renal disease. His most recent glomerular filtration rate (GFR) was 4 on 8/30/19 (a normal GFR is 60). At this level of renal failure, the kidneys can no longer filter body waste. He has refused dialysis.[4] His renal disease also causes secondary hyperparathyroidism, anemia in chronic kidney disease, and is likely the cause of the [sic] his worsening, widespread itching. Untreated end stage renal disease eventually causes death from buildup of unfiltered body waste.

(Ex. C.) The BOP also concluded that Mr. Madoff has a life expectancy of less than 18 months. (Ex. C.) Madoff is experiencing complications, including acid build up, which causes muscle and joint pain, itching, and fatigue, weakness, shortness of breath, sleep disturbances, itching, and edema. (Ex. D, at 146, 155–156; Ex. C.).

### C. Madoff Suffers From Numerous Other Serious Medical Conditions That Have Worsened And Make Prison Overly Difficult For Elderly Inmates.

In addition to end-stage renal disease, Madoff suffers from other multiple serious medical conditions. His physical health is also deteriorating because of the aging process. These conditions will continue to worsen, making it difficult for him to provide self-care. Madoff's additional diagnoses include:

- *Atherosclerotic cardiovascular disease.* (Ex. B; Ex. C; Ex. D, at 149.) Madoff's cardiac conditions are managed with medication. He has a history of non-ST elevation myocardial infarction diagnosed December 2013; a cardiac catheterization procedure showed 99% ulcerated plaque mid-left circumflex

---

[4]     While Madoff previously refused dialysis, Madoff began dialysis in December 2019.

treated with a bare metal stent and an ejection fracture of 40–45% (normal EF 55–70%). (Ex. B; Ex. C; Ex. D, at 148–150.)

- *Hypertension*, managed with medication, but "[n]ot well controlled." (Ex. B; Ex. C; Ex. D, at 146.) He requires blood pressure checks every two weeks. (Ex. D, at 143.)

- *Esophageal reflux*, managed with medication. (Ex. B; Ex. C.)

- *Hyperparathyroidism*, which is a complication of end-stage renal disease. (Ex. B; Ex. C; Ex. D, at 149.) This condition is managed with medication and requires regular monitoring through lab work.

- *Hyperlipidemia*, managed with medication and requiring regular lab monitoring. (Ex. B; Ex. C.)

- *Bladder neck obstruction*. (Ex. B; Ex. C.)

- *Insomnia*, managed with medication. (Ex. C; Ex. D, at 58–59.)

- *Shortness of breath on exertion and at night*. He has to walk slowly and rest and he has oxygen to use as needed. (Ex. D, at 33–35, 148.)

- *Adjustment disorder with mixed anxiety*, managed with medication. (Ex. D, at 33, 58–59.)

- *Back pain,* managed with medication. Madoff has pain in his lower back rated an 8 out of 10, which is exacerbated by standing up. (Ex. D, at 114, 136.)

- *Leg cramps*, managed with medication. (Ex. D, at 57, 136.)

- *Pruritus (itching)*, managed with medication. (Ex. D, at 78–79.)

Madoff is taking the following prescription medications: amlodipine (hypertension), acetaminophen (back pain); aspirin (hyperlipidemia); atorvastatin (cholesterol); diphenhydramine (itching); diltiazem (hypertension); calcitriol (kidney failure); fluticasone nasal spray (allergies); ranitidine (GERD), sodium bicarbonate (kidney failure); trazodone (palliative care). (Ex. D, at 114, 163–167.) He also uses oxygen to alleviate his shortness of breath. (Ex. D, at 32.)

Madoff experiences frequent fatigue, weakness, and exhaustion; his gait is unstable, and he has pain and cramping in his thighs, hips, and knees. (Ex. D, at 136, 145.) He previously used a 4-wheel walker to ambulate and is a low to moderate fall risk. (Ex. D, at 139.) He now is confined to a wheelchair. He has a back brace, bed wedge, medical shoes, a lower bunk, and he is authorized to have an inmate companion. (Ex. D, at 161, 255.)

Madoff experiences leg cramps at night, which wake him frequently and he "[r]arely sleeps more than 1 hour." (Ex. D, at 142, 145.) He also has pitting edema. (Ex. D, at 145.) He experiences congestion and shortness of breath at night requiring the use of supplemental oxygen. (Ex. D, at 33.) He also reports shortness of breath with mild exertion requiring him to walk slowly and rest. (Ex. D, at 148.) He requires moderate and regular assistance or supervision with grooming. (Ex. D, at 185.)

The nature of Mr. Madoff's serious medical conditions coupled with the effects of incarceration will only cause his overall physical condition to worsen as his illnesses progress and his death becomes ever more inevitable.

**D.    End-Stage Renal Disease Is Expressly Recognized As An
"Extraordinary And Compelling Reason" For Compassionate
Release And BOP Admits That Madoff's Condition Qualifies Him
For A Reduction In Sentence.**

Madoff's diagnosis of end-stage renal failure falls squarely within the
definition of "extraordinary and compelling reasons" as expressly provided in the U.S.
Sentencing Guideline § 1B1.13 Policy Statement. Specifically, Application Note
1(A)(i) to § 1B1.13 lists specific examples of medical conditions that qualify as
"extraordinary and compelling reasons" and include "end-stage organ disease."
U.S.S.G. § 1B1.13, App. N. 1(A)(i).

In addition, the BOP concluded that Madoff's condition was terminal and that
he has a life expectancy of less than 18 months. (Ex. B; Ex. C.) Therefore, the
Government cannot deny that Madoff has met his burden of demonstrating an
extraordinary and compelling reason for compassionate release because the BOP
admits that Madoff is terminally ill. (Ex. B; Ex. C.)

Since Madoff has exhausted his administrative remedies and presented an
extraordinary and compelling reason for a reduction in sentence, this Court's decision
should turn on its analysis of the § 1B1.13 policy statement and consideration of the
§ 3553(a) factors.

**E.    Reducing Madoff's Sentence Would Be Consistent With The §
1B1.13 Policy Statement.**

Section 3582(c)(1)(A) requires all reductions in sentence be "consistent with
applicable policy statements issued by the Sentencing Commission." U.S.S.G. §
1B1.13. Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A).

Meaning, in addition to providing an extraordinary and compelling reason warranting a sentence reduction (which has already been established by the BOP) and the consideration of § 3553(a) factors, the Court must determine that Madoff "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

It is evident from a review of the § 3142(g) factors that Madoff presents no danger to any person or the community. He has no history of violence, he has less than 18 months to live, and the public nature of his crimes guarantee that he would be unable to participate in financial or investment-related activities ever again. Furthermore, it is important to note that the BOP did not deny Madoff's compassionate release request on the basis that he posed a danger to the community.

### (1) Compassionate Release Granted in *United States v. Ebbers*

Over the past year, courts across the country have grappled with applying the changes made by the First Step Act to motions for compassionate release. However, a recent decision from the Southern District of New York, *United States v. Ebbers*, is particularly instructive in this case.

On December 18, 2019, the Honorable Valerie Caproni granted compassionate release to Bernard Ebbers. *United States v. Ebbers*, 2020 U.S. Dist. LEXIS 3746 (S.D.N.Y. Jan. 8, 2020). Bernard Ebbers was[5] the former CEO of WorldCom, Inc. who

---

[5]     Ebbers was released from BOP custody on December 21, 2019. Ebbers is reported to have died on February 2, 2020, 44 days after he was granted compassionate release. https://www.npr.org/2020/02/03/802288166/bernard-ebbers-telecom-ceo-sent-to-prison-in-accounting-scandal-dies

was sentenced to 25 years in prison for securities fraud that resulted in losses estimated around $2 billion. *Id.* at *1. "As a result of his crimes, investors and shareholders lost hundreds of millions, perhaps billions of dollars, and thousands of WorldCom employees lost their jobs and savings." *Id.* Ebbers moved for compassionate release under the First Step Act arguing that he presented extraordinary and compelling reasons for a reduction based on his age and serious health issues under U.S.S.G. § 1B1.13, Application Note 1(B), "Age of Defendant." *Id.* at *13. The court ultimately concluded that his medical conditions were "extraordinary and compelling reasons" and that he posed no risk to society, so a sentence reduction would be compatible with the policy statements. *Id.* at *25. Lastly, the court concluded that the § 3553(a) factors "do not outweigh its finding that Ebbers's deteriorating health and old age qualify him for compassionate release." *Id.* at *25.

> Ebbers's present poor health does not reduce his culpability or diminish the harm he caused. His crimes were egregious; but having been incarcerated from aged 65 to aged 78, during what should have been his golden years, and having reached a point where his quality of life is quite low, releasing Ebbers will not prevent him from being adequately punished nor will it discount the seriousness of his offense or diminish the message that his crimes were unacceptable. It also will not prevent his sentence from serving as a general deterrent to white-collar criminal conduct. Thirteen years of incarceration—up to the point of approaching death—is not a slap on the wrist; it seems likely that no one who might be considering committing accounting fraud would view his sentence as lenient. Far from it—Ebbers has essentially served the life sentence that the sentencing court predicted it had imposed.

*Id.*

### (2)   Nature and Circumstance of Offense Charged, 18 U.S.C. § 3142(g)(1).

Madoff's offenses were, in the aggregate, characterized by fraud. These were non-violent offenses and Mr. Madoff was a first-time felony offender. (Judgment, ECF No. 100; PSR ¶¶ 129–130.)

### (3)   Madoff's History and Characteristics, 18 U.S.C. § 3142(g)(3).

Mr. Madoff has been married for over 60 years to his wife Ruth; they have two sons, who are now deceased. (PSR ¶¶ 142–143.) Prior to his incarceration, Madoff was active in his community and made significant contributions to charities. He has no history of drug or alcohol abuse. (PSR ¶¶ 173–174.) Except for the offenses in this case, Mr. Madoff has no other felony convictions. (PSR ¶¶ 129–130.)

Mr. Madoff is an 81-year old man facing significant health issues who has less than 18 months to live. (Ex. B; Ex. C.) His weakened and declining physical condition is such that he would pose no danger to anyone. He will be unable to work because of his failing health and physical conditions.

Madoff forfeited all his assets; he will financially support himself through Social Security and Medicare benefits. If released, he will live with a friend.[6]

### (4)   Madoff's Release Would Pose No Danger to Any Person or the Community, 18 U.S.C. § 3142(g)(4).

Madoff was a first-time felony offender for non-violent offenses. (Judgment, ECF No. 100; PSR ¶¶ 129–130.) He has no history of violence and his failing physical

---

[6]     Madoff does not identify the name of the friend or their whereabouts in this public filing for privacy reasons.

health prevent him from posing any danger—he requires a walker to ambulate; experiences weakness, fatigue, and insomnia; uses supplemental oxygen for shortness of breath; and he is not expected to be alive in 18 months.

Moreover, the SEC barred Mr. Madoff from associating with any investment or brokerage firm. (PSR ¶ 179.) The highly public nature of Madoff's crimes and the SEC's ban prohibit him from engaging in any financial or investment-related activities in the future. His remaining months on earth will be spent receiving palliative care and managing the symptoms of his terminal illness—he will not be participating in any fraudulent investment schemes. Despite Madoff's terminal condition, if the Court is concerned about any risk to the public it can manage those risks by fashioning appropriate terms of his supervised release. *See* 18 U.S.C. § 3142(g) (noting conditions of release can mitigate danger to the community); *see also, United States v. Gray*, 2019 U.S. Dist. LEXIS 160593, at **12–13 (S.D. Ind. Sept. 20, 2019) (finding that post-release supervision would serve "as a sanction and general deterrent, appropriately recognizing the seriousness" of the defendant's conduct).

Perhaps most telling is the BOP's rationale for denying Mr. Madoff's compassionate release request. The BOP denied Madoff's request for compassionate release because it concluded that his release "would minimize the severity of his offense." (Ex. B.) The BOP did not deny his request because they believed he would pose a danger to people or the community. Given Madoff's physically weakened state, terminal illness diagnosis, and his inability to ever again participate in the finance

and investment industry, granting Madoff's request for compassionate release would be consistent with the § 1B1.13 Policy Statement—he poses no danger.

### F.   With Full Consideration of the § 3553(a) Factors, Time Served Constitutes A Sentence Sufficient but Not Greater Than Necessary to Accomplish the Goals of Sentencing For Madoff.

A review of the § 3553(a) factors, to the extent that they apply, weigh in favor of a reduction in sentence—compassionate release would not undermine the goals of Madoff's original sentence.

### (1)   Nature and Circumstances of the Offense and History and   Characteristics of Madoff, § 3553(a)(1).

As previously stated, Madoff's offenses were fraudulent in nature. These were non-violent offenses and Madoff is a first-time offender. (Judgment, ECF No. 100; PSR ¶¶ 129–130.)

Since Madoff's sentencing, his "history and characteristics" have changed. Madoff is now 81-years old and his medical conditions have worsened significantly such that he now has end-stage renal disease and has less than 18 months to live. His condition will only continue to worsen and, despite receiving palliative care, his dependence on others for assistance with activities of daily living and need for additional medical and staffing resources will only increase.

### (2)   Compassionate Release Would Not Diminish the Seriousness of the Offense, Respect for the Law, and Goal of Providing Just Punishment, § 3553(a)(2)(A).

Similar to the observations made by the *Ebbers* court, Madoff's terminal illness does not reduce his culpability or diminish the harm he imposed on his victims.[7] *See Ebbers*, 2020 U.S. LEXIS 3746, at *25. Madoff has been incarcerated since he was 71 years old—he is now 81 years old and he has spent "what should have been his golden years" incarcerated. *Id*. His complicated medical conditions have significantly diminished his quality of life and he is expected to die in less than 18 months. As in *Ebbers*, releasing Madoff does not prevent him from being adequately punished—he has spent the last ten years in prison, most of the time being seriously ill, and his incarceration has led "up to the point of approaching death." *Id*. That "is not a slap on the wrist . . . [he] has essentially served the life sentence that the sentencing court predicted it had imposed." *Id*. Reducing Madoff's sentence would bring about the same result: Madoff has spent ten years in prison and, if released, would still be under significant supervision and spend his final days battling illness. Even with release, Madoff still will serve a functional life sentence.

Madoff cannot impose any more harm and the "compassionate thing to do in this case is to release [Madoff] early, consistent with the intent of Congress when it passed the First Step Act." *See id*., at *26 (granting Ebbers's request for compassionate release).

---

[7]   Furthermore, "[a]s of January 24, 2020, the Securities Investor Protection Act (SIPA) Trustee has recovered or reached agreements to recover approximately $14.328 billion. This recovery far exceeds any prior restitution effort related to Ponzi schemes both in terms of dollars and percentage of stolen funds recovered." https://www.madofftrustee.com/recoveries-25.html

### (3)   Compassionate Release Would Not Diminish the Deterrent Effect Madoff's Sentence Has on the Criminal Conduct of Others, § 3553(a)(2)(B).

Madoff's 150-year sentence was broadcast around the world, and Bernie Madoff was, and continues to be, a household name. In fact, several movies featuring high-profile actors have been made about Madoff in recent years, almost ten years after his imprisonment. Mehler & Krantz, *No Movie Could Capture the Crazy Details of Bernie Madoff's Story*, The Atlantic (May 20, 2017), *available at* https://www.theatlantic.com/business/archive/2017/05/madoff-hbo-wizard-of-lies-abc/527343/ (last visited Jan. 24, 2020). Madoff's arrest transformed the investment industry and his sentence communicated, in no uncertain terms, that white collar criminals will face significant terms of imprisonment proportional to their crimes.

Granting Madoff compassionate release does not diminish the message communicated by his 150-year sentence; Madoff has served ten years in prison while battling a terminal illness and is now facing the harsh reality that he has less than 18 months to live.

### (4)   The Public Will Not Be Harmed by Further Crimes, § 3553(a)(2)(C).

As discussed previously, Madoff is physically and practically incapable of imposing further harm on the public. His end-stage renal disease and other debilitating medical conditions have left him in a weakened state and the SEC has barred him from working in the investment and finance industry. While it would seem impossible for Madoff to harm the public by committing further crimes, if the

Court has doubts it is free to fashion appropriate conditions to mitigate any risk. 18 U.S.C. § 3142(g) (noting conditions of release can mitigate danger to the community).

Additionally, incarcerated individuals 50 years and older have a 15% re-arrest rate, compared to 41% re-arrest rate for the general federal prison population." https://www.schatz.senate.gov/download/compassionate-release-letter-2017 (last accessed September 10, 2019). Madoff poses no risk of reoffending.

### (5)   A Sentence Reduction Would Afford Madoff Medical Care in the Most Effective Manner, § 3553(a)(2)(D).

Madoff's health has and will continue to deteriorate, and he will require more assistance physically and medically leading up to his death. The Court must consider the need "to provide [Madoff] with . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

The BOP might claim that it is capable of providing adequate medical care and treatment for Madoff, but that claim seems unlikely given the complexities associated with Madoff's many conditions, his increasing need for care, and the significant issues with the BOP's provision of health care services. The BOP is plagued with medical staffing shortages, treatment delays, and medical personnel recruiting issues. Erica Zunkel, *18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant with Rehabilitation, Training, and Treatment in "the Most Effective Manner,"* 9 NOTRE DAME JOURNAL OF INT'L LAW 49, 61 (2019).

Granting Madoff compassionate release would allow him to receive end-of-life care in the community, which would be more efficient, timely, and less burdensome on the BOP. Compassionate release and treatment outside of a correctional

environment is not only the most effective manner of treatment, it would also be the most efficient and least expensive.

Even if the BOP can provide competent care, Madoff's conditions are "extraordinary" under § 3553(a)(2)(D) and he is entitled to "the most effective manner" of treatment. In the Eighth Circuit case of *United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006), the court recognized that while the defendant could obtain dialysis treatments and medical care in prison, "[18 U.S.C.] § 3553(a)(2)(D) explicitly states that the effective provision of necessary medical care is an appropriate factor for the district court's consideration in sentencing." *Id.* at 739. Moreover, "[t]he district court had the discretion to decide that it would be more efficient and effective for [the prisoner] to receive treatment from his current healthcare provider." *Id.*

In this case, the most efficient and effective treatment for Madoff is outside of prison where he can receive support and comfort from the remaining loved ones he has during his final months.

### (6)   Relevant Policy Statement Favors Compassionate Release, § 3553(a)(5).

Granting Madoff compassionate release would be consistent with U.S.S.G. § 1B1.13. Reducing Madoff's sentence would not undermine the goals of sentencing nor the symbolism this Court's original sentence intended. Rather, affording Madoff compassionate release provides a different form of symbolism—that an 81-year old terminally ill man, who no longer poses a danger to society, is not unable to receive mercy and compassion during his final months on this earth.

# VI. CONCLUSION

Madoff does not dispute the severity of his crimes nor does he seek to minimize the suffering of his victims. Rather, Madoff presents extraordinary and compelling reasons in support of compassionate release as embodied by the First Step Act. A reduction in Madoff's sentence is consistent with the sentencing guidelines, and Madoff poses no danger to society. Moreover, granting compassionate release would not diminish the goals of sentencing under § 3553(a). Because Madoff satisfies the requirements for compassionate release, it is unnecessarily retributive and punitive to continue to incarcerate Madoff, an 81-year old man who has spent over ten years in prison, for the final months of his life.

Accordingly, for all of the above reasons, the Court should grant this motion and reduce Madoff's sentence to time served.


Respectfully submitted,

By:    /s/Brandon Sample
Brandon Sample
Brandon Sample PLC
P.O. BOX 250
Rutland, VT 05702
Tel: 802-444-4357
E-mail: brandon@brandonsample.com
https://compassionaterelease.com
https://sentencing.net
https://2255motion.com
https:clemency.com
https://brandonsample.com
Vt Bar # 5573

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served this 5th day of February, 2020, via CM/ECF on all counsel of record.


/s/Brandon Sample
Brandon Sample