UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,       :

             -v.-          :          09 Cr. 213 (DC)

BERNARD L. MADOFF,       :

            Defendant.    :

-------------------------------------------------------x

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
# IN OPPOSITION TO DEFENDANT'S MOTION FOR A REDUCTION IN SENTENCE

AUDREY STRAUSS
Attorney for the United States, Acting
Under Authority Conferred by 28 U.S.C. § 515
Southern District of New York
One St. Andrews Plaza
New York, New York 10007

Drew Skinner
Louis A. Pellegrino
Assistant United States Attorneys
- Of Counsel -

# Table of Contents

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................... 1

    I.    Madoff Orchestrates the Largest Ponzi Scheme in History ................................................ 1

    II.    Madoff's Conviction ................................................................................................... 6

    III.  Madoff's Sentencing ................................................................................................... 9

    IV.  Madoff's Previous Efforts To Be Released ............................................................. 10

    V.    Madoff's Current Motion and His Medical Condition ....................................... 12

APPLICABLE LAW ........................................................................................................... 13

ARGUMENT ....................................................................................................................... 16

    I.    Madoff Qualifies to Bring a Motion for a Sentence Reduction. .......................... 16

    II.    Madoff May Live Longer than 18 Months and His Functional Condition Has Improved. 17

    III.  Madoff Has Never Fully Accepted Responsibility for His Crimes. ...................... 19

    IV.  The Section 3553(a) Factors Counsel Heavily Against Release ......................... 25

        A.    Madoff's History and Characteristics ............................................................. 25

        B.    The Nature and Circumstances of the Offense, the Seriousness of the Offense, and the Need to Promote Respect for the Law and to Provide Just Punishment .............................. 26

        C.    The Need to Afford Adequate Deterrence ...................................................... 29

        D.    The Need to Provide Medical Care ................................................................. 29

        E.    The Need to Avoid Unwarranted Sentencing Disparities ............................. 30

CONCLUSION ................................................................................................................... 31

# Table of Authorities

**Cases**

*Caminetti v. United States*, 242 U.S. 470 (1917) ........................................................ 14

*I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183 (1991) ..................... 14

*Stewart v. United States*, No. 02 Cr. 0395 JGK, 2013 WL 4044756 (S.D.N.Y. Aug. 9, 2013) 18

*United States v. Butler*, 970 F.2d 1017 (2d Cir. 1992) ............................................. 16

*United States v. Ebbers*, No. S4 02 Cr. 1144-3 (VEC), 2020 WL 91399 (S.D.N.Y. Jan. 8, 2020)........................................................................................................... 14, 15, 19

*United States v. Israel*, No. 05 CR 1039 (CM), 2019 WL 6702522 (S.D.N.Y. Dec. 9, 2019) . 15

*United States v. Johns*, No. CR 91-392-TUC-CKJ, 2019 WL 2646663 (D. Ariz. June 27, 2019) ....................................................................................................................... 13

*United States v. Willis*, 382 F. Supp. 3d 1185 (D.N.M. 2019) ................................... 14

**Statutes and Other**

18 U.S.C. § 3553(a) ...................................................................................................... 16

18 U.S.C. § 3582(c)(1)(A)......................................................................................... 13, 17

First Step Act, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).................... 14

U.S.S.G. § 1B1.13 ..................................................................................................... 15, 17

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendant Bernard L. Madoff's request for 92% reduction in his sentence.  The nature of Madoff's crime—unprecedented in scope and magnitude—wholly justified the 150-year sentence this Court imposed and is by itself a sufficient reason to deny Madoff's motion.  Furthermore, since his sentencing, Madoff has demonstrated a wholesale lack of understanding of the seriousness of his crimes and a lack of compassion for his victims, underscoring that he is undeserving of compassionate release himself.  Finally, the Section 3553(a) factors weigh heavily against his release.

Denying Madoff's motion will uphold his victims' and the public's faith in our system of justice.  It will send the message that after a just conviction and a sentence appropriate to the crime, one of history's worst fraudsters cannot escape the full consequences of his criminal conduct, even when those consequences include spending his last days in prison.  Madoff's motion should be denied.

## FACTUAL BACKGROUND

### I.    Madoff Orchestrates the Largest Ponzi Scheme in History

Madoff founded Bernard L. Madoff Investment Securities, LLC ("BLMIS") in 1960 as a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC"). (Presentence Investigation Report revised June 22, 2009 ("PSR") ¶¶ 29-30).  By December 2008, the company had grown to employ approximately 200 people in New York as well as 20 to 25 people in London at an affiliate entity.  (PSR ¶¶ 31, 181).  BLMIS operated three primary divisions: proprietary trading, market making, and investment advisory services.  (PSR ¶ 29). After the mid-1980s, the investment advisory business operated on a separate floor in New York from the other divisions.  (PSR ¶ 29).

Beginning "at least in the 1980s," Madoff perpetrated a scheme to defraud BLMIS investment advisory clients of billions of dollars through false pretenses, failing to invest investors' funds as promised, and misappropriating and converting investors' funds to Madoff's own use.  (PSR ¶ 44).  Among other means of the fraud, Madoff promised at one point to most existing and all prospective clients that he would employ a "split-strike conversion strategy." (PSR ¶¶ 47-49).  Madoff told potential investors this would involve investing their funds in several dozen common stocks on the Standard and Poor's 100 Index that had been specially selected to mimic the overall price movements of the S&P 100.  (PSR ¶¶ 47-48).  Madoff claimed he would time those purchases to maximize their value while occasionally dropping out of the market to invest in government-issued securities.  (PSR ¶ 48).  To hedge the investments, Madoff claimed he would buy and sell options contracts related to the stocks he had purchased in order to limit potential losses.  (PSR ¶ 48).

To entice potential investors, Madoff promised clients that this strategy would net consistent positive annual returns.  (PSR ¶ 49).  After registering as an investment advisor in 2006, Madoff claimed that his fee would be a $0.04 per-share commission on any stocks Madoff traded.  However, despite his promises to clients, Madoff actually used most of his investors' funds to meet redemption requests of other investors.  (PSR ¶ 62).  Instead of taking commissions on non-existent trades, he withdrew investment funds to support the market-making and proprietary trading divisions within BLMIS, and from which he and his family received millions of dollars of benefits.  (PSR ¶ 62).

In order to keep the scheme operational, Madoff instructed fund managers who had chosen to invest not to inform their clients that BLMIS was their money manager.  (PSR ¶ 63).

Moreover, BLMIS did not provide customers with real-time access to their online accounts. (PSR ¶ 63).  Instead, BLMIS's investment advisory division used antiquated technology, such as paper trade confirmations, in order to claim fraudulently that securities were being traded.  (PSR ¶ 64).  Madoff also ensured that BLMIS functioned as both investment manager and custodian of securities, which eliminated the possibility that an independent custodian could uncover fraudulent trading activity.  (PSR ¶ 65).  Madoff's employees in the investment advisory business communicated with clients and generated fabricated documents, including fictitious monthly account statements and trade confirmations.  (PSR ¶ 67).

Furthermore, Madoff directed the creation of fraudulent certified financial statements for BLMIS, such as balance sheets, statements of income, statements of cash flows, and reports on internal controls.  (PSR ¶ 73).  Madoff sent these statements to existing and prospective clients and filed them with the SEC, falsely certifying that they had been prepared in accordance with generally accepted auditing standards.  (PSR ¶ 73).

Madoff's purchases for himself and his family out of BLMIS accounts containing customer funds included two yachts worth $11.5 million, ownership shares in private jets, a $6.5 million loan to buy a home in Nantucket, a $4.4 million Manhattan apartment, the salaries of Madoff's personal boat captain and his housekeepers, and four country club memberships totaling $950,000.  (PSR ¶¶ 82(e), (f), (g), (h), 83, 84).  Moreover, between 2002 and 2008, Madoff directed more than $250 million of client funds to be transferred to the market-marking and proprietary trading divisions of BLMIS through a series of wire transfers that essentially laundered the money through Madoff's London affiliate.  (PSR ¶ 68).

In late 2008, BLMIS received increasing numbers of redemption requests eventually totaling approximately $7 billion.  (PSR ¶ 36).  Madoff knew he did not have the liquidity to meet the obligations and that after several decades his scheme was due to collapse.  (PSR ¶¶ 36-38).  Madoff directed his wife to make wire transfers of $5.5 and $10 million in November and early December 2018 from a business account to her personal bank account, under the purported guise that they were to be used for customer redemptions.  (PSR ¶ 41).

On December 9, 2008, Madoff informed his brother Peter, an officer at the firm, that the investment advisory business was a Ponzi scheme, and that he wanted to pay out customer funds to friends, family, and as early bonuses to employees.  (PSR ¶ 37; Transcript of Peter Madoff Plea dated June 29, 2012, attached as Exhibit A, at 38).  According to Madoff, when the plan to pay out these funds was challenged the following day by his sons Andrew and Mark, also firm employees, Madoff admitted to them that the investment advisory business was "one big lie" and "basically, a giant Ponzi scheme."  (PSR ¶ 38).

Andrew and Mark advised their attorney of Madoff's admission.  (PSR ¶ 29).  Their attorney then contacted the SEC and the Federal Bureau of Investigation ("FBI").  On December 11, two FBI agents went to Madoff's apartment in Manhattan to interview him.  (PSR ¶ 42).  Madoff acknowledged that he was now "broke [and] insolvent" and admitted "[t]here is no innocent explanation."  (PSR ¶ 42).  Subsequent to their interview, FBI agents discovered in his office desk 100 signed checks totaling $173 million, made payable to certain employees, friends, and family.  (PSR ¶ 43).  Madoff was arrested that same day.  While on bail prior to his guilty plea, Madoff and his wife mailed packages to family members and friends containing personal items valued in excess of $1 million.  (PSR ¶ 26).

4

An analysis prepared before Madoff's sentencing found that at least 1,341 investor accounts suffered direct aggregate losses totaling at least $13 billion.  (PSR ¶ 90).  The list of victims is extensive and diverse: HSBC Securities Services lost more than $2 billion; Gary S. Holmes Trusts lost $43 million; IBEW 325, a labor union, lost $2.2 million from its pension funds; and the Elie Wiesel Foundation, a charity founded by Holocaust survivor Elie Wiesel, lost more than $10 million.  (PSR ¶ 91).

Two investors committed suicide in the months after the scheme unraveled upon realizing the substantial losses they had incurred as a result of investing with Madoff.[1]  (PSR ¶¶ 94-95). Madoff's son Mark hanged himself on the second anniversary of Madoff's arrest.  Moreover, as reported in the many victim submissions provided in response to Madoff's motion, Madoff caused many victims immense personal suffering, including by wrecking their family's financial security,[2] ruining their retirements or other life plans,[3] or exacerbating the health conditions of

---

[1] The wife of one of the suicide victims wrote to the Court that she is opposed to Madoff's release:  "I lost all my money and my husband of 40 years committed suicide because of his horrific crimes.  As far as I am concerned, he should spend the rest of his life in jail."

[2] One victim wrote to the Court recalling a phone call from the victim's parents who were on a cruise in December 2008:  "My father asked if I had heard the news . . . Bernie Madoff was arrested.  And I knew exactly what that meant.  Our lives were forever changed.  And this would be the last vacation my parents could ever afford since their financial future was just stolen.  My family lost their life savings, including their proceeds from the sale of a home, as well as any dream of ever being able to retire."

[3] Another of Madoff's victims wrote:  "I am 84 years old, living on a small pension, which does not cover my expenses.  I expected that my Madoff investment would be used in my retirement years, to supplement my pension.  This has not happened, and I have had to budget very carefully in order to survive.  In view of the fact that he has had such an impact on my life, I have no sympathy for this depraved individual.  Why should he be shown any compassion, when he had none for his many victims?"

5

themselves or loved ones.[4]  Many of these victims were not independently wealthy, and worked

their entire lives to accumulate the savings that Madoff stole to fuel his and his family's

extravagant lifestyle.[5]

## II.     Madoff's Conviction

On March 12, 2009, Madoff pleaded guilty to 11 counts in Information 09 Cr. 213 (DC)

without a plea agreement.  The Information charged Madoff with the following offenses:

| | |
|---|---|
| **Count 1:** | Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; and 17 C.F.R. § 240.10b-5; |
| **Count 2:** | Investment Adviser Fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17; |
| **Count 3:** | Mail Fraud, in violation of 18 U.S.C. § 1341; |
| **Count 4:** | Wire Fraud, in violation of 18 U.S.C. § 1343; |
| **Count 5:** | International Money Laundering, in violation of 18 U.S.C. § 1956(a)(2)(A); |
| **Count 6:** | Concealment Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (f); |
| **Count 7:** | Engaging in Monetary Transactions in Criminally Derived Property, in violation of 18 U.S.C. § 1957; |
| **Count 8:** | False Statements, in violation of 18 U.S.C. § 1001; |

---

[4] One of Madoff's victims wrote to the Court:  "I believe with all my heart that my husband would be alive today if he had not had to deal with the stress and emotional despair that the loss of almost all of our money had on the family.  I developed a rare cancer one year after the debacle (probably due to stress as I had been extremely healthy) and my husband had to deal with my illness, financial ruin and a clawback suit.  His already compromised heart condition could not withstand the stress and he sadly passed on in 2015."  Another victim wrote to the Court opposed to Madoff's release:  "He knowingly defrauded thousands of people and I know this stress contributed to the early death of my husband . . . the stress of the past 11 years has taken a toll on me as well.  Although I do know he must be suffering with his ailments, there are many of his victims who are suffering and who will continue to suffer."

[5] One victim wrote that she and her husband, now in their 70s, lost $850,000 to Madoff and did not come from a wealthy background:  "My husband came from a lower middle class family, and worked his way through college.  I am a coal miner's daughter from West Virginia, who started with nothing, and grew up in a loving, but poor, family.  I started working [when] I was 13 years old to help my family financially. . . . We felt like we had made it . . . until January 2009, when we were notified of our losses with Madoff.  My husband fell around March of the same year.  Our lives, and not just financially, also emotionally, mentally, and physically . . . were destroyed."

| Count 9: | Perjury, in violation of 18 U.S.C. § 1621; |
|---|---|
| Count 10: | False Filing with the SEC, in violation of 15 U.S.C. §§ 78q(e) and 78ff; 17 C.F.R. §§ 240.17a-5, 240.17a-13 and 210.2-01; and |
| Count 11: | Theft from an Employee Benefit Plan, in violation of 18 U.S.C. § 664. |

During his plea allocution, Madoff admitted that he made "false" "representations" to

clients that he would "invest their money in shares of common stock, options and other securities

of large well known corporations, and upon request, would return to them their profits and

principal." (Plea Transcript dated March 12, 2009 ("Plea Tr."), attached as Exhibit B, at 24).

Madoff admitted he

> never invested those funds in the securities, as I had promised.
> Instead, those funds were deposited in a bank account at Chase
> Manhattan Bank. When clients wished to receive the profits they
> believed they had earned with me or to redeem their principal, I
> used the money in the Chase Manhattan bank account that
> belonged to them or other clients to pay the requested funds.

(Plea Tr. 24).

Madoff claimed: "To the best of my recollection, my fraud began in the early 1990s."

(Plea Tr. 25). Madoff admitted that he "claimed that I employed an investment strategy I had

developed called a 'split strike conversion strategy,' to falsely give the appearance to clients that

I had achieved the results I believed they expected." (Plea Tr. 25). He admitted that he gave

false testimony to the SEC under oath. He admitted that he

> knowingly caused false trading confirmations and client account
> statements that reflected the bogus transactions and positions to be
> created and sent to clients purportedly involved in the split strike
> conversion strategy, as well as other clients I defrauded who
> believed they had invested in securities through me. The clients
> receiving trade confirmations and account statements had no way
> of knowing by reviewing these documents that I had never

7

engaged in the transactions represented on the statements and
confirmations.

(Plea Tr. 27).  Madoff also admitted to filing false audit reports and financial statements with the

SEC and filing a false investment advisor registration document with the SEC.  (Plea Tr. 27-28).

Madoff also admitted that he had wired money from the New York bank account of his

fraudulent investment advisory business to the bank account of his London entity and then back

to the New York bank account of his market-making and proprietary trading businesses.  (Plea

Tr. 28-29).  Madoff stated he did this to support his false claim that he had purchased European

securities for his investment advisory clients and to ensure "that the expenses associated with the

operation of the fraudulent investment advisory business would not be paid from the operations

of the legitimate proprietary trading and market making business."  (Plea Tr. 29).  Finally,

Madoff admitted that he fraudulently extracted funds representing "commission" on non-existent

trades from the investment advisory business to the legitimate businesses.  (Plea Tr. 29-30).

Madoff was remanded after entering his guilty plea.

On March 27, 2009, Madoff was interviewed by a probation officer in connection with

the preparation of the Presentence Report.  Among other things, Madoff said that the "50 billion

figure . . . bandying around [was] not principal, but profits.  Hopefully before sentencing the real

number will come out.  For my wife and family I want to be able to get a real number—to make

it seem not as dramatic."  (PSR ¶ 112).  Madoff claimed that he was "committed to invest these

monies [in the] split strike strategy but there was a recession and the market was not there to do

it."  (PSR ¶ 112).  Madoff said that he "tried not to take clients.  I had dinner with Elie Wiesel

and his friend.  He begged me to invest, and I should have said no."  (PSR ¶ 112).

### III.    Madoff's Sentencing

The Court sentenced Madoff on June 29, 2009.  Under the Sentencing Guidelines, Madoff's total offense level was 52.  (PSR ¶ 128).  The loss amount of over $13 billion was more than 32 times the baseline level of loss that would have carried a recommended life sentence.  Madoff had no criminal convictions and was in Criminal History Category I, which resulted in a Guidelines sentence of life imprisonment, or, in this case, because the statutory maximum was less than life, the statutory maximum of 150 years' imprisonment.  (PSR ¶ 206; Sentencing Transcript dated June 29, 2009 ("Sent. Tr."), attached as Exhibit C, at 4).

In his sentencing submission, Madoff, 71 years old at the time, cited his medical condition and argued that his life expectancy was approximately 13 years (or until about 2022). Madoff sought a sentence of 12 years' imprisonment (or until about 2021) or alternatively 15 to 20 years.   (Madoff Sentencing Submission dated June 23, 2009, ECF No. 84, at 3).  The Court explicitly rejected that request, explaining that while a sentence above 20 to 25 years would be "largely, if not entirely, symbolic," the "symbolism is important."  (Sent. Tr. 46-47).  The Court articulated that the Guideline sentence of 150 years was necessary for at least three reasons:  (1) "retribution," to "punish[]" Madoff "according to his moral culpability" and to send the message that "Madoff's crimes were extraordinarily evil;" (2) deterrence, to send the "strongest possible message" to others that "they will be punished to the fullest extent of the law;" and (3) to give the victims—who included charities, pension funds, "the elderly living on retirement funds and social security [and] middle class folks trying to put their kids through college,"—"the knowledge that Mr. Madoff has been punished to the fullest extent of the law," which might "help these victims in their healing process."  (Sent. Tr. 48-49).

9

IV.     **Madoff's Previous Efforts To Be Released**

Madoff has been seeking release from prison since at least February 2019, at which time he had served less than 10 years of his sentence.  Madoff filed with the Office of the Pardon Attorney a petition signed by him in February 2019 for a presidential commutation of his sentence.  Madoff referenced his end-stage renal disease, however, he sought release not primarily for health reasons, but rather out of compassion and so that he could care for his wife in her old age—apparently confident that his health was sufficient to do so.  Displaying a lack of appreciation for his conduct and the reasons for his 150-year sentence, Madoff compared his sentence to lesser sentences received by defendants in unrelated treason and espionage cases. (*See* Section 7 of Petition for Commutation of Sentence, attached as Exhibit D).[6]  Madoff's petition is pending.  (Office of the Pardon Attorney, Search Clemency Case Status, https://www.justice.gov/pardon/search-clemency-case-status-since-1989, last visited March 2, 2020).

In September 2019, Madoff submitted a request that the Bureau of Prisons move for a reduction in his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).  Madoff initially stated that he planned to live, if released, with his wife, but then later advised prison officials that he planned to live with an unrelated person in another state.  Madoff's current counsel advocated for his release primarily based on the same reasons advanced in his current motion, namely based on Madoff's medical condition and life expectancy.

In connection with that application, Dr. Jeffery D. Allen, the Medical Director of the Bureau of Prisons, submitted a memorandum summarizing Madoff's medical condition as of

---

[6] Because Madoff's commutation petition was not publicly filed, the Government submits Exhibit D under seal.

October 22, 2019.  (*See* Memorandum from Jeffrey D. Allen, M.D., dated October 22, 2019 (the

"October 2019 Memorandum"), attached as Exhibit E).  Dr. Allen noted that Madoff "ha[d] been

adamantly refusing his dialysis and any further testing including lab work."  (October 2019

Memorandum at 1).  "Given his refusal for treatment," he was admitted to the Bureau of Prison's

"comfort care," or hospice, program; however, the medical staff continued to encourage dialysis

and lab work.  (*Id.*).  Dr. Allen reported that Madoff could attend to the majority of activities of

daily living, including bathing, dressing, feeding, using the phone and computer, medication

management, light housekeeping, meal preparation, and navigating the correctional environment.

(*Id.*).  Madoff requested assistance with laundry and used a walker for stability.  (*Id.*).  Dr.

Allen's memorandum stated that "given that Mr. Madoff is refusing dialysis, he is at significant

risk of death from renal failure within 18 months or less."  (*Id.*).  The October 2019

Memorandum also noted that published studies show that among patients 80 years and older with

end-stage renal disease, there is no significant difference in survival between those receiving

dialysis and those who receive "conservative care."  (*Id.*).  The Memorandum explained that

although Madoff could live beyond 18 months, his end-stage renal disease will likely result in his

death at some point, "and therefore, is likely to be associated with an end-of-life trajectory," the

term used by the Sentencing Guidelines commentary relevant to a motion for sentence reduction.

(*Id.* at 2).

On December 5, 2019, the Bureau of Prisons denied Madoff's request.  (*See* Exhibit B to

Madoff's Brief in Support of His Motion for Compassionate Release dated February 5, 2020

("Br.")).  The Bureau of Prisons noted that Madoff's condition was "terminal with a life

expectancy of less than 18 months," but found that "in light of the nature and circumstances of his offense, his release at this time would minimize the severity of his offense." (*Id.*).

### V.      Madoff's Current Motion and His Medical Condition

Madoff filed the instant motion on February 5, 2020.  Madoff relies in his brief primarily on the medical information in the October 2019 Memorandum and in medical records from October 2019.[7]  Based on communications with Bureau of Prisons representatives and Dr. Allen (summaries of which have been provided to defense counsel), the Government understands that Madoff's functional condition initially worsened, but is now improving.  As Madoff continued to refuse dialysis and lab treatment, his medical condition continued "on a downward path," as Dr. Allen would have predicted for someone in his condition.  (Government Letter to Defense Counsel dated February 12, 2020, attached as Exhibit F, at 2).[8]  Madoff had to be admitted to the Bureau of Prisons' 24-hour nursing care unit, and Madoff claims that he was "confined to a wheelchair." (Br. 15).

After re-starting dialysis in November 2019, however, Madoff's functional condition has improved.  As of January 2020, Madoff's "functional status ha[d] steadily improved" and he was "able to perform most of his self care."  (Government Letter to Defense Counsel dated February 10, 2020, attached as Exhibit G, at 1).  He used a wheelchair for longer distances—as many inmates who are not petitioning for release do—and he was able to walk with a walker for

---

[7] The Government has since obtained and provided to defense counsel updated medical records dated February 2020.

[8] While Madoff has no doubt placed his medical condition at issue by making the current motion, and the Government therefore refers to his medical condition publicly herein, the Government has submitted under seal Exhibits F and G, which quote at length from his medical records or communications from doctors.

shorter distances.  (Ex. G at 1).  As of February 11, 2020, Madoff was able to "accomplish most of his [Activities of Daily Living] independently" and the Bureau of Prisons was planning to transfer him out of 24-hour nursing care to a lower acuity floor.  (Ex. F, at 1).  Dr. Allen suspected that this improvement was due to Madoff's re-starting dialysis treatment.  (Ex. F, at 1).  To be clear, the Government's understanding is that Madoff continues to suffer from terminal end-stage renal disease, and Dr. Allen's view is that whether Madoff is on dialysis or not, the medical literature suggests that he has a life expectancy of approximately 18 months.

## APPLICABLE LAW

Pursuant to 18 U.S.C. § 3582(c)(1)(A), the Court "may not modify a term of imprisonment once it has been imposed except" for certain limited exceptions.  As relevant here,

> the court . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).  Before Congress passed the First Step Act, a defendant's prison term could only be modified by the Court "upon motion of the Director of the Bureau of Prisons." *See United States v. Johns*, No. CR 91-392-TUC-CKJ, 2019 WL 2646663, at *1 (D. Ariz. June 27, 2019).  The First Step Act amended Section 3582(c)(1)(A) to permit a defendant to file a motion for sentence reduction directly with a court, "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).  The First Step Act thus changed who could bring a motion: the defendant (under certain circumstances) in addition to the

Director of the Bureau of Prisons.  The First Step Act, however, did not alter the Court's broad

discretion to deny or grant such a motion, the factors the Court should consider in deciding such

a motion, nor the overall number of requests that should or should not be granted.[9]  *See* Pub. L.

115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018); *United States v. Willis*, 382 F. Supp. 3d 1185,

1187 (D.N.M. 2019) ("Aside from allowing prisoners to bring a motion directly, the First Step

Act did not change the standards for compassionate release.").

The United States Sentencing Guidelines contain a provision, Section 1B1.13, that

discusses sentencing reductions pursuant Section 3582(c)(1)(A), and which, at least pre-First

---

[9] Madoff points out that the relevant section of the First Step Act is titled "Increasing the Use and
Transparency of Compassionate Release" (Br. 7), but the text of the First Step Act
unambiguously says nothing about the number of requests that should be granted or denied.
While the title of an act can aid in resolving ambiguity where the text is unclear, there is no
ambiguity here, and the title thus has no bearing on this Court's decision.  *See I.N.S. v. Nat'l Ctr.
for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid
in resolving an ambiguity in the legislation's text."); *Caminetti v. United States*, 242 U.S. 470,
490 (1917) ("[T]he name given to an act by way of designation or description . . . cannot change
the plain import of its words.  If the words are plain, they give meaning to the act, and it is
neither the duty nor the privilege of the courts to enter speculative fields in search of a different
meaning.").  Moreover, even if the title did have some relevance, it at most could be read to
match the text that follows; the act increases the "use" of sentencing reduction motions by
increasing prisoners' ability to bring them before courts, but it does not serve to increase the
granting of such motions.  *See United States v. Ebbers*, No. S4 02 Cr. 1144-3 (VEC), 2020 WL
91399, at *4 (S.D.N.Y. Jan. 8, 2020) ("Although the history and text of the First Step Act
suggest that Congress intended to broaden the *availability* of compassionate release . . . ,
Congress in fact only expanded access to the courts; it did not change the standard." (emphasis
added)).  To the extent the Court in *Ebbers* found relevant that Congress "made the legislative
judgment to increase" the granting of sentencing reductions, based in part on the existence of a
Department of Justice Inspector General's report criticizing the Bureau of Prisons' prior
practices, *Ebbers*, 2020 WL 91399, at *7, the Government respectfully disagrees that such extra-
textual considerations should factor into the Court's analysis here of the statute Congress
actually passed.

Step Act, constituted the "applicable policy statement" issued by the Sentencing Commission for

purposes of the statute.[10]  Section 1B1.13 provides:

> [T]he court may reduce a term of imprisonment . . . if, after
> considering the factors set forth in 18 U.S.C. § 3553(a), to the
> extent that they are applicable, the court determines that--(1) (A)
> Extraordinary and compelling reasons warrant the reduction; . . .
> (2) The defendant is not a danger to the safety of any other person
> or to the community . . . ; and (3) The reduction is consistent with
> this policy statement.

U.S.S.G. § 1B1.13.  Application Note 1 to that Section provides a definition for "extraordinary

and compelling reasons," which includes, as relevant here:

> The defendant is suffering from a terminal illness (i.e., a serious
> and advanced illness with an end of life trajectory).  A specific
> prognosis of life expectancy (i.e., a probability of death within a
> specific time period) is not required. Examples include metastatic
> solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage
> organ disease, and advanced dementia.

"[T]he existence *vel non* of 'extraordinary and compelling reasons' determines only

whether a defendant can be considered for release—the existence of such reasons does not

mandate release."  *United States v. Ebbers*, No. S4 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *6

(S.D.N.Y. Jan. 8, 2020); *see also United States v. Israel*, No. 05 CR 1039 (CM), 2019 WL

6702522, at *11 (S.D.N.Y. Dec. 9, 2019) ("A court is not required to reduce a sentence on

compassionate release grounds, even if a prisoner qualifies for such reduction because of his

medical condition. . . . [Section 3582] was drafted using the word 'may,' not 'must.'").  If a court

finds a defendant qualifies for consideration, it must then consider the Section 3553(a) factors.

Those factors include:  (1) "the nature and circumstances of the offense and the history and

---

[10] Section 1B1.13 is "at least partly anachronistic because it has not yet been updated to reflect
the new" First Step Act procedures, but courts have nonetheless found it helpful in applying
Section 3582(c)(1)(A).  *See Ebbers*, 2020 WL 91399, at *4.

15

characteristics of the defendant;" (2) "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct . . . ; and (D) to provide the defendant with needed . . . medical care;" [and ] (3) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

Madoff has the burden of showing that he is entitled to a sentence reduction. *See, e.g.*, *United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

## ARGUMENT

The Court should deny Madoff's motion. At Madoff's sentencing, the Court considered whether Madoff's requested sentence of 12 years, or of 15 to 20 years, which might have allowed Madoff to be free at the end of his life, would be appropriate. The Court rejected such a sentence, finding that a sentence of 150 years and a fine of more than $170 billion was warranted to send a message that Madoff had been punished to the fullest extent of the law. Even though time has passed and Madoff may now be near the end of his life, that message is equally important. He should not be released.

### I.    Madoff Qualifies to Bring a Motion for a Sentence Reduction.

For the limited purposes of this case, the Government assumes *arguendo* that Madoff qualifies to bring a motion for a sentence reduction. Madoff's request that the Bureau of Prisons move for a sentencing reduction on his behalf was denied, and 30 days appears to have "lapse[d]" from the warden's receipt of Madoff's request (before the Bureau of Prisons denied

16

his request).  *See* 18 U.S.C. § 3582(c)(1)(A).  The Bureau of Prisons has determined that he

suffers from a "terminal illness," an "extraordinary and compelling reason" under Guidelines

Section 1B1.13.  *See* U.S.S.G. § 1B1.13.

Madoff's submission is devoted in large part to discussing the history of Section

3582(c)(1)(A) and showing that Madoff has a terminal illness, but that only provides the

procedural basis for Madoff to bring his motion.  The question is whether the "reason" Madoff

asserts—his terminal illness—"warrant[s] such a reduction" "after considering the factors set

forth in [S]ection 3553(a)."  18 U.S.C. § 3582(c)(1)(A).  It emphatically does not.  Indeed,

granting Madoff—who committed one of the worst fraud crimes in history—a sentence

reduction simply because he has a medical condition qualifying him to make such a motion

would be tantamount to reading the Court's discretion and a consideration of the 3553(a) factors

out of the statute.

## II.   Madoff May Live Longer than 18 Months and His Functional Condition Has Improved.

Assuming that Madoff suffers from a "terminal illness," certain observations about

Madoff's medical condition are nevertheless relevant to the Court's ultimate decision on his

motion.

*First*, Madoff may well live longer than 18 months.  In his submission, Madoff

repeatedly asserts that he "has less than 18 months to live," or even that he has "only 14 months

to live—under a best case scenario" (*E.g.*, Br. 3, 11 & n.3, 19), as if he is certain to pass away by

April 2021.  That is not consistent with the medical information available to the Court and the

parties, nor with common sense.[11]  As Dr. Allen has explained in communications with the

Government and as referenced in his October 2019 Memorandum, no one can predict with

certainty that Madoff will die in 18 months.  Madoff could very well live longer than 18 months.

The 18-month estimated life expectancy is the median life expectancy for people in Madoff's

condition: half of people will have a shorter life expectancy and half of people will have a longer

life expectancy.  (Ex. F, at 2).

Second, as discussed above, Madoff's functional capabilities have recently improved

since he stopped refusing treatment.  While Madoff plainly has serious medical conditions,[12]

Madoff's current functional condition is not so debilitating that he cannot care for himself or

conduct most activities of daily living.  While Madoff's quality of life is not dispositive, this cuts

against his request for immediate release.

Third, it should be noted that to the extent Madoff seeks to compare his medical

condition (to say nothing of Madoff's crime, which was much worse) to that of Bernard Ebbers,

---

[11] Defendants released based on terminal illnesses sometimes live longer than expected.  For example, John Rigas, convicted of fraud offenses in the Adelphia Communications case, was released from prison in February 2016 after he was diagnosed with stage-4 bladder cancer and given approximately six months to live.  He appears to still be alive today.  *See Tim Rigas Freed*, MultiChannel News, July 11, 2019, https://www.multichannel.com/news/tim-rigas-freed.  In another example, Lynne Stewart was determined based on a diagnosis of breast cancer to have a life expectancy of fewer than 18 months in July 2013.  She was ordered released in December 2013 and lived until March 2017, almost four years from the original diagnosis.  *See Stewart v. United States*, No. 02 Cr. 0395 JGK, 2013 WL 4044756, at *2 (S.D.N.Y. Aug. 9, 2013); *Lynne Stewart, Lawyer Imprisoned in Terrorism Case, Dies at 77*, N.Y. TIMES, Mar. 7, 2017, https://www.nytimes.com/2017/03/07/nyregion/lynne-stewart-dead-radical-leftist-lawyer.html.  The Lockerbie bomber, referenced in Madoff's brief, was determined to have a life expectancy of less than 3 months and was released in August 2009.  He survived for almost three more years, until May 2012.  *Lockerbie Bomber Megrahi Is Dead at 60*, WALL ST. J., May 20, 2012, https://www.wsj.com/articles/SB10001424052702304019404577415962886791998.

[12] Madoff's more minor medical complaints, such as those of heartburn and anxiety (Br. 14), are irrelevant to his motion.

whose motion for a sentence reduction was granted, Ebbers appears to have been in a substantially worse medical condition at the time of his release.  Ebbers was, like Madoff is, housed in a Bureau of Prisons Federal Medical Center, but Ebbers, unlike Madoff, required multiple trips to outside hospitals, including at least three in the month before he was released. *Ebbers*, 2020 WL 91399, at *8.  Ebbers also lost 58 pounds over the course of a year and a half leading up to his release and his death less than two months later.  *Id.* ("He is six feet and four inches tall, and he weighed 200 pounds on July 12, 2018.  By January 17, 2019, Ebbers's weight was down to 187 pounds. By the time of his motion to this Court, Ebbers weighed just 160 pounds. His weight continued to decline despite hospital intervention: he weighed 155 pounds on October 9, 2019, 148 pounds on November 12, 2019, and 142 pounds on December 12, 2019.").

### III.    Madoff Has Never Fully Accepted Responsibility for His Crimes.

Through his current counsel, who specializes in sentence reduction motions, Madoff claims that he "does not dispute the severity of his crimes nor does he seek to minimize the suffering of his victims.  Madoff has expressed remorse for his crimes."  (Br. 3).  But Madoff's own words and actions since his sentencing show that he has minimized his conduct, blamed his victims, and has never fully accepted responsibility for his crimes.  From his prison cell, Madoff promotes a revisionist history of his crimes in interviews with the press and through statements provided in sworn depositions that stand in contrast to the facts.  His words matter.  They affect ongoing civil cases regarding investor funds and, more importantly, reflect that Madoff has not changed.  After decades of lying to investors and regulators, Madoff has continued to do what he does best: tell things like he wishes them to be, rather than how they really are.

Among other things, Madoff has claimed that: 1) his crime was merely an SEC "bookkeeping violation" and not a Ponzi scheme; 2) he "just made a mistake at one point;" 3) he

was talked into his fraud scheme by greedy investors; 4) investor Jeffry Picower "created the fraud" (Declaration of Bernard L. Madoff dated Nov. 17, 2015, attached as Ex. H, at ¶ 4); and 5) the "biggest mistake [Madoff] made was not going to trial" (Deposition of Bernard L. Madoff, dated April 26, 2017 ("4/26/17 Depo."), attached as Ex. I, at 122:12-13).[13]

Madoff's failure to come to terms with the full scope and seriousness of his conduct, even after the Court's imposition of a 150-year sentence, illustrates how deeply Madoff has self-rationalized his fraud.  Here is Madoff in his own words discussing his crimes since his sentencing:

- **Interview for 2017 Podcast.**  "My business was a successful business for 35 years. . . .  I had more than enough money to support any of my lifestyle and my family's lifestyle. I didn't need to do this for that, *I just allowed myself to be talked into something* and that's my fault . . . I thought I could extricate myself after a period of time.  I thought it would be a very short period of time, I just couldn't."  (*Ponzi Supernova* Podcast, Episode 2, at timestamp 22:39, released 2017, *available at* https://www.stitcher.com/podcast/audible/ponzi-supernova) (emphasis added).

- **Interview for 2017 Podcast.**  "They had a sense something was not right . . . but they just, no one, everybody was greedy, everybody wanted to go on and I just went along with it." (*Ponzi Supernova* Podcast, Episode 3, at 25:30).

- **2017 Deposition.**
  **Q.**          So was it illegal for you to send a statement say beginning in '94 or whenever you stopped buying the securities shown on the split strike, was it illegal for you to send a statement to a split strike customer that indicated that the customer owned certain Fortune 100 company stocks when you hadn't purchased them?
  **Madoff:**      No. It was not illegal.

---

[13] With respect to the deposition transcripts cited herein, the Government has attached the cited pages as exhibits.  Full copies of the deposition transcripts have been provided to defense counsel and can be provided to the Court at the Court's request.

> **Q.**          Okay. So if it was not illegal for you to sell unlimited naked shorts, what was illegal about the split strike activity?
> **Madoff:**          Well, what was illegal and what we did was not reflect our short positions to the clients on our audited financials. . . .
> **Q.**          And that was a fraud on anyone to whom you gave your financial statements; is that right?
> **Madoff:**          Well, *depends upon how you define fraud. It was a bookkeeping violation. I don't think anybody initially would consider it a fraud. You know, that's -- well, I just don't know. I would say that it clearly was an SEC violation*. (4/26/17 Depo. at 16-17) (emphasis added).

- **2017 Deposition.**
  > **Q.**          [O]n that definition was the split strike ever a Ponzi scheme? In other words, did you ever need new cash from new customers in order to redeem other customers?
  > **Madoff:**          No. (4/26/17 Depo. at 107).

- **Feb. 5, 2020 Interview.** "My business was perfectly legitimate for 36 years, and *I just made a mistake at one point*, and I didn't realize at the time that I wouldn't be able to get myself out of it, and it was certainly not my intention to create all these issues and all these problems for everybody." (*Ponzi scheme king Bernie Madoff, who bilked investors out of billions, seeks medical release from prison*, WASH. POST, Feb. 5, 2020, https://www.washingtonpost.com/local/public-safety/ponzi-scheme-king-bernie-madoff-who-bilked-investors-out-of-billions-seeks-medical-release-from-prison/2020/02/05/d16a9098-475d-11ea-bc78-8a18f7afcee7_story.html) (emphasis added).

Despite Madoff's hearing from his victims personally at his sentencing about the harm he caused them and having 11 years in prison to think about what he had done, Madoff has frequently been unable to express sympathy for his victims without blaming them or excusing his conduct in the same breath:

- **2011 Interview.** "They had to know . . . but the attitude was sort of, 'If you're doing something wrong, we don't want to know.' . . . I would have loved for [the victims] to not lose anything, but that was a risk they were well aware of by investing in the market."

21

(*From Prison, Madoff Says Banks 'Had to Know' of Fraud*, N.Y. TIMES, Feb. 15, 2011, https://www.nytimes.com/2011/02/16/business/madoff-prison-interview.html).

- **October 11, 2011 Email to a Reporter.**  "I will never get over the distortions being presented by everyone as to the poor and now homeless when in fact they all signed documents when opening their accounts that they were sophisticated and had enough wealth to withstand the possible losses of short term trading.  I wish I had saved the hundreds of letters I received thanking me for how I was responsible for their happiness over the years and their pleading with me to keep their accounts open when I tried to close them . . . when I worried about the wreckage I might cause if I couldn't recover. . . .  I felt obligated to take over those commitments and losses until the clients made me whole.  It was tragic that [I] had to go out of business to say nothing of going to jail in order to force them to return the money or go to jail themselves."  (*Exclusive: The Secret Madoff Prison Letters*, FORBES, Mar. 20, 2012, https://www.forbes.com/sites/dianabhenriques/2012/03/20/exclusive-the-secret-madoff-prison-letters/#22b1eefd6de1).

- **Interview for 2017 Podcast.**  "Look, none of my clients can, even if they lost every penny they put in there, can plead poverty. Doesn't mean that I'm . . . I'm excusing what I did, it doesn't mean that I don't feel sorry for them. You . . . you had to have a certain net worth to be a client. I would, they were told time and time again that, you know, they should not you know put more than 50% of their marketables . . . or investments with me. On all of their confirmations, on all of their statements they saw there were . . . there were . . . things that they signed that basically they knew that this kind of trading is speculative, and, believe me, if you don't think they had doubts, they had doubts."  (*Ponzi Supernova* Podcast, Episode 5, at 3:26).

- **Interview for 2017 Podcast**.  "Now of course you listen to them they're all, they're living out of dumpsters and they're . . . they, you know, they don't have any money and so on and so forth and I'm sure it's a, it's a traumatic experience to some, but, you know, I made a lot of money for a lot of people."  (*Ponzi Supernova* Podcast, Episode 5, at 5:19).

22

Madoff has also been spending his time in prison promoting a theory that he operated a legitimate securities business for approximately 30 years and only turned to fraud in approximately 1992 when he began claiming to use the "split strike conversion" strategy.[14] Madoff's claims fly in the face of: 1) Madoff's statements in his first proffer session with the Government in December 2008 that the fraud began in the 1970s;[15] 2) the Court's observation at sentencing that "it is clear that the fraud began earlier" than the 1990s (Sent. Tr. 43; *see also* PSR ¶ 44 (stating that the fraud began at least in the 1980s)); 3) the testimony of an expert forensic accountant at the trial of five Madoff employees that "no trading ever occurred . . . back to . . . the late 70s" (Transcript of Trial Testimony in *United States v. Bonventre, et al.*, S2 10 Cr. 228 (S.D.N.Y.) ("*Bonventre* Tr."), at 1168:17-20)[16]; 4) the testimony of Madoff employee David Kugel that he helped create "fake, backdated trades" at BLMIS beginning in the early 1970s (*Bonventre* Tr. at 1810:8-19); 5) and the testimony of Madoff employee Frank DiPascali that he observed Kugel since 1975 engaged in spreading out old newspapers in BLMIS's offices to find historical stock prices to provide to another co-conspirator (*Bonventre* Tr. at 4545-47).

_____

[14] Madoff made the cautious statement in his plea allocution that "to the best of my recollection, my fraud began in the early 1990s." (Plea Tr. 25).  Immediately after his plea allocution, the Government attorney noted "the Government does not entirely agree with all of the defendant's description of his conduct."  (Plea Tr. 31).

[15] Madoff argued in connection with his original sentencing that the fraud began in the 1990s (Madoff Sentencing Letter dated June 28, 2009, ECF No. 95), thus opening the door to the use of his proffer statements.  In civil depositions, Madoff has denied making these proffer statements.

[16] Bruce Dubinsky, the forensic accountant, has issued an updated expert report dated January 26, 2019 (the "Dubinsky Report"), which includes the finding: "There is no evidence that the purported transactions for [Investment Advisory] Business customers ever occurred at least as far back as the 1970s.  In fact, the evidence shows the trading did not occur."  (Dubinsky Report, at 33).  A copy of the 203-page Dubinsky Report was provided to defense counsel and can be made available to the Court at the Court's request.

Madoff has sought not only to deny the duration of his fraud but also the number of co-conspirators. Madoff, who plead guilty only to substantive, and not conspiracy, counts, has long asserted that he acted virtually alone in perpetrating his massive fraud. Madoff took this position despite the complexity and size of his scheme and the fact that 14 other BLMIS employees and Madoff associates were convicted of federal crimes, including five at trial, in connection with Madoff's fraud. Madoff eventually admitted that DiPascali, who cooperated with the Government and testified against other Madoff employees, was a co-conspirator. Madoff also admitted that he had been initially attempting to protect DiPascali by taking all of the blame himself. (Deposition of Bernard L. Madoff dated November 13, 2019 ("11/13/19 Depo."), attached as Exhibit J, at 60 (Madoff stating that no one besides DiPascali was involved in the fraud); Deposition of Bernard L. Madoff dated October 19, 2015 ("10/19/15 Depo."), attached as Exhibit K, at 214 (Madoff acknowledging that he was protecting Frank, "[b]ut that was all.")). Nevertheless, Madoff continues to assert falsely that no one else participated in his fraud. (*Id.*).

Madoff's failure to acknowledge the full scope of his fraud and his deflecting blame to his investors is not just a gross distortion of the historical record. With every revisionist statement he makes from prison, Madoff victimizes his investors again, perpetuates his failure to mitigate the harm he caused, and continues to cause millions of dollars in investor funds to be tied up in costly litigation, in part fueled by his statements, that is ongoing to this day. Far from showing acceptance of responsibility and remorse, Madoff has shown that he has not changed.

In Madoff's brief, he cites as apparent mitigation the fact that the Securities Investor Protection Corporation ("SIPC") Trustee (the "Trustee")—acting on behalf of Madoff's investors to recover money in civil actions—has recovered a substantial portion of the losses he caused.

24

(Br. 22 n.7).  But most investors are still waiting for a full recovery, even while Madoff asks to

be released.[17]  And the recovery that has been obtained was without the help of Madoff.  Madoff

never cooperated with the Government, nor did he assist the Government's Madoff Victim

Fund's efforts, nor the Trustee's efforts, to return money to investors.  Indeed, the Trustee's

office informed the Government in connection with this motion that Madoff "has not helped at

all."  Madoff, unsurprisingly, has convinced himself of the opposite:  "Nine billion dollars came

back, which, of course . . . [the Trustee] has taken the credit for.  He did all of that.  Trust me, he

didn't.  I was the one that recovered."  (10/19/15 Depo. at 152; *see also id.* at 189 (Madoff

testifying about the Trustee: "Nor did he ever get the money back, other than what I—what I

drew in.")).

## IV.      The Section 3553(a) Factors Counsel Heavily Against Release.

### A.      Madoff's History and Characteristics

Madoff's history and characteristics weigh against release.  Madoff enjoyed immense

wealth for years earned by stealing from investors and lying to his victims and regulators.  His

fraud stopped not because he had a change of heart but because he could not prop it up any

longer.  Even when he knew his house of lies was destined to collapse, his last act was to try to

extract $173 million more from investors by writing over 100 checks to family members and

employees.  (PSR ¶ 43).  And even after his arrest, Madoff and his wife mailed packages to

family and friends containing over $1 million worth of jewelry and personal items.  (PSR ¶ 26).

---

[17] SIPC's General Counsel wrote to the Court in opposition to Madoff's release: "Indeed, many former BLMIS customers remain only partially compensated for their losses, and SIPC expects the liquidation proceeding to continue for several more years.  As time marches on, many of Madoff's former customers are now facing their own 'end-of-life trajectory,' and, as a result of Madoff's crimes, many of those victims will have to suffer the indignity of financial uncertainty in their final days."

Madoff committed these crimes not because he grew up in a disadvantaged environment with no support from family and friends; he acted out of greed. Nor is Madoff's case a tragic story of an otherwise law-abiding person who made one mistake; he chose again and again, over the course of decades, to lie, cheat, and steal for his own gain. The nature of his character is clear. Nor has it changed since sentencing. To the contrary, after earning a living from lying, Madoff's statements show that he continues to lie (perhaps even to himself) about the true scope and nature of his crime.

B.   **The Nature and Circumstances of the Offense, the Seriousness of the Offense, and the Need to Promote Respect for the Law and to Provide Just Punishment**

Madoff's Ponzi scheme was the largest in history. As a result of Madoff's decades-long fraud, approximately $170 billion flowed into the primary account he used to perpetrate his scheme. (PSR ¶ 16(o)). At the time the scheme collapsed, Madoff falsely claimed to investors that they had approximately $65 billion of assets with BLMIS. (PSR ¶¶ 35, 62). Known investor losses at the time of Madoff's sentencing totaled over $13 billion and have recently been calculated at over $19.4 billion. (PSR ¶¶ 90, 116; Madoff Recovery Initiative, "Total Value of Allowed Claims," https://www.madofftrustee.com/claims-03.html (last visited Feb. 24, 2020)).

The unprecedented size of the fraud and its resulting seriousness alone is enough reason to deny Madoff's request for release, but the numbers capture only part of the story. Thousands of investors—including individuals, charitable foundations, and pension funds[18]—were

---

[18] The administrator for a construction-workers' pension fund wrote to the Court in opposition to Madoff's release: "As hard-working construction workers, our participants cannot physically work into their later years. Our participants saw their retirement, for which they worked for decades, vanish overnight, all because of the overt greed of Mr. Madoff. . . . The stress of losing

victimized by Madoff's crimes.  At Madoff's original sentencing, the Court heard from victims,

some of whom were sick or elderly, who lost their life's savings, retirement funds, and college

savings accounts to Madoff's greed.  In connection with this proceeding, the Court has received

additional comments from Madoff's victims, who have recounted the harms—financial,

emotional, and physical—that Madoff's massive breach of trust caused and continues to cause.[19]

The approximately 520 victims who wrote to the Court are overwhelmingly opposed to Madoff's

request for early release.  Only approximately 20, or 4%, wrote in support of his release.  It is

remarkable that so many victims took the time to write to the Court over 10 years after Madoff's

original sentencing.  Their letters show how deeply Madoff's crimes continue to affect his

victims, many of whom, as one put it in a letter to the Court, are "serv[ing] a kind of life

sentence of [their] own."

Madoff has also now outlived many other victims, whose voices cannot be heard on his

motion for a sentence reduction.  Some of these victims spoke out against mercy for Madoff

while his case was pending.  In one prominent example, before his death in 2016, Holocaust

survivor and Nobel Peace Prize recipient Elie Wiesel had this to say about the punishment he

wished for Madoff:

> I would like him to be in a solitary cell with only a screen, and on
> that screen for at least five years of his life, every day and every
> night, there should be pictures of his victims, one after the other

---

your retirement funds and having to worry and wonder how you and your family will survive is
unmeasurable."

[19] One victim wrote that Madoff's crime caused her to lose "trust in government oversight
agencies, financial planners, and a religious organization that encouraged the investment.  I lost
trust in the stock market and taking financial risks.  My very conservative financial decisions
moving forward means I lost out of the terrific gains in the stock market since 2008.  But I
cannot sleep knowing *any* money is at risk. This theft was life changing for me.  I[t] needs to
continue to be life changing for Madoff."

> after the other, all the time a voice saying, 'Look what you have
> done to this old lady, look what you have done to that child, look
> what you have done,' nothing else."

(*Elie Wiesel Levels Scorn at Madoff*, N.Y. TIMES, Feb. 26, 2009,

https://www.nytimes.com/2009/02/27/business/worldbusiness/27iht-27madoff.20475093.html).

The Court was right when it observed at Madoff's sentencing that "the message must be

sent that Mr. Madoff's crimes were extraordinarily evil, and that this kind of irresponsible

manipulation of the system is not merely a bloodless financial crime that takes place just on

paper, but that it is instead, as we have heard, one that takes a staggering human toll."  (Sent. Tr.

47).  Knowing that no human being could physically serve a 150-year term of imprisonment, the

Court explained its reasons for nevertheless imposing such a sentence, noting that it not only sent

a message about the seriousness of the offense, but also served to uphold the victims' "trust in

our system of justice," and helped the victims "in their healing process" by providing just

punishment to Madoff.[20]  (Sent. Tr. 49).  The Court clearly reckoned with the fact that Madoff

would die in prison well before his term expired.  Nothing in the intervening years, particularly

given Madoff's continuing refusal to accept responsibility and show remorse to his victims,

should change that analysis.

---

[20] Victims who wrote to the Court in connection with this motion have confirmed the ongoing
impact the Court's original sentence had on them.  One wrote:  "Our entire life savings were
stolen by Madoff and we have never recovered either financially or emotionally.  Regardless, we
found some small satisfaction in learning that Madoff had been sentenced to 150 years in jail for
his crime.  Please do not waver and do not let him pretend remorse because he has none."
Another victim wrote that she left the courthouse after Madoff's original sentencing "with a
feeling that justice had been done," and is left now with the question:  "Should an incarcerated
person be released from prison because of a terminal illness, is not the serving of a 150 year
sentence meant to be terminal?"  As another victim who wrote to the Court put it, "[t]o grant
Bernard Madoff's request for 'compassionate release' would be to put another knife in the hearts
of his victims."

28

C.     **The Need to Afford Adequate Deterrence**

Madoff's crimes and the 150-year sentence the Court imposed attracted significant public attention.  The Court's sentence sent "the strongest possible message . . . to those who would engage in similar conduct that they will be caught and that they will be punished to the fullest extent of the law."  (Sent Tr. 47).  Reducing Madoff's sentence now—particularly if Madoff were to live for 18 months, or longer, after being released—would contradict that message.

D.     **The Need to Provide Medical Care**

Madoff does not claim that his medical care in prison is insufficient.  Instead, he makes generalized claims about prison healthcare and cites a law review article that does not itself contain any evidence of insufficient medical care for any Bureau of Prisons inmate, never mind for Madoff himself.  (Br. 24).  Madoff is housed at the Butner Federal Medical Center, one of the Bureau of Prisons' premier medical facilities located in North Carolina's Research Triangle area and maintained specifically for inmates in need of medical care.  Madoff's unsupported assertion that his medical care outside of prison would be more "efficient" is irrelevant.  (Br. 24). Efficiency is not a Section 3553(a) consideration.  The Government may be paying for Madoff's medical care in any event, as he acknowledges that he would live off Social Security and Medicare (to the extent he is eligible) if released.  (Br. 19).  Regardless, the fact that the Bureau of Prisons, and likely the Government as a whole, could save money from Madoff's release from prison is not a reason to release him.  Madoff's imprisonment, for all of the reasons the Court articulated at Madoff's original sentencing and for the reasons discussed herein, serves a critical societal purpose that is worth the cost.

E.     **The Need to Avoid Unwarranted Sentencing Disparities**

Madoff's crime dwarfed that of other fraud defendants that came before, or after, him in this District or anywhere.  If the Court were to release Madoff now, his effective sentence of approximately 11 years would not only be less than the 12-year sentence he sought at his sentencing, it would place his sentence firmly in the middle of, or even below, the range of sentences handed out to serious fraud defendants in this District and around the country.  Indeed, an 11-year sentence for Madoff would be less time than that served by:

- Bernard Ebbers (WorldCom): served 13 years of a 25-year sentence before being released;

- Samuel Israel (approximately $450 million Ponzi scheme): has served more than 11 years of his 22-year sentence; and

- Jeffrey Skilling (Enron): served 12 years of his 14-year sentence upon re-sentencing.

Madoff's crime, however, has no comparison in the annals of white-collar fraud.  (Sent. Tr. 46 (the Court noting that "none of these other cases is comparable to this case in terms of the scope, duration and enormity of the fraud, and the degree of the betrayal.")).  Madoff, unlike other serious white-collar fraudsters, received a sentence he could not possibly outlive because his crime was exponentially more serious than even the most serious other offenses.  Reducing Madoff's sentence would not only trivialize his offense, it would be unjust in view of the many defendants who have served, and are serving, longer sentences for lesser offenses.

## <u>CONCLUSION</u>

Madoff's crimes were "extraordinarily evil." (Sent. Tr. 47). His sentence was appropriately long. It should not be reduced. For the reasons set forth above, the Government respectfully submits that the Court should deny the defendant's motion.

Respectfully submitted,
AUDREY STRAUSS
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

By: _____

Dated: New York, New York       Drew Skinner
       March 4, 2020             Louis A. Pellegrino
                             Assistant United States Attorneys

31