# Exhibit B

93CMMADP1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          09 CR 213  (DC)

5   BERNARD L. MADOFF,

6              Defendant.

7   ------------------------------x

8                                    New York, N.Y.
                                     March 12, 2009
9                                    10:00 a.m.

10

11  Before:

12                        HON. DENNY CHIN,

                                      District Judge
13

14                       APPEARANCES

15  LEV L. DASSIN
         United States Attorney for the
16       Southern District of New York
    MARC O. LITT
17  LISA BARONI
         Assistant United States Attorneys
18

    DICKSTEIN SHAPIRO LLP
19       Attorneys for Defendant
    BY:  IRA LEE SORKIN
20       DANIEL J. HORWITZ
         NICOLE P. DE BELLO
21       MAURO M. WOLFE

22  ALSO PRESENT:  STEVEN GARFINKEL, FBI
                   KEITH KELLY, FBI
23                 JULIA SCHULTE HANISH, USDOJ, FBI
                   THEODORE V. CACIOPPI, FBI

24

25

93CMMADP1

```
 1              (Case called)
 2          MR. LITT:  Marc Litt for the United States.  With me
 3     at counsel table are Lisa Baroni, an Assistant U.S. Attorney,
 4     and four FBI agents:  Steven Garfinkel, Keith Kelly, Julia
 5     Hanish, and Ted Cacioppi.  Good morning, your Honor.
 6          MR. SORKIN:  Good morning, your Honor.  On behalf of
 7     the defendant Bernard L. Madoff, the law firm of Dickstein
 8     Shapiro LLP.  Mr. Madoff is sitting to my left.  To my right is
 9     Daniel Horwitz of my firm.  To Mr. Madoff's left is Mauro Wolfe
10     from my firm, and to Mr. Wolfe's left is Nicole De Bello from
11     my firm.  Good morning.
12          THE COURT:  Good morning.
13          Mr. Sorkin, your client is still prepared to plead
14     guilty today as we discussed on Tuesday?
15          MR. SORKIN:  Yes, your Honor.
16          THE COURT:  Mr. Madoff, if you would stand, please,
17     and the deputy clerk will administer the oath.
18              (Defendant sworn)
19          MR. SORKIN:  Your Honor, before you begin the
20     allocution, we have provided the government and the court
21     reporter with a copy of the allocution that Mr. Madoff will
22     read, and we have a copy if the Court wishes to see it as well.
23          THE COURT:  Yes.  Thank you.
24          MR. SORKIN:  May I hand it up?
25          THE COURT:  Yes.
```

93CMMADP1

1          This statement is intended to cover all 11 counts?

2          MR. SORKIN:  Yes, your Honor.  After your Honor goes

3     through, he will give a statement which we believe will cover

4     all the elements.  Thank you.

5          THE COURT:  Mr. Madoff, do you understand that you are

6     now under oath and that if you answer my questions falsely,

7     your untrue answers may later be used against you in another

8     prosecution for perjury or making false statements?

9          THE DEFENDANT:  Yes, I do.

10         THE COURT:  Try to keep your voice up so that I can

11    hear you, please.

12         THE DEFENDANT:  Yes, I do, your Honor.

13         MR. SORKIN:  Can we get some water, your Honor?

14         THE COURT:  Yes.

15         MR. LITT:  I would note that the defendant has not yet

16    been arraigned on the information.

17         THE COURT:  All right.  That's true.  Technically, we

18    did the first part of it.  We never did the final part.  Let me

19    just ask the final question.

20         Mr. Madoff, the other day you waived indictment and

21    you consented to being charged by an information of the

22    government, correct?

23         THE DEFENDANT:  Yes.

24         THE COURT:  And how do you now plead to the

25    information, guilty or not guilty?

93CMMADP1

1          THE DEFENDANT:  Guilty.

2          THE COURT:  Before I accept the plea I will conduct

3     the allocution.

4          Would you state your full name for the record, please.

5          THE DEFENDANT:  Bernard L. Madoff.

6          THE COURT:  On Tuesday you told me your age and

7     educational background.  We talked a little bit about your

8     medical condition.  Has your medical condition changed since

9     Tuesday?

10          THE DEFENDANT:  No, it has not.

11          THE COURT:  In the past 24 hours, have you taken any

12     drugs, medicine, or pills, or have you drunk any alcohol?

13          THE DEFENDANT:  No.

14          THE COURT:  Is your mind clear today?

15          THE DEFENDANT:  Yes, it is.

16          THE COURT:  And are you feeling all right today under

17     the circumstances?

18          THE DEFENDANT:  Yes, I am.

19          THE COURT:  Do either counsel have any doubt as to Mr.

20     Madoff's competence to plead at this time?

21          MR. LITT:  The government does not.

22          MR. SORKIN:  No, your Honor.

23          THE COURT:  Now, Mr. Madoff, as I understand it, you

24     wish to plead guilty today to all 11 counts of the information,

25     is that correct?

93CMMADP1

1          THE DEFENDANT:  Yes, it is correct.

2          THE COURT:  Have you had a full opportunity to discuss

3    your case with Mr. Sorkin and to discuss the consequences of

4    pleading guilty?

5          THE DEFENDANT:  Yes, I have.

6          THE COURT:  You told me on Tuesday that you were

7    satisfied with Mr. Sorkin and his representation of you.  Are

8    you still satisfied?

9          THE DEFENDANT:  Yes, I am.

10          THE COURT:  On the basis of Mr. Madoff's responses to

11    my questions and my observations of his demeanor, I find that

12    he is fully competent to enter an informed plea at this time.

13          Now, Mr. Madoff, before I accept any plea from you I

14    am going to ask you some additional questions that are intended

15    to satisfy me that you wish to plead guilty because you are

16    guilty and that you fully understand the consequences of your

17    plea.  If you do not understand any of my questions, please ask

18    me or Mr. Sorkin to explain.

19          I am going to describe to you certain rights that you

20    have under the Constitution and laws of the United States.  You

21    will be giving up these rights if you plead guilty, so please

22    listen carefully.

23          Under the Constitution and laws of the United States,

24    you have a right to a speedy and public trial by a jury on the

25    charges against you which are contained in the information.  If

93CMMADP1

1   there were a trial, you would be presumed innocent and the

2   government would be required to prove your guilt by competent

3   evidence beyond a reasonable doubt.  You would not have to

4   prove that you were innocent if you were to go to trial.

5       If there were a trial, you would have the right to be

6   represented by an attorney.  And if you could not afford one,

7   an attorney would be provided for you free of cost.

8       If there were a trial, you would have a right to see

9   and hear all the witnesses against you and your attorney could

10  cross-examine them.  You would have a right to have your

11  attorney object to the government's evidence and to offer

12  evidence on your own behalf if you so desired, and you would

13  have the right to have subpoenas issued or other process used

14  to compel witnesses to testify in your defense.

15      If there were a trial, you would have the right to

16  testify if you wanted to, but no one could force you to testify

17  if you did not want to.  Furthermore, no inference or

18  suggestion of guilt could be drawn if you chose not to testify

19  at trial.

20      Mr. Madoff, do you understand each and every one of

21  these rights?

22      THE DEFENDANT:  Yes, I do.

23      THE COURT:  Do you understand that by pleading guilty

24  today you are giving up each and every one of these rights, you

25  are waiving these rights, and you will have no trial?

93CMMADP1

1              THE DEFENDANT:  I do.

2              THE COURT:  Do you understand that you have the right

3     even now to refuse to plead guilty?

4              THE DEFENDANT:  Yes, I do.

5              THE COURT:  You do not have to enter a plea of guilty

6     if you do not want to, for any reason.

7              Do you understand that?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Now, did you receive a copy of the

10    information?

11             THE DEFENDANT:  Yes, I have.

12             THE COURT:  And as we discussed on Tuesday and as we

13    discussed a moment ago, do you understand that you have waived

14    your right to be charged by an indictment, which is issued by a

15    grand jury, and you have consented to being charged by the

16    information which is issued by the prosecutor?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And did you waive that right voluntarily

19    and knowingly?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Now, I am going to review the counts with

22    you.  As we said, the information contains 11 counts.

23             Count One charges securities fraud.

24             Count Two charges investment adviser fraud.

25             Count Three charges mail fraud.

93CMMADP1

1 Count Four charges wire fraud.

2 Count Five charges international money laundering to

3 promote fraud in the sale of securities.

4 Count Six charges international money laundering to

5 conceal the proceeds of fraud in the sale of securities.

6 Count Seven charges money laundering.

7 Count Eight charges making false statements.

8 Count Nine charges perjury.

9 Count Ten charges making a false filing with the

10 Securities and Exchange Commission.

11 And Count Eleven charges theft from an employee

12 benefit plan.

13 Do you understand that those are the charges against

14 you?

15 THE DEFENDANT:  Yes, I do.

16 THE COURT:  I'll ask the government to advise the

17 defendant of the elements of the crimes.

18 MR. LITT:  Yes, your Honor.  With respect to Count

19 One, securities fraud --

20 THE COURT:  Hold on one second.

21 Mr. Madoff, you can be seated.  Pour yourself some

22 water.

23 THE DEFENDANT:  Thank you.

24 MR. LITT:  With respect to Count One, securities

25 fraud, in order to prove the crime of securities fraud, the

93CMMADP1

government must establish each of the following three elements
beyond a reasonable doubt:

First, that in connection with the purchase or sale of
a security, the defendant did any one or more of the following:
(1) employed a device, scheme, or artifice to defraud or (2)
made an untrue statement of a material fact or omitted to state
a material fact which made what was said under the
circumstances misleading; or (3) engaged in an act, practice,
or course of business that operated or would operate as a fraud
or deceit upon a purchaser or seller.

Second, that the defendant acted knowingly, willfully,
and with the intent to defraud;

And, third, that the defendant knowingly used or
caused to be used any means or instruments of transportation or
communication in interstate commerce or the use of the mails in
furtherance of the fraudulent conduct.

With respect to investment adviser fraud, the
government would have to prove beyond a reasonable doubt all
four of the following elements:  First, that the defendant was
an investment adviser; second, that the defendant either (A)
employed a device, scheme, or artifice to defraud clients and
prospective clients; (B) engaged in a transaction, practice, or
course of business which operated as a fraud or deceit upon
those clients and prospective clients; or (C) engaged in an
act, practice, and course of business that was fraudulent,

93CMMADP1

1    deceptive, and manipulative.

2          Third, that the defendant devised or participated in

3    such alleged device, scheme, or artifice to defraud or engaged

4    in such alleged transaction, practice, or course of business,

5    knowingly, willfully, and with intent to defraud.

6          And, fourth, that the defendant employed such alleged

7    device, scheme, or artifice to defraud or engaged in such

8    alleged transaction, practice, or course of business by use of

9    the mails or other instrumentality of interstate commerce.

10         In order to prove the crime of mail fraud, the

11   government must establish beyond a reasonable doubt the

12   following four elements:

13         First, that at or about the time alleged in the

14   indictment there was a scheme or artifice to defraud in order

15   to obtain property or money by false and fraudulent pretenses,

16   representations, or promises;

17         Second, that the false or fraudulent statements and

18   representations concerned material facts;

19         Third, that the defendant knowingly and willfully

20   devised or participated in the scheme or artifice to defraud

21   with knowledge of its fraudulent nature and with specific

22   intent to defraud;

23         And, fourth, that the United States Mails were used in

24   furtherance of the scheme as specified in the information.

25         In order to prove the crime of wire fraud the

93CMMADP1

1  government must establish the following four essential

2  elements:

3          First, that at or about the time alleged in the

4  information there was a scheme or artifice to defraud in order

5  to obtain property or money by false and fraudulent pretenses,

6  representations, or promises;

7          Second, that the false or fraudulent statements and

8  representations concerned material facts;

9          Third, that the defendant knowingly and willfully

10  devised or participated in the scheme or artifice to defraud

11  with knowledge of its fraudulent nature and with specific

12  intent to defraud

13          And, fourth, that interstate or foreign wire

14  facilities were used in furtherance of the scheme to defraud as

15  specified in the information.

16          In order to prove the crime of unlawful transportation

17  of funds or monetary instruments with the intent to promote the

18  carrying on of specified unlawful activity, in violation of

19  Section 1956(a)(2)(A), the government must establish beyond a

20  reasonable doubt each of the following elements:

21          First, that the defendant transported a monetary

22  instrument or funds from a place in the United States to or

23  through a place outside the United States, or to a place in the

24  United States from or through a place outside the United

25  States;

93CMMADP1

1    And, second, that the defendant did so with the intent

2    to promote the carrying on of specified unlawful activity.

3    In order to prove the crime of unlawful transportation

4    of funds or monetary instruments to conceal and disguise the

5    proceeds of specified unlawful activity, the government must

6    establish beyond a reasonable doubt each of the following:

7    First, that the defendant transported a monetary

8    instrument or funds from a place in the United States to or

9    through a place outside the United States, or to a place in the

10   United States from or through a place outside the United

11   States;

12   And, second, that the defendant did so with the

13   knowledge that the monetary instrument or funds involved

14   represent the proceeds of some form of unlawful activity;

15   And, third, that the defendant did so with knowledge

16   that the transportation was designed in whole or in part to

17   conceal or disguise the nature, location, source, ownership, or

18   control of the proceeds of securities fraud, mail fraud, wire

19   fraud, and theft from an employee benefit plan.

20   In order to prove the crime of engaging in monetary

21   transactions in property derived from specified unlawful

22   activity in violation of Section 1957, the government must

23   establish the following beyond a reasonable doubt:

24   First, that the defendant engaged or attempted to

25   engage in a monetary transaction in or affecting interstate

93CMMADP1

1    commerce;

2         Second, that the monetary transaction involved

3    criminally derived property of a value greater than $10,000;

4         Third, that the property was derived from specified

5    unlawful activity; in this case, from securities fraud, mail

6    fraud, wire fraud, or theft from a pension benefit plan;

7         Fourth, that the defendant acted knowingly; that is,

8    with knowledge that the transaction involved proceeds of a

9    criminal offense;

10         And, fifth, that the transaction took place in the

11    United States or that the defendant is a United States person.

12         In order to prove the crime of making false statements

13    to the SEC, in violation of 18 U.S.C. 1001, the government must

14    establish the following elements beyond a reasonable doubt:

15         First, that the defendant made a statement or

16    representation;

17         Second, that the statement or representation was

18    material;

19         Third, that the statement or representation was false,

20    fictitious or fraudulent;

21         Fourth, that the false, fictitious or fraudulent

22    statement was made knowingly or willfully;

23         And, fifth, that the statement or representation was

24    made in a matter within the jurisdiction of the government of

25    the United States.

93CMMADP1



1    To prove the crime of perjury the government must

2    prove beyond a reasonable doubt each of the following:

3        First, that the defendant took an oath to testify

4    truly before the Securities and Exchange Commission, a body

5    authorized by law to administer oaths;

6        Second, that the defendant made false statements as to

7    matters about which the defendant testified under oath as set

8    forth in the information;

9        Third, that the matters as to which it is charged that

10   the defendant made false statements were material to the issues

11   under inquiry by the Securities and Exchange Commission;

12       And, fourth, that such false statements were willfully

13   made.

14       To prove the offense of making a false filing with the

15   SEC the government must prove beyond a reasonable doubt each of

16   the following:

17       First, that the defendant was required to file an

18   application, report, or document with the SEC under the

19   Securities Exchange Act of 1934 and the rules and regulations

20   thereunder;

21       Second, that the application, report, or document

22   filed with the SEC contained false or misleading statements;

23       Third, that the false or misleading statements were

24   material;

25       And, fourth, that the defendant acted knowingly and

93CMMADP1

1   willfully.

2          To prove the offense of theft from an employee pension

3   benefit plan the government must prove beyond a reasonable

4   doubt the following elements:

5          First, that the defendant abstracted or converted to

6   his own use or the use of others the monies, funds, securities,

7   premiums, credits, property, or other assets of an employee

8   welfare benefit plan;

9          Second, that the funds abstracted or converted from --

10  excuse me, that the fund abstracted or converted from was an

11  employee welfare benefit plan within the meaning of the

12  statute;

13         And, third, that the defendant acted knowingly and

14  willfully.

15         THE COURT:  Thank you.

16         Mr. Madoff, would you rise again, please.

17         Mr. Madoff, do you understand that if you were to go

18  to trial the government would have to prove all of those

19  elements beyond a reasonable doubt?

20         THE DEFENDANT:  Yes, I do.

21         THE COURT:  Now I am going to review with you the

22  maximum possible penalties for the crimes in question.

23         Count One charging securities fraud carries a maximum

24  sentence of 20 years' imprisonment, a maximum fine of the

25  greatest of $5 million, or twice the gross gain or twice the

93CMMADP1

gross loss, a mandatory special assessment of $100, and a maximum term of supervised release of three years.

In fact, each count carries a mandatory special assessment of $100, so I am not going to repeat that for each of the 11 counts.

Count Two charges investment adviser fraud. It carries a maximum sentence of five years' imprisonment, a maximum fine of the greatest of $10,000, or twice the gross gain or twice the gross loss, and a maximum term of supervised release of three years.

Count Three, the mail fraud count, charges a maximum sentence of 20 years' imprisonment, a maximum fine of the greatest of $250,000, or twice the gross gain or twice the gross loss, and a maximum term of supervised release of three years.

In fact, all 11 counts carry the same maximum term of supervised release of three years, so I won't repeat that either.

I'm up to Count Four, the wire fraud count. That carries a maximum sentence of 20 years' imprisonment, a maximum fine of the greatest of $250,000, or twice the gross gain or twice the gross loss.

Count Five, the international money laundering count, the first of those counts, carries a maximum sentence of 20 years' imprisonment, a maximum fine of the greatest of

93CMMADP1

1    $500,000, twice the value of the funds involved, or twice the

2    gross gain to any person or twice the pecuniary loss to any

3    person other than yourself.

4         Count Six, the second international money laundering

5    count, carries a maximum sentence of 20 years' imprisonment, a

6    maximum fine of the greatest of $500,000, or twice the value of

7    the funds involved or twice the gross gain or twice the

8    pecuniary loss.

9         Count Seven, a money laundering count, charges a

10   maximum sentence of ten years' imprisonment, a maximum fine of

11   the greatest of $250,000, or twice the gross gain or twice the

12   pecuniary loss.

13        Count Eight, which charges making false statements,

14   carries a maximum sentence of five years' imprisonment, a

15   maximum fine of $250,000, or twice the gross gain or twice the

16   pecuniary loss.

17        Count Nine charges perjury.  It carries a maximum

18   sentence of five years' imprisonment, a maximum fine of the

19   greatest of $250,000, or twice the gross gain or twice the

20   pecuniary loss.

21        Count Ten charges making a false filing with the SEC.

22   It carries a maximum sentence of 20 years' imprisonment, a

23   maximum fine of the greatest of $5 million, or twice the gross

24   gain or twice the pecuniary loss.

25        Finally, Count Eleven, which charges theft from an

93CMMADP1

1    employee benefit plan, carries a maximum sentence of five

2    years' imprisonment, a maximum fine of the greatest of

3    $250,000, or twice the gross gain or twice the pecuniary loss.

4         Do you understand that those are the possible maximum

5    sentences?

6         THE DEFENDANT:  Yes, I do.

7         THE COURT:  Now, taking all the counts together, do

8    you understand that the total maximum sentence of incarceration

9    that you face is 150 years' imprisonment?

10        THE DEFENDANT:  I do.

11        THE COURT:  In addition, do you understand that as

12   part of your sentence I can order restitution to any person or

13   entity injured as a result of your criminal conduct?

14        THE DEFENDANT:  Yes.

15        MR. LITT:  Your Honor, I would just note that

16   restitution is mandatory, not discretionary.

17        THE COURT:  I will order restitution if it's

18   mandatory.

19        You understand that?

20        THE DEFENDANT:  I do.

21        THE COURT:  I mentioned supervised release.  By that I

22   mean that you would be subject to monitoring when you were

23   released from prison under terms and conditions that could lead

24   to reimprisonment without a jury trial if you were to violate

25   them.  And if you were to violate the terms of your supervised

93CMMADP1

1   release you could be sent back to prison for the entire term of

2   your supervised release.

3           Do you understand that?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Are you a citizen of the United States?

6           THE DEFENDANT:  Yes, I am.

7           THE COURT:  Do you understand that as a result of your

8   guilty plea you may lose certain valuable civil rights, such as

9   the right to vote, the right to hold public office, the right

10  to serve on a jury, and the right to possess any kind of

11  firearm?

12          THE DEFENDANT:  Yes, I do.

13          THE COURT:  Now, have you talked to Mr. Sorkin about

14  the federal sentencing guidelines?

15          THE DEFENDANT:  Yes, I have.

16          THE COURT:  Do you understand that the guidelines are

17  now advisory only and that they are no longer mandatory?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Nonetheless, before I can sentence you I

20  still have to determine what your sentencing range is under the

21  guidelines.  I can't do that until after the probation

22  department prepares a presentence report and you, your lawyer,

23  and the government have had a chance to review the report and

24  to make any objections.

25          Do you understand that?

93CMMADP1

1          THE DEFENDANT:  Yes.

2          THE COURT:  And even after I decide what your

3     guideline range is, I still have the authority in appropriate

4     circumstances to impose a sentence that is above or below the

5     guideline range.

6          Do you understand that?

7          THE DEFENDANT:  I do.

8          THE COURT:  Do you understand that parole has been

9     abolished in the federal system and, thus, you would not be

10    released from prison any earlier on parole?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Do you understand that if your attorneys

13    or anyone else has attempted to predict what your sentence will

14    be that the prediction could be wrong?

15         THE DEFENDANT:  Yes.

16         THE COURT:  And that is because no one, not your

17    attorney, not the government, can or should make any promises

18    to you as to what your sentence will be as your sentence cannot

19    be decided until after the presentence report is completed, I

20    have ruled on any objections, and I have decided whether there

21    is any basis to go above or below the guideline range.

22         Do you understand that?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Finally, do you understand that even if

25    your sentence turns out to be different from what your attorney

93CMMADP1

1   or anyone else has told you it might be, or even if your

2   sentence turns out to be different from what you expect, you

3   will still be bound to your guilty plea and you will not be

4   allowed to withdraw your plea of guilty?

5           THE DEFENDANT:  Yes.

6           THE COURT:  Do you understand that by pleading guilty

7   you may be giving up or waiving certain aspects of your right

8   to appeal?

9           THE DEFENDANT:  Yes.

10          THE COURT:  The government provided your lawyers with

11  a letter, dated March 10, 2009, which we call a Pimentel

12  letter?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Did you review that with your lawyers?

15          THE DEFENDANT:  I did.

16          THE COURT:  And that Pimentel letter explains that

17  your guideline sentence is 150 years.

18          Do you understand that?

19          THE DEFENDANT:  I do.

20          THE COURT:  That's the government's calculation.

21  That's the government's position and you and your lawyers will

22  have the opportunity to comment on that.

23          Do you understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  And do you understand also that this

93CMMADP1

1    calculation that's set forth in the government's letter is not

2    binding on the Court?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Has anyone offered you any inducements or

5    threatened you or forced you to plead guilty?

6              THE DEFENDANT:  No.

7              THE COURT:  Mr. Sorkin, do you know of any valid

8    defense that would prevail at trial, or do you know any reason

9    why your client should not be permitted to plead guilty?

10             THE DEFENDANT:  I do not, your Honor.

11             THE COURT:  Mr. Madoff, tell me what you did.

12             MR. SORKIN:  Your Honor, may I make one,

13   respectfully -- according to the Pimentel letter, we agree that

14   while the maximum statutory penalty in terms of imprisonment is

15   150 years, the guideline range -- and this can be found on page

16   6 of the Pimentel letter -- is life imprisonment.  The criminal

17   history category I yields a sentencing range of life

18   imprisonment.

19             THE COURT:  I understand.  But the government goes on

20   further to take the position that when a count does not permit

21   life, then you look at the statutory maximum.  That's the

22   government's position.

23             MR. SORKIN:  I just want to make sure Mr. Madoff

24   understood that.  Thank you, your Honor.

25             THE COURT:  Mr. Madoff, you understand that?

93CMMADP1

1              THE DEFENDANT:  Yes, I do.

2              THE COURT:  Technically, the guideline range is life,

3      but none of the counts in question carries a sentence that can

4      go up to life.  The top is 20 years.  According to the

5      government, in that circumstance then the guideline range is

6      the maximum and the government's position is that the guideline

7      range is 150 years.  Again, I don't know whether Mr. Sorkin

8      agrees or disagrees, but we will deal with that before

9      sentencing.

10             MR. SORKIN:  Thank you, your Honor.

11             THE COURT:  Mr. Madoff, would you tell me what you

12     did, please.

13             THE DEFENDANT:  Yes, your Honor.

14             Your Honor, for many years up until my arrest on

15     December 11, 2008, I operated a Ponzi scheme through the

16     investment advisory side of my business, Bernard L. Madoff

17     Securities LLC, which was located here in Manhattan, New York,

18     at 885 Third Avenue.  I am actually grateful for this

19     opportunity to publicly speak about my crimes, for which I am

20     so deeply sorry and ashamed.  As I engaged in my fraud, I knew

21     what I was doing wrong, indeed criminal.  When I began the

22     Ponzi scheme I believed it would end shortly and I would be

23     able to extricate myself and my clients from the scheme.

24     However, this proved difficult, and ultimately impossible, and

25     as the years went by I realized that my arrest and this day

93CMMADP1

```
 1    would inevitably come.  I am painfully aware that I have deeply
 2    hurt many, many people, including the members of my family, my
 3    closest friends, business associates, and the thousands of
 4    clients who gave me their money.  I cannot adequately express
 5    how sorry I am for what I have done.  I am here today to accept
 6    responsibility for my crimes by pleading guilty and, with this
 7    plea allocution, explain the means by which I carried out and
 8    concealed my fraud.
 9             The essence of my scheme was that I represented to
10    clients and prospective clients who wished to open investment
11    advisory and individual trading accounts with me that I would
12    invest their money in shares of common stock, options, and
13    other securities of large well-known corporations, and upon
14    request, would return to them their profits and principal.
15    Those representations were false for many years.  Up until I
16    was arrested on December 11, 2008, I never invested these funds
17    in the securities, as I had promised.  Instead, those funds
18    were deposited in a bank account at Chase Manhattan Bank.  When
19    clients wished to receive the profits they believed they had
20    earned with me or to redeem their principal, I used the money
21    in the Chase Manhattan bank account that belonged to them or
22    other clients to pay the requested funds.  The victims of my
23    scheme included individuals, charitable organizations, trusts,
24    pension funds, and hedge funds.  Among other means, I obtained
25    their funds through interstate wire transfers they sent from
```

93CMMADP1

1  financial institutions located outside New York State to the

2  bank account of my investment advisory business, located in

3  Manhattan, New York, and through mailings delivered by the

4  United States Postal Service and private interstate carriers to

5  my firm here in Manhattan.

6      I want to emphasize today that while my investment

7  advisory business, the vehicle of my wrongdoing, was part of my

8  firm, Bernard L. Madoff Securities, the other businesses my

9  firm engaged in, proprietary trading and market making, were

10 legitimate, profitable, and successful in all respects.  Those

11 businesses were managed by my brother and two sons.

12     To the best of my recollection, my fraud began in the

13 early 1990s.  At that time, the country was in a recession and

14 this posed a problem for investments in the securities markets.

15 Nevertheless, I had received investment commitments from

16 certain institutional clients and understood that those

17 clients, like all professional investors, expected to see their

18 investments out-perform the market.  While I never promised a

19 specific rate of return to my client, I felt compelled to

20 satisfy my clients' expectations, at any cost.  I therefore

21 claimed that I employed an investment strategy I had developed,

22 called the split strike conversion strategy, to falsely give

23 the appearance to clients that I had achieved the results I

24 believed they expected.

25     Through the split strike conversion strategy I

93CMMADP1

 1    promised to clients and prospective clients that client funds

 2    would be invested in a basket of common stocks within the

 3    Standard & Poors 100 index, a collection of the 100 largest

 4    publicly-traded companies in terms of their market

 5    capitalization.  I promised that I would select a basket of

 6    stocks that would closely mimic the price movements of the

 7    Standard & Poors 100 index.  I promised that I would

 8    opportunistically time those purchases and would be out of the

 9    market intermittently, investing client funds during these

10    periods in United States Government-issued securities, such as

11    United States Treasury bills.  In addition, I promised that as

12    part of the split strike conversion strategy, I would hedge the

13    investments I made in the basket of common stocks by using

14    client funds to buy and sell option contracts related to those

15    stocks, thereby limiting potential client losses caused by

16    unpredictable changes in stock prices.  In fact, I never made

17    those investments I promised clients, who believed they were

18    invested with me in the split strike conversion strategy.

19           To conceal my fraud, I misrepresented to clients,

20    employees, and others that I purchased securities for clients

21    in overseas markets.  Indeed, when the United States Securities

22    and Exchange Commission asked me to testify as part of an

23    investigation they were conducting about my investment advisory

24    business, I knowingly gave false testimony under oath to the

25    staff of the SEC on May 19, 2006 that I executed trades of

93CMMADP1

1   common stock on behalf of my investment advisory clients and

2   that I purchased and sold the equities that were part of my

3   investment strategy in European markets.   In that session with

4   the SEC, which took place here in Manhattan, New York, I also

5   knowingly gave false testimony under oath that I had executed

6   options contracts on behalf of my investment advisory clients

7   and that my firm had custody of the assets managed on behalf of

8   my investment advisory clients.

9        To further cover up the fact that I had not executed

10  trades on behalf of my investment advisory clients, I knowingly

11  caused false trading confirmations and client account

12  statements that reflected the bogus transactions and positions

13  to be created and sent to clients purportedly involved in the

14  split strike conversion strategy, as well as other individual

15  clients I defrauded who believed they had invested in

16  securities through me.   The clients receiving trade

17  confirmations and account statements had no way of knowing by

18  reviewing these documents that I had never engaged in

19  transactions represented on the statements and confirmations.

20  I knew those false statements and account statements would be

21  and were sent to clients through the U.S. Mails from my office

22  here in Manhattan.

23        Another way that I concealed my fraud was through the

24  filing of false and misleading certified annual reports and

25  financial statements -- excuse me.   Another way that I

93CMMADP1

1    concealed my fraud was through the filing of false and

2    misleading certified audit reports and financial statements

3    with the SEC.  I knew that these audit reports and financial

4    statements were false and that they would also be sent to

5    clients.  These reports, which were prepared here in the

6    Southern District of New York, among other things, falsely

7    reflected my firm's liabilities as a result of my intentional

8    failure to purchase securities on behalf of my advisory

9    clients.

10           Similarly, when I recently caused my firm in 2006 to

11    register as an investment adviser with the SEC, I subsequently

12    filed with the SEC a document called the form ADV uniform

13    application for investment adviser registration.  On this form

14    I intentionally and falsely certified under penalty of perjury

15    that Bernard L. Madoff Investment Securities had custody of my

16    advisory clients' securities.  That was not true, and I knew it

17    when I completed and filed the form with the SEC, which I did

18    from my office on the 17th floor of 885 Third Avenue, here in

19    Manhattan.

20           In more recent years, I used yet another method to

21    conceal my fraud.  I wired money between the United States and

22    the United Kingdom to make it appear as though there were

23    actual securities transactions executed on behalf of my

24    investment advisory clients.  Specifically, I had money

25    transferred from the U.S. bank account of my investment

93CMMADP1

1    advisory business to the London bank account of Madoff

2    Securities International Limited, a United Kingdom corporation

3    that was an affiliate of my business in New York.  Madoff

4    Securities International Limited was principally engaged in

5    proprietary trading and was a legitimate, honestly run and

6    operated business.  Nevertheless, to support my false statement

7    that I purchased and sold securities for my investment advisory

8    clients in European markets, I caused money from the bank

9    account of my fraudulent advisory business, located here in

10   Manhattan, to be wire transferred to the London bank account of

11   Madoff Securities International Limited.

12        There were also times in recent years when I had

13   money, which had originated in the New York Chase Manhattan

14   bank account of my investment advisory business, transferred

15   from the London bank account of Madoff Securities International

16   Limited to the Bank of New York operating bank account of my

17   firm's legitimate proprietary and market making business.  That

18   Bank of New York account was located in New York.  I did this

19   as a way of ensuring that the expenses associated with the

20   operation of the fraudulent investment advisory business would

21   not be paid from the operations of the legitimate proprietary

22   trading and market making businesses.

23        In connection with the purported trades, I caused the

24   fraudulent investment advisory side of my business to charge

25   the investment advisory clients four cents per share as a

93CMMADP1

1  commission.  At times in the last few years, these commissions

2  were transferred from Chase Manhattan bank account of the

3  fraudulent investment advisory side of my firm to the account

4  at Bank of New York, which was the operating account for the

5  legitimate side of Bernard L. Madoff Investment Securities, the

6  proprietary trading and market making side of my firm.  I did

7  this to ensure that the expenses associated with the operation

8  of my fraudulent investment advisory business would not be paid

9  from the operations of the legitimate proprietary trading and

10 market making business.  It is my belief that the salaries and

11 bonuses of the personnel involved in the operation of the

12 legitimate side of Bernard L. Madoff Investment Securities were

13 funded by the operations of the firm's successful proprietary

14 trading and market making businesses.

15        Your Honor, I hope I have conveyed with some

16 particularity in my own words the crimes I committed and the

17 means by which I committed them.  Thank you, your Honor.

18        THE COURT:  Thank you, Mr. Madoff.

19        Mr. Sorkin, I don't think there was mention of an

20 employee benefit plan.

21        MR. SORKIN:  The pension fund was mentioned, your

22 Honor.

23        THE COURT:  What page that?

24        MR. SORKIN:  I think it's page 2.  If you look at the

25 top, the victim -- I'm quoting -- the victims of my scheme

93CMMADP1

1    included individuals, charitable organizations, trusts, pension

2    funds, and hedge funds.

3            THE COURT:  I see.

4            And those pension funds include employee welfare

5    benefit plans?

6            MR. SORKIN:  Yes, your Honor.

7            Is that correct?

8            THE DEFENDANT:  Yes.

9            THE COURT:  Mr. Madoff, you can be seated for a

10   moment.

11           Does the government believe that Mr. Madoff's

12   admissions cover the elements of the crimes of each count?

13           MR. LITT:  Yes, your Honor.  The government does not

14   entirely agree with all of the defendant's description of his

15   conduct.  However, the government does believe that his

16   allocution does cover each of the elements of the charged

17   offenses.

18           THE COURT:  Would you summarize what the government's

19   evidence would be if the defendant were to go to trial?

20           MR. LITT:  Yes.

21           Had this case proceeded to trial, the government would

22   have proven through testimony and evidence beyond a reasonable

23   doubt all of the facts set forth in the criminal information.

24           In summary, the government would have proven the

25   following:  The defendant operated a massive Ponzi scheme

93CMMADP1

 1   through his company, Bernard L. Madoff Investment Securities,

 2   beginning at least as early as the 1980s.  Over the decades

 3   working from his New York City office and elsewhere, Madoff

 4   solicited and caused others to solicit prospective clients to

 5   open accounts with his company.  His clients included

 6   individuals, charitable organizations, trusts, pension funds,

 7   and hedge funds, among others, and those clients were also his

 8   victims.

 9         Madoff told those clients that he would invest their

10   funds in publicly-traded securities, options, and treasury

11   bills.  In fact, over the life of his scheme Madoff did not buy

12   stocks or options as he had promised.  Instead, Madoff used

13   client funds to pay other clients who sought to redeem their

14   investments, and used so-called commission revenue generated by

15   charging clients four cents per share for shares that he never,

16   in fact, purchased to generate revenue for his firm.  At times,

17   his firm would have been unable to operate but for the cash

18   generated from this Ponzi scheme.  Madoff repeatedly lied to

19   clients in person, on telephone calls, and through mailings,

20   including account statements and confirmations of purchases and

21   sales of securities that he mailed through the U.S. Postal

22   Service.

23         Some investors sent checks to Madoff through the

24   mails, others wired money to Madoff, and many of those wires

25   came from outside New York State into the Southern District of

93CMMADP1

         New York.  Madoff also caused hundreds of millions of dollars
    1

    2   of client funds to be wired overseas to accounts in London.

    3   Some of that money was sent back to his firm and used to pay

    4   its expenses.  Other money was sent back and forth between New

    5   York and London to give the false impression that he was

    6   actually buying and selling securities in European markets

    7   when, in fact, he was not.

    8        Madoff also used some of the money funneled through

    9   London to support his lavish lifestyle.  Madoff also used other

   10   means of deception to hide his scheme.  He lied when he told

   11   clients that he was purchasing securities on their behalf.

   12        He also lied to regulators, including the SEC.  He

   13   filed false and fraudulent certified financial statements with

   14   the SEC that failed to disclose his fraud scheme, failed to

   15   disclose his liabilities to the victims of his Ponzi scheme,

   16   and contained false certifications that the audited statements

   17   had been prepared in accordance with generally-accepted

   18   auditing standards and principles.

   19        Mr. Madoff lied in a form that he was required to file

   20   with the SEC as an investment adviser, claiming that his

   21   company had custody of client securities when, in fact, he had

   22   not purchased any securities for those clients.

   23        He also lied at least seven separate times in an SEC

   24   deposition in 2006.

   25        At the end, Madoff told his clients that he was

93CMMADP1

1    holding nearly $65 billion in securities on behalf of those

2    clients.   In fact, he had only a small fraction of that amount.

3              (Continued on next page)

93CGMADP2

1           THE COURT:  Thank you.  Mr. Madoff, please stand.

2           When you did the things you told me you did in your

3    statement, did you know that what you were doing was wrong and

4    illegal?

5           THE DEFENDANT:  Yes, I did, your Honor.

6           THE COURT:  How do you now plead to Count One of the

7    information, guilty or not guilty?

8           THE DEFENDANT:  Guilty.

9           THE COURT:  How do you now plead to Count Two of the

10   information, guilty or not guilty?

11          THE DEFENDANT:  Guilty.

12          THE COURT:  How do you now plead to Count Three,

13   guilty or not guilty?

14          THE DEFENDANT:  Guilty.

15          THE COURT:  How do you now plead to Count Four, guilty

16   or not guilty?

17          THE DEFENDANT:  Guilty.

18          THE COURT:  How do you now plead to Count Five, guilty

19   or not guilty?

20          THE DEFENDANT:  Guilty.

21          THE COURT:  How do you now plead to Count Six, guilty

22   or not guilty?

23          THE DEFENDANT:  Guilty.

24          THE COURT:  How do you now plead to Count Seven,

25   guilty or not guilty?

93CGMADP2

| | |
|---|---|
| 1 | THE DEFENDANT:  Guilty. |
| 2 | THE COURT:  How do you plead to Count Eight, guilty or |
| 3 | not guilty? |
| 4 | THE DEFENDANT:  Guilty. |
| 5 | THE COURT:  How do you plead to Count Nine, guilty or |
| 6 | not guilty? |
| 7 | THE DEFENDANT:  Guilty. |
| 8 | THE COURT:  How do you now plead to Count Ten, guilty |
| 9 | or not guilty? |
| 10 | THE DEFENDANT:  Guilty. |
| 11 | THE COURT:  And finally, how do you now plead to Count |
| 12 | Eleven, guilty or not guilty? |
| 13 | THE DEFENDANT:  Guilty, your Honor. |
| 14 | THE COURT:  Did you do the things that you are charged |
| 15 | with doing in all 11 counts of the information? |
| 16 | THE DEFENDANT:  Yes, I did, your Honor. |
| 17 | THE COURT:  And are you pleading guilty because you |
| 18 | are guilty? |
| 19 | THE DEFENDANT:  Yes, I am. |
| 20 | THE COURT:  Are you pleading guilty voluntarily and of |
| 21 | your own free will? |
| 22 | THE DEFENDANT:  Yes, I am. |
| 23 | THE COURT:  All right.  Mr. Madoff, you may be seated. |
| 24 | Based on what I have heard, I am inclined to accept |
| 25 | Mr. Madoff's guilty plea. |

93CGMADP2

 1          As I stated the other day, the government received a

 2    number of e-mails from victims objecting to any plea bargain or

 3    any plea deal.  As it is clear that there is no plea bargain or

 4    plea deal, there is no basis for these objections.  At this

 5    time, nonetheless, if there is any victim who signed our

 6    sign-in sheet who wishes to be heard on the question of whether

 7    I should accept Mr. Madoff's guilty plea, you can have a chance

 8    to speak now.  We have a list.

 9          Mr. Nierenberg, do you want to speak?

10          MR. NIERENBERG:  Yes.

11          THE COURT:  All right, sir.  Come to the microphone.

12    And remember that today is not the sentencing.  Victims will

13    have a chance to speak at sentencing.  Go ahead.

14          MR. NIERENBERG:  I am one of the many victims of

15    Madoff's egregious crimes.  I don't know whether you had a

16    chance to turn around and look at the victims --

17          THE COURT:  Mr. Nierenberg, Mr. Nierenberg --

18          MR. NIERENBERG:  I just wanted to --

19          THE COURT:  Remain at the podium, please.

20          MR. NIERENBERG:  All right.  I know that the

21    operation -- Madoff's operation was massive, that he didn't

22    commit these crimes alone, and I don't understand why

23    conspiracy is not a part of one of his pleas.  Just to produce

24    the reams of documents that were received and the elaborate

25    data that went into them must have required an army of people

93CGMADP2

1      to produce.  And we all know that Madoff wasn't around a lot at

2      his operation.  There were other people that were there who

3      handled it when he was gone.  I --

4              THE COURT:  I gather your point is that I should

5      reject the plea because the government has not charged

6      conspiracy?

7              MR. NIERENBERG:  No.  The question is -- I'm not

8      suggesting that you reject the plea.  What I'm suggesting is

9      that there's an additional crime that was committed that wasn't

10     included in the plea that needs to be considered.

11             THE COURT:  All right.  What I want to hear from now

12     are victims who object to my accepting the plea.

13             MR. NIERENBERG:  Okay.

14             THE COURT:  Do you object to my accepting the plea?

15             MR. NIERENBERG:  No, I don't.

16             THE COURT:  Well, thank you, then.  You can have your

17     seat.

18             MR. NIERENBERG:  Okay.

19             THE COURT:  Mark Labianca?  No.

20             Brian Felsen?  Mr. Felsen, do you want to be heard?

21             MR. FELSEN:  I would like to be heard, but I do not

22     object to the plea.

23             THE COURT:  All right.  If you want to be heard with

24     respect to sentencing, we will make sure we have procedures to

25     give victims an opportunity to be heard at sentencing.

93CGMADP2

1          MR. FELSEN:  Okay.

2          THE COURT:  All right.  Thank you.

3          Bennett Goldwait?  I can't quite read the handwriting.

4          MR. GOLDWORTH:  Goldworth.  No thank you.

5          THE COURT:  Ronnie Sue and Dominic Ambrosino, do you

6   wish to be heard?

7          MS. AMBROSINO:  Yes, I do.

8          THE COURT:  All right.  Come forward, please.  And say

9   your name again when you get to the microphone.

10          MS. AMBROSINO:  My name is Ronnie Sue Ambrosino, and I

11   would object to the plea -- I just need to find a spot.  I have

12   taken a lot of notes.  Judge, I believe that you have the

13   opportunity today to find out information as to where the money

14   is and to find out who else may be involved in this crime.  And

15   if that plea is accepted without those two pieces of

16   information, then I do object.  If you can ascertain that you

17   can get those two pieces of information, I would love to see

18   this man, who admits that he lied under oath in May of 2006 and

19   sat here and took an oath today -- I would like to see him

20   guilty.

21          THE COURT:  All right.  Thank you.

22          MS. AMBROSINO:  Thank you, sir.

23          THE COURT:  Maureen Aebel?  Go ahead.

24          MS. AEBEL:  Judge Chin, I would like to present you

25   with a different scenario that our country could witness if you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

93CGMADP2

```
 1    reject Mr. Madoff's plea.  If we go to trial, we will show our
 2    people in this struggling country and the world, who looks to
 3    us as the global moral leader, that we hold all people
 4    accountable.  If we go to trial, we can show all our world that
 5    all crimes, all crimes, including crimes of greed, can be
 6    dissected, ruled upon, and punished.  And we can demonstrate
 7    that we are a country that can learn from our mistakes, and we
 8    will be then able to reexamine and improve the mechanisms that
 9    exist for our protection that have failed so completely.  If we
10    go to trial, we have more of a chance to comprehend the global
11    scope of this horrendous crime.  At trial we can hear and bear
12    witness to the pain that Mr. Madoff has inflicted on the young,
13    the old, and the infirmed.  No man, no matter who he knows or
14    who he is able to influence, is above the law.  Thank you,
15    Judge Chin.
16              THE COURT:  Thank you.  All right.  That is it with
17    respect to the victims who signed up on the acceptance of the
18    plea.  Does the government or the defense want to respond to
19    anything?  Does the government want to respond to anything?
20              MR. LITT:  May I just have a moment?
21              THE COURT:  Yes.
22              MR. LITT:  I think the only thing the government would
23    say is that the government's investigation continues.  It is
24    continuing.  A lot of resources and effort are being expended,
25    both to find assets and to find anyone else who may be
```

93CGMADP2

1    responsible for this fraud.

2                THE COURT:  Thank you.  Mr. Sorkin?

3                MR. SORKIN:  Nothing at this time, your Honor.  Thank

4    you.

5                THE COURT:  First of all, I appreciate the comments

6    from the victims.  With respect to Ms. Ambrosino's comments

7    about where the money is, as the government has just said, it

8    is continuing its investigation, and this guilty plea certainly

9    does not preclude the government from proceeding.

10               With respect to Ms. Aebel's comment about how a trial

11   would show the world that we hold all people accountable, I

12   believe that these proceedings will do the same thing.

13               Mr. Madoff, please stand.  I am accepting the plea.

14   Mr. Madoff, because you acknowledge that you are guilty as

15   charged in Counts One through Eleven of the information,

16   because you know your rights and are waiving them, because your

17   plea is entered knowingly and voluntarily and is supported by

18   an independent basis in fact for each of the elements of the 11

19   offenses, I accept your guilty plea and adjudge you guilty on

20   Counts One through Eleven of the information.  You can be

21   seated.

22               Mr. Madoff, the probation department will prepare a

23   presentence report to assist me in sentencing you.  You will be

24   interviewed by the probation department, and it is important

25   that you give the probation officer truthful and accurate

93CGMADP2

1  information, for the report is important in my decision as to

2  what your sentence will be.  You and your attorney have a right

3  and will have an opportunity to review the report, to challenge

4  or comment upon it and to speak on your behalf before

5  sentencing.

6         Sentencing is set for June 16th at 1:30 p.m.

7         Turning to bail, is the government requesting that I

8  remand Mr. Madoff pending sentencing?

9         MR. LITT:  Yes.  The government moves for remand at

10  this time pursuant to 18 USC 3143, which puts the burden on the

11  defendant to show by clear and convincing evidence that he can

12  be trusted to appear for future court appearances.

13         The defendant has now pled guilty and been found

14  guilty of 11 -- or does the Court wish to hear argument now

15  or --

16         THE COURT:  Well, let me ask Mr. Sorkin whether he

17  opposes remand.

18         MR. SORKIN:  We do, your Honor, and I'd like to be

19  heard on that point.

20         THE COURT:  Let me hear from Mr. Sorkin.

21         MR. SORKIN:  Thank you, your Honor.  May I go to the

22  podium, your Honor?

23         THE COURT:  Yes, wherever you would like.

24         MR. SORKIN:  Thank you.  Thank you, your Honor.  Your

25  Honor, let me take just a little bit of while, because I want

93CGMADP2

1      to review the history of the bail as it related to this case.

2              THE COURT:  Yes.  The government provided me with the

3      transcripts and the letter briefs, and I've reviewed them too.

4              MR. SORKIN:  I'm not going to go through every one of

5      them, but I think it's important that I list the chronology and

6      how we got to this point today.

7              THE COURT:  That's fine.  That's fine.

8              MR. SORKIN:  Your Honor, this case started when

9      Mr. Madoff on December 10th confessed his wrongdoing to his two

10     sons, knowing full well that his two sons were going to turn

11     him in.  He didn't run.  He didn't attempt to flee at that

12     time.  When he was arrested by the FBI the next morning, he

13     confessed to the FBI.

14             He appeared on December 11th before Magistrate Judge

15     Eaton, and a personal recognizance bond of ten million dollars

16     was signed by Mr. Madoff and his wife.  There were three

17     additional cosigners that were required, and it was secured by

18     Mr. Madoff's residence in Manhattan.  Surrender of Mr. Madoff's

19     travel documents took place, and his travel was restricted to

20     the Southern and Eastern Districts of New York and the District

21     of Connecticut.

22             The Pretrial Services at the time, your Honor, did not

23     recommend in its initial recommendation that Mr. Madoff be

24     remanded, and I add additionally that the government had no

25     difference and no objection with any of the conditions that

93CGMADP2

1    were imposed on December 11th.   That was before Magistrate

2    Judge Eaton.

3          On December 17th, your Honor, before another

4    magistrate judge, Magistrate Judge Gorenstein, Mr. Madoff --

5    and it was ratcheted up -- was placed on home detention in his

6    apartment with electronic ankle bracelet monitoring.   He was

7    permitted to travel only to his attorney's offices and to the

8    court.   A curfew of 7:00 p.m. through 9:00 a.m. was imposed,

9    and this was done in addition to the entry of confession of

10   judgments with respect to his wife's properties on Montauk, New

11   York, and Palm Beach, Florida, a surrender of Mrs. Madoff's

12   passport and a reduction of the number of cosigners on the bond

13   from four to two.   This, too, your Honor, was consented to by

14   the government.   Indeed, I believe it was done by stipulation

15   without argument before Magistrate Judge Gorenstein.

16         On December 19th, again, on consent of the government,

17   a ten million dollar personal recognizance bond was signed by

18   Mr. Madoff, his wife, and his brother, secured by confessions

19   of judgment on his wife's properties in Montauk, in New York,

20   and Palm Beach.   The passports of both Mrs. Madoff had already

21   been surrendered, and other than scheduled court appearances,

22   Mr. Madoff was confined to his home 24 hours a day.   He was no

23   longer permitted to visit his counsel.   And they had, in

24   addition to the 24-hour-a-day confinement, an electronic

25   monitoring device, which is still attached to his ankle.

93CGMADP2

1        At his wife's own expense --

2        THE COURT:  Would the audience please remain quiet.

3   Go ahead.

4        MR. SORKIN:  Because Mr. Madoff's assets were all

5   frozen, but his wife's were not, although she later voluntarily

6   committed to a freeze of her assets under certain restrictions.

7   So with the government's consent, Mrs. Madoff's own assets,

8   which were not frozen by Judge Stanton or any judge in this

9   court -- she agreed to pay a security firm acceptable to the

10  government to provide the following services to prevent harm or

11  flight.

12        And with these unfrozen assets, not objected to by the

13  government, Mr. Madoff has round-the-clock monitoring at his

14  building 24 hours a day, including video monitoring of all of

15  his apartment, doors, communications devices, and services

16  permitting security to send a direct signal from an observation

17  post to the FBI in the event of even the suspicion of harm or

18  flight.  This is known as a panic button.  There are additional

19  guards available on request, if necessary, to prevent flight or

20  harm, both inflicted by Mr. Madoff -- I'm dealing with the

21  danger to the community issue -- and also harm to Mr. Madoff.

22        On January 12th, your Honor -- and again, this was by

23  consent of the government.  On January 12th, Magistrate Judge

24  Ronald Ellis imposed additional restrictions.  This was

25  briefed, as your Honor well knows.  It was argued by Magistrate

93CGMADP2

Judge Ellis.  And on that date, Magistrate Judge Ellis

incorporated the restrictions set forth in the order of Judge

Stanton, who has jurisdiction over the SEC matter, including

restrictions on the transfer of all property whatsoever

wherever located in the possession or under the control of

Mr. Madoff.  And that was part of the SEC consent under the TRO

and also the consent under the preliminary injunction, which

Mr. Madoff consented to.  Magistrate Judge Ellis incorporated

these restrictions to a voluntary restraint agreement, which

the government agreed to, involving Mrs. Madoff's assets and

restricted the transfer of all assets owned by her voluntarily,

your Honor.

Additionally, Magistrate Judge Ellis directed the

compilation of an inventory of all valuable portable items in

the Manhattan home, which is to be checked once every two weeks

by government-approved security, who are also required to

inspect all outgoing mail.

The government appealed Magistrate Judge Ellis'

ruling, and before District Judge Lawrence McKenna on January

16th, 2009, argument was held.  The matter was briefed, and

Judge McKenna added additional conditions:  One, a compilation

of any inventory of all valuable portable items in the homes in

Montauk, Palm Beach, as well as any property owned by

Mrs. Madoff in a small residence in France.

I quote, which your Honor, I'm sure, has read, from

93CGMADP2

1    Judge McKenna's statement in court after hearing argument and

2    seeing papers, that, quote -- and this is from Judge McKenna --

3    I think the chances of Mr. Madoff fleeing at this point are as

4    close to nil as you can get in any bail package, period,

5    unquote.

6           Now, nothing has changed, your Honor, and I agree it

7    has changed substantially in terms of the plea.  And I agree

8    with Mr. Litt that the burden is upon us to show by clear and

9    convincing evidence that Mr. Madoff is neither a flight risk

10   nor a risk to the community.

11          As far as we are aware, your Honor, Pretrial Services

12   has not found that Mr. Madoff has been negligent or careless in

13   complying with all of the bail conditions.  There has been no

14   incident at all, as far as we are aware, that has been conveyed

15   to us by Pretrial or the government that Mr. Madoff has

16   attempted at any time to flee or certainly, which the

17   government conceded before Magistrate Judge Ellis and Judge

18   McKenna, posed any risk of harm.  The argument before Judge

19   Ellis and Judge McKenna was the risk of harm was in the

20   financial world, that he would dissipate assets.  That was

21   taken care of, your Honor, respectfully, by Magistrate Judge

22   Ellis and by Judge McKenna.  All mail going out, all packages

23   going out are inspected by the security firm approved by the

24   government.

25          I respectfully submit, your Honor, that the change has

93CGMADP2

 1    been the media attention and the increased and, in many cases,

 2    justifiable anger by people who claim they lost money, but the

 3    Bail Reform Act doesn't deal with those two issues.   I do not

 4    believe, your Honor, that the precedent set in this court where

 5    such individuals as Rigas in the Adelphia case, Ebbers in the

 6    WorldCom case, Messrs. Skilling and Lay -- Mr. Lay passed away

 7    before sentencing -- all of whom were facing substantial years

 8    in prison, Rigas and Ebbers in this court, Mr. Skilling in

 9    Texas.   All were released on bail pending sentence.   All went

10    to trial but did not plead guilty, and all, your Honor, as far

11    as I am aware, never once confessed at the get-go to the

12    wrongdoing that you heard Mr. Madoff confess to today.

13         So I would respectfully submit, your Honor, that there

14    is no chance that Mr. Madoff will certainly be a risk to the

15    community, a danger to the community.   And his risk of

16    flight -- and I agree with Judge McKenna -- is virtually nil

17    with all of the restrictions that have been imposed on him.   So

18    I respectfully request that his bail be continued.

19         I would also add, your Honor -- again, I refer to the

20    Bail Reform Act as not being relevant on those two other

21    issues.   What is also relevant, your Honor, is that Mr. Madoff

22    is going to have the opportunity, I am sure, if the government

23    and the defense can come to some agreement, to review literally

24    thousands of thousands of documents which the trustee and the

25    government have been reviewing to discover where this

1    forfeiture number comes from.  And we've been able to

2    communicate with him in his apartment, and I think that is a

3    factor that your Honor should consider, even though that is not

4    my argument with respect to the Bail Reform Act.  I think we

5    have met all the conditions under the act.

6          So by clear and convincing evidence, I don't think he

7    is a risk of either danger to the community, flight, and I

8    would respectfully request that his bail be continued.  Thank

9    you, your Honor.

10         THE COURT:  I don't need to hear from the government.

11   It is my intention to remand Mr. Madoff.

12         Please, ladies and gentlemen, please.

13         Now, I have a number of people who signed in who

14   wanted to be heard on the issue of bail, and I think you should

15   only be heard if you object to remand.

16         Adriane Biondo?  Mr. Ross?  Helen Chaitman?

17         MS. CHAITMAN:  No objection.

18         THE COURT:  Donald Schupak?

19         MR. SCHUPAK:  I do not object.

20         THE COURT:  Mark Labianca?

21         MR. LABIANCA:  I do not object.

22         THE COURT:  Sharon Lissauer?

23         As Mr. Madoff has pled guilty, he is no longer

24   entitled to the presumption of innocence.  The exposure is

25   great, 150 years in prison.  In light of Mr. Madoff's age, he

93CGMADP2

1  has an incentive to flee, he has the means to flee, and thus,

2  he presents a risk of flight.  Bail is revoked, and the

3  defendant is remanded.

4          MR. SORKIN:  Your Honor, would your Honor consider,

5  respectfully, a stay so that we might appeal your Honor's bail

6  decision?  We intend to do it expeditiously.

7          THE COURT:  The request for a stay is denied.

8          MR. SORKIN:  Thank you.

9          THE COURT:  Sentencing, as I said, is set for June

10  16th, 1:30 p.m.  Some of the victims may wonder why do we need

11  so much time.  Well, the probation department has to prepare a

12  presentence report.  By law, the defendant is entitled to 35

13  days to review the presentence report before sentencing.  We

14  also have to give the parties an opportunity to submit written

15  materials.

16          Mr. Madoff, I will see you at sentencing.  We are

17  adjourned.

18                          o0o

19

20

21

22

23

24

25