UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

           - v -           :        **MEMORANDUM DECISION**

BERNARD L. MADOFF,        :        09 Cr. 213 (DC)

          Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:        BRANDON SAMPLE PLC
                    Attorney for Defendant
                        By:    Brandon Sample, Esq.
                    P.O. Box 250
                    Rutland, VT  05702

                    AUDREY STRAUSS, Esq.
                    Attorney for the United States,
                    Acting Under Authority Conferred by 28 U.S.C. § 515
                        By:    Drew Skinner, Esq.
                                Louis A. Pellegrino, Esq.
                                Assistant United States Attorneys
                    One St. Andrews Plaza
                    New York, NY  10007

CHIN, Circuit Judge:

        On March 12, 2009, defendant Bernard L. Madoff pleaded guilty to 11

counts of securities fraud and related crimes.  On June 29, 2009, I sentenced him to a

term of imprisonment of 150 years.  Mr. Madoff now moves for a reduction in sentence

and  "compassionate release" pursuant to 18 U.S.C. § 3582(c)(1)(A), as modified by the

First Step Act (the "FSA"), Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018).  He

contends that he suffers from "end-stage renal disease" and other serious medical

conditions and that, as a consequence, he has a life expectancy of less than 18 months.

Def. Motion at 2-3.  Accordingly, he asks that the Court show him "mercy and

compassion" and release him so that he is not incarcerated for "his final months on this

earth."  *Id.* at 25, 26.

For the reasons set forth below, the motion is denied.

## *BACKGROUND*

**1.**   *Madoff's Crimes*

In the Government's words, "Madoff's Ponzi scheme was the largest in

history."  Gov't Mem. at 26.  At sentencing, I observed that none of the other financial

fraud cases in the district were "comparable . . . in terms of the scope, duration and

enormity of the fraud, and the degree of the betrayal."  Sent. Tr. at 46.

Mr. Madoff's scheme went on for more than 20 years, and the fraud

reached "thousands of victims."  Sent. Tr. at 43; *see* Gov't Mem. at 2, 26.  The fraud was

brazen, as victims were told their monies were being invested in stocks when they were

not.  Instead, Mr. Madoff (and others) fabricated millions of pages of account statements

purporting to confirm trades that were never made and balances that did not exist.  *See*

Sent. Tr. at 44; Gov't Mem. at 3.

The financial loss was enormous.  The loss amount for calculating the

Guidelines range was $13 billion, *see id*. at 43, but that amount did not include losses

invested through feeder funds, and estimates of the actual loss ranged as high as $65

billion, with some $170 billion flowing through the primary account used for the

scheme, *see* Gov't Mem. at 26; Sent. Tr. at 43; Plea Tr. at 33-34 ("At the end, Madoff told

his clients that he was holding nearly $65 billion in securities on behalf of those clients.

In fact, he had only a small fraction of that amount.").  The loss amount of $13 billion

was literally "off the chart," as the loss amount chart used to calculate Mr. Madoff's

offense level of 52 topped out at $400 million.  Sent. Tr. at 43-44; *see* Gov't Mem. at 9

("The loss amount of over $13 billion was more than 32 times the baseline level of loss

that would have carried a recommended life sentence.").

The breach of trust was massive.  Mr. Madoff was a respected figure who

had held leadership positions in the securities industry.  He was on the boards of

charities and other organizations.  And yet he lied repeatedly to the Securities and

Exchange Commission (the "SEC") and created fraudulent certified financial statements

to mislead regulators.  *See* Gov't Mem. at 3; Sent. Tr. at 44.  He lied to governmental

entities, charities, academic institutions, labor unions, employee benefit plans, pension

funds, large institutional clients, and individuals.  *See* Gov't Mem. at 5; Sent. Tr. at 44,

47.  He even lied to a grieving widow.[1]  Individual investors made important decisions

---

[1]      At sentencing, I noted that:

   I was particularly struck by one story that I read in the [victim] letters.  A man
   invested his family's life savings with Mr. Madoff.  Tragically, he died of a heart
   attack just two weeks later.  The widow eventually went in to see Mr. Madoff.

about their lives -- "when to retire, how to care for elderly parents, whether to buy a car

or sell a house, how to save for their children's college tuition," -- and institutional

victims made important decisions about their businesses, all based on false information

about fictitious accounts.  Sent. Tr. at 44  Prior to the sentencing, hundreds of victims

wrote to the Court attesting to the devastating impact the loss of their savings had on

their lives.  *See* Sent. Tr. 4, 44, 47-48.  At sentencing, a number of victims spoke

eloquently -- and painfully -- about the "devastation" Mr. Madoff had wreaked.  Sent.

Tr. at 11, 13, 14.  Two investors committed suicide after Mr. Madoff's scheme was

revealed.  *See* Gov't Mem. at 5 (citing PSR ¶¶ 94-95).

       At sentencing, Mr. Madoff's counsel argued that "[m]ost of the money . . .

went for redemptions.  People who invested money were given back money."  Sent. Tr.

at 33.  That may be so, but much of the money was also diverted to Mr. Madoff, his

family, and friends.  Mr. Madoff's tax returns showed more than $250 million in

adjusted gross income for 1998 through 2007.  *See id*. at 45.  Mr. Madoff used his firm's

business accounts -- which contained customer funds -- to pay for personal expenses,

---

    He put his arm around her, as she describes it, and in a kindly manner told her
    not to worry, the money is safe with me.  And so not only did the widow leave
    the money with him, she eventually deposited more funds with him, her 401(k),
    her pension funds.  Now, all the money is gone.  She will have to sell her home,
    and she will not be able to keep her promise to help her granddaughter pay for
    college.

Sent. Tr. at 48.

including two yachts, shares in private jets, four country club memberships, a home in

Nantucket, and an apartment in Manhattan.  *See* Gov't Mem. at 3; Sent. Tr. at 45.  In

November and December 2018, Mr. Madoff caused wire transfers of $5.5 million and

$10 million to be made from a business account to his wife's personal account.  *See* Gov't

Mem. at 4; Sent. Tr. at 46.  And even in the end, on the day he was arrested, FBI agents

discovered in Mr. Madoff's office 100 signed checks totaling $173 million, made payable

to certain employees, friends, and family.  *See* Gov't Mem. at 4; Sent. Tr. at 41.

**2.      *Madoff's Guilty Plea and Sentencing***

On March 12, 2009, Mr. Madoff pleaded guilty to all 11 counts of the

Information:  securities fraud, investment adviser fraud, mail fraud, wire fraud,

international money laundering, concealment of money laundering, transactions in

criminally derived property, false statements, perjury, false filing with the SEC, and

theft from an employee benefit plan.  *See* Gov't Mem. at 6-7; Plea Tr. at 7-8, 35-36.

On June 29, 2009, I sentenced Mr. Madoff.  His total offense level was 52

and his Criminal History Category was I, which called for a sentencing range of life

imprisonment.  But no count carried a life sentence.  Consequently, I calculated Mr.

Madoff's Guidelines range by "stacking" -- or adding together -- the maximum sentence

for each of the 11 counts of conviction, resulting in an advisory Guideline sentence of

150 years.  Sent. Tr. 3-4 (citing *United States v. Evans*, 352 F.3d 65 (2d Cir. 2003)).  The

Probation Department recommended a sentence of 50 years.  *See* Sent. Tr. at 4.  Mr.

5

Madoff's counsel asked for a sentence of 12 years, which counsel characterized as "just short . . . of a life sentence" based on statistics showing that Mr. Madoff, as a 71-year old man, had a life expectancy of 13 years.  *Id*. at 34, 46.  Alternatively, counsel suggested a sentence of 15 to 20 years:  "So that if Mr. Madoff ever sees the light of day, in his 90s, impoverished and alone, he will have paid a terrible price.  He expects . . . to live out his years in prison."  *Id*.  The Government requested a sentence of "150 years . . . or a substantial term of imprisonment that ensures that he will spend the rest of his life in jail."  *Id*. at 42.

I sentenced Mr. Madoff to 150 years' imprisonment.  I noted that any sentence above 20 or 25 years for a 71-year old man would be "largely, if not entirely, symbolic."  *Id*. at 46-47.  I felt the symbolism, however, was important.  *See id*. at 47.  In my view, Mr. Madoff's crimes were "extraordinarily evil," and I sentenced him accordingly.  *Id*.

## 2.     *Madoff's Request for Compassionate Release*

On September 24, 2019, after serving some 10 years of his sentence, Mr. Madoff submitted a request for compassionate release to the Bureau of Prisons ("BOP").  *See* Def. Motion at 10 & Ex. A.  He advised of the following:  He was then 81 years old. He had recently been diagnosed with "Stage 5 kidney disease" and was living in the "hospice" at his facility (the Federal Medical Center in Butner, North Carolina).  *Id*. Ex.

A.  Stage 5 kidney disease is a "terminal disorder" with "an 'end-of-life trajectory.'" *Id*.

He had secured a "release residence with a family friend." *Id*.

By letter dated December 5, 2019, the BOP denied the request.  *See* Def.

Mem. at 10 & Ex. B.  The BOP acknowledged that Mr. Madoff met the criteria for a

reduction in sentence because he "has a history of end-stage renal disease" and "[h]is

condition is considered terminal with a life expectancy of less than 18 months." *Id*. Ex.

B.  The BOP noted that Mr. Madoff had refused dialysis and further testing, and that

consequently he had been admitted to the facility's "comfort care program." *Id*.  The

BOP concluded that "in light of the nature and circumstances of his offense, his release

at this time would minimize the severity of his offense." *Id*.

Mr. Madoff filed the instant motion for compassionate release on February

5, 2020.  *See* Doc. 212.  The Government opposed the motion on March 5, 2020.  *See* Doc.

223.  Mr. Madoff filed reply papers on March 11, 2020.  *See* Doc. 226.  After the Court

issued an order giving the victims an opportunity to respond to Mr. Madoff's motion,

*see* Doc. 216, some 520 victims wrote to the Court.  *See* Gov't Mem. at 27.  The

overwhelming majority -- some 96% -- opposed the request.  *See id*.[2]

---

[2]      A few victims supported compassionate release, offering the view, for example, that Mr.
Madoff "has already paid a substantial price for his malfeasance and no further justice would be
served in keeping him imprisoned."  Def. Reply at 9 (quoting victim letter).

*DISCUSSION*

**1.     *Applicable Law***

Pursuant to 18 U.S.C. § 3582(c)(1)(A), as modified by the FSA, a court may

reduce a defendant's sentence upon motion of the  BOP or the defendant.  *See United*

*States v. Gil*, No. 90 Cr. 306 (KMW), 2020 WL 2611872, at *1 (S.D.N.Y. May 22, 2020);

*United States v. Patterson*, No. 17 Cr. 118-6 (KPF), 2020 WL 2571044, at *2 (S.D.N.Y. May

21, 2020).  A defendant may move for a reduction under the statute only upon

exhausting administrative remedies within the BOP.  *See* 18 U.S.C. § 3582(c)(1)(A).

A court may reduce a sentence if it finds, "after considering the factors set

forth in section 3553(a) to the extent they are applicable," that "extraordinary and

compelling reasons warrant such a reduction" and that the reduction "is consistent with

applicable policy statements issued by the Sentencing Commission."  *Id.*[3]  The

Sentencing Commission has determined that "extraordinary and compelling"

circumstances exist to permit a court to grant a reduction when the defendant is

"suffering from a terminal illness" or a "serious physical or medical condition . . . that

substantially diminishes the ability of the defendant to provide self-care within the

environment of a correctional facility and from which he or she is not expected to

recover."  U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A).  One consideration is the extent to

---

[3]     The court may also reduce a sentence where a defendant is at least 70 years old and has
served at least 30 years in prison.  *See* 18 U.S.C. § 3582(c)(1)(A)(ii).  That provision is not
applicable here, as Mr. Madoff has not served 30 years.

which the "condition can be treated within the context of a correctional facility." *United States v. Hidalgo*, No. 13 Cr. 413-2 (JGK), 2020 WL 2642133, at *2 (S.D.N.Y. May 26, 2020). In addition, in accordance with Sentencing Commission guidance, the court may not reduce a sentence unless it determines that the "defendant is not a danger to the safety of any other person or the community." *Id.* (quoting U.S.S.G. § 1B1.13(2)); *see Patterson*, 2020 WL 2571044, at *2.

The existence of "extraordinary and compelling reasons" for a reduction does not mean that a district court *must* release the defendant. *See United States v. Ebbers*, No. S4 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *6 (S.D.N.Y. Jan. 8, 2020). Rather, section 3582(c)(1)(A) provides that a court "may" reduce a sentence if "extraordinary and compelling circumstances" are shown, and thus a district court has the discretion to grant or deny a request for compassionate release even if a defendant is medically eligible. *See United States v. Israel*, No. 05 Cr. 1039 (CM), 2019 WL 6702522, at *11 (S.D.N.Y. Dec. 9, 2019) ("A court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such reduction because of his medical condition . . . ."). If a defendant qualifies for a reduction, the court must decide whether to grant the reduction by weighing the factors set forth in section 3553(a), to the extent they are applicable. *See id.* at *2. These include:  the nature and circumstances of the offense; the defendant's history and characteristics; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just

punishment for the offense, to afford adequate deterrence to criminal conduct, and to

provide the defendant with needed medical care; and the need to avoid unwarranted

disparities in sentences.  *See* 18 U.S.C. § 3553(a).

On a motion for compassionate release, the defendant bears the burden of

showing that a reduction is warranted.  *See Patterson*, 2020 WL 2571044, at *2; *Ebbers*,

2020 WL 91399, at *4; *see also United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A

party with an affirmative goal and presumptive access to proof on a given issue

normally has the burden of proof as to that issue.").

### 2.    *Application*

Although the Government does not concede the issue, it "assumes

*arguendo* that Madoff qualifies to bring a motion for a sentence reduction."  Gov't Mem.

at 16.  On the record before me, I conclude that Mr. Madoff indeed qualifies to be

considered for a compassionate release under section 3582(c)(1)(A).

Mr. Madoff has exhausted his administrative remedies, as the BOP did not

respond to his request for compassionate release within thirty days, *see* 18 U.S.C. §

3582(c)(1)(A), and the BOP eventually denied his request.

The Government quarrels with whether Mr. Madoff actually has a life

expectancy of less than 18 months and argues that he "may well live longer."  Gov't

Mem. at 17.[4]  The Government notes that at one point Mr. Madoff was refusing medical

treatment, and that his condition has improved since he started accepting treatment.

*See id*. at 17-18.  For purposes of this motion, however, I accept Mr. Madoff's assertion

that he has less than eighteen months to live.  The question is, assuming that to be the

case, whether compassionate release is warranted in light of the section 3553(a) factors.

I have considered all of the statutory factors, and I conclude that

compassionate release is not warranted, for the following reasons:

First, this was one of the most egregious financial crimes of our time.

Given its length, breadth, and impact, Mr. Madoff's fraud was unprecedented.

Although this was a financial crime, as I observed at sentencing, it was not "bloodless."

Sent. Tr. at 47.  Rather, it has taken and continues to take "a staggering human toll,"

causing heartache, despair, and even suicide.  *Id*.[5]  As the Government notes, it is

"remarkable" that in response to Mr. Madoff's motion so many victims -- some 520 --

wrote to the Court more than 10 years after his guilty plea and sentencing; it is clear

---

[4]      Defense counsel acknowledges that "[n]o one can know for certain how long Madoff will
live; however, while he could live longer than 18 months, he could also die before that time."
Def. Reply at 4.  Counsel also points out that Mr. Madoff was deemed terminally ill with a life
expectancy of less than 18 months on September 30, 2019, now some eight months ago.  *See id*.

[5]      The recent letters echoed the letters submitted in 2009.  One victim wrote:  "I believe
with all my heart that my husband would be alive today if he had not had to deal with the
stress and emotional despair that the loss of almost all our money had on our family."  Gov't
Mem. at 6 n.4 (quoting victim letter).  Another added: "[Mr. Madoff] knowingly defrauded
thousands of people and I know this stress contributed to the early death of my husband."  *Id*.
(quoting victim letter).

that Mr. Madoff's crimes continue to have a tragic impact on the lives of many.   Gov't

Mem. at 5-6 & nn.1-5, 26-28 & nn.18-20 (quoting victim letters).  The nature,

circumstances, and seriousness of Mr. Madoff's crimes weigh heavily against

compassionate release.

      Second, in imposing a sentence of 150 years, I very much had in mind the

need for the sentence to promote respect for the law, to provide just punishment for the

crimes, and to deter further criminal conduct.  All of these goals would be undermined

if the 150-year sentence were to be reduced now to essentially an 11-year sentence.  As I

explained at sentencing, the symbolism of a 150-year sentence was important: the public

trust had been eroded by Mr. Madoff's ability to manipulate the system for so many

years, he deserved to be punished according to his moral culpability, and the message

had to be sent that those who would engage in similar conduct would be punished to

the fullest extent of the law.  These factors -- promoting respect for the law, providing

just punishment, and deterring further criminal conduct -- also weigh heavily against

early termination of Mr. Madoff's sentence.

      Third, as for the issue of adequate medical care, Mr. Madoff contends that

"[t]he BOP is plagued with medical staffing shortages, treatment delays, and medical

personnel recruiting issues." Def. Motion at 24.  He does not argue, however, that the

Butner Federal Medical Center, where he is housed and which is maintained

specifically for inmates in need of medical care, *see* Gov't Mem. at 29, is unable to

provide him with adequate care.  Rather, he argues that "compassionate release would

allow him to receive end-of-life care in the community, which would be more efficient,

timely, and less burdensome on the BOP."  Def. Motion at 24.  The hard truth is that

what is at stake is "palliative care for end-stage renal disease," intended "to make a

patient as comfortable as possible for [his] remaining life."  Def. Motion at 12.  While

Mr. Madoff would undoubtedly be more comfortable in palliative care outside of

prison, I conclude that this factor is either neutral or weighs slightly in favor of

compassionate release.

        Fourth, as to the need to avoid unwarranted disparities in sentencing, to

the extent there are disparities in the sense that a 150-year sentence is longer than other

sentences in white collar cases, the disparities are not unwarranted, given the nature

and circumstances of Mr. Madoff's crimes.  Moreover, the Government points to several

other prominent fraud cases where the defendants are (or were) serving sentences of 14

to 25 years, and argues that an effective sentence of approximately 11 years would place

Madoff below those sentences for a much more egregious crime.  *See* Gov't Mem. at 30.

I agree.  This factor is either neutral or weighs slightly against the granting of a

compassionate release.[6]

---

[6]      Mr. Madoff relies heavily on the *Ebbers* case, as Bernard Ebbers, the former CEO of
WorldCom, Inc., was granted compassionate release after serving 13 years of a 25-year sentence.
*See Ebbers*, 2020 WL 91399, at *1; Def. Motion at 17-18; Gov't Mem. at 18-19.  While Mr. Ebbers's
crimes were indeed serious, *see Ebbers*, 2020 WL 91399, at *2, they were of a different magnitude.
For example, the sentencing court found that the loss amount was in the range of $2 billion and

Finally, I consider Mr. Madoff's history and characteristics.  It is true that

Mr. Madoff is "a first-time felony offender."  Def. Motion at 19.  But the fact is that his

criminal conduct went on for decades, and he was caught only because his scheme

began to unravel with the financial crisis as he was unable to keep up with the

increasing requests for redemptions.  I also agree that at age 81, with his declining

physical condition, Mr. Madoff probably does not pose a danger to any person or the

community.  *See id*.  But as the recent victim letters show, many people are still suffering

from Mr. Madoff's actions.  I also believe that Mr. Madoff was never truly remorseful,

and that he was only sorry that his life as he knew it was collapsing around him.  Even

at the end, he was trying to send more millions of his ill-gotten gains to family

members, friends, and certain employees.

The Government also provides a collection of statements made by Mr.

Madoff in public interviews, depositions, and other communications since his

sentencing that show that he has never fully accepted responsibility for his actions and

that he even faults his victims.  These statements include, for example:

> ●     2017:  "I had more than enough money to support any of my lifestyle and my family's lifestyle.  I didn't need to do this for that, I just allowed myself to be talked into something and that's my fault."

---

that the Guidelines range was 30 years to life, and it concluded that a below-Guidelines
sentence was appropriate, sentencing Mr. Ebbers to 25 years.  *Id*.  Here, the loss amount (for
Guidelines purposes) was $13 billion; the Guidelines range was 150 years; and I did not -- and
do not -- believe that Mr. Madoff deserved a below-Guidelines sentence.

●      2017:  "They had a sense something was not right . . . but they just, no one, everybody was greedy, everybody wanted to go on and I just went along with it."

●      2017:  "Look, none of my clients can, even if they lost every penny they put in there, can plead poverty."

●      2020:   "My business was perfectly legitimate for 36 years, and I just made a mistake at one point, and I didn't realize at the time that I wouldn't be able to get myself out of it . . . ."

Gov't Mem. at 20-22 (citations omitted).

The history and characteristics of the defendant weigh strongly against the granting of compassionate release.

\* \* \*

When I sentenced Mr. Madoff in 2009, it was fully my intent that he live out the rest of his life in prison.  His lawyers asked then for a sentence of 12 to 15 to 20 years, specifically with the hope that Mr. Madoff would live to see "the light of day." Sent. Tr. at 34.  I was not persuaded; I did not believe that Mr. Madoff was deserving of that hope.  Nothing has happened in the 11 years since to change my thinking.  While Mr. Madoff's present medical situation is most unfortunate, compassionate release is not warranted.

## *CONCLUSION*

For the reasons set forth above, Mr. Madoff's motion for compassionate release is DENIED.  His motion to seal medical records submitted as Exhibit D, made by counsel's letter dated February 5, 2020 (Doc. 213), is GRANTED.  His motion to seal

letter 000053, made by counsel's letter dated March 12, 2020 (Doc. 227), is GRANTED.

His motion for a hearing, made by counsel's letter dated March 12, 2020 (Doc. 228), is

DENIED.

SO ORDERED.

Dated: New York, New York
   June 4, 2020

          s/Denny Chin_____
         DENNY CHIN
         United States Circuit Judge
         Sitting by Designation